## Attachment A

## Affidavit of Peter Ostrovsky

# AFFIDAVIT

County of Whatcom               }
                                  }§§

State of Washington               }

      I, Peter Ostrovsky, of the United States Immigration and Customs Enforcement, being duly sworn under oath, hereby say:

      1. I am a Special Agent of the U.S. Immigration and Customs Enforcement (ICE), a branch of the Department of Homeland Security, and have been some employed as a special agent and Criminal investigator since 1987. I currently am the Assistant Special Agent in Charge, in Blaine, Washington, a position I began this year after serving as the ICE Deputy Attache to the U.S. Embassy in London from 2008 to 2011. Between 2000 and 2008, I was a Senior Supervisory Agent in Blaine and, as such, was the supervisory agent on a large scale, border investigation internally titled "Frozen Timber." I make this affidavit based on my personal knowledge and on a review of my files and records, to provide the Court with the facts of the law enforcement interactions during and in relation to the Frozen Timber investigation. "Frozen Timber" was solely a U.S. investigation designed in 2004 to address a newly-identified vulnerability at the border. It was not a Canadian investigation.

*Background*

      2. In the fall of 2004, the Border Integrity Section (BIT) of the RCMP relayed to ICE that they had information that helicopters were used to smuggle across the international border. BIT had no specific information on where the flying occurred, to the best of my knowledge.

      3. In 1999, ICE received intelligence that a man named Ove Jensen had a Bell Jet Ranger helicopter which he flew. We had little else other than public domain information on Jensen, who later died in a helicopter crash. In November 2004, Ove Jensen's former roommate was questioned as he crossed the border into the United States with a satellite phone and other unusual equipment. ICE agent Chad Boucher followed the man to outside of Sedro Woolleey, Washington.

4. That month, RCMP shared information that a helicopter associated with Ove Jensen had been seen at a farm in Mission, B.C., as had an Oregon-plated vehicle. The vehicle was registered to an American named Douglas Spink who crossed the border into the United States frequently. ICE kept a lookout for Spink at the border and, in early 2005, followed Spink when he came into the U.S. and saw him meet up with the other man in the Methow Valley. On one of Spink's next border crossings (February 28, 2005), agents watched as Spink met a different man with whom he exchanged large bags. Spink was stopped that day near Monroe, Washington, and found to have over 75 kilograms of cocaine with him. As a result of that significant seizure, ICE continued its focus on helicopter smuggling, specifically, into the Methow Valley. Spink was prosecuted by U.S. authorities. I know of no Canadian prosecution which resulted from these events.

5. In the spring and summer of 2005, ICE personnel saw several helicopters bring marijuana loads across the international border. ICE agents followed the cars which met the helicopters, stopped the cars, seized marijuana loads and identified several people, some of whom are discussed below. When smugglers were seen breaching the border by helicopter, ICE and RCMP exchanged that information. That is, the agencies told the other agency if one side saw an illegally crossing helicopter fly into the other country.

6. In March 2005, Whatcom County Sheriff's Office reported a suspicious-acting man near Baker Lake. ICE investigated and identified two men, Mark Banicevic and Jeffrey Sayle, who did not appear to have legitimate business in the area. ICE asked CBP to notify ICE when these men crossed the border. The next time the men entered the U.S., ICE surveilled them as they rented a truck in Bellingham, drove to Seattle, picked up a cargo top for the rental truck, drove to Baker Lake, and took delivery of a load of marijuana. They were arrested and prosecuted in this District.

7. ICE agents began intensively monitoring rental car records in Bellingham. Following leads from those records as well as tips from the National Park Service and Forest Service about people and activities in the Methow Valley, ICE agents identified others who were surveilled and stopped with loads of marijuana, including Trevor Schouten and Brian Fews. Schouten dropped

1   a speeding ticket issued to him near a location where a hiking citizen reported seeing a helicopter

2   land briefly.  Fews was prosecuted in this District.  Schouten returned to Canada and he has

3   never been questioned or prosecuted in that country to my knowledge.

4        8.  ICE agents searched and found what appeared to be informal helicopter landing zones

5   in the National Park and National Forest.  ICE installed motion-activated cameras at the sites.

6   We were able to identify several targets within this broad Frozen Timber investigation and they

7   proved to be related to several different groups or associations of smugglers.

8   *Investigation Resulting in June 9, 2005 Seizure*

9        9.  On March 6, 2005,  U.S. Forest Service Officer Dave Graves contacted Canadian Kip

10  Whelpley on a forest service road in the Okanagan National Forest.  Officer Graves saw

11  Whelpley drive a rented 2005 Dodge Ram pickup with Washington license plates past a Road-

12  Closed barricade on Forest Road 51, then heard a helicopter flying in the vicinity.  When

13  Whelpley reappeared from the closed road area, Officer Graves conducted a traffic stop.

14  Whelpley  presented a Washington State drivers license, even though he was later identified as a

15  Canadian citizen with a home address in Vernon, British Columbia.  On May 18, 2005, FS

16  Special Agent Minden advised ICE that she confirmed Whelpley was renting a residence in

17  Twisp, Washington, and that he had a different pickup truck, a blue Ford F-150, registered in his

18  name at a Twisp address.

19       10.  On June 9, 2005 CBP aircraft were flying near the border and ICE agents were on the

20  ground.  Around 4:30 a.m., a CBP pilot reported a pickup truck driving on a Winthrop area

21  Forest Road.  ICE Agent Boucher confirmed it was Whelpley's blue Ford F150.  Close to

22  5:00 a.m.,  another CBP Pilot saw a red and white Bell Jet Ranger flying in a southeasterly

23  direction, at an elevation just above the treetops, approximately three miles from the U.S. -

24  Canada border.  The CBP pilot confirmed no aircraft had reported foreign arrival into the U.S. in

25  that area that morning, so he tracked the helicopter until it was near the FS Road clearing.

26       11.  The first CBP pilot saw the helicopter was Bell Jet Ranger, white with a red stripe,

27  tail identifier C-FALQ, with large bags strapped to each skid.  The CBP pilot watched as the

28  helicopter pilot and Whelpley loaded the bags into Whelpley's truck. The unidentified pilot

1  returned to the helicopter, lifted off, and was seen flying northbound across the border and into

2  Canada.  Whelpley was surveilled as he drove out of the National Forest, eventually driving

3  towards Seattle.  When he was stopped before reaching Seattle, law enforcement found

4  approximately 485 pounds of marijuana in his truck.  Whelpley was not arrested that day. He

5  returned to Canada, apparently was not questioned by Canadian law enforcement, and was never

6  prosecuted by Canadian authorities.  The U.S. later extradited and prosecuted him.  Whelpley

7  told U.S. investigators that Rosenau was the helicopter pilot that day and, further, that he worked

8  with Rosenau routinely when smuggling in 2004 and 2005.

9  *Investigation Resulting in September 21, 2005 Seizure*

10      12.  On the morning of September 21, 2005, two helicopters were seen by Canadian law

11  enforcement, flying low near the border and without apparent legal authority to cross the border.

12  One was a blue/green and white Robinson R-44 bearing tail identifier C-FRKM.  The other was a

13  white with dark strip Robinson R-22, bearing tail identifier CF-YTG.  That morning, as set out

14  below, RCMP shared their observations of the flights of the two helicopters as the aircraft flew in

15  Canadian airspace.  ICE agents were not conducting surveillance or planning on being in the

16  Methow Valley that morning.

17      13.  At 7:30 a.m., RCMP reported a blue/green and white helicopter Robinson R-44 C-

18  FRKM flying northbound in Canada airspace, north of the border adjacent to the Okanagan

19  National Forest.  At 8:00 a.m., RCMP reported the same helicopter flying southbound towards

20  the United States and that hockey bags attached by a long line were clearly visible hanging

21  underneath.  At 8:40 a.m. RCMP saw the helicopter flying northbound but with nothing hanging

22  underneath.  At 9:00 a.m.  RCMP saw the helicopter flying south, again with hockey bags

23  attached but by a short line on this trip.  (The times noted are approximate).

24      14.  ICE responded to the suspected and known loading sites in the area.  At 9:45 a.m.,

25  ICE Agent Kevin Martin saw C-FRKM leaving Lamb Butte, a suspected loading site in the

26  Methow Valley.  The helicopter left flying northbound.  Agent Martin saw a truck, being

27  followed by a van, driving in the Lamb Butte area.  He recognized the truck from an August 12,

28  2005, event in which the truck was seen driving in tandem with a vehicle driven by Alexander

1  Swanson. (On August 12, 2005, Swanson was arrested in this District after being found with

2  over 100 pounds of marijuana which had been smuggled by helicopter CFNMM across the

3  border to him. Both Canadian and U.S. law enforcement aircraft surveilled CFNMM on that day.

4  Alexander Swanson was prosecuted in this District).

5      15.  On September 21, 2005, ICE agents, realizing that a marijuana load had been

6  delivered,  followed the recognized truck and van for several hours until it stopped at a house in

7  Puyallup.  Agents found over 1,000 pounds of marijuana in the van, identified Birgis Brooks at

8  the residence, and arrested the van occupants, the Miraback brothers. The truck had been driven

9  by Birgis Brooks, who was an associate of Swanson's.

10     16.  We did not inform RCMP or other Canadian law enforcement about Birgis Brooks or

11  the Miraback brothers since they were germane only to our investigation.  We were investigating

12  the U.S. side of this smuggle, that is, the off-loaders and distributors in the United States, and we

13  were not conducting any investigation in Canada.  I may have asked the RCMP Sergeant, now

14  retired, if RCMP could discretely identify the pilot or get the license plates of cars connected to

15  the helicopter, however we did not ask, and never contemplated that they would, conduct an in-

16  person contact with Rosenau.

17     17.  At 11:10 a.m., acting on behalf of Canada and without any prior notification to us,

18  two RCMP members watched as C-FRKM flew onto a property known as The Shop in Yale,

19  British Columbia.  They reported the following to ICE later but we were not present or privy to

20  the actions: That they approached Rosenau, the pilot, as he left the just-parked helicopter.

21   Rosenau claimed to have flown the helicopter around Hope, B.C. that day which the RCMP

22  members knew to be untrue.  RCMP Corporal Kachur advised Rosenau he was being detained

23  for investigation regarding the illegal border crossings in the helicopter, may have advised him of

24  his [Canadian Charter] rights, inquired about illegal or dangerous items in the helicopter, secured

25  the loaded firearm from under the pilot's seat, and found two satellite phones, a GPS device and

26  night vision goggles, and saw that the tail identifier actually was C-FBKM.  The bottom curve of

27  the 'B' was covered with white tape so that it appeared to be an R, rather than a B.  The property

28  owner was present, gave the RCMP permission to search his property and hanger, and confirmed

1   Rosenau was the pilot of the C-FRKM helicopter.  There was another helicopter, red and white a

2   Bell 206 Jet Ranger, tail identifier C-FA_Q, on the property as well as a Jeep registered to

3   Rosenau.  (The was an empty space between the A and the Q on the tail).  Corporal Kachur asked

4   Rosenau about the Bell 206 Jet Ranger and Rosenau denied knowing whose it was.  Before

5   leaving, the Corporal advised Rosenau that U.S. law enforcement had spotted Rosenau's

6   helicopters  and was investigating him.

7   *Relationship with Canadian Law Enforcement*

8          18.  Had I been directing or involved with the Canadian investigators, I would never have

9   allowed them to tell Rosenau that we had seen his helicopters on prior occasions or that he was

10  being investigated by us.   Nothing could have damaged our investigation into Rosenau more.

11  Indeed, telling Rosenau of the American surveillance seems to have ended all cross-border

12  smuggling into the Methow Valley.  We did not get another single report of helicopter smuggling

13  into that area after September 21, 2005.

14         19.  Early on during our Frozen Timber investigation, I spoke with an RCMP supervisor

15  about the emerging cross-border, helicopter smuggling.  I described our strategy, which was to

16  watch and follow the helicopter off-loaders, hoping they would lead us to distributors.  I clearly

17  recall that the RCMP supervisor specifically disagreed with, and gently belittled, the ICE

18  strategy, saying RCMP was striving to work a higher-level strata of drug traffickers.  The RCMP

19  was not interested in working the lower level loaders, off-loaders or pilots -- those we viewed as

20  the transportation crews.  That said, although we ran different investigations, we continued to

21  share some information through the Customs Mutual Assistance Agreement.  This statutorily-

22  derived authority allows customs authorities to share certain, routine information without

23  resorting to MLATS.  This is also the basis of IBIT's information sharing as was done the

24  morning of  September 21, 2005.   As noted on their website,

25  www.rcmp-grc.gc.ca/ibet-eipf/index-eng.htm, "The Integrated Border Enforcement Team

26  Program is comprised of both Canadian and American law enforcement agencies. The bi-national

27  partnership enables the five core law enforcement partners to work together daily for more

28  efficient sharing of information and intelligence."

1    20.  In summary, we did not know the Canadian domestic investigation activities

2  regarding  Henry Rosenau, higher level drug traffickers, or of other Canadians identified.  We did

3  not ask Canadian law enforcement to conduct searches on our behalf, to question suspects, to

4  routinely surveill, to monitor those we identified, or to announce our investigations to suspects.

5  We did not know, and still do not know, the identity of the RCMP targets - higher or lower level.

6  We did not know, and do not know, their investigative strategy or their prosecutive goals, other

7  than they aimed to work higher level traffickers.   ICE'S Frozen Timber investigation was a U.S.

8  investigation, sometimes aided and sometimes hindered, by cooperatively sharing routine

9  information between the U.S. and Canada.

_____

PETER OSTROVSKY
Immigration and Customs Enforcement

SUBSCRIBED and SWORN to before me this ___19___ day of September, 2011, by

Peter Ostrovsky .

_____

Notary Public in and for the State
of Washington, residing
at 9375 Owl Ln, Blaine, WA
My appointment expires 8/29/14

(Notary Seal)

SHANNON BREIVIK
COMMISSION EXPIRES
NOTARY
PUBLIC
8-29-14
STATE OF WASHINGTON

**<u>Attachment B</u>**

**ICE ROI's**
**September 21, 2005**

O F F I C I A L   U S E   O N L Y

| | |
|---|---|
| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE      3 |
| | CASE NUMBER  BL13MR05BL0088 |
| | REPORT NUMBER:  007 |

DETAILS OF INVESTIGATION:

On September 21, 2005 at approximately 0945, ICE ASAC/Blaine Special Agent (SA) Kevin Martin, observed a white and blue Robinson R-44 helicopter flying out of the Lamb Butte area The helicopter's paint scheme was white with a blue/green striped pattern and a blue/green tail fitting the description of C-FRKM. SA Martin was positioned at the Eight-mile Snowpark on FS 51 in the Okanogan National Forest when he observed the helicopter fly east then north and then west when he lost visual contact with the helicopter.

At approximately 1000 hours, SA Martin observed two vehicles exiting Forest Road 5130. Both vehicles turned south on West Chewuch Road (FS51) The vehicles operators were white males. The white GMC van and a Maroon Toyota Tacoma pickup were later identified as WA/A83286B (GMC) and CO/900JLF (Toyota). The vehicles appeared to be traveling together due to their proximity to each other and matching speed. The white GMC van was traveling in front, and the maroon Toyota pickup was staying very close behind.

At approximately 1005 both vehicles were observed crossing over to the East Chewuch Road and continued toward the downtown area of Winthrop, Washington.

At approximately 1015 both vehicles were observed continuing east on Washington State Road 20.

At approximately 1030 both vehicles were observed continuing on Washington State Highway 153.

At approximately 1100 both vehicles arrived in Pateros, WA and turned right onto Washington State Highway 97 heading southbound.

At approximately 1200 both vehicles turned right on Washington State Highway 2 west to Seattle/Ellensburg.

At approximately 1210 both vehicles were observed parking in Arby's Restaurant located at 135 Easy St Wenatchee, WA 98801.

At approximately 1225 both vehicles departed Arby's Restaurant and went to the "76" gas station located at 2115 N Wenatchee Ave, Wenatchee, WA.

At approximately 1240 both vehicles departed the "76" gas station and continued on Washington State Highway 2 heading west.

At approximately 1315 both vehicles were observed heading south on Washington State Highway 97.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER BL13MR05BL0088 |
| | REPORT NUMBER: 007 |

At approximately 1400 both vehicles were observed heading west on State Highway 90.

At approximately 1430 the surveillance of both vehicles was turned over to ICE SAC/Seattle Special Agents.

This investigation will be continued.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| | |
|---|---|
| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE     3 |
| | CASE NUMBER BL13MR05BL0088 |
| | REPORT NUMBER: 008 |

DETAILS OF INVESTIGATON:

On September 21, 2005, ASAC/Blaine ICE Agents observed a blue-green/white R-44 helicopter with tail number "C-FRKM" fly out of the Lamb Butte area in the Okanogan National Forest, Washington.  Prior to this observation, RCMP members had observed and photographed the same helicopter transporting hockey-bags southbound towards the United States.  Subsequent to these sightings, ICE surveillance followed two vehicles to the Seattle area, where SAC/Seattle ICE Agents arrested Zachary and Braydon MIRABACK, who were in possession of 1,128 pounds of marijuana that was smuggled via helicopter.

The following is a summary of the RCMP members' helicopter observations and contact with ROSENAU on September 21, 2005, all times are in approximation:

At 7:30 a.m., RCMP Constables Ken Bloy and Luke Kenvall observed "C-FRKM" traveling Northbound through the Ashinola River Valley, British Columbia, Canada, north of the Pasayten Wilderness in the Okanogan National Forest.

At 8:00 a.m., "C-FRKM" was observed Southbound towards the United States with hockey-bags attached via a long line underneath the helicopter.

At 8:25 a.m., a Robinson R-22 "CF-YTG" was observed southbound with a sling load of hockey bags. This helicopter is known by the RCMP to be operated by Canadian Saul SHARPE of Peachland, British Columbia, Canada.

At 8:39 a.m., "C-FRKM" was observed Northbound, without the hockey-bags underneath it.

At 9:00 a.m., "C-FRKM" was again observed Southbound, this time a short-line with hockey-bags was attached underneath it.

At 9:45 a.m., ICE S/A K. Martin observes "C-FRKM" departing the Lamb Butte area, traveling Northbound back towards British Columbia, Canada.  At 10:00 a.m. S/A Martin observed two suspect vehicles departing the 8-Mile Road area, this road leads to the Lamb Butte area.  Surveillance was conducted on both suspect vehicles to Seattle, Washington.  Both vehicles were stopped and subsequently three suspects were arrested and 1,128 pounds of marijuana was seized by ICE.

At 10:00 a.m., "C-FYTG" R-22 Helicopter landed near Saul SHARPE's residence in Peachland, British Columbia as observed by the RCMP.

At 11:10 a.m., in Yale, British Columbia, Canada, RCMP Corporal Ken Kachur and Cpl. Poulson observed "C-FRKM" flying towards a landing area known as the "Shop", and an unknown person in a purple shirt was flying the helicopter.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER BL13MR05BL0088 |
| | REPORT NUMBER: 008 |

At 11:15 a.m., Cpl. Kachur and Cpl. Poulson approached "C-FRKM" at the "Shop" and observed Henry ROSENAU, who was wearing a purple shirt walking away from the helicopter which still had its rotors turning.

Cpl. Kachur identified himself as a police officer to ROSENAU and he provided a British Columbia drivers license in the name of:

ROSENAU, Henry, Carl

            Armstrong, BC.


Cpl. Kachur advised  ROSENAU he was being detained for investigation into Marijuana Exportation and advised him of his rights.  ROSENAU said that he was flying the helicopter during the day around Hope, British Columbia.

ROSENAU advised Cpl. Kachur that the gym bags in the helicopter were his. Cpl. Kachur asked ROSENAU if there was anything illegal in the helicopter and ROSENAU advised there was a loaded handgun under the front seat of the helicopter.  Cpl. Kachur for officer safety located and detained the loaded .44 magnum handgun from inside the helicopter, and made the gun safe.

Cpl. Kachur looked into ROSENAU'S gym bags and located a GPS, night vision goggles, and two satellite phones.  The GPS had Lat/Long coordinates for the "Shop", two landing zones located just north of the Canada/U.S. Border that have been identified by RCMP as landing zones used to load contraband onto helicopters.  There were two GPS coordinates on the border; one of the coordinates was titled "Entrance".  There were several GPS locations just south of the Canada/U.S. Border; one of those locations was identified as the landing zone in the Lamb Butte area.

Cpl. Kachur also observed the tail numbers on "C-FRKM" R-44 Helicopter covered with white duct tape covering the R to look like a B.  With the tape on the number it would appear that the tail number was "C-FBKM" instead of the actual number of "C-FRKM".

Cpl. Kachur also spoke with another male that came onto the property, who was identified as the property owner:

STEWART, Glen, Gordon

            , Hope, BC.

STEWART advised that he owns the property, address of 29605- Hwy 1 N, Yale,BC.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   5 |
|---|---|
| | CASE NUMBER  BL13MR05BL0088 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 008 |

STEWART also said that he was selling the property to ROSENAU but the deal fell through last week. STEWART owns the shed on the property and he lets ROSENAU use it to store his helicopter in it.  ROSENAU advised Cpl. Kachur that the shed belonged to STEWART.  STEWART gave Cpl. Kachur permission to look inside the shed.

STEWART further advised that ROSENAU flies quite frequently and that he has observed him as the pilot of the helicopter.  STEWART also observed ROSENAU today landing the helicopter as he arrived onto the property. STEWART advised he has seen ROSENAU and other person(s) at the shed on prior ocassions.

Inside the shed were a red and white Bell 206 Jet Ranger Helicopter with a partial tail number of "C-FA Q", although that particular helicopter is known to ICE Special Agents and RCMP as "C-FALQ". There was a space in-between the "A" and the "Q" so you could place any letter configuration in-between.  Also inside the shed was a red Jeep Cherokee bearing British Columbia License plate HSK-744, which is registered to ROSENAU, and a trailer with 2 tidy tanks on it as well as a cargo net and several barrels believed to have fuel in them.

Cpl. Kachur asked ROSENAU if the red/white Bell Jet Ranger helicopter was his and he advised no it was not and he did not know whose it was. ROSENAU then further advised that it was not his shed but he used it.

Cpl. Kachur concluded his contact with ROSENAU and left the area.

At 1:00 p.m., "C-FRKM" and ROSENAU were observed at ROSENAU residence, 4667 North Grandview Flats, Armstrong, British Columbia by RCMP.

At 1:40 p.m., Trevor ARMSTRONG arrived at ROSENAU's residence.  ARMSTRONG and ROSENAU had a short meeting on the back deck, and then ARMSTRONG left the residence. "CF-NMM " a green and white R-44 Helicopter was also seen at the residence by RCMP.

The day prior, on September 20, 2005 at 5:00 p.m., "C-FALQ" the red/white Bell Jet Ranger was observed at ROSENAU's residence and he was observed flying it.

HELICOPTER SUMMARY:

"C-FRKM", blue-green and white R-44, flown by ROSENAU on September 21, 2005, connected to the smuggle of 1,128 lbs of marijuana offloaded by the MIRABACKS.

"CF-YTG" white with dark stripe R-22, known to be flown by Saul SHARPE, also connected to the delivery of 499 pounds of marijuana on June 16, 2005 and seen flying southbound with a sling load of hockey bags on September 21, 2005.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    6 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER BL13MR05BL0088 |
| | REPORT NUMBER: 008 |

"C-FALQ" red and white Bell 206 Jet Ranger helicopter connected to the smuggle of 486 pounds of marijuana on June 9, 2005 offloaded by Kip WHELPLEY and Tyrel OWENS and the smuggle of 509 pounds of marijuana on August 4, 2005 offloaded by David MENDOZA, Danny ZYLSTRA and Jonathan SENECAL.

"CF-NMM", green and white R-44 known to be flown and kept by Saul SHARPE and connected to the smuggle of 522 pounds of marijuana on August 12, 2005 that was offloaded by Alexander SWANSON and Birgis BROOKS.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

**<u>Attachment C</u>**

**RCMP "will say" Report**

2005-09-29

**Will Say Evidence of Cpl. Ken KACHUR:**

That on 2005-09-21 I was on duty in plain clothes as a member of the South Fraser Integrated Probe Team of the Royal Canadian Mounted Police.

That on 2005-09-21 I received a phone call from Cst. DEREPENTIDNY advising of the following information. That the Integrated Border Enforcement Team (IBET) is following a green and white helicopter that has hockey bags on a rack underneath it. That this helicopter could possibly be heading to Yale BC. That (IBET) is requesting if we could attend to confirm if the helicopter is at Yale BC.

That on 2005-09-21 Cpl. POULSON and I attended Yale BC. That I observed a green and white helicopter fly overhead with, an unknown person in a purple shirt flying the helicopter.

That on 2005-09-21 Cpl. POULSON and I attended the property where the helicopter landed and observe the rotors turning on a green and white helicopter and a male in a purple shirt walking away from the helicopter.

That on 2005-09-21 I identify myself as a police officer to the male and he provides a British Columbia drivers license in the name of:

ROSENAU, Henry, Carl

Armstrong, BC.

That on 2005-09-21 I spoke with another male on the property and he was identified as:

STEWART, Glen, Gordon

-, Hope, BC.

That on 2005-09-21 I spoke with STEWART and he advised me that, he owns the property we were at and the address is 29605- Hwy 1 N, Yale, BC.

That STEWART was selling the property to ROSENAU but the deal fell through last week.
That STEWART owns the shed on the property and he lets ROSENAU use it to store his helicopter in it.

That STEWART gave permission to look inside the shed.

That STEWART advised that ROSENAU flies quite frequently and that he has observed him as the pilot of the helicopter.

That STEWART observed ROSENAU today landing the helicopter as he arrived onto the property.

That STEWARY advised he has seen ROSENAU and other person(s) at the shed.

That on 2005-09-21 I advised ROSENAU he was being detained for investigation into Marihuana Exportation and advised him of his rights.

That on 2005-09-21 I spoke with ROSENAU and he advised me that the gym bags in the helicopter were his.

That I asked ROSENAU if there was anything illegal in the helicopter and he advised there was a loaded handgun under the front seat of the helicopter.

That I seized the loaded Handgun from inside the helicopter, and made the gun safe.

That I looked through ROSENAU'S gym bags and located a GPS, 2 Satellite Phones

That ROSENAU admitted to flying the helicopter this day around Hope, BC.

That on 2005-09-21 on STEWARTS permission entered the shed and observed a Red and White Bell 206 Jet Ranger Helicopter inside, and a Red Jeep Cherokee Bearing British Columbia License Plate HSK 744, and a trailer with 2 tidy tanks on it as well as a cargo net and several barrels believed to have fuel in them.

That on 2005-09-21 I asked ROSENAU if the Red and White Bell Ranger Helicopter was his and he advised no it was not and he did not know who it was. That ROSENAU also advised that it was not his shed but he used it. ROSENAU advised it was STEWARTS shed.

That on 2005-09-21 ROSENAU advised me that he has type 2 diabetes.

That on 2005-09-21 I observed the call numbers on the R44 Astro Helicopter covered with white duct tape covering the R to look like a B.

That on 2005-09-21 I left ROSENAU my name and phone number for him to contact me.


Will Say Evidence of Cpl. Ken KACHUR
Reg# 41029

Cpl. Ken KACHUR
South Fraser Integrated Probe Team

## <u>Attachment D</u>

## Canadian Order of Surrender

CANADA

**O R D E R  O F  S U R R E N D E R**
**A R R Ê T É  D ' E X T R A D I T I O N**
(Section 58 and 60 *Extradition Act)*
(Articles 58 et 60 de la *Loi sur l'extradition*)

| | |
|---|---|
| **TO THE KEEPER OF THE AU RESPONSABLE DE/DU** | SURREY PRE-TRIAL SERVICES CENTRE |
| **and to et à** | the United States Marshals Service hereby designated in accordance with s. 58(e) of the *Extradition Act* |
| **and to et à** | all peace officers in Canada hereby designated in accordance with s. 58(e) of the *Extradition Act* |
| **and to et à** | the keeper of any other institution to which Mr. Henry C. Rosenau is brought |
| **I ORDER the surrender of J'ORDONNE la remise de** | HENRY C. ROSENAU |
| **To à** | the United States of America |
| **for the offences of: au regard des infractions suivantes:** | • Conspiracy to import marijuana, in violation of Title 21, United States Code, Sections 952, 960(a)(1), 960(b)(1)(G), and 963 (count 1); • Conspiracy to distribute marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (count 2); and • Possession of marijuana with intent to distribute, in violation of Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(B), and Title 18, United States Code, Section 2 (count 3), |
| | as set out it the Superseding Indictment, No. CR06-157 MJP, filed in the United States District Court for the Western District of Washington on September 17, 2008. |
| **I FURTHER ORDER the Keeper, to deliver J'ORDONNE EN OUTRE au responsable ci-haut de livrer** | HENRY C. ROSENAU |
| **into the custody of à la garde de** | the persons designated above in accordance with s. 58(e) of the *Extradition Act* |

into the territory over which the United States of America has jurisdiction.
et à l'amener dans le ressort de

Dated at *Niagara Falls* this   DEC 1 5 2009

Minister of Justice
Ministre de la Justice

## <u>Attachment E</u>

## Letter Accompanying
## Canadian Order of Surrender



MEW:JMO:RC:kl
95-100-16803

**U.S. Department of Justice**

Criminal Division
*Office of International Affairs*

Washington, D.C.  20530

May 3, 2011

By Email

Susan Roe
U.S. Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, WA 98101

Re:   Extradition from Canada of Henry Carl Rosenau

Dear Ms. Roe:

The Government of Canada has granted your office's request for the extradition of Henry Carl Rosenau ("ROSENAU") and surrendered him to the United States on April 28, 2011.  The specific offenses for which extradition has been approved are identified in the enclosed Order of Surrender from the Minister of Justice of Canada.

The detention, trial or punishment of ROSENAU for any offenses beyond those specifically identified in the enclosed surrender order is strictly forbidden by the U.S.-Canadian Extradition Treaty (the "Treaty"), with few exceptions.  The Government of the United States has a legally binding obligation to abide by the provisions of the Treaty, including obligations governed by the Rule of Specialty, found in Article 12 of the Treaty, to the effect that the defendant shall not be detained, tried, or punished for an offense other than those for which extradition is granted; and that the defendant shall not be extradited to a third country except in accordance with the Treaty.  Please contact me if you have questions about the application of the Rule of Specialty or any of its exceptions.  YOUR OFFICE IS NOT AUTHORIZED TO PROCEED IN ANY FASHION AGAINST ROSENAU IN RELIANCE UPON ANY OF THE EXCEPTIONS TO THE RULE OF SPECIALTY WITHOUT FIRST CONSULTING WITH OIA.

Additionally, please be aware of the rights of foreign nationals in the United States, pursuant to the Vienna Convention on Consular Relations ("the VCCR"), specifically with regard to consular notification and access.  Because ROSENAU is a foreign national of Canada, the law enforcement officers who arrest the defendant following his extradition to the United States and/or assume responsibility for his detention in the United States have the responsibility to inform him of the relevant consular notification rights and requirements under the VCCR and, in federal cases, for conveying the foreign national's wishes to the U.S. Attorney's Office.  The U.S. Attorney's Office is then responsible for providing notification to the appropriate consular

official when required to do so under the VCCR.  (See 28 C.F.R. Section 50.5.)  In state cases, the law enforcement officers who arrest the defendant and/or assume responsibility for his detention, in addition to informing the defendant of the relevant consular notification rights and requirements, should also provide notification to the appropriate consular official when required to do so by the VCCR, unless relevant state implementing regulations provide for a different notification procedure.  For further information regarding the VCCR notification requirements, please see the following Department of State web site: www.travel.state.gov/consularnotification.

Please contact me at telephone number (202) 305-4849, or Paralegal Specialist Katelyn Leader at telephone number (202) 514-7429, if we can be of any further assistance.

Sincerely,

Mary Ellen Warlow
Director

By:

Roman Chaban
Trial Attorney

Enclosure – Order of Surrender, dated December 15, 2009

## <u>Attachment F</u>

## Excerpt of Extradition Packet

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, )
             Plaintiff, )
         v. )
HENRY C. ROSENAU, )
             Defendant. )

NO.  CR06-157 MJP

## LEGAL STATEMENT IN SUPPORT OF REQUEST FOR EXTRADITION OF HENRY C. ROSENAU

I, Douglas B. Whalley, Assistant United States Attorney, state that:

1.     I am a citizen of the United States of America and a resident of the State of Washington.

2.     I received a Bachelor of Arts degree from the University of Washington in 1967, and a Juris Doctor (law) degree from the University of Washington Law School in 1972. I was admitted to the bar of Washington State that same year.  I was a Deputy Prosecuting Attorney for King County, State of Washington, from 1972 to 1977, and a Senior Deputy Prosecuting Attorney again from 1979 to 1981.  From 1981 to 1990 I was Director of the Criminal Division for the Seattle City Attorney's Office, supervising approximately twenty prosecuting attorneys.  I was admitted to the bar of the United States District Court for the Western District of Washington in 1978.  From May 1990 to the present, I have been an Assistant United States Attorney for the Western District of

Legal Statement/Rosenau – 1

1    Washington, assigned to the Criminal Division.  Since 2002, I have supervised the

2    Criminal Enterprises Unit in the United States Attorneys Office, an eight-attorney group

3    focusing on the investigation and prosecution of large criminal organizations.  My duties

4    include the investigation and prosecution of persons charged with violating the criminal

5    laws of the United States.  I have personally participated in the preparation and trial of

6    several dozen cases involving alleged violations of United States law.  Based upon my

7    training and experience, I am an expert in the criminal law and procedures of the United

8    States.

9         3.      As part of my duties, I have prosecuted members of organized criminal

10   enterprises that were responsible for the importation and distribution of controlled

11   substances.  I am therefore particularly knowledgeable in the area of law relating to

12   violations of the federal controlled substances statutes, including Conspiracy to Import

13   Marijuana, in violation of Title 21, United States Code, Sections 952, 960(a)(1),

14   960(b)(2)(G), and 963; Conspiracy to Distribute Marijuana, in violation of Title 21,

15   United States Code, Sections 841(a)(1), 841(b)(1)(B) and 846, and Possession of

16   Marijuana with Intent to Distribute, Title 21, United States Code, Sections 841(a)(1), and

17   841(b)(1)(B), and Title 18, United States Code, Section 2.

18        4.      In the course of my duties, I have become familiar with the charges and

19   evidence in the case of United States v. Henry C. Rosenau, CR 06-157 MJP.  The case

20   arose out of a joint investigation by the Royal Canadian Mounted Police (RCMP) and

21   agents of the United States Bureau of Immigration and Customs Enforcement (ICE),

22   Department of Homeland Security.  On September 21, 2005, law enforcement personnel

23   on both sides of the Canada/United States border witnessed a helicopter with 1,128

24   pounds of marijuana piloted by Rosenau from Canada into the United States.  ICE agents

25   in the United States positively identified the helicopter by identifying number as it flew

26   to Canada after delivering the marijuana.  RCMP officials in Canada met Rosenau when

27   he landed his helicopter after the delivery of marijuana, and positively identified him as

28   the pilot of the same helicopter.  They seized a firearm he carried on the helicopter.

Legal Statement/Rosenau – 2

1  Rosenau's criminal associates, including the two men who took delivery of the

2  marijuana, cooperated with the United States government after they were arrested, and

3  they positively identified Rosenau as the pilot of the helicopter that carried marijuana

4  across the border on September 21, 2005, and as the pilot responsible for earlier

5  marijuana smuggling trips in which they were involved.

### PROCEDURAL HISTORY OF THE CASE

7      5.      On May 11, 2006, Henry C. Rosenau was indicted (charged) with three

8  offenses by a federal grand jury sitting in Seattle: Count 1, conspiracy to import

9  marijuana; Count 2, conspiracy to distribute marijuana; and Count 3, possession of

10  marijuana with intent to distribute. A copy of the Indictment in this case is attached as

11  Exhibit A. On May 12, 2006, United States Magistrate Judge Mary Alice Theiler

12  ordered that an arrest warrant be issued for the arrest of Henry C. Rosenau. A copy of

13  the Order Issuing Warrant is attached as Exhibit B, and a copy of the Arrest Warrant is

14  attached as Exhibit C. That warrant remains outstanding, and Mr. Rosenau has not

15  appeared in court on this charge. United States District Judge Marsha J. Pechman has

16  been assigned the case.

17      6.      Under the federal law of the United States, a criminal prosecution is

18  commenced when a grand jury files an indictment. Institutionally, a grand jury, though an

19  arm of the court, is an independent body composed of private citizens—not fewer than 16

20  and not more than 23 people—whom the United States District Court selects at random

21  from the residents of the judicial district in which the court resides. The purpose of the

22  grand jury is to review the evidence of crimes presented to it by United States law

23  enforcement authorities. After independently reviewing this evidence, each member of

24  the grand jury must determine whether there is probable cause to believe that a crime has

25  been committed and that a particular person committed that crime. If at least 12 jurors

26  find that the evidence they have reviewed provides probable cause to believe that a

27  particular person committed the crime, the grand jury may return an indictment. An

28  indictment is a formal written accusation that charges the particular person, now a

Legal Statement/Rosenau – 3

defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

7.     The grand jury initiates a criminal prosecution when it files the indictment with the United States District Court.  Thereafter, the clerk of the court, at the direction of a United States District Judge or Magistrate Judge, normally issues a warrant for the defendant's arrest.

8.     Pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the clerk of the court is the authority competent to sign arrest warrants and deliver them for execution to law enforcement authorities competent to make arrests.  A copy of Rule 9 is attached to this statement as Exhibit D.  This function—to sign and deliver arrest warrants—also resides in, and is appropriately, customarily, and lawfully exercised by, deputy clerks of the court.  In fact, in nearly every case in this district, a deputy clerk, and not the appointed clerk, signs and delivers arrest warrants.

## THE CHARGES AND PERTINENT UNITED STATES LAW

9.     The Indictment charges that Henry C. Rosenau committed the following offenses:

| Count 1 | Conspiracy to Import Marijuana,[1] Title 21, United States Code, Sections 952, 960(a)(1), 960(b)(2)(G) (penalty section), and 963 |
| Count 2 | Conspiracy to Distribute Marijuana, Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) (penalty section), and 846 |
| Count 3 | Possession of Marijuana with Intent to Distribute, Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(B) (penalty section), and Title 18, United States Code, Section 2 |

10.     The United States requests the extradition of Henry C. Rosenau for the offenses specified in Counts 1, 2, and 3 of the Indictment.  All of these offenses are punishable under a statute that (1) was the duly enacted law of the United States at the

---

[1] Marijuana is a controlled substance under Schedule I of Title 21, United States Code, Section 812.

Legal Statement/Rosenau – 4

1   time the offense was committed, (2) was the duly enacted law of the United States at the

2   time the Indictment was filed, and (3) is currently in effect.  Each offense is a felony

3   punishable under the United States law by more than one year of imprisonment.

4   Specifically, the maximum penalty for Counts 1, 2, and 3 is imprisonment for a term of

5   40 years.  Copies of the pertinent sections of these statutes are attached as Exhibit E.

6        11.    To satisfy its burden of proof and convict Henry C. Rosenau of the offense

7   specified in Count 1, Conspiracy to Import Marijuana, the government, at trial, must

8   establish beyond a reasonable doubt each of the following elements:  (1) Beginning at a

9   time unknown, but within the last five years, and continuing until on or about September

10  21, 2005, Rosenau entered into an agreement with at least one other person to

11  import marijuana into the United States from Canada, and (2) Rosenau became a member

12  of the conspiracy knowing of its object and intending to help accomplish it.  These

13  elements will be established at trial by the testimony of several RCMP and ICE officers,

14  and by the testimony of Rosenau's co-conspirators.  Two RCMP officers and Rosenau's

15  two accomplices will positively identify Rosenau as the pilot of a helicopter that

16  transported marijuana from Canada into the United States on September 21, 2005, for

17  distribution to others.  ICE agents will positively identify the helicopter that Rosenau

18  used, the same helicopter that RCMP officers saw Rosenau land immediately after the trip

19  to the United States.  The former owner of the helicopter, and two other witnesses, will

20  identify Rosenau as the owner of the helicopter that was used to smuggle the marijuana.

21  Conspiracy to Import Marijuana (Count 1) is an offense for which extradition may be

22  granted under the laws of the United States.

23       12.    To satisfy its burden of proof and convict Rosenau of the offense specified

24  in Count 2, Conspiracy to Distribute Marijuana, the government, at trial, must establish

25  beyond a reasonable doubt each of the following elements:  (1) Beginning at a time

26  unknown, but within the last five years, and continuing until on or about September 21,

27  2005, Rosenau entered into an agreement with at least one other person to distribute

28  marijuana; and (2) Rosenau became a member of the conspiracy knowing of its object

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

000031

1   and intending to help accomplish it.  These elements will be established at trial by the

2   same evidence described above.  Conspiracy to Distribute Marijuana (Count 2) is an

3   offense for which extradition may be granted under the laws of the United States.

4           13.   To satisfy its burden of proof and convict  Rosenau of the offense specified

5   in Count 3, Possession of Marijuana with Intent to Distribute, the government, at trial,

6   must establish beyond a reasonable doubt each of the following elements:  (1) On or

7   about September 21, 2005, Henry C. Rosenau knowingly and intentionally possessed

8   marijuana; and (2) Rosenau possessed the marijuana with the intent to distribute it to

9   another person.  These elements will be established at trial by the same evidence

10   described above.  Possession of Marijuana with Intent to Distribute (Count 3) is an

11   offense for which extradition may be granted under the laws of the United States.

12   **Statute of Limitations**

13           14.   The statute of limitations applicable to the offenses charged in Counts 1, 2

14   and 3 of the Indictment is contained in Title 18 United States Code,  Section 3282, which

15   allows prosecution to commence within five years after the offense is committed.  A copy

16   of the statute is attached as Exhibit F.  The Indictment is dated May 11, 2006.  The

17   allegations contained in Counts 1 and 2 stem from an offense that began at a time

18   unknown, but within the five years preceding the indictment, and continued until May 11,

19   2006.   The allegations contained in Count 3 stem from an offense that occurred on

20   September 21, 2005.  Therefore, the charges were filed within the prescribed five year

21   time period for each count.

22                           **CONCLUSION**

23           15.   As referenced in the above statement, I have attached hereto the following

24   documents:

25           Exhibit A:   A certified copy of the Indictment against Henry C. Rosenau,

26                              returned on May 11, 2006.

27           Exhibit B:   Certified copy of the Order Issuing Bench Warrant dated May 12,

28                              2006, signed by Magistrate Judge Theiler.

Legal Statement/Rosenau – 6

Exhibit C:   Certified copy of the Warrant for Arrest, dated May 12, 2006.

Exhibit D:   Copy of Rule 9 of the Federal Rules of Criminal Procedure.

Exhibit E:   Copies of the following applicable statutes: Title 18, United States Code, Section 2; Title 21, United States Code, Sections 802, 812, 841(a)(1), 841(b)(1)(B), 846, 853, 952, 960(a)(1), 960(b)(2)(G), and 963.

Exhibit F:   Copy of the applicable statue of limitations, Title 18 United States Code, Section 3282.

April 9, 2007
Date

DOUGLAS B. WHALLEY
Assistant United States Attorney
Western District of Washington

Legal Statement/Rosenau – 7

## Certification of Supplemental Record of the Case for Prosecution

**In the Matter of the request by the United States for the extradition of HENRY ROSENAU from Canada for prosecution**

The United States requests the extradition of HENRY ROSENAU from Canada for prosecution.

In relation to that request, I, Douglas B. Whalley, Assistant United States Attorney for the Western District of Washington, certify that the evidence summarized or contained in the attached documents is available for trial and is sufficient under the laws of the United States to justify prosecution.

Seattle, Washington
December 4, 2006

DOUGLAS B. WHALLEY
Assistant United States Attorney
Western District of Washington

1

## SUPPLEMENTAL RECORD OF THE CASE
## HENRY ROSENAU

1.      This supplemental Record supplements the Record of the Case for Prosecution (the "original Record"), dated July 11, 2006, submitted as part of the United States' request for the extradition of HENRY ROSENAU from Canada.

2.      In reference to paragraph 1 of the original Record, the two constables correct names are Kim Bloy and Luc Quenneville. (Special Agent Miller reports that he misunderstood their names.) They are expected to testify that they were two to three miles north of the Canada - United States border, in the Ashnola River Valley, when they observed the helicopter flying north (empty) and south (with hockey bags in a sling).

3.      In reference to paragraph 2 of the original Record, the correct spelling of the river is the Ashnola River.

4.      In reference to paragraphs 2, 3, 5 and 6 of the original Record, there is a correction concerning the agent who stopped Brooks and the Miraback brothers in Seattle. For paragraphs 2 and 3, although Special Agent Martin followed the vehicles occupied by Birgis Brooks, Zachary Miraback and Braydon Miraback to Seattle, he then broke off surveillance and Special Agent Steve Cagen took over surveillance and was present at the arrests. For Paragraphs 5 and 6 it should be Special Agent Steve Cagen who will testify that Zachary Miraback cooperated with the agents after his arrest, and that Zachary Miraback identified a photograph of HENRY ROSENAU (Exhibit A of the original Record) as the pilot of the helicopter that smuggled the marijuana into the United States. Zachary said ROSENAU had dropped marijuana several different times to him and his brother. Special Agent Cagen will also testify that Braydon Miraback cooperated, and he identified a photograph of HENRY ROSENAU (Exhibit A of the original Record) as the pilot of the delivery helicopter for four different loads of marijuana he helped smuggled into the United States. Braydon Miraback also identified a photograph of the helicopter, C-FRKM (attached as Exhibit B to the original Record), that was used in all four loads.

5.      In reference to paragraphs 5, 6 and 7 of the original Record, Zachary Miraback and Brandon Miraback have cooperated completely with United States Immigration and Customs Enforcement (ICE) agents following their arrest, and they have provided full statements relating to their involvement with the marihuana seized from their vehicles on September 21, 2005. Based on these statements, they are expected to testify to the following matters: They both know HENRY ROSENAU personally and can identify his picture (Exhibit A of the original Record) because they met with him several

2

times in Canada to plan marijuana-smuggling trips to the United States from Canada, using a helicopter. They both saw him during those trips operating the helicopter. Zachary Miraback will testify that on one occasion he accompanied ROSENAU when ROSENAU flew into the United States with a load of marijuana. Both Zachary and Brandon will further testify that they met with ROSENAU in Canada shortly before September 21, 2005, and that they discussed with ROSENAU that he would be operating the helicopter which would transport marijuana from Canada to the United States. They agreed that they (Zachary and Brandon Miraback) would be meeting the helicopter operated by ROSENAU and would be transporting the marijuana to Seattle. They will testify that on September 21, 2005, they were together in the vicinity of the 8-Mile Road area of Forest Service Road 51, in the Pasayten Wilderness Area of Okanogan National Forest, in northern Washington State, close to the Canadian border. Birgis Brooks met them later and was participating in their smuggling plan. A helicopter flew to that location four times and delivered marijuana. They knew that the pilot of the helicopter was HENRY ROSENAU and they knew it contained marijuana from Canada because that was the plan they had agreed to with ROSENAU, because they saw ROSENAU operating the helicopter, and because they took possession of the marijuana after ROSENAU delivered it.

Both Zachary Miraback and Brandon Miraback will testify that after the fourth load of marihuana was delivered by ROSENAU, they loaded the marihuana into a white van, and drove towards Seattle. When they arrived in Seattle, ICE agents stopped them and seized a total of 1,128 pounds of marihuana from the van. They will testify that the marihuana seized from the van was the same marihuana which had been delivered by helicopter by HENRY ROSENAU earlier on September 21, 2005, that it had been in their possession since they received it from ROSENAU, and that it had been smuggled into the United States from Canada by ROSENAU.

Both Braydon and Zachary Miraback will testify that they identified a photograph of the helicopter (attached as Exhibit B to the original Record) that HENRY ROSENAU was operating on September 21, 2005. They were able to identify it because they saw it on September 21, 2005, as planned, and had seen it in earlier smuggling trips made by ROSENAU. Both Braydon and Zachary Miraback will both testify that they identified a photograph of HENRY ROSEAU, attached as Exhibit A to the original Record. Both will testify that they were shown more than one picture of a helicopter when they identified the one used by ROSENAU, and that they were shown a series of photographs of males when they identified ROSENAU'S photograph. They will testify they were not told which picture was ROSENAU'S.

3

6.      For clarification, in reference to paragraph 4 of the original Record, John S. Chappel will testify that he is employed at the Drug Enforcement Administration Western Laboratory in San Francisco.  He is a criminalist and forensic chemist, and is trained to identify marijuana.  He will testify that he examined samples of the marijuana that were seized on September 21, 2005 by Agent Martin and others, identified by the Case Number, No. SE13MR05BL0088, and the seizure number, no. 2005SA002415301, and the name "Zachary Mirabach."  He identified the contents as marijuana, also known as cannabis.  Criminalist Chappel's two-page report is attached as Exhibit A.

7.      For clarification, in reference to paragraphs 8 and 9 of the original Record, Cpl. Kachur can identify HENRY ROSEAU from the  photograph, Exhibit A attached to the original Record, and can testify that he took this photograph of ROSENAU.

Seattle, Washington
December 4, 2006


DOUGLAS B. WHALLEY
Assistant United States Attorney
Western District of Washington

4

000142

## SUPPLEMENTAL RECORD OF THE CASE FOR PROSECUTION

1.      This supplemental Record supplements the Record of the Case for Prosecution (the "original Record"), dated April 9, 2007, submitted as part of the United States' request for the extradition of Henry C. Rosenau from Canada.

2.      There is an additional witness who was not available at the time the original Record was submitted. Kip John Whelpley came voluntarily to the United States, entered a guilty plea to conspiracy to import and distribute marijuana, and has cooperated fully with agents from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), since his arrival in the United States. Whelpley is expected to testify to the following:

a.      Whelpley came to United States in the spring of 2004 to assist with smuggling marijuana from Canada into the United States. He first looked for helicopter landing spots in unpopulated and rural areas south of the United States-Canada border. With the assistance of another person, he purchased a truck and canopy cover which he used to receive and transport shipments of marijuana in the United States. In the summer of 2004, Whelpley received approximately seven loads of marijuana in the United States. Each load was brought across the international border by helicopter from Canada. Specifically, Whelpley saw a Robinson 44 helicopter, with a missing or taped-over tail number, which was used to smuggle the marijuana that summer. Whelpley identified the picture of that helicopter, tail number C-FRKM, which was referred to in the original Record. Each load consisted of 10 to 12 hockey bags which he estimated contained approximately 50 pounds each for a full load of approximately 500 to 600 pounds of marijuana. He was paid $7,000 per load and, that summer, he made $50,000 to $60,000 smuggling marijuana in this fashion before the smuggling season ended.

b.      In early 2005, Whelpley resumed his role in marijuana smuggling after meeting Henry Rosenau in Canada. During the meeting Henry Rosenau discussed the 2004 trips, acknowledged he was the pilot of the helicopter, referred to above, during the 2004 trips, and confirmed their prior contacts by his knowledge of Whelpley's Blackberry name and previous discussions. Specifically Rosenau recognized Whelpley's Blackberry moniker of "Gilligan" and discussed details of a smuggling trip which was cancelled because of fog. Henry Rosenau also told Whelpley that he maintained Whelpley's cash payments in his safe during the prior summer. Whelpley visited Henry Rosenau at his residence at 4767 Grandview Flats, Armstrong, British Columbia, Canada.

c.      In spring 2005, Whelpley returned to the United States with Henry Rosenau. Together, they scouted areas in Washington State for landing zones for Henry Rosenau's helicopter. Whelpley rented a small home in Washington State for the summer and began receiving loads of marijuana. Henry Rosenau brought a few marijuana loads in his smaller helicopter, a Robinson 22, however, that smaller helicopter could carry only 200 pounds at a time. Henry Rosenau began flying a larger, red Bell helicopter by late spring and brought marijuana loads of approximately 500 pounds at a time. Whelpley estimates that he received twenty 500 pound marijuana loads from Henry Rosenau that summer, including one week in

which he received three 500 pound loads in five days.  Whelpley said that Henry Rosenau was the pilot of every helicopter load, either flying alone or with one other person.  Whelpley was stopped by ICE agents on June 9, 2005 with a 500 pound marijuana load he had just received from Henry Rosenau.

   d.  Whelpley identified the person depicted in the photograph attached as Exhibit A as Henry Rosenau.

3. Referring to paragraph 7 of the original Record, Zachary and Braydon Miraback are no longer expected to testify.

Seattle, Washington
October 6, 2008

SUSAN M. ROE
Assistant United States Attorney
Western District of Washington

## SECOND SUPPLEMENTAL RECORD OF THE CASE FOR PROSECUTION

1.     This supplemental Record supplements the Record of the Case for Prosecution (the "original Record"), dated April 9, 2007, and the first Supplemental Record of the Case, dated October 7, 2008, submitted as part of the United States' request for the extradition of Henry C. Rosenau from Canada.

2.     In reference to paragraph 2 of the first Supplemental Record, Immigration and Customs Enforcement (ICE) Special Agent Chad Boucher is expected to testify to the following: on June 9, 2005, agents from ICE, U.S. Forest Service, and Customs and Border Protection (CBP) Air and Marine initiated a surveillance operation in the Okanogan National Forest at a location near where Kip John Whelpley had been observed earlier by Officer Graves.

3     CBP Pilot Mike Corcoran is expected to testify that he participated in the operation in a surveillance aircraft as an aircraft crew member.  At approximately 4:35 a.m. on June 9, 2005, he observed a truck traveling westbound on Forest Road 5140, north of Winthrop, Washington.  The truck stopped at a clearing on a spur road off of Road 5140, identified as Forest Service Road 280.  (The vehicle was later determined by Special Agent Boucher to be Whelpley's blue Ford F150 vehicle, with Washington plates, no. A09099W.)  The F-150 vehicle had a large camper shell on the back of it.

4.     CBP Pilot Eric Hausner is expected to testify that he also participated in the operation in a surveillance aircraft on June 9, 2005.  At approximately 4:53 a.m., he observed an aircraft flying in a southeast direction approximately three miles from the United States/Canadian border.  He observed that the aircraft was a Bell Jet Ranger helicopter and was flying at an elevation just above the treetops.  He confirmed that no aircraft had reported foreign arrival into the United States on the morning of June 9, 2005, at the nearby Oroville, Washington Port of Entry.  CBP Pilot Hausner continued to track the helicopter until it arrived at a clearing on Forest Service Road 280.

5.     CBP Pilot Mike Corcoran will further testify that at approximately 4:56 a.m. on June 9, 2005, he observed a helicopter land at the clearing on Forest Service Road 280, near the Ford F-150 vehicle.  He observed that the helicopter was a Bell Jet Ranger and was white in color with a red stripe.  He observed large bags strapped to each skid of the helicopter.  When the helicopter landed he saw the pilot exit, and unload the bags.  He observed a man (later identified as Kip John Whelpley) approach the helicopter, and help the pilot unload the large bags from the skids.  The pilot and Whelpley also unloaded several other bags that were located inside of the helicopter.  Both the pilot and Whelpley carried the bags to the rear of Whelpley's Ford F-150 vehicle.  CBP Pilot Corcoran

observed several bags being placed inside the rear of the camper shell on Whelpley's vehicle.  At approximately 5:01 a.m., he observed the pilot get back into the helicopter and take-off from the clearing.  At approximately 5:05 a.m. CBP Pilot Corcoran observed Whelpley's Ford F-150 vehicle depart the clearing and proceed down Forest Service Road 5140.  He observed Whelpley's vehicle travel to the intersection of Forest Service Road 5140 and West Chewuch Road, where the driver of Whelpley's vehicle met with the driver of a Dodge Durango vehicle.  (The Dodge Durango vehicle was later observed by Special Agent Boucher to have no affixed license plates and a paper, possibly a temporary license, in the rear window).  CBP Pilot Corcoran observed the Ford F-150 vehicle and the Dodge Durango vehicle, now driving in tandem, travel to the Boulder Creek Campground, before traveling to the Chevron Service Station in Pateros, Washington.  Equipment in CBP Pilot Corcoran's aircraft videotaped the Chevron gas station meeting involving the occupants of the F-150 truck and the Dodge Durango vehicle.

6.     CBP Pilot Ernest Szuminshi will testify that he participated in the operation in a surveillance aircraft, and that he tracked the helicopter as it left the clearing where it was observed by CBP Pilot Corcoran.  He will testify that the helicopter flew northbound across the United States/Canadian border and into Canada, where he lost visual sight because of bad weather.

7.     ICE Special Agent Chad Boucher is expected to testify that at approximately 6:35 a.m. on June 9, 2005, he observed Whelpley's Ford F-150 truck and a Dodge Durango vehicle parked at the Chevron Service Station in Pateros, Washington.  He communicated with other agents, and confirmed that the Ford F-150 truck had been followed from the site of the helicopter marijuana delivery.  He observed Whelpley and an unidentified passenger exit the F-150 truck and enter the Chevron Service Station.  Shortly thereafter, he observed that the drivers of the F-150 truck and the Dodge Durango vehicle leaving the Chevron station.  He will testify that he reviewed a CBP air surveillance videotape of the incident, and it revealed that only Whelpley got into the F-150 truck, not the passenger who exited the truck earlier.  He observed both vehicles being driven in tandem southbound on Highway 9.

8.     Special Agent Boucher will further testify that at approximately 9:10 a.m. on June 9, 2005, he observed Whelpley in the F-150 vehicle and the unidentified man in the Dodge Durango vehicle drive their vehicles to Interstate 90, and proceeded westbound.  Approximately two miles later, under the border search authority of ICE, Washington State Patrol Trooper David Anderson initiated a traffic stop of Whelpley's Ford F-150 truck.  Special Agent Boucher will testify that the F-150 truck had been under

constant surveillance by ICE and CBP agents from the time the bags from the helicopter were transferred to the truck until the traffic stop.

9.      Washington State Patrol (WSP) Trooper David Anderson will testify that he stopped the Ford F-150 truck driven by Whelpley. Trooper Anderson asked Whelpley for his drivers license and registration for his vehicle. Whelpley presented his Washington State drivers license, and started looking through his vehicle for his registration. Whelpley found the registration to the truck, however he stated that he did not know where the registration to the camper was located. Trooper Anderson then informed Whelpley that the camper registration was located on the paper license that was located in the rear window of the camper on his vehicle. He then asked Whelpley to get the registration out of the camper. Whelpley stated that he would rather not. Trooper Anderson again asked him to get his registration and Whelpley stated "I fail to see how I'm going to be in any less trouble by allowing you to see what is inside." At that time Whelpley was placed in handcuffs and placed in the back seat of the Trooper's car. Whelpley and the Ford F-150 truck were then transported to the nearest WSP office. Whelpley was later released to avoid revealing the ongoing investigation. He was not fingerprinted.

10.     ICE Special Agents Boucher and Kevin Martin, WSP Trooper Anderson, WSP Trooper Paul Woodside, and United States Forest Service Special Agent Minden will all testify that they conducted a search of Whelpley's Ford F-150 vehicle at the WSP District Office. They acted under the authority of federal agents to conduct a search for smuggled contraband entering the United States, when the vehicle searched has been followed from the border, or from an area where smuggled items could be loaded. During the search, 11 large black hockey style bags containing approximately 486 pounds of marijuana were discovered in the camper of Whelpley's vehicle. Special Agent Boucher will testify that he took representative samples of the marijuana seized from Whelpley's vehicle and submitted them to the Drug Enforcement Administration (DEA) Western Laboratory in San Francisco.

11.     Special Agent Boucher will further testify that, while conducting a follow-up investigation of Whelpley and the Dodge Durango vehicle, he reviewed Washington State vehicle registration records. Those records revealed that "Kip Whelpley" was the registered owner of a silver, 1998 Dodge Durango, Washington license 384TTR, registered to an address of 43 Twisp Airport Road, Twisp, Washington 98856. He will also testify that in June 2005, Whelpley had a parking permit for a Dodge Durango vehicle, Washington license 384TTR, at the Harbor Steps Apartments parking garage, on Western Avenue, Seattle, Washington. Special Agent Boucher will further testify that records for that license number led him to a car dealership. On October 4, 2005, he

interviewed Mike Kaiser ("Kaiser"), the owner of Choice Auto and Truck in Omak, Washington. Kaiser stated that, on May 16, 2005, Whelpley purchased a silver 1998 Dodge Durango vehicle from Choice Auto for $9,661.55. Kaiser said that the same Dodge vehicle was later resold to Choice Auto by a man named Jonathan Senecal on August 24, 2005. Senecal's driver's license was from Ontario, Canada. Senecal told Kaiser that he had bought the car from Kip John Whelpley. Special Agent Boucher will testify that he viewed a picture of the Dodge Durango vehicle that was sold to Whelpley, and then resold back to Choice Auto, and noticed that the Durango was the same color as the one that he observed on June 9, 2005. He was told by Kaiser that Choice Auto puts an advertisement in the license plate holder when the vehicle has no license. The ad has a bright yellow border and red letters saying "CHOICE."

12.    Paul Eyerly will testify that he is employed at the DEA Western Laboratory in San Francisco. He is a criminalist and forensic chemist, and is trained to identify marijuana. He will testify that he examined representative samples of the packages of marijuana that were seized on June 9, 2005, by Agent Boucher and others, identified by the Case Number, BL13MR05BL0079, and the Seizure No. 2005300400016101, and the name "Kip John Whelpley." He will testify that he identified the representative samples taken from the seizure, weighing approximately 480 grams, as marijuana which is also known as cannabis.

February 5, 2009
DATE

SUSAN M. ROE
Assistant United States Attorney

4

# **<u>Attachment G</u>**

## **Webpage**



Royal Canadian   Gendarmerie royale
Mounted Police    du Canada

Canada

Home > Integrated Border Enforcement Teams (IBETs)

# Integrated Border Enforcement Teams (IBETs)

IBETs enhance border integrity and security along the shared Canada/U.S. border, between designated ports of entry, by identifying, investigating and interdicting persons, organizations and goods that threaten the national security of one or both countries or that are involved in organized criminal activity.

IBET units protect both Canada and the United States from potential threats of terrorism and impede the trafficking/smuggling of people and contraband.

## Partners

The five core IBET agencies – each having law enforcement responsibilities for areas at or near the shared border – are:

- Royal Canadian Mounted Police  (RCMP)
- Canada Border Services Agency (CBSA)
- US Customs and Border Protection/Office of Border Patrol (CBP/OBP)
- US Bureau of Immigration and Customs Enforcement (ICE)
- US Coast Guard (USCG)

The Integrated Border Enforcement Team Program is comprised of both Canadian and American law enforcement agencies. The bi-national partnership enables the five core law enforcement partners to work together daily for more efficient sharing of information and intelligence.

## IBETs:

- Secure the shared border between Canada and the United States, while respecting the laws and jurisdiction of each nation
- Focus on national security and target organized crime and other criminal activity between the ports of entry
- Collaborate with municipal, provincial, state, federal and First Nation law enforcement agencies, stakeholder agencies and related government departments

**IBET is a cooperative bi-national initiative that ensures that borders are open for trade, but closed to crime.**

Date Modified: 2009-03-03