# United States District Court

## Western District of Washington

Case No. 2:06-cr-00157-MJP

UNITED STATES OF AMERICA

V.

HENRY CARL ROSENAU

---

**IN THE MATTER OF THE UNITED STATES OF AMERICA V. HENRY CARL ROSENAU AND IN THE MATTER OF A HEARING SCHEDULED FOR FRIDAY, OCTOBER 28, 2011 INTO AN ALLEGATION THAT HENRY CARL ROSENAU VIOLATED A CONDITION OF HIS RELEASE BOND**

---

### AFFIDAVIT

I, Padraig Mac Roibeaird, of 2931 Victoria Street East, Vanderhoof, British Columbia, Canada, HEREBY MAKE OATH AND SAY THAT:

1. I am the appointed agent for Henry Carl Rosenau in the matter of Henry Carl Rosenau, Plaintiff, v. Kip John Whelpley, Defendant, which is File number 14781 in the Quesnel Registry of the Supreme Court of British Columbia, and as such I have personal knowledge of the matters hereinafter deposed to, except where such matters are stated to be based on information and belief, in which case I believe such matters to be true.
2. I act pro bono for Henry Carl Rosenau ("Mr. Rosenau") in this civil matter, which was first filed on or about January 25, 2011. I also act as a paralegal in association with Dr. Gary Botting ("Dr. Botting"), a British Columbia lawyer who has acted for Mr. Rosenau in matters before the Supreme Court of Canada and in submissions to Canada's Minister of Justice in regard to the extradition of Mr. Rosenau to the United States.
3. I do not believe there is a corresponding role in United States courts to that of an agent in provincial and Supreme Courts in British Columbia. In British Columbia, due primarily to the inability of many, if not most, litigants to afford lawyers, there has been a marked increase in the presence of unpaid volunteers representing persons incapable of handling their own affairs due to lack of any legal knowledge whatsoever. Representation by agent is very common in civil matters at the provincial and Supreme Court levels in British Columbia and in summary conviction (misdemeanour) matters in our provincial courts.
4. I have been involved in a number of cases as an exercise of social conscience on my part, and as a result have a considerable experience of appearing in civil matters before the Supreme Court of BC, which I am happy to say has to date been tolerant of my efforts on behalf of others while not infringing on the economic monopoly of the legal profession. The

1

standard term for the role I and other pro bono representatives play is described as an agent and sometimes as an advocate.

5. In addition to this matter with Mr. Rosenau, in the past two years I have acted as defence counsel for two individuals in a minor criminal matter in the provincial court, am retained as a forensic accounting investigator in a civil debt and fraud action in the Supreme Court, and am retained as an expert witness to prepare a report and testify in an aviation business case in progress in the High Court in the province of Ontario.

6. My legal experience also includes three years as a court reporter for two different daily newspapers in British Columbia, during which I witnessed hundreds of hours of courtroom procedures and arguments in high profile criminal cases and inquests. I have also acted as an expert advisor to Mr. James Connolly, a former US Attorney for Eastern Washington, then in private practice and representing US victims of a Canadian air crash at inquest proceedings, and have appeared as counsel for clients arguing licensing matters before the Canadian Transport Commission in public hearings in British Columbia.

7. In the subject matter that this affidavit addresses, I acted as an agent for Mr. Rosenau in a civil matter between Mr. Rosenau and Mr. Kip Whelpley ("Mr. Whelpley) in which Mr. Rosenau was the Plaintiff suing Mr. Whelpley for damages and injunctive relief in regard to false statements Mr. Whelpley made related to extradition proceedings in Canada, and in a roundabout way, to the matters now before this Honorable Court. A copy of the Notice of Civil Claim that I prepared for Mr. Rosenau in that matter is attached as Exhibit A to this my affidavit, for future reference in this affidavit.

8. I had been approached by Mr. Rosenau at some point after his arrest in Canada at the beginning of extradition proceedings to see if I could proceed with an attempt to prosecute him in Canada through private prosecution provisions in the Canadian Criminal Code. I could not as I did not have reasonable and probable grounds to swear a private information charging Mr. Rosenau with exportation of marijuana from Canada.

9. At the time, I was well known in British Columbia to persons facing extradition to the United States, and preferring to face Canadian legal processes, as a result of my highly publicized efforts to preserve Canadian sovereignty over Canadians by the tactic of filing private criminal informations in Canada against Marc Emery and two others. Mr. Emery was a world famous Canadian politician and marijuana legalization advocate targeted by US authorities for extradition after Canadian police and courts refused to deal harshly with him over his marijuana seed sales which were used to fund his legalization efforts worldwide.

10. In Mr. Emery's case, he openly admitted his guilt, and I had no difficulty swearing to the requisite knowledge to file an information. Mr. Rosenau, however, maintained his innocence, and I did not have any independent evidence of his guilt. In fact, I knew of one helicopter pilot who was the actual pilot of at least one, and possibly all, of the helicopters Mr. Rosenau is now accused of flying. As a result of that, the Canadian charges tactic could not proceed at law.

11. I did, however, offer to assist Mr. Rosenau in obtaining legal counsel and as a result of that assistance, I first introduced him to Mr. Douglas Jevning, a Vancouver lawyer who conducted matters at Mr. Rosenau's extradition hearing, and his appeal of the committal order to the British Columbia Court of Appeal.

12. Following the British Columbia Court of Appeal decision, I introduced Mr. Rosenau to Mr. Botting, who is one of Canada's leading authorities on extradition law, and who I had worked with on the extradition of Marc Emery to the United States. Dr. Botting was retained by Mr. Rosenau to conduct an application for leave to appeal to the Supreme Court of Canada. I assisted to a small extent in a pro bono paralegal assistant type of role.

13. In my day to day paid employment and professional life, I am the program coordinator for an aviation business diploma program at a British Columbia post secondary institution and a member of the faculty at that institution, instructing in university business courses and aviation safety courses.
14. I hold a bachelor's degree in business administration from Simon Fraser University in Burnaby, British Columbia and a master's degree in business administration from Trinity College, Dublin in Dublin, Ireland. I am an airline transport licensed pilot for airplanes, and a commercial helicopter pilot. I have over 7000 hours as a pilot in command of aircraft, and a wide experience in operational and management roles in air carriers and air operations in Canada, the United States, and Europe.
15. I am involved in the political life of British Columbia, am the founder and chairman of a political party advocating the independence of British Columbia from Canada and have in the past been a well known public advocate for the legalization of marijuana and have stood for election to the legislature of British Columbia in two of the last three provincial elections. While I am no longer involved in the marijuana legalization movement, I remain actively involved in the political issues posed in the extradition processes between Canada and the United States, which are most contentious in regard to marijuana cases.
16. As many of these cases involve helicopters, and not a small number of those sought by the US have come to me for help in the Canadian charges tactic, I have developed a close to expert level knowledge of the history of helicopter smuggling between British Columbia and the north-western United States of Washington, Idaho, and Montana and in one instance, airplane smuggling between British Columbia and Montana.
17. I have in particular been an observer and commentator of the progression of this tactic from a relatively benign venture moving marijuana into the United States to one almost always resulting in cocaine trafficking back into Canada and for a period, a great increase in violence in my province, which to me is my country. I am considered a highly reliable source of information by reporters at the Canadian Broadcasting Corporation, and have been contacted for story insights by the Associated Press, Rolling Stone Magazine, and Magnum magazine. I have been involved in the production of national investigative reports on the BC marijuana industry, and have been a featured commentator on a recent documentary that aired many times across Canada and to my understanding, in the United States.
18. I am in agreement with Canadian and US law enforcement officials that the use of helicopters in drug smuggling has created an expertise that constitutes a serious threat to the United States by providing a certain method of entry for personnel and material to the United States undetected, and for the entry of dangerous drugs into Canada from the United States.
19. There is a particularly contentious issue in the proceedings now underway in the western district of Washington court in regard to Mr. Rosenau that relates back to events connected to the extradition process which went on in Canada.
20. In my assistance to Mr. Jevning, and Mr. Rosenau, I came to see a document called the Supplementary Record of the Case ("SROC") filed in the documentation supporting the American request for the extradition of Mr. Rosenau. This document listed the evidence that Mr. Whelpley was supposedly going to testify to at Mr. Rosenau's trial. A copy of that document is attached as Exhibit B to this my affidavit.
21. As a result of the aviation qualifications detailed above, and which were known to Mr. Jevning, he asked me to ████████████████████████████████
████



22. I firstly identified ███████

23. I then received information that led me to believe that ███████

24. I was very familiar with ███████

25. ███████

26. ███████
    a. ███████
    b. ███████
    c. ███████

27. I began to monitor the progress of Mr. Whelpley in the United States courts and I became aware when he was released and returned to Canada. I have family in Vernon, British Columbia, which is where Mr. Whelpley comes from. I asked persons I knew there to see if they could get any contact information for him. Eventually I was provided with a telephone number and the information that he worked at a resort just south of Vernon.
28. At some time in 2009, when I was next in Vernon, I called Mr. Whelpley and told him I was assisting Mr. Rosenau and working with Mr. Rosenau's lawyer. He was initially receptive to a suggestion that he call Mr. Jevning with a view towards telling the truth of what had happened between him and the US attorney, Ms. Susan Roe. In a second call the same evening, he indicated that he did not wish to meet and I told him that I would give his number to the lawyer and the lawyer would call him, and arrange for him to have legal counsel present for any meeting that he might agree to.
29. Unfortunately, I lost his number and no further telephone or any other type of contact went on for over a year, if not longer.
30. In the fall of 2010, I was at Mr. Rosenau's house and we were discussing the perplexing problem of the falseness of Mr. Whelpley's alleged "testimony" and the harm it was causing to Mr. Rosenau. I came up with the idea that he was liable in the Canadian courts for the

damages he had caused to Mr. Rosenau through what was essentially a false and malicious prosecution, although we could not think of why he would do such a thing.
31. The issue that was faced was that we were fairly sure that Mr. Whelpley did not say the things attributed to him in the SROC. He couldn't have even known about ████████ ████████████████████████████████████████████████████████████████
32. The alternative reality was that Ms. Roe and US law enforcement officials had either simply made up Mr. Whelpley's story for him, or spoon fed him the story and told him he was going to tell that story when the time came. Implicit in that was that they had ████████████████████████████
33. This opened up an avenue of resolution for Mr. Rosenau. If Mr. Whelpley would admit he never said the things attributed to him by Ms. Roe, than at that time there were still Canadian avenues open to bring the falseness of the ROC to ministerial and court authorities and have the extradition process ended.
34. I contacted Dr. Botting with the analysis. He said he could not become involved and did not wish to discuss it as he was then still acting as Mr. Rosenau's counsel in the extradition matter and he felt it would create some type of conflict for him. He asked me to let me know if it was resolved, but he would take no role in it himself.
35. ████████████████████████████████████ I received quite firm information that ████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████ I resolved to not have any further conversations with Mr. Whelpley out of fear that he might concoct stories about what I said to him. I decided that I would always have dealings with him on paper or email, so that there always was a record of what said and that it was appropriate.
36. In late 2010 and early January of 2011, there were some email approaches that gave Mr. Whelpley the disputed sections of the SROC and asked him if it was true that he said what Ms. Roe certified he said. There was no response that I can recall to anything, other than when it was decided that suing him was the last recourse and given his likely fear of meeting people, it would be desirable to mail him the originating process papers. He did respond with an address.
37. Exhibit A was prepared. It contains all of the pertinent details as to the facts and legal issues involved. It lays out a perfectly valid cause of legal action and valid legal remedies in the Canadian courts. It was mailed to Mr. Whelpley at the address he gave and he received it.
38. There was some contact by some individual claiming to be a lawyer representing Mr. Whelpley. Contact was made with Dr. Botting, who denied any involvement and informed the letter writer that he was not counsel for Mr. Rosenau in the civil matter. The letter was wild and defamatory and there was some concern that Mr. Whelpley himself had simply found the name of a lawyer and concocted a Microsoft Word document with a primitive logotype and written the letter himself. I wrote one letter back to the individual telling him that if the conduct continued, I would report him to the law society and there was no further correspondence. I did discover there was such a lawyer, and after having observed his behaviour in the courts in Salmon Arm in July of 2011, I concluded that he was capable of writing the letter and that Mr. Whelpley did not write it.
39. No response was filed within the time allowed by the Rules and on March 7, 2011 the Supreme Court issued an Order that I attach as Exhibit C. The only operative part of the

5

    Order was an order in the nature of prohibition or injunction prohibiting Mr Whelpley from leaving Canada for travel to the United States. The purpose of the order was, as stated in the pleadings, to stop him from continuing his false and malicious attacks in the United States with possibly dire consequences for Mr. Rosenau.

40. Orders prohibiting Canadians from leaving Canada are very commonplace in Canadian courts and issue for any number of reasons. The Order against Mr. Whelpley is a valid order of the Supreme Court of British Columbia, obtained on true facts and arguments advanced in that court, and not denied or in any way contested by Mr. Whelpley. It is exactly as valid an Order as the Order committing Mr. Rosenau to the United States, issued by the same Court.
41. The Order also provides for a future assessment of damages and costs on further applications. From a tactical viewpoint, it was felt that it would be highly dangerous to crystallize the costs issue prior to Mr. Rosenau's trial in the United States. The fear was that if Mr. Whelpley found himself assessed several hundred thousand dollars in damages, he would have a powerful incentive to violate the prohibition against going to the United States and manufacture whatever story was necessary to put Mr. Rosenau away for many years and render him helpless to collect on his Canadian damages judgment.
42. There was also the fear that simply the possibility of damages might trigger a flight from Canada to do whatever he could to have Mr. Rosenau imprisoned in the US.
43. I mailed a copy of the Order to Mr. Whelpley. He did not acknowledge service.
44. At some point, May of 2011 to my recollection, Mr. Rosenau was required to surrender himself to the United States. He did not expect to be released and the issue arose as to how he would be represented in the civil matter. It was decided to file a Notice of Intention to Act by Agent, with me acting as the agent and the Notice was duly filed on March 31st, 2011. A copy of the Notice is attached as Exhibit D to this my affidavit.
45. It was part of the agreement that I act as agent that Mr. Rosenau would be at arm's length from my actions, if any, in respect to the civil action in the Supreme Court.
46. Mr. Rosenau was released by the Court and returned to Canada. At some point, he showed me a no contact order that was part of his bond condition. I explained to him that he could not comply with the order as written as it did not name any witnesses and co accused or co conspirators and left him to his imagination alone as to who those might be. I advised him that he should go to his bail supervisor and request a list of who these people were.
47. I understand that sometime later, a list was provided. Mr. Rosenau said he wouldn't be able to identify any of the people on the list, and only knew one name, that of Whelpley. He only knew Whelpley in the sense that he knew that was the name in the SROC, and that was the name I had put into the lawsuit, but he would not have been able to identify Whelpley by physical appearance any more than he could identify any of the other names on the list.
48. I told him to request pictures of the people involved, so that he didn't find himself standing beside one of them, or worse still, have Mr. Whelpley come up to him, be photographed beside him, and then come up with a story that Mr. Rosenau had threatened to kill him, or his family, or offered him bribes, or something similar, with the result that Mr. Rosenau would have to go back to the Unites States and into prison awaiting his trial.
49. The no contact conditions created an issue in respect to what remained of the civil proceedings against Whelpley. Mr. Rosenau broke the arms length agreement and strongly stated that he did not want any contact with Whelpley related to the civil proceedings out of fear that such contact would violate the no contact conditions and that he would have to go to prison in the United States. Mr. Rosenau appeared to me to be almost terrified at the prospect that serving Whelpley with a court paper could result in him being imprisoned. He

was adamant about no contact with Mr. Whelpley and his wishes were respected in the short term, because there really was no reason to contact Mr. Whelpley on the presumption he had a copy of the order and would abide by its terms.

50. It was decided that Dr. Botting would approach Mr. Craig Platt, Mr. Rosenau's US counsel, and tell him that there were some civil proceedings underway in Canada that might require contact by persons other than Mr. Rosenau to correspond with Mr. Whelpley in respect to those proceedings or serve court documents. There was a feeling that it might be best to confirm that Whelpley was in receipt of the Court order and was aware of the travel restrictions on him.

51. In late May, I was forwarded an email from Mr. Platt to Dr. Botting on the issue of civil proceedings correspondence and service of documents. I attach a copy of that email as Exhibit E to this my affidavit. It clarifies the issue of how Mr. Whelpley may be contacted, but expresses a concern that perhaps I should not contact Mr. Whelpley for no legal reason, but simply because Mr. Platt was confused about my role.

52. There was no reason to contact Mr. Whelpley at the time, so that was not an issue.

53. My role was clarified at a meeting with Dr. Botting in Vancouver on or about August 13, 2011. I agreed to assist Dr. Botting in a paralegal capacity in dealing with minor things in Canada. I recall that my role then might have been to prepare what I knew about he helicopter smuggling business in a historical sense, and in a method sense based on what had been released by police authorities in press releases and disclosure in Canadian courts and newspaper articles.

54. The civil matter was not discussed, but the engagement was general enough that it would have included that matter. I had by then reverted back to my arms length arrangement with Mr. Rosenau and did not consult with him about any matter relative to the civil suit.

55. 

56. I eventually found

57.

58. Mr. Whelpley has judgment against him in Canada and an order that he not leave Canada to participate in a further false and malicious prosecution of Mr. Rosenau. He has potential damages of hundreds of thousands of dollars to be levied against him because of Ms. Roe's behaviour in the extradition process. Ms. Roe has tried and failed to continue to involve him by using the process of deposition in Canada, which the Court denied.

59. Approximately two weeks ago, I received word through either Dr. Botting or Mr. Rosenau that Ms. Roe was now saying that Mr. Whelpley was "expected" to testify in the United States. That raised the possibility that he was either going to violate the Canadian order prohibiting his leaving Canada, or claim that he did not receive it.

60. I did not discuss what was to be done with Mr. Rosenau, although he might have been aware of the statement Ms. Roe had made. I did contact Mr. Botting and suggested he send a copy of the Order to the Sheriff's at Vernon courthouse and ask them to serve Mr. Whelpley and file an affidavit of service attesting to the service.
61. Dr. Botting was reluctant to do that, given that he had previously told the lawyer for Mr. Whelpley that he was not counsel in the civil matter, which he then wasn't. I said that I would do it, and I think that by then I had the Sheriff's contact information, and fees and any other information necessary.
62. ███████████████████████████████████████████████████████████
There remained a feeling of sympathy for Mr. Whelpley as a victim of the whole affair and a desire if possible to mitigate any problems for him, including the payment of costs.
63. I took it upon myself to try one more email to him to gain acknowledgment of service and gain a confirmation that he was not going to violate the order. I sent the email attached as Exhibit F to this my affidavit.
64. I did not vet the email with Dr. Botting. It appeared to be very straightforward to me and well within the nature of a communication permitted by the agreement between Ms. Julie Busic, who I understand to be Mr. Rosenau's release supervisor, and Mr. Platt. I cannot see anything in other it than normal and courteous legal correspondence similar to what would issue hundreds of times a day in British Columbia.
65. I have had a chance to see the small bit of correspondence Ms. Roe has made in this regard and also to see what Mr. Whelpley has to say. I observe that Ms. Roe describes the email as "harassment and intimidation", but that Mr. Whelpley says nothing of the kind. He does not claim harassment and intimidation. He merely appears to be irritated.
66. At the time I wrote to him, Mr. Whelpley was not a witness. The US government request to depose him was denied. He is forbidden by an Order of the Supreme Court of British Columbia to leave Canada for the purposes of travelling to the United States, for any purpose whatsoever, but it is clear from the pleadings that the reason for the order is to stop him from being a witness in the United States and further compounding the harm already done to Mr. Rosenau.
67. In order for him to be a witness, he would have to be approached by Ms. Roe with encouragement to violate an order of the same Court that she misled in the extradition process and come down to the United States and testify. It is a criminal offense in Canada for anyone from outside Canada to send a communication into Canada encouraging a person in Canada to violate a lawful order of the Supreme Court in BC. It is also an offense in Canada to file false Records of Cases to secure the removal from Canada of a Canadian citizen.
68. ███████████████████████████████████████████████████████████

69. ███████████████████████████████████████████████████████████

70. I did not tell Mr. Rosenau anything about what I was doing in respect to the civil matter with Mr. Whelpley. Until half an hour before I wrote and sent the email, I didn't know myself. He did not direct me to contact Mr. Whelpley or do anything at all. As far as I know, the first he knew of it was when he was informed today that he has to appear in Seattle on Friday.
71. I see Ms. Busic's comments that she was unaware of a civil suit in British Columbia. I have an email from Mr. Platt in which he says he discussed this very thing with her, told her there were proceedings, and she agreed that contact such as was made would not be a violation of Mr. Rosenau's no contact conditions.
72. I also see Ms. Busic refers to Mr. Rosenau's agent (myself) as being somehow associated with associates of the United Nations gang and that she gains that information from Canadian police sources. I do not know any members of the United Nations gang. I do know who they are as there has been considerable press coverage of them.
73. As I indicate above, I was for several years contacted by quite a number of people with extradition problems looking to be charged in Canada. I suppose some of them could have been associates of some gang, in fact it is probably likely. If so, they asked me for legal help. That was the extent of my association with them.