UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 1



SUPREME COURT
OF BRITISH COLUMBIA

JAN 3 1 2011

QUESNEL
REGISTRY

Form 1 (Rule 3-1 (1) )

No. *147 81*

Quesnel Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

**HENRY CARL ROSENAU**

Plaintiff

and

**KIP JOHN WHELPLEY**

Defendant

**NOTICE OF CIVIL CLAIM**

*[Rule 22-3 of the Supreme Court Civil Rules applies to all forms.]*

**This action has been started by the Plaintiff for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

    (a)  file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

    (b)  serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

    (a)  file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

1

31JAN11  100073  RISS    300.00
39214    14781

(b)  serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

## Time for response to civil claim

A response to civil claim must be filed and served on the plaintiff(s),

(a)  if you reside anywhere in Canada, within 21 days after the date on which a copy of the filed notice of civil claim was served on you,

(b)  if you reside in the United States of America, within 35 days after the date on which a copy of the filed notice of civil claim was served on you,

(c)  if you reside elsewhere, within 49 days after the date on which a copy of the filed notice of civil claim was served on you, or

(d)  if the time for response to civil claim has been set by order of the court, within that time.

## Claim of the Plaintiff

## Part 1: STATEMENT OF FACTS

1.  The Plaintiff is a Canadian citizen and a truck driver who resides near Quesnel, British Columbia.

2.  The Defendant is a Canadian citizen and an employee of Sparkling Hill Resort near Vernon, British Columbia.

3.  The Defendant suffers from a mental illness or mental condition that requires medication and which is believed to be bipolar, or manic depressive, disorder.

4.  On or about June 5, 2005, the Defendant was arrested by United States (US) police in Washington state in the act of transporting some 500 pounds of marijuana. He was released within 24 hours and not charged.

2

5.  Glen Stewart is the owner of a property approximately 3 miles south of Yale which was being used in part for storage for three helicopters on the 21st of September, 2005. At approximately 9:20 AM on that date,  Mr. Stewart was on a part of his property away from the storage building where the helicopters were being kept. He was working with a friend on repairing a vehicle.

6.  While working on the vehicle as described above, Mr. Stewart noticed a helicopter landing out of his vision on the other side of the shed and a while later observed the Plaintiff talking to a man who he assumed was a friend of the Plaintiff. He approached the area to the point where the helicopter was then in his view and spoke with the man talking to the Plaintiff. He discovered that the man was an RCMP officer. The officer asked for a key to the storage building and Mr. Stewart refused to provide the key.

7.  Mr. Stewart returned to working on the vehicle. He was on the property for over an hour working on the vehicle and then left. The RCMP were still on the property when he left and he has learned that they searched the storage building without a warrant after he left. When he left, the helicopter was still on a concrete pad in front of a door into the storage building.

8.  At 9:45 AM on or about September 21, 2005, a US law enforcement officer observed a Robinson helicopter in an area in north central Washington state. The law enforcement officer did not observe the helicopter's registration or the helicopter land or meet any vehicle.

9.  A short while later a vehicle was observed driving out of this area and followed to an area near Puyallup, Washington. It was stopped and some 1000 pounds of marijuana was seized. Two Canadian brothers named Miraback were arrested.

10. On or about the 10th of November, 2005, the Defendant was indicted along with one Tyrell Owens and charged with several counts related to the importation and distribution of marijuana. The US indictment contained a Notice of Criminal Forfeiture in regard to a Canadian Bell Jet Ranger helicopter with the registration C-FALQ.  A warrant for the arrest of the Defendant was contemporaneously issued.

11. On the 11th of May, 2006, the Plaintiff was indicted in the US on three counts related to the importation and distribution of marijuana. The US indictment contained a Forfeiture Allegation which does not make any reference to any helicopter.

12. On the 9th of April, 2007, a Record of the Case in support of a request to Canada for the extradition of the Plaintiff was certified.

13. The Record of the Case dealt with the seizure of marijuana from the Miraback brothers and indicated that they were expected to testify that he was the pilot of a Robinson R44 model helicopter with registration C-FRKM that had delivered the marijuana that had been seized from them on September 21, 2005.

14. A Robertson R44 helicopter is not capable of lifting a 1000 pound load.

15. In the same record of the case, two RCMP officers who appear to be the same ones observed by Mr. Stewart on his property near Yale between 9:20 AM and 10:20AM or even later claim C-FRKM was sitting on the ground before them and confirm they were talking to Mr. Rosenau.

16. On the 16th of April, 2007, the Minister of Justice for Canada issued an authority to proceed based on the Record of the Case certified on the 9th of April, 2007.

17. The Plaintiff was subsequently arrested and spent three days in prison before being released on conditions which seriously affected his personal liberty.

18. By the 30th of May, 2008, the Defendant was in US custody. The US District Court of the Western District of Washington issued a detention order holding him in custody based in part on representations made that he was a danger to the public and a danger to flee.

19. On or about the 8th of August, 2008, the Defendant pleaded guilty to an altered version of the original indictment against him.

20. On the 17th of September, 2008, a superseding indictment against the Plaintiff was issued by a federal grand jury in Seattle, Washington. The only significant difference from the original indictment was that the amount of marijuana involved in the conspiracy charge was raised to more than 1,000 pounds from more than 100 pounds.

21. On the 7th of October, 2008, a Supplemental Record of the Case (SROC) was certified by Assistant US Attorney Susan Roe and forwarded to Canadian authorities.

22. In the SROC, Roe certifies that the expectation that the Miraback brothers were returning to testify in the US no longer existed.

23. The Defendant is introduced in the SROC. He is said to have returned voluntarily to the US and to have cooperated fully with agents of the US Department of Homeland Security. As it did with the Mirabacks, the SROC says that "Whelpley is expected to testify to the following."

24. In the enumeration of what the Defendant will testify to, the SROC says in part "In the summer of 2004, Whelpley received approximately seven loads of marijuana in the United States. Each load was brought across the international border by helicopter from Canada. Specifically, Whelpley saw a Robinson 44 helicopter, with a missing or taped-over tail number, which was used to smuggle the marijuana that summer. Whelpley identified the picture of that helicopter, tail number C-FRKM, which was referred to in the original Record. Each load consisted of 10 to 12 hockey bags which he estimated contained approximately 50 pounds each for a full load of approximately 500 to 600 pounds of marijuana. He was paid $7,000 per load and, that summer, he made $50,000 to $60,000 smuggling in this fashion before the smuggling season ended."

25. The balance of what the Defendant was expected to say had no such specifics as did his claimed statement about the summer of 2004 and the helicopter C-FRKM. He made a number of allegations about events in 2005 that were extremely vague, void of names or places, and which could not be contradicted by evidence adduced by the Plaintiff at his extradition hearing.

26. In the summer of 2004 and until July 5, 2005, the aircraft in question was owned by Airborne Energy Services Ltd., an Alberta company which is one of the largest suppliers of helicopters to the western Canadian oil and gas industry. All of its helicopters are equipped with satellite tracking which provides continuous information as to the position of the aircraft within several meters. These helicopters are almost exclusively based in northern Alberta and the Northwest Territories, a minimum of 700 kilometres from the area in which these offences are alleged to have occurred.

27. At the committal hearing before Mr. Justice Slade of the BC Supreme Court, held in Vancouver on May 15, 2009, the Plaintiff provided affidavit evidence from the President of Airborne, Anthony Hunley, to the effect that the helicopter was operated by Airborne for several years prior to 2004, up until July, 2005. Mr. Hunley deposed that the Plaintiff was never an employee of Airborne and did not have access to the helicopter during the summer of 2004 or at any time while it was registered to Airborne.

28. The Defendant claims that the Plaintiff also delivered marijuana to him in a red Bell Jet Ranger Helicopter on June 5, 2005. His evidence is contradicted by US law enforcement officials who observed the delivery flight and described the helicopter as being white.

29. The Plaintiff has been committed for extradition and the Minister of Justice has signed a surrender order. The Plaintiff now has an application for leave to appeal before the Supreme Court of Canada as a result of the decision of the BC Court of Appeal confirming the committal decision in the BC Supreme Court.

30. In its ruling, the BC Court of Appeal explicitly says the committal is based solely on the uncorroborated evidence of the Defendant.

31. The Defendant has been provided with a copy of the SROC containing what the US says he will testify to at a trial against the Plaintiff is he is extradited. He has not denied the American account of what he will testify to, and by implication, what he told law enforcement authorities and prosecutors in the United States.

6

32. The Plaintiff has incurred significant legal expenses since the first Record of the Case was withdrawn in favour of the SROC, based entirely on the false claims of the Defendant. The legal expenses incurred as a result of the Defendant's false claim in respect to helicopter smuggling in Robinson 44 C-FRKM total $70,000. Those expenses will continue to be incurred as the Plaintiff appeals to the Supreme Court of Canada on grounds primarily related to the false statements of the Defendant.

33. In addition to legal fee expenses, the Plaintiff has spent 18 days in prison in Canada, lost employment, and been subjected to an ongoing campaign of harassment by RCMP officers at Quesnel, British Columbia. The Plaintiff has suffered great emotional stress as a result of the extradition proceedings, which, as the Court of Appeal notes, are supported only by the statements, or claimed statements of the Defendant, and which are demonstrably false in the one instance in which specifics are given.

## Part 2: RELIEF SOUGHT

1. General Damages

2. Specific Damages for legal expenses and loss of income that continue to accrue at the time of filing of this Notice of Civil Claim and will continue to accrue through a costly appeal to the Supreme Court of Canada in respect to the Minister of Justice's decision to surrender the Plaintiff to the US.

3. Punitive damages for false imprisonment and for malice in the event that the Defendant actually does return to the US to continue with his false statements against the Plaintiff.

4. An injunction against the Defendant prohibiting any attempt on his part to return to the US to continue his false and malicious attack against the Plaintiff.

5. Costs of the action

**Part 3: LEGAL BASIS**

1. The Plaintiff says that the Defendant contrived both in Canada and the United States to mitigate the consequences of his own criminal behaviour by bringing about the false and malicious prosecution of the Plaintiff in both Canada and the United States.

2. The Plaintiff says that American authorities suspected him of being involved in the Miraback matter based on the September 21, 2005 incident where RCMP spoke to the Plaintiff when he was observed standing near the Robinson 44 helicopter with registration letters C-FRKM near Yale, British Columbia. This incident resulted in the US authorities gaining access to a photograph of the Robinson helicopter C-FRKM.

3. The Plaintiff says that when the US authorities were forced to admit that their claim that the Miraback brothers were expected to testify to the Plaintiff's involvement was false, those authorities conspired with the Defendant to concoct the story about many loads of marijuana being flown to the US in the helicopter C-FRKM.

4. The Plaintiff says that this conspiracy was in part contrived to solve the problem then facing the US in that their Miraback case was the one for which the Minister of Justice had issued an authority to proceed with the Plaintiff's extradition. That authority to proceed had nothing to do with the Defendant. The only evidence the Mirabacks were supposedly to deliver was that they had identified the Plaintiff's picture as the pilot of helicopter C-FRKM. They allegedly provided this information while they were American captives facing long prison sentences if they did not come up with a story implicating others.

5. The Plaintiff says that when the truth came out that the Mirabacks were not going to say anything the US authorities attributed to them, the authority to proceed was essentially extinguished as there was no evidence against the Plaintiff. The US then went to another captive, the Defendant. This captive was not only facing the same ten year minimum sentence as the Mirabacks had been, he was also suffering from bipolar disorder.

6. The Plaintiff says that there is a very close correlation between bipolar disorder and lying behaviour.  Lying and bipolar disorder seem to go hand in hand for most manic-depressives and this association is grounded in more than one

8

source. One obvious reason for the association between lying and bipolar disorder is fear. Almost every lie is rooted in fear- the fear of some possible punishment.

7. The Plaintiff says that the US authorities intimidated the Defendant into falsely identifying the helicopter C-FRKM and signing on to the story that this was the helicopter that had delivered him several loads of marijuana in 2004 and early 2005, then US authorities would significantly reduce his sentence. That story is demonstrably false and a total fabrication.

8. The Plaintiff says the facts fully support that contention. The Defendant, although admitting to being involved in the distribution of some 14,000 pounds of marijuana and facing a minimum ten year sentence, was allowed to plead guilty to a lesser amount of marijuana and received 21 months imprisonment, including time served.

9. The Plaintiff says that this fabrication in exchange for a reduced sentence was one which had the purpose of establishing a continuous and false link between the single event of September 21, 2005, the event which precipitated the Minister of Justice's authority to proceed, and the totally uncorroborated claims of the Defendant in respect to helicopter smuggling in 2004 and early 2005.

10. The Plaintiff says that he understands and has sympathy for Canadians who become captives in the US law enforcement system and who can be placed under enormous stress and pressure to implicate innocent persons. He understands that this problem is endemic in the US criminal justice system, and that the Defendant suffers from problems of a mental health nature.

11. The Plaintiff says, however that, the Defendant is now back in Canada, is under no compulsion from the US legal authorities, is fully aware of what he is alleged to have done, and refuses to put it right and instead chooses to allow the harm he has done to the Plaintiff to continue.

12. The Plaintiff further says that as the Defendant is entirely free to refuse to continue on with this persecution by returning to the US at some future time and perjuring himself at such a trial with the false information about the helicopter used in 2004, or other false information, any such return should normally attract a very high level of punitive damages.

9

13. The Plaintiff says that damages are not a suitable recourse against the
    Defendant returning to the US to further this malicious prosecution and says that
    injunction is the proper remedy against the harm that such a return would bring
    about.

14. The Plaintiff says that the Defendant has engaged in a false and malicious
    prosecution and persecution of the Plaintiff both in Canada and the United States
    and that the Defendant is liable at law for the damages the Plaintiff has suffered
    as a result.

**Plaintiff's address for service:**

Street Address: 138 5th Street, Vanderhoof, B.C.

Mail Address: Box 2577, Vanderhoof, B.C. V0G 3A0

Fax number address for service: (250) 567-5817

E-mail address for service: pmacroibeaird@gmail.com

**Place of trial: Quesnel, B.C.**

**The address of the registry is:** 305 - 350 Barlow Avenue
                                     Quesnel, BC
                                     V2J 2C1

Date: January 24, 2011

Henry C. Rosenau
Plaintiff

10

Rule 7-1 (1) of the Supreme Court Civil Rules states:

(1) Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

(a) prepare a list of documents in Form 22 that lists

(i) all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

(ii) all other documents to which the party intends to refer at trial, and

(b) serve the list on all parties of record.

———————

## Appendix

*[The following information is provided for data collection purposes only and is of no legal effect.]*

**Part 1: CONCISE SUMMARY OF NATURE OF CLAIM:**

This is a claim for damages, punitive damages, and special damages and costs for malicious prosecution.

**Part 2: THIS CLAIM ARISES FROM THE FOLLOWING:**

*[Check one box below for the case type that best describes this case.]*

A personal injury arising out of:

[ ] a motor vehicle accident

[ ] medical malpractice

[X] another cause

A dispute concerning:

[ ] contaminated sites

12

[ ] construction defects

[ ] real property (real estate)

[ ] personal property

[ ] the provision of goods or services or other general commercial matters

[ ] investment losses

[ ] the lending of money

[ ] an employment relationship

[ ] a will or other issues concerning the probate of an estate

[ X] a matter not listed here

**Part 3: THIS CLAIM INVOLVES:**

*[Check all boxes below that apply to this case]*

[ ] a class action

[ ] maritime law

[ ] aboriginal law

[ ] constitutional law

[ ] conflict of laws

[ X] none of the above

[ ] do not know

**Part 4:**

NA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 2

```
15:10        TECS II EXTERNAL MESSAGE DISPLAY        11082011  T2MD0611
                                                               T2PD0634

QUEUE TYPE:   PERSONAL           QUEUE NAME:  P18X
                                 MSG STATUS:  NACK
******************* TEXT OF MESSAGE *************** PAGE 02 ***************

    THIS RECORD MAY OR MAY NOT PERTAIN TO THE SUBJECT OF YOUR ENQUIRY.
    POSITIVE IDENTIFICATION CAN ONLY BE CONFIRMED THROUGH SUBMISSION
    OF FINGERPRINTS TO RCMP IDENTIFICATION SERVICES DIRECTORATE,
    OTTAWA, ONTARIO, CANADA.

    TO OBTAIN THE CRIMINAL HISTORY ASSOCIATED WITH YOUR ENQUIRY,
    SUBMIT THE APPROPRIATE NLETS TRANSACTION USING THE 'FPS' NUMBER
    FROM THE RECORD.
*******************************************************************************
*

    RESPONDENTS 3 FOR:
    ROBERTS PATRICK
    SEX: M  DOB: 1947
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                        PF16(NEXT MSG). PF19(MSG LOG)   PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

```
  15:10        TECS II EXTERNAL MESSAGE DISPLAY                    T2PD0634

QUEUE TYPE:   PERSONAL            QUEUE NAME:  P18X
                                  MSG STATUS:  NACK
******************** TEXT OF MESSAGE **************** PAGE 03 **************
  >>>QUERY REMARKS: N,IQ,WAICE0ZT6,,DALLAS
  QUERY VALUE 21

  RESPONDENT SCORE: 21

  FPS: 225538A    FPC:U08,U04,U08,W05,U08,U05,A,U07,U03,U09
  FILE OPEN

  MALE, WHITE, BORN 1947.            , ALTA, AGE-NOW 64
  EYES BLUE, WAS 173 CM ( 5FT 08IN)  105 KG ( 231LBS) IN 1988-03
  MARKS 620-SCAR 6 INCH
        KNOWN-AS:.... 01....ROBERTS;PATRICK TYRONE JOHN
                      02....BENZ;WALTER
                      03....JAMES;BOB
                      04....COONTZ;SIDNEY
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                              PF16(NEXT MSG). PF19(MSG LOG)   PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

```
15:10      TECS II EXTERNAL MESSAGE DISPLAY            11002011  12MD0011
                                                        T2PD0634
QUEUE TYPE:  PERSONAL          QUEUE NAME:  P18X
                               MSG STATUS:   NACK
******************** TEXT OF MESSAGE **************** PAGE 04 **************
                  05....NORE;DINO
                  06....ROBERT;PAT
                  07....MACROBEAIRD;PADRAIG
                  08....MACROIBEAIRD;PADRAIG
                  09....SLIM;
                  10....ROBERTS;PAT,TYRONE


    RESPONDENT SCORE: 03

    FPS: 686223E     FPC:W09,W08,U08,W05,W06,W09,W07,U09,W08,W07
    FILE OPEN

    MALE, NON-WHITE, BORN 1948-       , OTH, AGE-NOW 63
    EYES BROWN, WAS 175 CM ( 5FT 09IN)  059 KG ( 130LBS) IN 2004-01
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                        PF16(NEXT MSG). PF19(MSG LOG)   PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

T2PD0634

QUEUE TYPE: PERSONAL QUEUE NAME: P18X
MSG STATUS: NACK

******************** TEXT OF MESSAGE **************** PAGE 01 ***************
FROM NLETS ON 11/08/11 AT 15:09:48

FR.CN0000000
13:09 11/08/2011 74565
13:09 11/08/2011 03818 WAICE02T6
*CQUP18X960
TXT
** RESPONSE FROM CANADIAN SYSTEM - CRIMINAL HISTORY FILE **
ATN/DALLAS
FPS:225538A

Q CR LANG:E LVL: 1
REM: N,FQ,WAICE02T6,,DALLAS

*ROYAL CANADIAN MOUNTED POLICE - IDENTIFICATION SERVICES
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
PF16(NEXT MSG). PF19(MSG LOG) PF18=(REROUTE)

FIRST PAGE OF MESSAGE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)

```
  15:10       TECS II EXTERNAL MESSAGE DISPLAY           11082011  T2MD0611
                                                                   T2PD0634
  QUEUE TYPE:  PERSONAL           QUEUE NAME:  P18X
                                  MSG STATUS:  NACK
  ***************** TEXT OF MESSAGE *************** PAGE 02 **************
*RESTRICTED - INFORMATION SUPPORTED BY FINGERPRINTS SUBMITTED BY LAW
*ENFORCEMENT AGENCIES - DISTRIBUTION TO AUTHORIZED AGENCIES ONLY.
  FPS: 225538A
  ROBERTS, PATRICK TYRONE JOHN


*CRIMINAL CONVICTIONS CONDITIONAL AND ABSOLUTE DISCHARGES
*AND RELATED INFORMATION
  1967-04-27      (1) FALSE PRETENCES (3 CHGS)    (1-2) 9 MOS DEF & 9 MOS
  WEST VANCOUVER  (2) UTTERING (2 CHGS)                 INDEF ON EACH CHG CONC
  BC              (3) FALSE PRETENCES (2 CHGS)    (3) SUSP SENT

  1967-05-08      (1) UTTERING SEC 311(1)(A) CC  (1-2) 9 MOS ON EACH CHG CONC
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                       PF16(NEXT MSG). PF19(MSG LOG)  PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

```
   15:10        IBCS II EXTERNAL MESSAGE DISPLAY        11082011  T2MD0611
                                                                  T2PD0634

QUEUE TYPE:  PERSONAL          QUEUE NAME:  P18X
                               MSG STATUS:   NACK

****************** TEXT OF MESSAGE ***************  PAGE 03 **************
VANCOUVER BC            (10 CHGS)                   TO SENT SERVING
                   (2) ATT UTTERING SEC 311(1)(B)
                       CC

   1967-05-23      (1) FALSE PRETENCES SEC 304 CC (1-2) 12 MOS ON EACH CHG CONC
   BURNABY BC          (7 CHGS)
                   (2) UTTERING FORGED DOCUMENT
                       SEC 311 CC (4 CHGS)

   1967-06-06      (1) FALSE PRETENCES SEC 304(1) (1) 3 MOS CONC WITH SENT
   NEW WESTMINSTER     (A) CC                       SERVING
   BC              (2) FALSE PRETENCES SEC 304(1) (2) 6 MOS CONC
                       (A) CC

   1969-05-23      POSS OF STOLEN PROPERTY      15 MOS EACH CHG CONC
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                            PF16(NEXT MSG). PF19(MSG LOG)  PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

```
   15:10        TECS II EXTERNAL MESSAGE DISPLAY        11082011  T2MD0611
                                                                  T2PD0634
QUEUE TYPE:  PERSONAL           QUEUE NAME: P18X
                               MSG STATUS:   NACK
******************* TEXT OF MESSAGE *************** PAGE 04 **************
EDMONTON ALTA    SEC 296 CC (2 CHGS)

1975-07-16      POSS OF NARCOTICS FOR THE     9 MOS
PRINCE GEORGE BC PURPOSE OF TRAFFICKING
                SEC 4(2) NC ACT

1988-03-10      (1) IMPORTING AND EXPORTING A  (1) 5 YRS
FREDERICTON NB      NARCOTIC SEC 5(1) NC ACT
                (2) POSS OF A NARCOTIC FOR THE (2) 3 YRS CONC
                    PURPOSE OF TRAFFICKING
                    SEC 4(2) NC ACT
                (INST SPRINGHILL)

*END OF CONVICTIONS AND DISCHARGES
20111108150946201111108150946
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN)  PF14(ACKD MSG)
                              PF16(NEXT MSG). PF19(MSG LOG)   PF18=(REROUTE)
USE PF KEYS TO CONTINUE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

```
15:10        IECS 11 EXTERNAL MESSAGE DISPLAY        11082011  T2MD0811
                                                               T2PD0634

QUEUE TYPE:   PERSONAL            QUEUE NAME:  P18X
                                  MSG STATUS:  NACK
******************* TEXT OF MESSAGE ****************  PAGE 05 ***************
*** END OF CPIC RESPONSE ***
OTTAWA, CANADA
```

```
MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                              PF16(NEXT MSG). PF19(MSG LOG)  PF18=(REROUTE)
END OF THIS MESSAGE
(PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,    )    NO. CR06-157MJP
   )
       Plaintiff, )    GOVERNMENT'S RESPONSE
   )    TO DEFENDANT'S MOTION FOR
     v.    )    REVOCATION OF DETENTION
   )    ORDER
HENRY CARL ROSENAU,    )
   )
       Defendant. )

# Exhibit 3



No 14781

Quesnel Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

### HENRY CARL ROSENAU

Plaintiff

and

### KIP JOHN WHELPLEY

Defendant

## NOTICE OF INTENTION TO ACT BY AGENT

TAKE NOTICE that the Plaintiff, HENRY CARL ROSENAU, intends to act by an Agent in all further matters before the Court in the above described action and appoints Padraig Mac Roibeaird as his Agent.

FURTHER TAKE NOTICE that the Plaintiff grants to Padraig Mac Roibeard the right to do all those things the Plaintiff could himself do in person or by counsel in respect of this matter, and by leave of the Court, where such leave is required.

Dated at Quesnel, British Columbia, this 31st day of March, 2011.

_Henry C Rosenau_

Henry Carl Rosenau

Plaintiff

#5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 4

On Mon, Jan 17, 2011 at 6:52 PM, Kip Whelpley

On 2011-01-17, at 6:07 PM, Padraig Mac Roibeaird wrote:

> I need an address for service for some civil court documents that are to be served on you. If you have
a lawyer, please provide his or her address.
>
> If we do not receive a reply, we will commence to have the papers served on you at your work.
>
>
> Padraig.

2

Begin forwarded message:

**From: Kip Whelpley**
**Date: January 18, 2011 9:23:47 AM PST**
**To: Padraig Mac Roibeaird <pmacroibeaird@gmail.com>**
**Subject: Re: Address for service**

I will accept it by mail, and yes I have no desire to meet with anyone in person in regards to this matter... this may be a continued part of others lives sir but as far as im concerned.... This is my past and a crappy one at that... I prefer to leave it that way and have no involvement with any of it....Im in the process of creating a new life for myself that does not involve such people and events and would very much like to keep it that way if possible... Thank you for understanding this...
You and Mr Botting have my address please feel free to send me what you must but this will be the last email communication  or response you will receive from me..

Respectfully

Kip

Begin forwarded message:

**From:** Padraig Mac Roibeaird <<u>pmacroibeaird@gmail.com</u>>
**Date:** January 17, 2011 11:21:27 PM PST
**To:** Kip Whelpley
**Subject: Re: Address for service**

Thank you.

I do understand your situation and your reluctance to meet people who might be a danger to you. I assure you that Mr. Rosenau, Mr. Botting, and myself are, and always will be, acting within the law in all of our dealings with you.

I know of some of the other people alleged to be involved in this mess and as far as I can tell, no one intends to do you any harm and that is more so now that I have let it be known that you have said you do not intend to return to the US. I stress the words "as far as I can tell" and would urge you to contact the RCMP immediately if you feel under threat.

Let me know if you will accept service by registered mail, and that will save you having to meet anyone.

Padraig

Begin forwarded message:

**From:** Padraig Mac Roibeaird <pmacroibeaird@gmail.com>
**Date:** February 7, 2011 11:10:14 PM PST
**To:** Kip Whelpley
**Subject:** Notice of Civil Claim

<u>**WITHOUT PREJUDICE**</u>

Hi Kip,

I see from Canada Post that the Notice of Civil Claim filed in the Quesnel Registry of the Supreme Court of BC has been served at the address you gave.

I firstly want to make it clear that Mr. Botting does not act in any way in this civil matter. He is Mr. Rosenau's counsel in the extradition process only.

I am assisting Mr. Rosenau as what has come to be called an "agent" in civil matters in the Supreme Court. Many people now use unpaid agents due to the extraordinary expense of lawyers and take the view that it is better to have a friend or other associate who may have a greater level of legal knowledge handle these matters, which are fairly straightforward, than to try and do it themselves. As an example, it was I who drafted the Notice of Civil Claim.

If you wish to engage such a person at this preliminary stage to save legal expenses in a matter that may well be resolved short of trial, or even to conduct your own case, I would be happy to deal with that person or yourself in doing basically the same things that counsel do when retained. I cannot give your agent or yourself legal advice, but I can provide you with clarification on matters related to the claim, and I can hear your side of the story if you choose to give it under the Without Prejudice qualification I attach to this email. Without Prejudice is a qualifier to anything written beneath those words in a written communication. It means that nothing thus said can ever be brought before a court and held against the party. There is not an equivalent term, other than "Off the record" for verbal communication, but you have my undertaking that anything that may be said by yourself or your agent will never be brought before a court and held to be proof of any fact or agreement. I would expect the same from yourself or your agent.

While the Notice may seem complex, and it is understood that you may not have knowledge one way or the other about some of the background facts, this claim centers on two factual issues. They are whether or not you identified a helicopter with the identification numbers C-FRKM as being a Robinson 44 helicopter that delivered seven 500-600 pound loads of marijuana to you in the summer of 2004, as the US prosecutor Roe says you did in her material before the court here. The other issue is her claim that she expects you to testify. We believe that expectation has no factual basis now that you are in Canada and under no legal obligation under Canadian law to return. Mr. Rosenau can easily prove that C-FRKM could not have ever been used for any such activity in 2004. I personally doubt that you ever said what Roe says you did, or in the alternative believe that the US authorities threatened and coerced you into signing a prepared admission and in those circumstances you felt compelled to go along with their lie. That would certainly be considered a mitigating factor if this matter were to be resolved at this early stage. The history of these sad adventures involving the exploitation of people such as yourselves is that virtually everyone cooperates and as is the saying in my Irish homeland, people develop such good memories that they can  remember things that never even happened.

I do recall you saying that you did not then intend to return to the United States, in which case I expect you would not object to that part of the Relief Sought which is a court order prohibiting your return to

repeat this false allegation against Mr. Rosenau in a US court, which would be an act of extreme malice towards Mr. Rosenau.

Those are the only two issues in this matter and I am presently proceeding on the basis that you wish to make an honest resolution of this matter by addressing any falsehoods that appear in the American Supplemental Record of the case and which form the basis of Mr. Rosenau's claim. You may do so in your Response to Civil Claim, or prior to that by you or your agent corresponding with me.

Regards,

Padraig.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 5

# *Robert M. Moffat*
### BARRISTER AND SOLICITOR

2912 - 29th Street
Vernon, B.C., V1T 5A6
Phone:(250) 542-1312
Fax: (250) 542-2788
E-Mail: moffatvernon@shawcable.com

Our File:    W-11062

February 15, 2011

- 10 PAGES
VIA FAX: (778) 355-0065
Gary Botting and Associates
1088 Grover Avenue
Coquitlam, BC, V3J 3G1

VIA EMAIL: pmacroibeaird@gmail.com
VIA FAX: (250) 567-5817
Padraig Mac Roibeaird
Box 2577
Vanderhoof, BC, B0G 3A0

Attention: Mr. Gary Botting

Dear Sirs:

RE:    Henry Rosenau v. Kip Whelpley
       BC Supreme Court Quesnel Registry Action # 14781

1.    I am retained by Kip Whelpley. I understand that Gary Botting is counsel for Mr. Rosenau with respect to extradition proceedings to the US. I understand that Padraig Mac Roibeaird purports to be an agent for Mr. Rosenau with respect to civil proceedings.

2.    Enclosed for Mr. Botting are copies of e-mails between Mr. Roibeaird and Mr. Whelpley as follows:

   a.    January 8, 2011 from Mr. Roibeaird to Mr. Whelpley;

   b.    January 9, 2011 from Mr. Roibeaird to Mr. Whelpley;

   c.    January 18, 2011 from Mr. Whelpley to Mr. Roibeaird and from Mr. Roibeaird to Mr. Whelpley;

   d.    February 7, 2011 from Mr. Roibeaird to Mr. Whelpley.

3.    I also enclose a copy of the Notice of Civil Claim filed in the Quesnel registry January 31, 2011. This document was drafted by Mr. Roibeaird. In my respectful view Mr. Roibeaird may be practising law without a licence. That however is entirely incidental.

.../2

Mr. Gary Botting
Padraig Mac Roibeaird
February 15, 2011
Page 2

4.      In his e-mail January 8 Mr. Roibeaird makes it clear that if Mr. Whelpley does not confer with Mr. Botting and provide appropriate information to Mr. Botting that a civil claim will ensue. In this e-mail Mr. Roibeaird accuses Mr. Whelpley of giving false testimony.

5.      By his January 18 e-mail Mr. Roibeaird makes a clear threat of harm or danger to Mr. Whelpley.  Mr. Roibeaird also allies himself with Mr. Botting in his dealings with Mr. Whelpley.

6.      In his e-mail February 7 Mr. Roibeaird offers to compromise the civil action by, *inter alia*, having Mr. Whelpley agree to recant evidence previously given.

7.      The Notice of Civil Claim by itself is extortionary and an abuse of the court process.

8.      The emails contain veiled but clear threats of harm to Mr. Whelpley and his family.

9.      Taken as a whole the e-mails and the Notice of Civil Claim amount to an attempt to intimidate and to extort conduct from Mr. Whelpley. They are scandalous and vexatious within the meaning of Rule 9-5 of the Supreme Court Civil Rules. They probably amount to an abuse of the process of the court. They are also defamatory.

10.     Would Mr. Botting please indicate by return fax that he will file a Notice of Discontinuance forthwith in the Quesnel registry and provide a copy to me.

11.     In the alternative please do not take any default proceedings against Mr. Whelpley but provide me adequate written notice so that the appropriate Response and application under Rule 9-5 may be made.

12.     If a court application is required we put you on notice that a copy of this letter will be filed and an order for special costs sought.

Yours very truly,

ROBERT M. MOFFAT
Per:

"Robert M. Moffat"
ROBERT M. MOFFAT

RMM/jas
Enclosure
cc:   Mr. Kip Whelpley
BOTTING-FAX-1

Begin forwarded message:

**From:** "Moffat Law Corporation" <moffatvernon@shawcable.com>
**Date:** February 24, 2011 10:48:27 AM PST
**To:** <kip
**Subject: Whelpley ats Rosenau - Discontinuance**

  Mr. Kip Whelpley 1.   By fax February 17 Mr. Botting refuses to get involved in the civil action. I enclose a copy. Enclosed is my further letter to Mr. Botting and Mr. Mac Roibeaird dead lining a Notice of Discontinuance for February 25.
2.   If the action is not discontinued it is my advice that a court application should be made immediately to have the action dismissed. I can prepare the paper work, The cost of sending me to Quesnel is significant. Mr. Whelpley can attend at court in Quesnel on his own and speak to the matter.
3.   The cost of paperwork will be $1,500.
4.   Can you let me know what you would like to do?
Yours very truly
Robert M. Moffat

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

# *Robert M. Moffat*

### BARRISTER AND SOLICITOR

2912 - 29th Street
Vernon, B.C., V1T 5A6
Phone:(250) 542-1312
Fax: (250) 542-2788
E-Mail: moffatvernon@shawcable.com

Our File:       W-11062

February 22, 2011

-1 PAGE                                              VIA EMAIL: pmacroibeaird@gmail.com
**VIA FAX: (778) 355-0065**               **VIA FAX: (250) 567-5817**
Gary Botting and Associates                 Padraig Mac Roibeaird
1088 Grover Avenue                             Box 2577
Coquitlam, BC,  V3J 3G1                       Vanderhoof, BC,  B0G 3A0

**Attention: Mr. Gary Botting**

Dear Sirs:

> RE:   Henry Rosenau v. Kip Whelpley
> __BC Supreme Court Quesnel Registry Action # 14781__

1.      By letter February 15 I asked Mr. Gary Botting to seek instructions to file a Notice of Discontinuance in this matter.  By e-mail February 19 Mr. Botting says that he does not act for Mr. Rosenau but will convey my concerns to Mr. Rosenau.

2.      By this letter I am asking that Mr. Mac Roibeaird reply to my e-mail of February 15, 2011 and confirm that Mr. Mac Roibeaird will file a Notice of Discontinuance forthwith in the civil action and will deliver a filed copy to me.

3.      If I have not received a filed Notice of Discontinuance by the close of business on February 25, 2011 I will seek instructions to make a court application to have the action dismissed and to claim special costs not only against Mr. Rosenau but against Mr. Mac Roibeaird.

4.      I will be filing copies of my correspondence with Mr. Mac Roibeaird in an Affidavit as part of the court application.

Yours very truly,

**ROBERT M. MOFFAT**
Per:
"Robert M. Moffat"
**ROBERT M. MOFFAT**

RMM/jas
cc:    Mr. Kip Whelpley
BOTTINGBOIDEAIRD-FAX-2

# EXHIBIT 3
## Email of March 9, 2011

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 6

**From:** Bruce Erickson [mailto:brucederickson@hotmail.com]
**Sent:** Friday, October 21, 2011 10:34 AM
**To:** Roe, Susan (USAWAW); Perez, Marc (USAWAW)
**Cc:** [ ]
**Subject:** FW: emails and files in regards to canadian lawsuit

Susie and Marc,

I am forwarding to you two emails from Kip Whelpley regarding the Canadian lawsuit. \
Bruce

---

**From:** kip
**Subject:** emails and files in regards to canadian lawsuit
**Date:** Thu, 20 Oct 2011 17:10:42 -0700
**To:** brucederickson@hotmail.com

Begin forwarded message:

**From: Padraig Mac Roibeaird <pmacroibeaird@gmail.com>**
**Date: March 9, 2011 10:18:40 PM PST**
**To: Kip Whelpley ‹**
**Subject: Rosenau v. Whelpley**

Kip,

I am in receipt of a letter addressed to Mr. Botting and copied to me from a person named Robert Moffat. In the letter, Mr. Moffat purports to be your lawyer and I do find that there is a lawyer in Vernon named Robert Moffat. Mr. Moffat does not say that he is instructed to receive service on your behalf and Mr. Rosenau has attended at the Supreme Court registry in Quesnel, where the action between you and he is filed and he has been told that there is no letter on file in the registry from either you or Mr. Moffat confirming that he is your counsel.

Neither you or Mr. Moffat filed a Notice of Response to Civil Claim within the time allowed. Accordingly, I am serving you with a copy of the default judgment approved by a Supreme Court justice in Quesnel on Monday, March 7th, 2011. As you can see, it provides general, punitive, and specific damages to be assessed, as well as an order that you be prohibited from leaving Canada for the purpose of going to the United States. If you weren't intending to go to the United States before, you now have a Supreme Court order prohibiting you from doing so in any case.

The Rules of Court provide that Mr. Rosenau may now make an *ex parte* application to the court to have the various damages assessed and to approve the form of the Order prohibiting you from returning to the United States until further order of the Court, which I expect will not be until Mr. Rosenau and his counsel are satisfied that you no longer will be a part of the false prosecution of Mr. Rosenau. *Ex parte* means that there is no requirement that you be provided with a notice of the application, or an opportunity to attend. However, Mr. Rosenau and I both remain sympathetic to the situation you must have found yourself in, compounded by your illness, and there is not a lack of understanding in that regard. It is my intention that the application include an Order that you appear for examination before a court reporter to answer questions as to the degree and method of coercion used against you and how you came to describe events in 2004 that could not possibly have happened. This examination will be used to determine the quantum of punitive damages, and to perhaps take other measures to ensure that neither

you, or Ms. Roe engage in alternative means to procure false testimony from you in regard to the summer of 2004.

In the event that, as I expect, that examination produces the sympathetic view of your circumstances and demonstrates regret for what has happened, then I expect that certainly this sad affair will not have unfortunate financial hardship imposed upon you in addition to the other problems you have encountered. You will, of course, be prohibited from going to the United States for any reason, however, as you are probably aware, in normal circumstances you would not be allowed entry to the US at any rate.

What has happened to you, and what has happened to Mr. Rosenau, is of great political importance in this country in the light of how it demonstrates the ends to which the US will go to secure, or blatantly manufacture, false statements in extradition proceedings, and how Canadian courts and the Canadian minister of justice simply rubber stamp every extradition request. If you have an interest in speaking to the media on your treatment, Bob Keating, one of CBC's best radio and investigative reporters, would be very interested in hearing from you when this civil matter is concluded. With your permission, I will pass along your contact details to him, or I can provide you with his contacts.

I have taken exception to the tone of the person who either was Mr. Moffat, or was pretending to be Mr. Moffat (the stationary was just made up in a computer), and I am taking other steps as a result of his letter, or letters, I believe it was. I do not propose to engage him again on this matter and if I am forced to, I will take that as a demonstration of lack of remorse on your part and will not make inquiries as to the extenuating circumstances that might be relevant to the awards of damages. If you choose another counsel, I would be happy to hear what he or she has to say.

On a personal level, I have had a look at your Facebook page and the profile picture you currently have up. I have to say it gives me great cause for concern for how it portrays a grim world, a desperate sense of hopelessness, and the terrible resolution of that hopelessness. I hope you step back from that hopelessness and realize that it is hope and love that really exist where you now see that terrible picture. You are, from what I have heard, an intelligent person. You have many friends. I understand you have children of your own who undoubtedly love you. Do not despair over this civil matter. It is a natural resolution with an objective of an honest and just end.

When I was in my late teens, I fell into a bad situation that seemed hopeless. I received a letter from my father, who was far away. In it he said, "Remember, Pat, the greatest champions are those who come up off the canvas to win".

I hope to see that terrible picture gone by tomorrow.

Padraig

SUPREME COURT
OF BRITISH COLUMBIA

MAR 0 7 2011

QUESNEL
REGISTRY

No 14781

Quesnel Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

### HENRY CARL ROSENAU

Plaintiff

and

### KIP JOHN WHELPLEY

Defendant

BEFORE A REGISTRAR

The Plaintiff having filed and served a Notice of Civil Claim and the Defendant Kip John Whelpley having failed to file and serve a Response to Civil Claim within the time allowed:

THIS COURT ORDERS THAT:

The Defendant pay to the Plaintiff general and punitive damages to be assessed.

The Defendant pay to the Plaintiff specific damages to be assessed

THIS COURT FURTHER ORDERS THAT Kip John Whelpley be prohibited from leaving Canada for the purpose of entering the United States of America until further order of this Court, with the form of the Order to be approved by the Court on application.

THIS COURT FURTHER ORDERS THAT the Defendant pay to the Plaintiff Costs to be assessed.

Dated this   7th   day of March, 2011

_____
District Registrar

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,      )      NO. CR06-157MJP
                                 )
                    Plaintiff, )      GOVERNMENT'S RESPONSE
                                 )      TO DEFENDANT'S MOTION FOR
           v.               )      REVOCATION OF DETENTION
                               )      ORDER
HENRY CARL ROSENAU,       )
                                 )
                  Defendant. )

# Exhibit 7

**From:** Bruce Erickson [mailto:brucederickson@hotmail.com]
**Sent:** Friday, October 21, 2011 10:36 AM
**To:** Roe, Susan (USAWAW); Perez, Marc (USAWAW)
**Subject:** FW: Can you please read and advise

---

**Subject:** Can you please read and advise
**From:** [
**Date:** Thu, 20 Oct 2011 15:25:09 -0700
**To:** brucederickson@hotmail.com

This has been some constant crap I've been dealing with up here. Please read and then give me a call.

Thanks.

Kip.

Begin forwarded message:

> **From:** Padraig Mac Roibeaird < pmacroibeaird@gmail.com >
> **Date:** 20 October, 2011 1:26:35 PM PDT
> **To:** Kip Whelpley
> **Subject:** Re: Address for service

"Mr. Whelpley,

Please confirm that this remains the correct address for service for documents in the civil matter between yourself and Mr. Henry Rosenau in the Supreme Court of British Columbia.

There is a document to be served which you may already have, but for which you have not acknowledged receipt of service. It is the order of the Court made March 7th, 2011 reflecting Default Judgment and four Orders made. Two orders are in respect of general and punitive damages to be assessed, and for specific damages. These Orders are not presently being pursued, but there is a further Order in the nature of a prohibition which reads as follows:

"THIS COURT FURTHER ORDERS THAT Kip John Whelpley be prohibited from leaving Canada for the purpose of entering the United States of America until further order of this Court, with the form of the Order to be approved by the Court on application."

I have previously forwarded a copy of the Order of default judgment to you at this email and have had no response. The concern which now arises comes from information originating in the United States to the effect you may be considering defying the order of the Supreme Court of British Columbia and travelling to the United States in contravention of the Order.

I accept that this information may be provided falsely and maliciously by the US government, however it makes it necessary that I, as Mr. Rosenau's agent in this matter, either confirm your acknowledgment of receipt of the Order of March 7th, 2011 and your acknowledgment that you intend to abide by the terms of the Order, or that I take steps to serve the order on you and have independent confirmation of service in order that Mr. Rosenau may have legal recourse in the event you violate the terms of the Order.

I enclose again a scanned copy of the Order. Please acknowledge receipt of the Order here, and acknowledge your intent to comply with the terms of the prohibition section of the Order.

If I have not had acknowledgment by 9am tomorrow, Friday, October 21, 2011 I will forward the Order to the Sheriffs at Vernon courthouse and have them personally serve it on you. The fourth Order made by the Court is an order for costs, and the costs of service, if necessary, will be charged to you under this Order.

I can be contacted at this email if you intend to acknowledge service and compliance with the Order.

Regards

Padraig Mac Roibeaird



No 14781

Quesnel Registry

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

Between

HENRY CARL ROSENAU

Plaintiff

and

KIP JOHN WHELPLEY

Defendant

BEFORE A REGISTRAR

The Plaintiff having filed and served a Notice of Civil Claim and the Defendant Kip John Whelpley having failed to file and serve a Response to Civil Claim within the time allowed:

THIS COURT ORDERS THAT:

The Defendant pay to the Plaintiff general and punitive damages to be assessed.

The Defendant pay to the Plaintiff specific damages to be assessed

THIS COURT FURTHER ORDERS THAT Kip John Whelpley be prohibited from leaving Canada for the purpose of entering the United States of America until further order of this Court, with the form of the Order to be approved by the Court on application.

THIS COURT FURTHER ORDERS THAT the Defendant pay to the Plaintiff Costs to be assessed.

Dated this 7ᵗʰ day of March, 2011

District Registrar

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 8

The following report was prepared by Cpl. Therese Cochlin
Royal Canadian Mounted Police - Integrated Border Enforcement Team, Surrey, BC

## Summary of First Meeting with Mr. Glen Stewart:

On Thursday October 18, 2011, Cst. Bali and I attended Glen Stewart's residence located at 21386 Lakeview Crescent in Hope, British Columbia (BC) to ask if he would be willing to be a witness for the United States (US) in the prosecution involving Henry ROSENAU.

Mr. Stewart and his wife welcomed us into their home where we visited for approximately one hour.  During this time Mr. Stewart said that he would be willing be a witness and agreed to meet with the Assistant US Attorney (AUSA) on October 25, 2011.  During the course of the conversation, Mr. Stewart said that he had an agreement with "Henry" to sell him his property in Yale, but the deal had fallen through after the police attended the property. I asked him if he had any documents relating to the proposed sale, and Mr. Stewart responded "no" that he did most of his deals with a handshake.

Prior to departing, I let Mr. Stewart know that I would be back in touch with him to confirm the date and time of the meeting and he provided me with a business card with all of his contact information.

## Summary of Second Meeting with Mr. Glen Stewart:

On Thursday October 20, 2011, Cst. Bali and I returned to Glen Stewart's residence in Hope, BC to set the date and time of the meeting with the AUSA for Wednesday, October 26, 2011 at 10am.  Mr. Stewart indicated he would be able to attend.  He also asked me a few questions about the extradition process, and, while I provided a general overview of the process, I suggested that he ask the AUSA any specific questions he had the following week.

Once again, Mr. Stewart and his wife welcomed us into their home, and other than a brief discussion about the ROSENAU case, we had a very light and pleasant chat about several topics not related to law enforcement (i.e. hiking, kayaking and wildlife).  Upon departing, I confirmed the date and time of the meeting with Mr. Stewart and he seemed prepared to attend.  Mr. Stewart and his wife also encouraged us to take and apple that had been picked at a local orchard for the drive home.

## Summary of Telephone call from Mr. Glen Stewart:

On October 25, 2011 at approximately 1648 hours, Mr. Glen Stewart called and said he had spoken to his lawyer and had decided he would not be a witness for the ROSENAU case.  I asked Mr. Stewart who his lawyer is and he said he couldn't remember.  When I asked him further about it, he simply said he had been advised not to speak with the U. S. attorneys.

I asked Mr. Stewart if anyone had contacted him about this case and, once again, all he said is he had been "advised" not to talk to the U.S. and said he "...just didn't want to get into that."  The total length of the call was only 3 or 4 minutes and it seemed to me like he wanted to deliver the news and hang up, which is in sharp contrast to how personable and hospitable he and his wife had been on the two occasions I met with them to set up the interview.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 9

File No. _ _ _ 2 5 9 0 2 ~

Vancouver Registry

# SUPREME COURT OF BRITISH COLUMBIA

Re the *Mutual Legal Assistance in Criminal Matters Act*

and the *Canadian Charter of Rights and Freedoms*

## NOTICE OF APPLICATION

### REGINA

Respondent

v.

### HENRY CARL ROSENAU

Applicant

TAKE NOTICE that an application will be made by HENRY CARL ROSENAU to the Court on Wednesday, November 2, 2011 at the Law Courts at 800 Smithe Street, Vancouver, British Columbia at 10 AM for the following Orders:

1) a declaration that the Royal Canadian Mounted Police ("RCMP") violated the Applicant's section 7 and 8 *Charter* rights to be free from unreasonable search and seizure by entering without authority or warrant issued under the provisions of section 10-15 of the *Mutual Legal Assistance in Criminal Matters Act* or *Criminal Code* onto a property leased by the Applicant at 29605 Trans Canada Highway, near Yale, British Columbia ("said property") on September 21, 2005, and there searching the Petitioner's person, a helicopter, and a building on said property, and seizing objects found in the warrantless search;

2) a declaration that by detaining the Applicant and questioning of him for two hours at said property between approximately 9:15 AM and 11:30 AM on September 21, 2005, the RCMP violated the Applicant's section 7, 9 and 10(a) and (b). *Charter* rights, including the right to be informed promptly of the reasons for detention, the right to retain and instruct counsel without delay, and the right to be informed of those rights;

3) an order in the nature of mandamus directing the RCMP to return to the Applicant any and all property seized as a result of the warrantless searches;

4) an order in the nature of mandamus directing the RCMP officers who conducted the illicit search without warrant and the interrogation of the Applicant without Charter

warning, not to disclose to any foreign court or foreign prosecutorial authority any notes of any statement made by the Applicant in response to their questions that reasonably would have been excluded in Canadian proceedings pursuant to section 24(2) of the Charter;

5) an order in the nature of prohibition prohibiting the said officers of the RCMP from leaving Canada for the purposes of testifying in their official capacity, or at all, at a criminal court in the United States regarding Canadian evidence gathered in violation of sections 7 to 10 of the Charter and in the absence of a warrant or other due process governing search and seizure in such situations set out in sections 10 to 14 of the *Mutual Legal Assistance in Criminal Matters Act*;

6) an order in the nature of prohibition prohibiting the sending abroad of evidence seized in violation of the Charter without following the due process of "Sending Abroad" outlined in sections 15 to 21 of the *Mutual Legal Assistance in Criminal Matters Act*.

IN SUPPORT OF THIS APPLICATION, THE APPLICANT RELIES UPON THE FOLLOWING EVIDENCE:

      a.  The affidavit of Henry Carl Rosenau, sworn the 25th day of October, 2011

      b.  The affidavit of Glen Stewart, sworn the 25th day of October, 2011.

      c.  Such other affidavit evidence as may prove necessary.

This application is based upon sections 7, 8, 9, 10a, 10b, and 24 (1) of the *Canadian Charter of Rights and Freedoms*; sections 10 to 21 of the *Mutual Legal Assistance in Criminal Matters Act*, and Rule 4 of the *Criminal Court Rules of the Supreme Court of British Columbia*.

It is expected that two hours will be needed for this application.

Dated at Vancouver, British Columbia, this 25th day of October, 2011.

Gary Botting

Counsel for the Applicant

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 10

VANCOUVER

NOV 0 4 2011   NOTICE OF APPEAL

COURT OF APPEAL
REGISTRY

CA 0 3 9 4 5 9

Lower Court Registry Number: 19508
Lower Court Registry Location: Vancouver

## COURT OF APPEAL

### REGINA

Respondent

v.

### HENRY CARL ROSENAU

Appellant

Date of Judgment Appealed from: November 2, 2011
Justice: Mr. Justice Wilkinson, British Columbia Supreme Court

TAKE NOTICE that the Appellant appeals against the judgment of the Honourable Mr. Justice Wilkinson on grounds involving questions of law alone. The grounds for appeal are:

1. That the learned justice erred in law in his conclusion that he could not adjudicate on the Appellant's application for relief under section 24(1) of the *Canadian Charter of Rights and Freedoms* ("the Charter") in connection with an admittedly warrantless search and seizure made in violation of section 8 of the Charter and/or without reference to the search and seizure provisions of the *Mutual Legal Assistance in Criminal Matters Act (MLA Act)* and Treaty.

2. That the learned justice erred in law in ruling that he could not give orders in the nature of declaration, mandamus and prohibition to prevent the RCMP from disclosing to the United States evidence seized in contravention of section 8 of the Charter and/or seized without reference to due process as set out in the provisions of sections 10 to 16 of the *MLA Act* and Treaty.

3. That the learned justice erred in law in holding that he did not have jurisdiction to issue an order preventing officers of the RCMP from testifying against the appellant in a U.S. trial when the essence of their expected testimony is the introduction of Canadian evidence seized in contravention of the Charter and/or without reference to the clear search and seizure and sending provisions set out in sections 10 to 21 of the *MLA Act.*

4. That taken together, and severally, these errors of law amount to a refusal or failure of the learned justice to exercise his jurisdiction in the Appellant's Charter application, specifically with respect to abuse of process and search and seizure.

2

The relief sought is:

1.  An order directing the learned justice to exercise his jurisdiction over the subject matter of search and seizure in conformity with sections 7 and 8 of the Charter, including whether actions of the RCMP near Yale, British Columbia on September 21, 2005 constituted violations of sections 7 and 8 of the Charter, and if so finding, whether the remedies and relief sought in the application, including those of section 24 of the Charter, should be granted as requested.

2.  An order in the nature of mandamus compelling the learned justice to exercise his jurisdiction with respect to the violation of due process implicit in the RCMP sending evidence to a foreign country without reference to the search, seizure and sending provisions of the *Mutual Legal Assistance in Criminal Matters Act*.

3.  An order directing that the learned justice was wrong in law to refuse Charter relief on the basis that this was a matter before the U.S. courts when the evidence has not yet been sent to the United States in any usable form, and the RCMP officers concerned have not yet testified with respect to their gathering of evidence in Canada.

4.  An order of prohibition preventing the RCMP from disclosing or sharing or "sending" evidence from Canada to the United States without first following the procedures explicitly set out in the *Mutual Legal Assistance in Criminal Matters Act*, and until such time as the issues raised in this appeal are judicially settled.

The Appellants address for service is:

Dr. Gary Botting
Barrister and Solicitor
1088 Grover Avenue
Coquitlam, BC V3J 3G1

Tel: 778-355-6106
Fax: 778-355-0065

Dated this 4th day of ~~October~~ November, 2011

G.N.A. Botting
Counsel for Appellant

3

TO:  The Registrar

And to:

The Attorney General of Canada
Federal Prosecutions Service
900 840 Howe Street
Vancouver, B.C.
V6Z 2S9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 11



Case 2:06-cr-00157-MJP   Document 13   Filed 05/04/11 ...

FILED
LODGED
ENTERED
RECEIVED

MAY - 4 2011

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

**United States District**
*Western District of Washington*



06-CR-00157-BOND

UNITED STATES OF AMERICA,
vs.

**HENRY ROSENAU**

# APPEARANCE BOND
## CASE No: CR06-157 MJP

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

- **Court Appearances.** I must appear in court at the *United States Courthouse, 700 Stewart Street, Seattle, Washington; Courtroom 12B,* on Monday, June 27, 2011 at 9:00 AM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**
- **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.
- **DNA Testing.** I must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.
- **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.
- **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day.
- **Restrictions on Travel.** I must not travel outside the Continental United States or as directed by Pretrial Services
- **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. § 1503, 1512, and 1513.
- **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, (206) 370-8950, United States Courthouse, 700 Stewart Street, Seattle, Washington within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

**OTHER SPECIAL CONDITIONS:**

- Travel is restricted to British Columbia, Canada, and the Western District of Washington for court purposes only, or as directed by Pretrial Services.
- Surrender all current and expired passports and travel documents to the court no later than May 18, 2011; if defendant does not have a passport, or cannot find the passport, the defendant must submit an affidavit to affect to his Pretrial Services officer. . Do not apply for/obtain a new passport or travel document from any country without permission of the court. If the surrendered passport is a foreign passport, it shall be forwarded to Immigration and Customs Enforcement if defendant is convicted of an offense, unless otherwise ordered by the Court.
- Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.
- You are prohibited from possessing or having access to firearms and dangerous weapons. All firearms and dangerous weapons must be removed from your residence(s), vehicle(s), and place of employment. This condition operates in conjunction with any restrictions imposed under Title 18, USC 922, and the Washington State Revised Code, Chapter 9.41.
- Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
- You are financially responsible for the costs of any treatment or testing services obtained in Canada.
- Contact Pretrial Services within 24 hours of your release from custody. Call Pretrial Services weekly as directed. Report to your local community corrections office and comply with all directives of their office. Report to Pretrial Services at the U.S. Customs office in Blaine, Washington, monthly as directed. You shall report to U.S. Pretrial Services any time you enter the Western District of Washington.
- You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) in this case.
- You shall not have direct contact or indirect contact with any existing and/or future witnesses in this case.
- **Defendant must post with the Clerk of Court all his pilot licenses. No operation of aircraft of any type.**

Appearance Bond    Case 2:06-cr-00157-MJP   Document 13   Filed 05/04/11   Page 2 of 2
Page 2 of 2

HENRY ROSENAU                                                                CR06-157 MJP

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _Henry C Rosenau_          _May 4, 2011_          _Quesnel, BC, Canada_
Signature                         Date Signed                   City, State of Residence

---

### ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as he or she complies with the provisions of this Appearance Bond, or until further order of the Court.

_May 4, 2011_
Date Signed                        Brian A. Tsuchida
                                   UNITED STATES MAGISTRATE JUDGE

cc: *Defendant, Defense Counsel, U.S. Attorney, U.S. Marshal, Pretrial Services*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 12

U.S. Courthouse
700 Stewart Street, Suite 10101
Seattle, Washington 98101
(206) 370-8950
Fax (206) 370-8950

Union Station, Room 1152
1717 Pacific Avenue
Tacoma, Washington 98402-3227
(253) 882-3705
Fax: (253) 882-3706

## WESTERN DISTRICT OF WASHINGTON
## U.S. PROBATION AND PRETRIAL SERVICES
## CONDITIONS OF SUPERVISION

UNITED STATES OF AMERICA
    vs.
Henry Rosenau

Docket Number: CR06-157 MJP

You have been placed under the supervision of the U.S. Pretrial Services Office. Failure to abide by the terms of your bond and the conditions set forth below may result in revocation of your bond and return to custody.

I shall comply with the following GENERAL conditions of release:

✓ 1. Report to Officer Julie M. Busic, telephonically every Monday. You will be required to report to the U.S. Customs Office located at the truck crossing in Blaine, Washington, monthly as directed. Report to your local community corrections office in person as directed. Report to U.S. Pretrial Services in Seattle, Washington, whenever you enter the Western District of Washington.

✓ 2. Notify the Officer within one business day of any changes in your telephone number or employment. You must not move without PRIOR approval of Pretrial Services.

✓ 3. Do not leave British Columbia without obtaining written authorization from the Officer. Travel to the Western District of Washington is only authorized for court/legal purposes.

✓ 4. Notify the Officer within one business day if you are arrested or questioned by a law enforcement officer for a violation of any law.

✓ 5. I understand that I am subject to home and/or employment contacts by the Officer while on bond.

✓ 6. Do not use, consume or possess any controlled substances, including medication, unless these substances are prescribed to you by a physician.

✓ 7. I shall also comply with any SPECIAL CONDITIONS of release as noted on my Court Appearance Bond. I verify the Officer has reviewed this Appearance Bond with me.

_Julie M. Busic_
OFFICER'S SIGNATURE

Julie M. Busic

_Henry C. Rosenau_
DEFENDANT'S SIGNATURE

DATE: 5/6/11

CAUSE _US v. Rosenau_
PLAINTIFF _CR06-157_
EXHIBIT
NO. _1_
ADMITTED _10/28/11_

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 13

October 28, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-------------------------------------------------------------

UNITED STATES OF AMERICA,        )

                Plaintiff,        )

    vs.                         )    No. CR06-157 MJP

HENRY ROSENAU,                   )

              Defendant.        )

-------------------------------------------------------------

BOND REVOCATION HEARING

Before the Hon. Brian A. Tsuchida

Magistrate Judge

October 28, 2011

-------------------------------------------------------------

REPORTED BY:   Audiotape

TRANSCRIBED BY:      Karen L. Larsen, RPR(Ret.)

                Seattle Deposition Reporters

                600 University Street, Suite 320

                Seattle, WA 98101

                206-622-6661

Page 2

```
 1   APPEARANCES:

 2   For the Plaintiff:  SUSAN ROE, ESQ.

 3                       MARC PEREZ, ESQ.

 4                       Assistant U.S. Attorneys

 5                       700 Stewart Street, Suite 5200

 6                       Seattle, WA 98101

 7   For the Defendant:  CRAIG PLATT, ESQ.

 8                       Platt & Buescher

 9                       P.O. Box 727

10                       Coupeville, WA 98239

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

October 28, 2011

Page 3

1                     E X H I B I T S

2    NO.   DESCRIPTION                                PAGE

3    1     Rosenau conditions of release              12

4    2     List of witnesses prohibited contact       12

5    3     Emails                                     27

6    4     Letter from Botting to Moffatt             50

7

8                  E X A M I N A T I O N

9    WITNESS                                          PAGE

10   Julie Busic

11        Direct by Ms. Roe                            8

12        Cross by Mr. Platt                          15

13        Redirect by Ms. Roe                         20

14   Bruce Erickson

15        Direct by Ms. Roe                           22

16        Cross by Mr. Platt                          27

17   Gary N. A. Botting

18        Direct by Mr. Platt                         35

19        Cross by Ms. Roe                            44

20        Redirect by Mr. Platt                       50

21   Closing Argument

22        By Ms. Roe                                  57

23        By Mr. Platt                                59

24   Ruling by the court                              67

25        Seattle, Washington; Friday, October 28, 2011

October 28, 2011

Page 4

1    ----------------------------

2           THE CLERK:  All rise.  United States District Court

3    for the Western District of Washington is now in session, the

4    Honorable Bryan H. Cheetham presiding.

5           THE COURT:   Good afternoon.  Please be seated.

6           THE CLERK:   Your Honor, the matter before you is

7    scheduled for an initial appearance on bond revocation

8    hearing, cause number CR06-157 MJP, assigned to Judge Pechman,

9    United States versus Henry Rosenau.  Counsel please make

10   appearances.

11          MS. ROE:  Good afternoon, your Honor.  Susan Roe on

12   behalf of United States.  Also present at counsel table is

13   Marc Perez and the pretrial services officer Julie Busic.

14          THE COURT:   And Ms. Roe, good afternoon.  Mr.

15   Platt, good afternoon.

16          MR. PLATT:  Good afternoon, your Honor.  Craig Platt

17   on behalf of Henry Rosenau, who is seated or standing to my

18   left.

19          THE COURT:   And good afternoon, Mr. Rosenau.

20   Please be seated.

21          Mr. Rosenau, we are here because I have received a

22   petition alleging a violation of a condition of release, and,

23   Mr. Platt, has the defense received a copy?

24          MR. PLATT:  Yes, your Honor.

25          THE COURT:   And for our record, Ms. Roe, if you'd

October 28, 2011

Page 5

1   state the allegation.

2        MS. ROE:  The allegation is that the defendant has

3   violated the special condition of his bond by having contact

4   indirect with existing or future witnesses in this case by

5   having indirect contact with Kip Whelpley on October 20th of

6   this year.

7        THE COURT:  All right.  So, Mr. Rosenau, you know

8   that the government has brought this allegation, and of course

9   you have no obligation to make any kind of admission, and we

10  can contest this.  I have in fact received a number of

11  materials regarding this allegation, and I trust, Mr. Platt,

12  that you also received a copy.  I think the government filed

13  it earlier today.  It's the government's -- it's a pleading in

14  support of a request for revocation with attachments, and I

15  also received from you, Mr. Platt, just a little while ago a

16  copy of an email from Craig Platt to Mr. Botting or Boatting

17  (phonetic).  All right.  And I also -- in terms of the

18  submissions from the government as well as the defense, do I

19  have everything or is there something I'm missing?

20       MS. ROE:  You have everything from the government,

21  your Honor.

22       THE COURT:  All right.

23       MR. PLATT:  Your Honor, the court should have

24  everything at this point.  We're going to ask Mr. Botting to

25  address the court at this hearing.  He does have with him some

Page 6

1    books that he brought that he's written.  It's just by way of

2    establishing his credentials as an expert in this area in

3    Canadian law.

4              THE COURT:  Well, I guess the question is whether

5    we need expert testimony about the factual allegations, so

6    what's really before me is a allegation on a violation of a

7    condition of supervision.  I don't think that's really a

8    matter of expert testimony in terms of whether the government

9    can show that there was indirect contact between Mr. Rosenau

10   and one of the witnesses in this case, unless of course Mr.

11   Botting is a fact witness and has some testimony regarding the

12   facts regarding that allegation.

13             MR. PLATT:  And, your Honor, our position would be

14   that it's a question of mixed facts and law in this matter.

15   He would be testifying as a fact witness as well because he is

16   personally aware of some of the circumstances surrounding the

17   allegations with respect to the violation.  To the extent that

18   there's an argument being made by the government that the

19   lawsuit in question was in any way frivolous or, you know, it

20   was -- it's referred to as vexatious I believe in their moving

21   paper.  To that extent I think that's a question of mixed fact

22   and law whether or not that's vexatious, and Mr. Botting is

23   able to address the court on that issue.

24             THE COURT:  All right.  Well, why don't we at this

25   point -- first of all, let's just start with what the

October 28, 2011

Page 7

1   government has, and so Ms. Roe, why don't you start, and then

2   we can address the whole issue about other evidence and as

3   presented by the defense as this plays out.

4        MS. ROE:  Your Honor, thank you.  I will.  But I'd

5   ask that any witness be excused from the courtroom.  Mr.

6   Botting shouldn't be present listening to the testimony if

7   he's going to be a fact witness.

8        THE COURT:  All right.  Do you have any objection?

9        MR. PLATT:  We will object.  I think it's important

10  if he is offering his opinion about the lawsuit that he be

11  able to hear the testimony so he can opine on that when he's

12  called to.

13       THE COURT:  Well, if he brought the lawsuit or

14  assisted, I don't know if he needs to hear what anybody else

15  thinks about it, so I'll grant the motion, and we'll excuse I

16  guess witnesses until they're called.  Are there any other

17  witnesses here?  From either side?

18       MR. PLATT:  No, your Honor.

19       THE COURT:  Just spectators.  All right.  Thank you

20  very much, Mr. Botting.  So Ms. Roe, go ahead.

21       MS. ROE:  Thank you.  Your Honor, the government

22  calls pretrial services officer Julie Busic.

23       THE COURT:  All right.  Ms. Busic, if you'll step

24  forward and we'll have you sworn in.

25  JULIE BUSIC, witness sworn.

Page 8

1                THE COURT:   And go ahead, Ms. Roe, any time you're

2     ready.

3                MS. ROE:   Thank you.

4                D I R E C T   E X A M I N A T I O N

5     BY MS. ROE:

6          Q.   Ms. Busic, would you just briefly identify yourself

7     for the record and give us briefly what you do and what your

8     role in this incident is.

9          A.   Yes.  I'm Julie Busic.  I'm a supervising U.S.

10    probation officer working in the pretrial unit, and I have

11    been so employed for over 14 years and currently supervising

12    Mr. Rosenau since May of 2011.

13         Q.   Okay.  Mr. Rosenau is living in Canada; is that

14    correct?

15         A.   Correct.

16         Q.   And so you deal with the Canadians.  One of your

17    duties is to deal with the Canadians who are on pretrial

18    release.

19         A.   That's correct.

20         Q.   When did you first take Mr. Rosenau on your case

21    load?

22         A.   May 6, 2011.

23         Q.   And what's your procedure for reviewing the

24    conditions of his release with him and what did you do with

25    him?

October 28, 2011

Page 9

1      A.    May 6 I telephonically reviewed the conditions of

2   supervision with Mr. Rosenau.   Given the distance between us,

3   he was provided an email copy of the documents and we reviewed

4   them telephonically.

5      Q.    Can you look at what's been marked exhibit 1?   Do

6   you recognize that as the written conditions of his release?

7                (Exhibit 1 marked.)

8      A.    Yes.

9      Q.    And is that his signature at the bottom?

10      A.    Correct.

11      Q.    And is one of the conditions that he not have

12   contact with witnesses direct or indirect?

13      A.    That is a special condition of his bond, yes.

14      Q.    Did he have one -- generally speaking has Mr.

15   Rosenau been pretty good on supervision?

16      A.    Mr. Rosenau has reported as directed.   There was a

17   previous violation in this matter that was before the court in

18   July.   As a result his bond was modified.

19      Q.    And it was modified so that he changed residences;

20   is that it?

21      A.    At the time the bond was actually modified to

22   include a drug and alcohol testing condition.   There were

23   discussions between Mr. Rosenau and myself about a move, and

24   essentially the requirement for supervision was he lived in a

25   home that would be free of any controlled substances or he

Page 10
1    would relocate.
2        Q.    And what was your understanding with Mr. Rosenau?
3        A.    We had several discussions about the topic, and
4    there was some discussion or some word from Mr. Rosenau that
5    he would move to another location and was preparing to do
6    that, and what the agreement between us was that he had
7    permission to move.  He'd provided me with the address and the
8    particulars; however, upon when he would be ready to
9    officially do that he would call me, and if he didn't reach me
10   personally, it was acceptable to leave a voice mail.  However,
11   as of today he has not moved.  He continues to reside in his
12   home that he released to.
13       Q.    And when did you learn that he hadn't moved?
14       A.    I did confirm with him on Monday of this week that
15   he was still residing in his home.
16       Q.    Did you discuss the condition that he have no
17   contact direct or indirect with witnesses also with his
18   attorney, Mr. Platt?
19       A.    Yes.
20       Q.    When was that discussion?
21       A.    Well, it was a condition of his release, and the
22   discussions started about that upon release.  At that time I
23   had made requests for a full list of the parties that he
24   should not have contact with, and that on May 25th, 2011, I
25   was contacted by counsel about the condition.  I was informed

October 28, 2011

1    that there were some proceedings in Canada and that there were

2    some third parties that may need to be served regarding

3    extradition, and would that be a violation of the conditions

4    of supervision.

5         Q.    What was your advice to Mr. Platt, defense counsel?

6         A.    What I said at the time is that I had not received

7    any lists of prohibited parties, and, therefore, as long as it

8    was a legal matter served by legal counsel, that was

9    acceptable for me and that I would document it in my records.

10        Q.    And did you so document?

11        A.    Yes, I did.

12        Q.    Both Mr. Platt's inquiry and your response.

13        A.    Yes.

14        Q.    Okay.  And did you understand that this had to do

15   with extradition, not with the underlying criminal matter?

16        A.    I understood it to be regarding extradition.

17        Q.    What would your response have been if you knew that

18   it was regarding the underlying criminal matter or the

19   availability of a witness?

20             MR. PLATT:  Objection, assumes facts not in

21   evidence.

22             THE COURT:   Go ahead and answer the question.

23        A.    I would not view myself as having the authority to

24   authorize that and would have sought direction from the court

25   directly or suggested that the parties do so.

Page 12

1          Q.   Sometime later, a few weeks later, did you give Mr.
2     Rosenau a list of the witnesses with whom he was prohibited
3     from contacting?
4          A.   Yes.  I was in receipt of the names.  I created a
5     document that would spell them out and to advise of what he
6     should do in the event there was contact, and on June 14th I
7     emailed the document to the defendant as well as counsel.
8          Q.   And looking at what's been marked for purposes of
9     this hearing exhibit number 2, is that a list of your memo to
10    Mr. Rosenau with a list of witnesses?
11         A.   Yes.
12              MS. ROE:  Government offers 1 and 2.
13              THE COURT:   Any objections, Mr. Platt.
14              MR. PLATT:  No objection.
15              THE COURT:  All right.  Number 1 and 2 are admitted.
16              (Exhibits 1-2 admitted.)
17         Q.   Did you also talk to Mr. Rosenau about the list?
18         A.   Yes.  We talked on June 16 of 2011 about the
19    document.  Mr. Rosenau was concerned at that point because he
20    indicated he didn't know any of the parties, and as I noted,
21    he indicated a concern that he might approach somebody and ask
22    them for directions and not knowing that they were someone he
23    should not be having contact with.
24         Q.   And what did you advise him to do?
25         A.   My response was if he didn't know any of the

October 28, 2011

Page 13

1    parties, that the condition was going to be easy to comply

2    with, and as it notes on my form, that if there was some kind

3    of incidental or accidental contact, he would report it to me

4    immediately.

5        Q.   Is that form signed by Mr. Rosenau?

6        A.   Yes.

7        Q.   And does it also have sort of an odd date, like a

8    date a week or two later?

9        A.   Yes.  At the time that I had sent this to the

10   defendant, there were a number of things going on.  He was

11   having some computer difficulties in being able to print the

12   document.  He could view it, and then it was amidst the

13   Canadian mail strike, and so he was being very receptive in

14   terms of telling me that there was going to be a delay in

15   getting it to me because of the mail strike.

16       Q.   Okay.  So that was received by your office in July.

17       A.   Correct.

18       Q.   Since that time has Mr. Rosenau mentioned that he or

19   his friends have contacted witnesses in this matter?

20       A.   No.

21       Q.   Inadvertently or other?

22       A.   No.

23       Q.   Did you receive copies -- oh, let me ask.  Where

24   does he live?

25       A.   Quesnel.

Page 14

1       Q.    Have you been there?

2       A.    No.

3       Q.    How far is it, do you know?

4       A.    It's my understanding it's about 8 hours north of

5    the border.

6       Q.    Did you receive copies this week of emails forwarded

7    by Bruce Erickson purportedly from his client Kip Whelpley?

8       A.    Yes.

9       Q.    Is Mr. Whelpley on the list of witnesses with whom

10   Mr. Rosenau was not sporesed to have contact?

11      A.    Yes.

12      Q.    And are there some emails between Patrick with a

13   Gaelic last name and Kip Whelpley regarding a civil lawsuit

14   and a default order?

15      A.    Yes.

16      Q.    Do most of those emails you've seen predate Mr.

17   Rosenau being on supervised release?

18      A.    Yes.

19      Q.    Is there one dated last week?

20      A.    Yes, October 20th.

21      Q.    And is the October 20th email one of the attached

22   for the basis of this allegation?

23      A.    Yes.

24      Q.    Have you asked Mr. Rosenau about it?

25      A.    No.

October 28, 2011

Page 15

1    Q.    Why do you view it as a violation of the condition?

2    A.    When I read the email, there had been no requests

3    for specific permission regarding that, and I noted the court

4    order which spells out the defendant's name and the witness's

5    name.

6    Q.    And does it seem to be about an underlying

7    extradition matter?

8    A.    No.

9          MS. ROE:  No further questions.

10         THE COURT:   Mr. Platt.

11         MR. PLATT:  Thank you, your Honor.

12               C R O S S - E X A M I N A T I O N

13   BY MR. PLATT:

14   Q.    Good afternoon, Ms. Busic.

15   A.    Hello.

16   Q.    I just have a few questions for you.  I just want to

17   confirm first of all the phone call that you and I had on the

18   25th.  Now, I called you; is that your recollection, on that

19   date?

20   A.    If I can just quickly refer to my notes, I will

21   confirm what I jotted down.  Yes.

22   Q.    And I told you that I was calling in part to ask you

23   about how to handle something that had come to my attention,

24   namely a lawsuit involving what we thought might be a

25   potential witness; is that correct?

Page 16

1        A.     There were proceedings regarding an extradition,

2    that you had learned from a Canadian attorney that some third

3    parties may be served paperwork as they were likely witnesses

4    in this matter.

5        Q.     Okay.  So I did tell you that I was concerned they

6    might be witnesses, correct?

7        A.     Right.

8        Q.     And in fact, at that point we had a discussion about

9    having a problem because there was no witness list yet

10    provided by the government; is that correct?

11        A.     That's correct.

12        Q.     And in fact, that was a little bit of an impediment

13    for us to be able to go forward and figure out who exactly Mr.

14    Rosenau was to have no contact with at that time.

15        A.     Correct.

16        Q.     But I think for the purpose of that discussion is it

17    fair to say I said let's just assume that it is a witness, and

18    that's why I need to talk to you about it, words to that

19    effect?

20        A.     Correct.

21        Q.     And then we agreed that if there was a valid lawsuit

22    existing in British Columbia and if paperwork from that

23    lawsuit was served on a witness, so long as it was done

24    through counsel and done legally, that that would be not

25    considered a violation of no contact, correct?

1      A.    Correct.

2      Q.    And I specifically expressed to you my concerns

3  about that issue because I did not want that to be later

4  misunderstood and interpreted as a violation of the no contact

5  condition.

6      A.    Yes.

7      Q.    Let's talk a little bit about Mr. Rosenau's

8  adjustment on release, and you've talked about that a bit, but

9  leaving aside the issue that we're here addressing and the

10 issue that we addressed at the last hearing, is it fair to say

11 that his adjustment has gone fairly smoothly?

12     A.    Yes.

13     Q.    That when you have asked him for paperwork, he has

14 provided it.

15     A.    Yes.

16     Q.    That when you have asked him to check in with you,

17 he has.

18     A.    Yes.

19     Q.    That he has met with you at least one or -- how many

20 times has he met with you at the border?

21     A.    Could be three.   Definitely two.

22     Q.    All right.

23     Q.    And is he always there?

24     A.    Yes.

25     Q.    And on time?

Page 18

1     A.   Yes.

2     Q.   And cooperative?

3     A.   Yes.

4     Q.   And answers your questions?

5     A.   He does.

6     Q.   And gives you the materials you need?

7     A.   Yes.

8     Q.   Thank you.  Now, let me just ask you the general

9  question then.  Other than the subject matter of this hearing

10 and the last hearing, have you had any problems whatsoever

11 supervising Mr. Rosenau on supervision?

12    A.   No.

13    Q.   Now, when you -- you said you talked to Mr. Rosenau

14 about whether or not he knew witnesses; is that correct?

15    A.   Uh-huh.

16    Q.   And he indicated to you that he was worried about

17 not recognizing people; is that correct?

18    A.   That's correct.

19    Q.   He didn't say I won't recognize their names, he said

20 I won't recognize how they look or words to that effect; is

21 that true?

22    A.   I need to refer to my notes.  He's worried because

23 he didn't know any of the names of the list of prohibited

24 parties.

25    Q.   Did he say that he would not recognize someone if he

1    met them on the street?

2        A.    Yes.

3        Q.    And he was concerned about that because he would not

4    recognize the way they looked.

5        A.    Correct.

6        Q.    And that was a concern he expressed to you.

7        A.    Yes, he did.

8        Q.    All right.  And your understanding of the subject

9    matter of today's hearing is that there was contact from some

10   third party, is that correct, somebody other than Henry

11   Rosenau had contact with a witness in the case; is that

12   correct?

13       A.    Correct.

14       Q.    And you're basing your conclusion that there was a

15   violation of the no contact condition on the fact that that

16   third person who made contact purported to have authorization

17   from Mr. Rosenau, that that information came from that third

18   person, correct?

19       A.    Correct.

20       Q.    And you've heard nothing from Mr. Rosenau to the

21   contrary.  He hasn't said, oh, yeah, I told him to have

22   contact or he knew about contact; is that correct?

23       A.    That's correct.

24       Q.    In fact, quite the opposite; is that true?

25       A.    We haven't spoke about the issue.

Page 20

1      Q.   Right.  So other than reading the document

2   prepared -- well, strike that.

3            One final question.  Is it fair to say -- and I

4   don't know if you can answer this.  If not, just say so.  But

5   is it fair to say that in your experience Mr. Rosenau is not

6   exactly an expert user of computers?  Do you have any opinion

7   on that?

8      A.   I can't make an assessment of his use of a computer,

9   nor can he properly make one of mine.  I will acknowledge he's

10  had some difficulties with email.

11     Q.   All right.  And he has expressed that he has trouble

12  with the computer and using emails and that type of thing, has

13  he ever said that?

14     A.   Yes, he has said that.

15            MR. PLATT:  Thank you very much.

16            THE COURT:    All right.  Any follow-up questions,

17  Ms. Roe?

18            MS. ROE:  Just a couple, your Honor, if I may.

19            R E D I R E C T   E X A M I N A T I O N

20  BY MS. ROE:

21     Q.   Ms. Busic, that conversation you had with defense

22  counsel was regarding future matters; is that right?  In May

23  the conversation about future matters, were you told at that

24  time that there was already some sort of civil lawsuit or

25  notice of lawsuit filed against one of the witnesses?

```
1      A.   I wasn't aware of that.
2      Q.   And were you told that when you handed over or gave
3  the list of names to the defendant and defense counsel?
4      A.   No.
5           MS. ROE:  Nothing further.  Thank you.
6           THE COURT:   You have further questions regarding
7  the cross, I mean the redirect?
8           MR. PLATT:  Yes, your Honor.
9           THE COURT:   Sure.  Go ahead.
10              R E C R O S S - E X A M I N A T I O N
11  BY MR. PLATT:
12      Q.   I'll just be brief here, but when we talked, I told
13  you there was a lawsuit in Canada; is that correct?
14      A.   Correct.
15      Q.   Okay.  So I told you there was already a lawsuit in
16  Canada, correct?
17      A.   Excuse me.  I'm going to go back to my notes, which
18  is how I recorded it, that you were concerned that there are
19  proceedings regarding the extradition that you'd learned from
20  a Canadian attorney and that some third parties needed to be
21  served and would likely be witnesses in this matter.  That's
22  what I understood.
23      Q.   Okay.  And I didn't say this is going to be a
24  lawsuit off in the future, did I?
25      A.   I don't recall that.
```

Page 22

1              MR. PLATT:  Thank you.  Nothing further.

2              MS. ROE:  Nothing further.

3              THE COURT:  All right.  And thank you very much,

4     Ms. Busic.

5                   (Witness excused.)

6              MS. ROE:  Bruce Erickson.

7              THE COURT:  All right.

8     BRUCE ERICKSON,           witness sworn.

9                   D I R E C T   E X A M I N A T I O N

10    BY MS. ROE:

11         Q.   State your name, please, spell your last name?

12         A.   Bruce Erickson, E-r-i-c-k-s-o-n.

13         Q.   Mr. Erickson, are you a criminal defense attorney in

14    this town?

15         A.   I am.

16         Q.   And do you represent a witness in the U.S. versus

17    Rosenau matter, Kip Whelpley?

18         A.   That's correct.

19         Q.   And Mr. Whelpley lives in Canada?

20         A.   That's correct.

21         Q.   But you represented him in his underlying matter

22    here and continue to represent him; is that correct?

23         A.   That's correct.

24         Q.   Do you know, does he know Henry Rosenau?

25         A.   I believe he does.

1    Q.   And how do you know that?

2    A.   I've heard many statements made by Mr. Whelpley in

3    various contexts to that effect.

4    Q.   And from a review of your discovery in the

5    underlying case of Mr. Whelpley's?

6    A.   That's true also.

7    Q.   Did you receive a series of emails from your client

8    Kip Whelpley on October 20th of this year?

9    A.   I'm thinking.  In terms of the date I --

10   Q.   May I ask that the witness be handed what's been

11   marked exhibit 3, which is sort of confusingly 4 packets,

12   exhibits 1 through 4 that were attached to the pleading today.

13          THE CLERK:  (Inaudible).

14          MS. ROE:  Well, let's do this.  Let's call it 3.

15             (Exhibit 3 marked.)

16   A.   All right.  I'm looking at it.

17   Q.   Right.  There should be 4 packets, and although your

18   client's email address and home address has been redacted,

19   otherwise are those the same?  Do you recognize them?

20   A.   It's the matters contained within what's marked as

21   exhibit 1 within plaintiff's exhibit number 3, and those do

22   appear to be the same emails that I received, yes.

23   Q.   Okay.  Would you also look at the other exhibits.

24   Is exhibit 2 and 3 and 4 other emails that you received from

25   your client as well as some attachments, for instance, some

Page 24

1    letters that were attached to those emails?

2        A.   I believe they are, but, you know, I can't be a

3    hundred percent sure, I'm sorry, because the ones that I

4    reviewed were the ones that were addressed to me.  The

5    attachments I didn't spend a lot of time with.

6        Q.   And those have page breaks in them for easier

7    reading.  So the ones that you had were just long and

8    sequential, some of those emails?

9        A.   That's correct.

10        Q.   Okay.  Did you forward the emails and the

11    attachments that you'd received from your client to my office?

12        A.   I did.

13        Q.   And are -- those emails and letters indicate that

14    they came to my office from your office, Bruce D. Erickson, by

15    the top or by the email note?

16        A.   Well, I -- there's no question that I sent along the

17    email, packet of emails that I received from my client Kip

18    Whelpley and the attachments to your office.  They had a

19    slightly different format, and I'm not sure if I'm recalling

20    precisely what your -- I think your question was is there

21    something in here that identifies them as coming from my

22    office to your office, and I'm not sure that I can find that

23    but --

24        Q.   Let me ask you this.  Do you recognize those as

25    appearing to be the emails you forwarded to my office?

October 28, 2011

Page 25

1       A.      Yes.

2       Q.      Why did you forward them to us?

3       A.      Mr. Whelpley in his plea agreement in his case had a

4   paragraph calling for cooperation.  The government was asking

5   him to fulfill his cooperation obligations.  He had made a

6   decision to do that and to make himself available for

7   testimony at the upcoming trial.  I had been in touch with him

8   just regarding logistics of getting ready to fulfill that

9   obligation, and he forwarded these emails to me.  I read them.

10  They were new to me, and I conferred with my client and

11  obtained his permission to forward them to you and did so.

12      Q.      And did they in fact appear to affect the ability to

13  fulfill his cooperation agreement, that is, to come down and

14  testify at the trial in U.S. versus Rosenau?

15      A.      Well, you know --

16              MR. PLATT:  That calls for an expert opinion.

17      A.      I'm sorry.

18              THE COURT:   Go ahead and answer.

19      A.      You know, I don't really have any information beyond

20  the documents themselves.  I'm aware that one of the documents

21  contains what purports to be an order from somebody in Canada

22  who is either a judicial person or a clerical or staff person

23  working with some court in Canada, and it appears that the

24  order prohibits him from entering -- him meaning Kip

25  Whelpley from entering the United States and therefore it did

Page 26

1    appear that it might be an obstacle towards his fulfilling his

2    obligationses pursuant to the cooperation clause in his plea

3    agreement, and I think that that's part of the reason why I

4    brought it to your attention.

5        Q.    Okay.   Does Mr. Whelpley, if you know, know a man

6    named Paddy (phonetic) Roberts, the man who sent him these

7    emails?

8        A.    I'm sorry, I didn't hear that.

9        Q.    Do you know if your client knows the man who sent

10   him these emails?

11       A.    I don't think he does.   I believe that there may

12   have been one face-to-face meeting about the time that this

13   sequence of emails started, but other than that he has no

14   connection with him.

15       Q.    And, Mr. Erickson, does your client live in the

16   interior of British Columbia?

17       A.    That's right, near --

18       Q.    Kelowna?

19       A.    Yes.

20       Q.    Near Kelowna?

21       A.    Yes.

22            MS. ROE:   No further questions.   Offer what's been

23   marked exhibit 3.

24            THE COURT:   And, Mr. Platt, any objections to the

25   exhibit 3?

October 28, 2011

Page 27

1          MR. PLATT:  I hate to be difficult, your Honor, but

2   with respect to any emails that are dated prior to the

3   imposition of conditions by this court in May, we would object

4   that they're irrelevant.

5          THE COURT:   All right.  I'm going to overrule the

6   objection, and I'll admit exhibit number 3.

7          (Exhibit 3 admitted.)

8          C R O S S - E X A M I N A T I O N

9   BY MR. PLATT:

10     Q.   Good afternoon, Mr. Erickson.  How are you.

11     A.   I'm good.  Thank you.

12     Q.   At some point during the last few months have you

13  had any contacts with the U.S. Attorney's office about making

14  arrangements to have Mr. Whelpley, your client, deposed in

15  Canada?

16     A.   Yes.

17     Q.   And as part of those discussionses did you talk with

18  anyone at the U.S. Attorney's office about reasons that a

19  deposition should take place in Canada?

20     A.   I think so, yes.  I think the answer to that

21  question is yes.

22     Q.   And what were those reasons?

23     A.   Convenience to my client, some reluctance of my

24  client to come into the United States.  My client -- as I

25  think the court knows, my client was previously here as a

Page 28

1    defendant, was convicted upon a plea of guilty and did time

2    and was trying to rebuild his life in Canada and was trying to

3    stay focused on rebuilding his life in Canada and was

4    reluctant to come down to the United States.

5        Q.    So it would largely be for the convenience of your

6    client.  Is that a fair statement?

7        A.    Yes, I think that -- I mean largely, I'm not sure

8    precisely what that word means, but I would agree with that,

9    yes.

10       Q.    And is it fair to assume then that Mr. Whelpley did

11   not tell you about any lawsuit that was pending against him,

12   any order that was out there preventing him from coming to the

13   United States?

14       A.    I don't recall that being mentioned to me by my

15   client at the time we were discussing the possibility of his

16   testimony being received by deposition.

17       Q.    At any point have you had a conversation with anyone

18   in the United States Attorney's office regarding the fact that

19   there is that lawsuit up in British Columbia?  At any time.

20       A.    Yes.  I think I mentioned, since, and I guess it was

21   the 20th -- I'm not sure which day on the calendar it was, but

22   not too long ago on the day that I forwarded -- same day I

23   forwarded this material to the U.S. Attorney we had a

24   conversation on the topic, yes.

25       Q.    Okay.  And did you know about the lawsuit before

October 28, 2011

Page 29

1    that?

2         A.    I don't think I did.  I mean it certainly didn't

3    penetrate my consciousness if there was any mention of it at

4    all to me prior to that.  I don't think there was.

5         Q.    Now, you and I had a conversation, I don't know, a

6    couple weeks ago regarding whether or not your client would be

7    available for an interview.  Do you recall that?

8         A.    Yeah.  Well, I think you -- it was fairly recently.

9         Q.    Yeah.

10        A.    Yes, I do.

11        Q.    But that was before the 20th, correct?

12        A.    I think that there was a series of phone calls is my

13   recollection, and -- here's my recollection, you know.  My

14   recollection is that it was mentioned I think -- I think we

15   encountered each other on an unrelated matter here in the

16   court house.  You called me a day or two later and indicated

17   you were representing Mr. Rosenau, and that it may have been

18   in that first message that you indicated that you might want

19   to meet with my client for an interview.  It was not -- the

20   inquiry was not answered, it wasn't really resolved is my

21   recollection.

22              And then when we went up -- recently I saw my client

23   in Canada, and at that time it still had not yet been

24   resolved, and it was only, you know, in the last couple of

25   days that I put the question to my client, and he said, no, he

Page 30

1    does not want -- he would prefer not to be interviewed.

2    That's my recollection.

3        Q.   Well, do you recall whether or not you and I have

4    discussed this since the 20th?

5        A.   Yes, I think we have.

6        Q.   All right.

7        A.   But I'm hoping -- I'm not getting my dates right, I

8    don't have a calendar here, I didn't bring my file, but I

9    believe that -- trying to -- let's see.  Well, it was just,

10   you know, last -- yes, I think it was this week.  Huh.

11       Q.   We talked yesterday, right?

12       A.   What's that?

13       Q.   We talked yesterday?

14       A.   Yeah.  Was that it?

15       Q.   We talked about Saipan?

16       A.   That's right.

17       Q.   Remember that?

18       A.   Yes.

19       Q.   Did we talk before then?

20       A.   Yes.  I'm sorry.  I'm doing my best to be precise on

21   this, and I -- I recall it just being in the last couple of

22   days here that I informed you that I'd conferred with my

23   client and he'd indicated that he preferred not to have an

24   interview with Mr. Rosenau's attorney.

25       Q.   And you were following up on a prior phone call.

October 28, 2011

Page 31

1      A.    That's correct.

2      Q.    And during that prior phone call you brought up the

3    topic of there was something going on up in Canada with some

4    lawsuit.  Do you remember that?

5      A.    Yes.  No one -- here's my recollection on that.

6    After -- after I sent the emails to the U.S. Attorney's

7    office, and I'm not sure whether telephones the same day -- I

8    think it was the next day -- I felt as a courtesy to you, Mr.

9    Rosenau's attorney, that I would inform you that I had -- that

10   this issue had come to my attention and I had brought it to

11   the attention of the U.S. Attorney's office.

12     Q.    All right.  And during our first phone call we

13   talked about that issue as well, correct, about the fact there

14   was a lawsuit.

15     A.    Was that -- is this -- are you referring to a

16   separate phone call than this one I was just talking about in

17   my last answer?

18     Q.    The one before the one yesterday.

19     A.    Yeah.  Well, no, you know, I'm not even clear

20   whether I just left -- yeah, we did talk.  There were a couple

21   of times when I left voice mail messages, but there was this

22   one occasion we did talk, and we did talk, yes.  I mean that

23   was the purpose of my call was to notify you of that fact.

24   The fact being that I had become aware of this and I had sent

25   this information off to the U.S. Attorney's office, and it

October 28, 2011

Page 32

1    might be something you would have to be dealing with.

2        Q.   And then one last question.  On this issue of the

3    lawsuit up there, you were asked whether or not that prevented

4    your client from leaving Canada to testify in this lawsuit,

5    whether or not there was a problem?  Ms. Roe just asked you

6    about that?

7        A.   Okay.  You're referencing my prior testimony here

8    this afternoon now?

9        Q.   Right.

10       A.   Uh-huh.

11       Q.   And I objected and said, you know, that's expert

12   something, you remember that answer?

13       A.   Just now?

14       Q.   Yeah.

15           THE COURT:   Why don't we ask another question, not

16   whether you remember the question and the actual answer.  Why

17   don't you ask.

18       A.   I'm sorry.

19       Q.   Let me ask you this.  Is it fair to say that reading

20   the pleadings from British Columbia, it's hard for you to have

21   a legal opinion about the full force and effect that any order

22   up there would have on someone's ability to travel?  Is that a

23   fair statement?

24       A.   Yes.

25           MR. PLATT:   Thank you.  Nothing further.

October 28, 2011

Page 33

1          THE COURT:  All right.

2          MS. ROE:  Nothing further, your Honor.

3          THE COURT:  All right.  Thank you very much, Mr.

4    Erickson.  Can Mr. Erickson be excused?

5          MS. ROE:  Yes.  The government would so ask.

6               (Witness excused.)

7          THE COURT:  And, Ms. Roe, any other witnesses?

8          MS. ROE:  No.

9          THE COURT:  All right.  Mr. Platt, witnesses?

10         MR. PLATT:  Mr. Botting, your Honor.

11         THE COURT:  All right.  Before Mr. Botting gets on

12   the stand, can you just give me a brief nutshell of exactly

13   what he's supposed to testify about?

14         MR. PLATT:  Yes, your Honor.  He can testify to

15   several things.  The allegation of violation here is that a

16   third party had contact with Kip Whelpley.  That third party

17   goes by different names, but for the purposes of this hearing

18   we'll call him Paddy Roberts.  I believe he has used a

19   different name in the email.  I believe that's his Gaelic

20   name.

21         Mr. Botting was involved in dealings with Mr.

22   Roberts with respect to the lawsuit that is the subject matter

23   of these emails.  He can testify that on several occasions he

24   advised Mr. Roberts not to have contact with Mr. Whelpley,

25   that he can also testify he was not involved directly in that

October 28, 2011

Page 34

1    lawsuit but was aware of it.

2                THE COURT:  Mr. Botting was not involved in it,

3    correct?

4                MR. PLATT:  Correct.  He was not counsel, and I

5    don't know if you got -- I didn't actually get to see the

6    exhibits that were just offered from the government.  I did

7    get them in an email.

8                THE COURT:  Right.

9                MR. PLATT:  But I don't know if the exhibits in

10   there with a letter from Mr. Botting basically telling the

11   attorney up in Canada I'm not involved in this lawsuit, I'm

12   not going to represent Mr. Rosenau on that, I'm just on the

13   extradition.  I don't know if you got a copy of that one, but

14   he can testify to that.  He can also testify to a meeting that

15   occurred where Mr. Rosenau was present, Mr. Roberts was

16   present, I was present, and the discussion of having no

17   contact with Mr. Whelpley came up, and he can testify about

18   what happened during that discussion, and I think that's

19   highly relevant to this litigation.

20               THE COURT:  All right.  So why don't you call him

21   for these facts regarding it sounds like his knowledge of the

22   contact between Paddy Roberts or Paddy Roibeaird or whatever

23   his name is, and let's start at that point.  So why don't you

24   go ahead and call your witness.

25               MR. PLATT:  Thank you, your Honor.

October 28, 2011

Page 35

1    GARY NORMAN ARTHUR BOTTING,   witness sworn.

2              THE COURT:   Please have a seat, Mr. Botting, and

3    Mr. Platt, go ahead.

4                    D I R E C T   E X A M I N A T I O N

5    BY MR. PLATT:

6         Q.   Mr. Botting, good afternoon.

7         A.   Good afternoon.

8         Q.   Can you please state your full name for the record?

9         A.   Gary Norman Arthur Botting.

10        Q.   Mr. Botting, can you tell us what your profession

11   is.

12        A.   I'm a lawyer.

13        Q.   And how long have you been a lawyer?

14        A.   20 years.

15        Q.   And where do you practice?

16        A.   In Vancouver, B.C., and area.

17        Q.   And what is your official designation up there,

18   barrister, solicitor?

19        A.   Both.

20        Q.   And have you had any involvement in your capacity as

21   an attorney representing Mr. Rosenau?

22        A.   Yes.  I represented him in an application and appeal

23   to the Supreme Court of Canada in 2010, 2011.

24        Q.   And can you tell us just what that case was about?

25        A.   Basically it was an extradition case to bring him to

Page 36

1    the United States, or to send him to the United States from

2    Canada.  That had gone through a hearing sometime earlier with

3    another lawyer, and it had gone through appeal, and I was

4    appealing the appeal to the Supreme Court of Canada.

5         Q.   All right.  What was the outcome of that?

6         A.   The Supreme Court of Canada receives about 3,000

7    applications a year, declined to hear the appeal.

8         Q.   Are you familiar with an individual by the name of

9    Paddy Roberts?

10        A.   Yes, I am.

11        Q.   Who is that?

12        A.   Paddy Roberts is basically a person who has a lot to

13   do with trying to defend people, especially when they have

14   been charged with offenses such as marijuana possession and

15   that kind of thing.  He's a leader of a political party in

16   Canada and basically an advocate for people who are not

17   represented, and he often refers clients to other lawyers, but

18   he's also in this particular case he has helped me as a

19   paralegal.

20        Q.   In what capacity?

21        A.   Well, basically to act as a go-between in certainly

22   anything that happens up island, or sorry, in the interior of

23   British Columbia as opposed to in the Vancouver area where I'm

24   located.  In particular he acted as a paralegal or potentially

25   acted as a paralegal with respect to -- well, we talked about

1    this at least, in connection with his serving a document that

2    he had initiated on his own in a civil claim --

3            MS. ROE:  Move to strike.  It's not responsive to

4    the question.

5            THE COURT:   Go ahead and just -- go ahead and

6    explain what he did.

7        A.   Yeah, in connection with a civil suit that he had

8    brought against John (phonetic) and Kip Whelpley, which was a

9    suit of defamation, and basically the suit sought remedies of

10   various kinds including damages, and also it basically sought

11   a court order so that Mr. Whelpley could not come to the

12   United States to increase the damage that he'd allegedly done.

13       Q.   And with respect to that lawsuit, not the

14   extradition but the other lawsuit, all right?  With respect to

15   that lawsuit were you representing Mr. Rosenau in your

16   capacity as his attorney in that lawsuit?

17       A.   No, I was not.  It was Mr. Roberts' own bailiwick.

18       Q.   And did you have any conversations with or

19   communications with an attorney representing Mr. Whelpley

20   regarding that lawsuit?

21       A.   Yes.  He thought that I had initiated it, and I

22   denied that I had, and that ended the communication.  He knew

23   that Mr. Roberts I believe had initiated that lawsuit.

24       Q.   And did you indicate to this attorney -- was his

25   name Mr. Moffat?

October 28, 2011

Page 38

1        A.    Yes, that's right.

2        Q.    Did you indicate to Mr. Moffat, Mr. Whelpley's

3    attorney, that you were not in any way involved in that

4    lawsuit and that Mr. Roberts was acting on his own in that

5    issue?

6        A.    Yes, that's right.  Because at that time I was

7    representing Mr. Rosenau in the extradition appeal to the

8    Supreme Court.

9        Q.    But in your capacity as his attorney on the

10    extradition, you and I did coordinate to partly to educate me

11    about what had occurred up in British Columbia; is that a fair

12    statement?

13        A.    That's correct.  And you came to my office, and in

14    fact Mr. Roberts was there as well, had driven down there, and

15    you made it very clear to him that you didn't want him

16    involved directly in serving Mr. Whelpley with the order,

17    because there was a -- I should explain.  There was a default

18    order.

19            MS. ROE:  Objection, your Honor.  (Inaudible).

20            MR. PLATT:  Well, I can ask another question.

21            THE COURT:  Go ahead.

22        Q.    I want to look back a little bit before that.  Back

23    in May 2011 when I first became involved --

24        A.    Right.

25        Q.    -- do you recall us having communication about you

Page 39

1  informing me about this other lawsuit and there was a question

2  about the no contact conditions that were imposed on Mr.

3  Rosenau, do you recall that?

4      A.   Yes, I do.

5      Q.   And do you recall that I informed you I would check

6  with Julie Busic and find out whether or not that would be a

7  problem?

8      A.   Yes, I remember that.  It was on the 24th of May, I

9  believe.  You had indicated or I had asked you whether it was

10  all right for us to continue, you know, in some capacity to

11  serve that order.

12      Q.   And on the 25th of May do you recall I sent an email

13  telling you that I'd just got off the phone with Ms. Busic --

14      A.   Yes.

15      Q.   -- and we determined it would at that point not be

16  necessarily an issue?

17      A.   Yes, that's correct.

18      Q.   But at that point were you acting in your legal

19  capacity for Mr. Rosenau or were your simply acting as his

20  extradition attorney making sure there were no complications

21  with the case?

22      A.   That's right.  I didn't want Mr. Rosenau to be

23  breached in any way.

24      Q.   And did you have any contact with Mr. Roberts about

25  informing him not to have contact with this other individual?

Page 40

1    A.    Yes.  I told him not to have direct contact with the
2  other individual.
3    Q.    How did you tell him that the process service should
4  be done?
5    A.    By process server or by sheriff.
6    Q.    And as far as you know, did Mr. Roberts follow those
7  instructions?
8    A.    Well, I thought he was going to, but as it turned
9  out, Mr. Roberts contacted me last week and said that he felt
10  that this is the time for us --
11    MS. ROE:  Objection (inaudible) Mr. Roberts, what he
12  said.
13    THE COURT:   Why don't you ask another question
14  because I think this is an answer to some other question.
15    MR. PLATT:  Right.
16    Q.    What did you learn of whether or not Mr. Roberts was
17  following instructions about serving paperwork?
18    A.    Well, basically he wasn't following instructions.
19  Mr. Roberts is a loose cannon.  He very often goes off on his
20  own, and since he initiated this claim in the first place, I
21  think he wanted to make sure that it didn't fall on deaf ears
22  and that it was served properly on Mr. Whelpley.  To that end
23  he called me, and I said make sure this goes through legal
24  channels and that it's done through process server.  He said
25  that he had contacted a sheriff and that he would do it that

1   way.  He did not consult me.  I understand that he sent an

2   email and he did not consult me about that ahead of time at

3   all.

4       Q.    And you didn't want there to be a problem with any

5   allegation that Mr. Rosenau was involved with contact; is that

6   correct?

7       A.    Precisely.

8       Q.    So had you and I discussed our concerns about Mr.

9   Roberts and his ability to follow instructions?

10      A.    I think we talked about it -- well, as I say, he's

11  rather a loose cannon.  He does what he does, he's Irish.

12  Sorry.  But that's basically -- that's basically the way he

13  operates is as an individual, and it's difficult to know when

14  he's going to follow instructions because he really

15  (inaudible).

16      Q.    Have you spoken to him specifically about whether or

17  not he obtained approval from Mr. Rosenau or had anything to

18  do with Mr. Rosenau with respect to this email that was sent

19  in the last few weeks?

20           MS. ROE:  Objection as to the double hearsay, your

21  Honor.

22           MR. PLATT:  It's the 1101, your Honor.

23           THE COURT:   Go ahead and answer if you know the

24  answer.

25      A.    Yeah, I do know the answer.  In talking to them

October 28, 2011

Page 42

1     individually, Mr. Rosenau was quite upset that Mr. Roberts had

2     taken that step because he felt that, you know, it might put

3     him in jeopardy.  And Mr. Roberts told me that he had

4     specifically done -- acted alone and had decided to do this

5     partly because we as lawyers were not acting precipitously

6     enough to serve Mr. Whelpley.

7          Q.   Now, there was a meeting up in Canada in mid August,

8     do you recall that, with myself and you?

9          A.   Yes.  Yes, I do.

10         Q.   And Mr. Roberts at one point was at the meeting; is

11    that correct?

12         A.   That's correct.

13         Q.   And Mr. Rosenau was there at the same time?

14         A.   That's right.

15         Q.   And do you recall me cautioning everyone that there

16    should be no contact with Mr. Whelpley?

17         A.   Yes, in particular that Mr. Roberts should not

18    contact him alone.  And I gave the same instruction to him.

19         Q.   And how would you characterize the way that I

20    relayed that instruction to Mr. Roberts?

21         A.   No uncertain terms.

22         Q.   And was Mr. Rosenau there when I said that?

23         A.   Yes.

24         Q.   And was there any resistance by Mr. Roberts to what

25    I was telling him or anything that you heard?  Did you hear

October 28, 2011

1    Mr. Rosenau say anything about that?

2        A.    That's kind of a double question.  Mr. Roberts

3    wasn't upset.  He acknowledged that we would be responsible,

4    that I would somehow take the step, and I think that was the

5    context in which I asked your earlier question.  Should I

6    decide to serve this on Mr. Whelpley, would that be okay and

7    it would not jeopardize Mr. Rosenau's status, and you said

8    that's fine, you'd clear with Ms. Busic,  and you eventually

9    gave me an email to that effect.  When it comes to Mr.

10   Rosenau, I think he was just standing there at the time that

11   we had this dialogue with Mr. Roberts.  It's a 3-way dialogue

12   rather than 4.

13       Q.    Did you hear Mr. Rosenau say anything to Mr. Roberts

14   about whether or not he should serve that paperwork himself?

15            MS. ROE:  Again, your Honor, I object.  The

16   defendant is here and can testify.  It's hearsay.  I know

17   it's --

18            THE COURT:  Go ahead if you (inaudible).

19       A.    As I recall, Mr. Rosenau said, yeah, don't do

20   anything to breach me, for goodness sake, words to that

21   effect.

22       Q.    All right.  Is it a crime in British Columbia to

23   serve a person named in a lawsuit with valid pleadings

24   pursuant to that lawsuit?

25       A.    Of course not.  It's normal process.

October 28, 2011

Page 44

1                    THE COURT:    That was a rhetorical question.

2        Q.    Although you're not involved in that separate

3    lawsuit with the order relating to travel, are you aware of

4    whether or not that's a real lawsuit?

5        A.    Yes, a real lawsuit.  It's real.  A real looker

6    springs out of it.

7        Q.    And is that a real order?  I mean that's not a

8    forgery or anything?

9        A.    No, it's a valid order, certainly looks it to me in

10    every respect.

11                    MR. PLATT:  Nothing further.  Thank you, Mr.

12    Botting.

13                    THE COURT:   Ms. Roe, any questions?

14                    MS. ROE:  Yes, thank you, your Honor.

15                    C R O S S - E X A M I N A T I O N

16    BY MS. ROE:

17        Q.    Mr. Botting, I talked to you on the phone yesterday;

18    is that right?

19        A.    That's correct.

20        Q.    Okay.  And you were I think driving because you

21    were -- I called your cell phone, and you pulled over and

22    chatted with me for a few minutes?

23        A.    That's correct.  I did pull over.

24        Q.    Thank you very much for doing that.  At that time

25    you said that Paddy Roberts was your paralegal, right?

October 28, 2011

Page 45

1     A.   Yes.

2     Q.   And that what he did was you said acting somewhat

3  beyond what I asked him to do.

4     A.   Yes.

5     Q.   And that is you asked him to have it served by the

6  sheriff; is that right?

7     A.   Yes.

8     Q.   Okay.  And then you indicated just now that you have

9  reviewed the order in the civil defamation case.

10    A.   Yes.

11    Q.   And it's a real order in your mind.

12    A.   In my mind, yes.

13    Q.   And you've reviewed the filings also?

14    A.   I believe a long time ago, but not recently.  I

15  should --

16    Q.   Let me ask you --

17    A.   Well, no, I have to clarify something because it's

18  not quite right.  Mr. Roberts was not acting as my agent or as

19  my paralegal in terms of deciding to serve this.  He phoned me

20  up, asking me how he should serve it.  In other words, he

21  initiated that, and I said either by process server or

22  sheriff.

23    Q.   And in fact, you told me that yesterday and said the

24  process server would cost $300, sheriff $100.

25    A.   Yes.

Page 46

1      Q.    So you discussed the service of this with him.

2      A.    That's right.

3      Q.    And he has been a paralegal in your office or

4   continues to be?

5      A.    Not in my office.  In the interior B.C.

6      Q.    Okay.  So paralegal for you in your law practice.

7      A.    Right.

8      Q.    So you received the paper and the order in the civil

9   defamation suit from Mr. Roberts.

10     A.    Yes, that's right.

11     Q.    Is Mr. Roberts here today?

12     A.    No.

13     Q.    Is he in the country?

14     A.    No.

15     Q.    Did he think of coming with you or did you ask him

16   to come with you?

17     A.    I asked him to stand by so that you could

18   interrogate him or ask him questions or ask him questions on

19   his affidavit which he had signed earlier on that I had seen.

20     Q.    And do you know why he didn't come to the United

21   States?  Could it be because he has a warrant outstanding for

22   drug importation?

23     A.    I have no idea whatsoever about anything to do with

24   that.

25     Q.    You know Mr. Roberts faced those charges in Canada

October 28, 2011

Page 47

1  at the same time the U.S. was trying to extradite him on
2  those?
3       A.   I have no knowledge of that whatsoever.
4       Q.   Have you ever looked at his blog?
5       A.   I beg your pardon.
6       Q.   Have you ever looked at Paddy Roberts' blog?
7       A.   I think I did at one point, very -- well, not his
8  blog so much as his web site, whatever it is that he has.
9       Q.   And his stories in the newspaper that he writes,
10 like cannabis and the magazine?
11      A.   I've looked at a couple.
12      Q.   And he really feels that extradition to the United
13 States is a violation of sovereignty, doesn't he?
14      A.   You could put it that way, especially when you can
15 prosecute in Canada and it's not extradition.  It's certain
16 times of extradition such as this one where actions take place
17 in Canada and in the United States, and Canada never -- it
18 always turns a blind eye and refuses to prosecute in Canada,
19 and it seems ridiculous that people should be sent out of
20 their homeland and into a -- well, a city like Seattle or in
21 California or all over the states.
22      Q.   And you feel that way --
23      A.   And typically what happens is that Canada will not
24 prosecute its own people, and that is Mr. Roberts' main
25 concern.

Page 48

1       Q.   And you're in agreement or sympathetic to that,

2   aren't you?

3       A.   I wouldn't say -- am I sympathetic?  Yeah, I'm

4   sympathetic.  Am I in agreement?  Well, I think extradition

5   process is extradition process.  I write books on extradition,

6   and basically of course I take an objective stand on that, but

7   increasingly I think this is disappointing that Canada does

8   not take its responsibility properly in my view.

9       Q.   And that it turns over its citizens in to the United

10  States --

11      A.   The United States, yeah.

12      Q.   Mr. Botting, did you -- have you ever been up to Mr.

13  Rosenau's home in Quesnel?

14      A.   No.

15      Q.   Why?  Is it far?

16      A.   Yes.

17      Q.   How many hours?

18      A.   Four or 5.  No, it's more than that because --

19      Q.   8 hours?

20      A.   Probably 6 hours, yeah.

21      Q.   You were his attorney on the extradition, is that

22  correct, just the appeal?

23      A.   Yes, to the Supreme Court of Canada only.

24      Q.   And your representation began in November of 2010?

25      A.   That's correct.

October 28, 2011

Page 49

1     Q.    And then the appeal was denied when?

2     A.    It wasn't denied.  It was -- the leave to appeal was

3  not granted.

4     Q.    Okay.  So not accepted.  It was like cert denied.

5     A.    Yes, and of course that happens to almost all but

6  200 cases a year out of 3000.

7     Q.    By far the majority, isn't that right?

8     A.    Right.

9     Q.    So when was that done?

10    A.    Oh dear.

11    Q.    In April?

12    A.    I can't recall the exact time.

13    Q.    And at that time you had completed or exhausted all

14  remedies on the extradition in Canada; is that correct?

15    A.    That's correct.

16    Q.    And was your representation of him done?

17    A.    Technically, yes.

18    Q.    I'd like to hand what's been marked exhibit 4.  Mr.

19  Botting, is that a letter that Mr. Platt asked you about, you

20  referenced in your direct testimony?

21              (Exhibit 4 marked.)

22    A.    Yes, that's correct.

23    Q.    And that's the one that you sent to Mr. Moffat, a

24  lawyer Kip Whelpley contacted in March or February of 2011?

25    A.    That's right, and this says I represent Mr. Rosenau

Page 50

1   strictly for his appeal of committal for extradition.

2        Q.   Right.  Okay.  And at that time you indicated your

3   familiarity with this civil lawsuit or civil, you know,

4   whatever it is, lawsuit that Paddy Roberts, using his Gaelic

5   name, had brought against Mr. Whelpley; is that right?

6        A.   If you can point that out to me in here?

7        Q.   You have had nothing to do but to give advice -- you

8   understand about it.  The emails in the second paragraph were

9   between the two people, your name has been used, but you sort

10  of separate yourself from that lawsuit.

11       A.   Yes, okay.

12            MS. ROE:  I offer exhibit 4.

13            THE COURT:   Mr. Platt?

14            MR. PLATT:  No objection.

15            THE COURT:   All right.  Number 4 is admitted.

16              (Exhibit 4 admitted.)

17            MS. ROE:  Nothing further then, your Honor.

18            THE COURT:   Mr. Platt?

19            R E D I R E C T   E X A M I N A T I O N

20  BY MR. PLATT:

21       Q.   By the way, is it Mr. Botting or Dr. Botting?

22       A.   I go by both, but doctor, yeah, is fine.

23       Q.   Is it a crime -- well, let me ask you this.  Have

24  you had an opportunity to review the email that was sent

25  within the last couple weeks allegedly by Paddy Roberts to Mr.

October 28, 2011

Page 51

1    Whelpley?

2         A.   I read it.  I do recall it.

3         Q.   In your opinion is that email -- does that

4    constitute a criminal act?

5         A.   No.

6         Q.   Okay.  Not under the laws of British Columbia; is

7    that correct?

8         A.   No, I think he's warning Mr. Whelpley that if he

9    comes down to the United States, he would be in contempt of

10   court.  That's by context, and indeed, he would be.

11        Q.   Now, Ms. Roe asked you about whether or not you

12   separate yourself from Mr. Roberts, and I want to ask you

13   about why.  Is one of the reasons you separate yourself from

14   Mr. Roberts because he's a bit of a loose cannon?

15        A.   Yeah.  You have to be very much -- be very specific

16   and direct with him, and now apparently even if you are

17   specific and direct as you and I have both been, he still acts

18   on his own initiative sometimes, especially in this particular

19   case it almost becomes a project.  He initiated the civil suit

20   in the first place, and he may have had the nod at the

21   beginning, but, you know, I chose not to serve this document,

22   and when finally he said, okay, now's the time to serve it, we

23   got to serve it, we got to serve it, we got to serve it, I

24   said, well, make sure you do it in a legal way then, either

25   through a sheriff or process server, and the email came as a

October 28, 2011

Page 52

1  complete surprise, but it's not illegal, no.

2      Q.    Would you characterize his interests in this area as

3  borderline if not totally obsessive?

4      A.    Obsessive is pretty close.

5      Q.    And it's true and you've been asked about this and

6  testified that your dealings with Paddy, it's very obvious

7  that he feels very strongly about these issues of extradition;

8  is that right?

9      A.    Yes, he feels very strongly, to the point that --

10  you know, he doesn't trust lawyers.  I don't think he trusts

11  you and I.  I don't think he trusts me either, but sometimes

12  he thinks that we are much too conservative, you know, that we

13  don't act quickly enough and he's drafted affidavits that are

14  frankly inflammatory.  As I say, he's a loose cannon, and it's

15  very hard to control somebody like that.

16      Q.    And have you seen an affidavit that he prepared for

17  this hearing where he talks about how he did this on his own

18  without Mr. Rosenau's sworn affidavit?

19      A.    Yes, I have.

20      Q.    So is it fair that it's somewhat of a personal issue

21  for him, this whole question of extradition, that he takes it

22  personally?

23      A.    Yes.  Initially he attempted to have Mr. Rosenau

24  charged in Canada so that any details, you know, that might

25  come out of this, like out of the extradition hearing would in

October 28, 2011

Page 53

1   fact be dealt with in a Canadian court rather than in an

2   American court and thereby avoiding extradition altogether,

3   and that of course the expectation was that the Canadian court

4   would simply throw it out because there was no -- there was

5   not enough evidence whatsoever.  So, you know, that's how he

6   was fighting off the extradition.

7          He did the same thing with Mark Emery (phonetic),

8   just trying to charge him domestically so that the Canadian

9   courts could meet their responsibility.  But this is a

10  political ploy on his part.  It's strictly a political gambit

11  where he tries to involve himself in other people's business,

12  shall we say, and in this case that's how he I think became

13  involved.

14         Q.   And he considers himself or he is the leader of a

15  political party whose stated purpose, one of them, is to

16  secede from the rest of Canada; is that correct?

17         A.   That's correct.

18         Q.   So does it surprise you that he would go off and act

19  independently even after we've instructed him not to do so?

20         A.   Well, it doesn't surprise me.  You want to tap into

21  that kind of enthusiasm I suppose at one level, but there are

22  downsides to that in this case.  We wouldn't know here if it

23  wasn't for his acting precipitously to try to get this -- Mr.

24  Whelpley served with the results of his litigation.

25         Q.   Now, you were asked about your feelings regarding

October 28, 2011

Page 54

1    the extradition process by Ms. Roe, and I'd like to follow up

2    on that.  Is it fair to say that to the extent you have a

3    problem with extradition that you have a problem with the way

4    the extradition was handled in Mr. Rosenau's case.

5         A.   Yes.

6         Q.   What is it?

7         A.   Well, first of all, the record of the case seems to

8    be something --

9              MS. ROE:  (Inaudible) with the underlying

10   (inaudible).

11             THE COURT:   I'm going to sustain that objection

12   only because we're not going to relitigate the litigation in

13   Canada at this point in this court.

14             MR. PLATT:  No further questions.  Thank you.

15             THE COURT:  All right.  Ms. Roe.

16             MS. ROE:  Your Honor, I have a point of inquiry.

17   Mr. Platt mentioned an affidavit from Mr. Roberts, and I

18   haven't seen that.  Relating that, may I ask --

19             MR. PLATT:  We're not offering it, your Honor.

20             MS. ROE:  Then I have no further questions.

21             THE COURT:   All right.  May Mr. Botting step down?

22             MR. PLATT:  Yes.

23             THE COURT:   And can he be excused if he wants to

24   go?

25             MR. PLATT:  Yes, your Honor.

October 28, 2011

Page 55

1           THE COURT:   All right.  Thank you very much, Mr.

2    Botting.  And Mr. Platt, additional witnesses?

3                (Witness excused.)

4           MR. PLATT:   Your Honor, I have a point of order to

5    inquire.

6           THE COURT:   Sure.

7           MR. PLATT:   I've never been in this situation

8    before, but if possible, and I normally never ask constructure

9    (phonetic) from the court, but we've debated whether or not we

10   wanted to put Mr. Rosenau on the stand for the very limited

11   purpose of responding to whether or not he directed Mr.

12   Roberts in any way to have this contact.  That seems to be the

13   gist of the entire violation.  But we would not want him to be

14   in any way considered to be waiving his fifth or sixth

15   amendment right, that he would not be cross-examined on

16   anything to do with the underlying offense, and that we would

17   strictly limit the inquiry to the specific issue of whether or

18   not he instructed Mr. Roberts or authorized or approved this,

19   comparable to a 3.5 hearing.

20          THE COURT:   Ms. Roe, what's your I guess position?

21          MS. ROE:   Your Honor, I think the appropriate

22   testimony if it's to be so limited would be coming from Mr.

23   Roberts as to his instructions.  I think it would be -- since

24   the scope of this hearing has been so broad that should Mr.

25   Rosenau take the stand, it should be equally broad regarding

Page 56

1  the lawsuit, the civil suit, what was expected, really bigger

2  than just a very limited question of whether he got --

3           THE COURT:   All right.  Mr. Platt?

4           MR. PLATT:   I have no response.  I would just --

5           THE COURT:   Well, I understood your first request

6  as a request to limit the examination as to matters relevant

7  to this hearing, although maybe your idea of the scope of that

8  limitation may be different than the scope as understood by

9  Ms. Roe, and I think what Ms. Roe is saying is that what's

10  before her or what's before the court has this whole issue

11  about what is your client's involvement in this lawsuit, and

12  it's not limited to a few questions about what he specifically

13  said on a certain day to Paddy Roberts or not.  So I don't

14  know if that is putting words in Ms. Roe's mouth, but I think

15  I suppose that -- I can't give you an advisory opinion or

16  ruling sort of in the abstract here because as you probably

17  could surmise, I suppose the questions rise and fall on how

18  relevant they are to the question before the court.

19           You know, we're not going to allow a situation where

20  Ms. Roe is going to say, well, let's talk about the charges

21  and helicopters or things like that.  Perhaps that would be

22  reserved for trial if your client wanted to testify then, but

23  of course I would have to make relevance determinations as to

24  any question posed in cross-examination as it relates to the

25  issue before me.  So that's about all I can say.

1          MR. PLATT:  That's extremely useful, your Honor.

2          THE COURT:   And I say this, Mr. Rosenau, because

3  you do have a right, as your lawyer is probably indicating, to

4  testify if you want.  You have the right not to testify.  It's

5  your decision to make between yourself and your lawyer.  All

6  right?  And so Mr. --

7          MR. ROSENAU:  I think I understand.

8          THE COURT:   So Mr. Platt, it's up to you how you

9  want to proceed at this moment.

10         MR. PLATT:  May I have just one moment, your Honor?

11         THE COURT:  Sure.

12         MR. PLATT:  Your Honor, this is a very difficult

13  decision, but we have no further witnesses at this time.

14         THE COURT:   All right.  All right.  So I guess I

15  should hear closing remarks.  Ms. Roe, why don't you start

16  off, and then we'll hear from the defense.

17         MS. ROE:  Your Honor, this is really an interesting

18  question of whether the court's going to enforce the

19  conditions of a release for a defendant who really seems to be

20  unsupervisable at this point.  He lives far from the border.

21  Ms. Busic has done a good job and tried to keep in touch, but

22  clearly there have been games being played for the lasts few

23  months.

24         The defendant has a presumption of being detained,

25  and at this point now the government's position is that he,

October 28, 2011

Page 58

1    through his friend Paddy Roberts, a drug -- a pilot who has

2    been charged with delivering marijuana into the United States

3    also, has acted on behalf of Mr. Rosenau and with Mr.

4    Rosenau's permission.

5              What's interesting about exhibit 4, the letter that

6    Mr. Botting authored, is the lasts paragraph in which he says,

7    you know, Mr. Rosenau gives instructions and we follow them,

8    and I think it's pretty clear that that's what's happening.

9    Mr. Rosenau is no fool.  He had someone else do it.  Probably

10   wisely or perhaps wisely, Mr. Botting wasn't going to do it,

11   but he had his friend Paddy Roberts do it under his Gaelic

12   name.

13             Most importantly, too, is that this had nothing to

14   do with an extradition order.  This is pure and simple trying

15   to stop a against Mr. Rosenau from testifying and being

16   available in court, and the history of this lawsuit, this

17   notice and defamation suit and this default order is what's

18   amazing here and what's important because it's all done to

19   stop the trial from going forward.

20             No one in this courtroom knows the validity of that

21   Canadian order, so the government cannot ask Mr. Whelpley to

22   ignore it, and we cannot hold him harmless for doing that.  It

23   may be a valid order, at least it seems to be at this time.

24   This is an attempt by Mr. Rosenau to thwart the witnesses

25   against him.  As such it is a violation of his supervised

1   release.  He is presumed to have been detained and we ask that

2   he be detained now as he has not conformed and is unable --

3   and the court is unable to assure that he is conforming with

4   the terms of his supervision.

5              THE COURT:  All right.  And Mr. Platt.

6              MR. PLATT:  Thank you, your Honor.  I know this

7   hearing has gone long, your Honor, but the reason is it's --

8              THE COURT:  No rush.  No rush.  Go ahead.

9              MR. PLATT:  Thank you.  Just responding to the point

10  about the term instructions.  I worked in London for a while

11  with a solicitor firm, and instruction means whether or not

12  you're retained.  That's really what that means.

13             And in that letter what Mr. Botting is saying over

14  and over again is I'm not involved in this.  How can I respond

15  if I haven't been instructed.  If I'm instructed, I'll

16  respond, and the implication is he wasn't instructed.  So to

17  flip that on the other side and say somehow that shows he was

18  instructed is patently absurd.

19             With respect to the violation here, the standard

20  that the court should apply is clear, cogent, and convincing

21  evidence.  Obviously the burden here is on the government.

22  Our position is that the evidence at this hearing is far from

23  clear, cogent, or convincing in terms of what happened about

24  this contact by Mr. Roberts with Mr. Whelpley, and there is

25  basically no evidence that Mr. Rosenau in any way authorized,

Page 60

1   requested, approved, or facilitated any action by Mr. Roberts
2   with respect to to Mr. Whelpley.
3              In fact, the only evidence offered in that regard is
4   to the contrary, that Mr. Roberts goes off on his own, he does
5   things on his own, he's hard to control, he was repeatedly
6   told not to have contact and did anyway, that he was told at a
7   meeting where Mr. Rosenau was participating not to have
8   contact with Whelpley, and that he did so anyway.  There's no
9   evidence to the contrary.  There is zero evidence linking Mr.
10  Rosenau with what occurred here whatsoever, none.  So Mr.
11  Rosenau did not authorize the email sent by Paddy Roberts, and
12  he denies any involvement in that.
13             Number two, in addition, all emails other than this
14  email in the last couple weeks were dated prior to the
15  imposition of pretrial release conditions in this case.
16  Therefore, it is essentially impossible for those to be
17  considered violations.  That would be an ex post facto
18  application of the conditions of release in this case, back in
19  time.  You can't impose conditions and then violate someone
20  because before those conditions were imposed there's an
21  allegation of violation.
22             But we don't even agree it is a violation.  Service
23  of process of legitimate legal pleadings which, let's face it,
24  includes notifying someone about the service, that's
25  legitimate.  You can call somebody up and say I got to serve

October 28, 2011

Page 61

1    you with legal papers.  It happens every single day.

2           There's also an implication here which we didn't get

3    too far into, but something about the lawsuit in Canada is

4    vexatious.  Well, I think every lawsuit is vexatious to the

5    person involved.  That doesn't mean it's illegal or it's

6    invalid or it's not proper.  There's nothing improper

7    whatsoever about the lawsuit that was prepared here, and

8    there's an implication that somehow that constitutes some kind

9    of interference with the witness.

10          And above all, the question of service of process

11   was brought to the attention of the person who is in charge of

12   reviewing whether or not the conditions are being followed,

13   and that's Julie Busic.  Early on in the case, a few weeks

14   after I was appointed, we contacted Ms. Busic, we taulked

15   about it.  I told her there was a lawsuit.  She read her

16   notes, she said that.  And she said that she didn't have a

17   witness list, but we assumed for the purpose of that

18   conversation that this would be a witness.  We couldn't have

19   been any more above board.  We weren't hiding the ball at all.

20          So filing the lawsuit is not a violation, and I

21   think there's an analogy here that is very relevant, and that

22   would be in the context of a dissolution.  It is quite common

23   for -- and unfortunate, but quite common that you would have a

24   husband who hits his wife and she wants a divorce.  The

25   husband winds up charged in criminal court, and there's also a

Page 62

1    divorce suit pending.  The husband no doubt will have a no

2    contact condition imposed, domestic violence no contact order

3    of some kind.  He retains counsel.  The attorney for the

4    husband may represent him in both the dissolution and the

5    criminal matter.  If he represents them in the dissolution,

6    it's quite likely that he would file the dissolution petition,

7    and if there are temporary orders, especially if it involves

8    children and so on, there could be affidavits filed by the

9    husband denying and disputing the subject matter of the

10   criminal case.  This is not a violation of the no contact

11   order.

12          Here we have a lawsuit disputing the allegations

13   made by Mr. Whelpley essentially saying that he's lying and

14   he's defaming Mr. Rosenau, and to serve him with such

15   paperwork or to make arrangements for that service could not

16   possibly be a violation of a no contact condition.  In fact,

17   I'm not sure, but I recall there was somewhat of a colloquy by

18   the court in the very first hearing where Mr. Rosenau was

19   released talking about you've got Mr. Platt as your attorney,

20   let him deal with all these things, and you admonished Mr.

21   Rosenau not to have any contact, and by implication verified

22   that it would be acceptable if I did have contact, and that's

23   all this amounts to.

24          So we're saying, you know, it's arguable there's not

25   a violation here at all, even by Mr. Roberts, even if he were

October 28, 2011

Page 63

1   acting with authority, which he was not.

2         So Mr. Roberts acted totally alone.  He was told by

3   everyone not to be involved in this, and Mr. Rosenau

4   specifically told him he didn't want to be breached on his

5   pretrial release conditions because of Mr. Roberts' behavior.

6   Personally I never knew anything about any of these emails

7   until they were provided to me a couple days ago.  I did know

8   about the lawsuit obviously.  But Mr. Roberts -- we're not

9   offering the affidavit because he cannot stay on task.  He did

10  supply an affidavit that was absurd, lengthy.  We're not

11  wasting the court's time with it, but in that he does say as

12  Mr. Botting indicated that he acted alone without any --

13        MS. ROE:  Objection as to something that's not

14  before the court (inaudible).

15        MR. PLATT:  Well, it was testified to.  So the other

16  argument the government may wish to make is that somehow this

17  lawsuit is illegal.  That's why I asked those questions.  This

18  is a legal order, it's been properly filed.  Mr. Botting

19  talked about that.  It was issued by a judge in Canada.  If

20  that's a crime, then the judge who issued the order is part of

21  the crime.  It's a legitimate legal process.  It was approved

22  in advantages by Ms. Busic, and I also asked Mr. Botting, who

23  is an attorney in British Columbia whether or not the emails

24  sent by Mr. Roberts constitutes a crime, and the answer was

25  no.  Ms. Roe herself has indicated that we don't know British

Page 64

1   Columbia law, so they can't show here that any crime occurred.

2   It has to be a violation of conditions, and they have to show

3   that by clear, cogent, and convincing evidence, which they

4   haven't done.

5          There are some things that weren't brought up in

6   testimony, but they're in the brief filed by Ms. Roe, and I

7   think they should be addressed.

8          There is an implication here of some impropriety

9   with the way we characterize the issue in our response to the

10  government's motion for authorization of deposition, which I

11  take strong issue with.  The implication there is that somehow

12  we were hiding the ball on the fact that there was this

13  lawsuit in British Columbia.  We obviously weren't.  I told

14  Ms. Busic about it early on.

15         Not only that, if you read the conclusion in that

16  document, it's document number 28, in the conclusion we say

17  the government has not met their burden.  Instead Ms. Roe

18  inserts a footnote in her brief where she quotes us as saying

19  that there is no issue here.  Now, that's a bit of a side

20  issue, but it's there, and I think it needs to be addressed.

21         Our conclusion is very clear.  The government had

22  the burden of showing that there were some substantial basis

23  for the request for a foreign deposition.  They didn't do it,

24  and the court ruled that in fact they would not be allowed to

25  have this deposition.

October 28, 2011

Page 65

1          As far as whether or not we knew anything about

2    whether or not the lawsuit would prevent someone from coming

3    to the United States, I don't think anyone in this courtroom

4    is clear on that.  That involves law in Canada, and I don't

5    think any of us totally understand it.  Mr. Erickson agreed

6    with that.

7          One thing that is interesting about the deposition,

8    though, is apparently the government was requesting a

9    deposition of a witness where there was a lawsuit supposedly

10   preventing him from leaving Canada, and yet nowhere is there

11   any discussion whatsoever of that lawsuit, and yet it's the

12   only witness the government has asked to depose in this case.

13   So that means they set up a deposition apparently without

14   talking to the witness first or they would have found out

15   about this lawsuit.

16         There's also something that wasn't talked about

17   here, which is Mr. Steward (phonetic), Glen Steward, and him

18   being contacted by someone.  It's completely unclear, it's far

19   from convincing.  There's no indication whatsoever who talked

20   to Mr. Steward.  I can assure the court as an officer of the

21   court, I'd be willing to make an offer of proof to this

22   regard.  I talked to Mr. Steward, and our conversation was

23   about how I wanted him to testify and I wanted to make

24   arrangements to get him down here to testify at the trial.

25         So casting aspersions on the defense that we were

Page 66

1    somehow impeding Mr. Steward from coming down to testify, if

2    it was Paddy Roberts involved in that, that shows just how far

3    afield Mr. Roberts goes, that anybody telling Mr. Steward not

4    to come down here and testify would be going directly against

5    my strategy as the trial attorney for Mr. Rosenau.  So we have

6    no idea what that's about.

7            And further, I can tell the the court Mr. Rosenau

8    was well aware that we wanted Mr. Steward to come down here

9    and testify, and discussions were had talking about getting

10   Mr. Steward down here to testify and what's the best way to

11   make the arrangements, what date would he be needed, that kind

12   of thing.  So why anybody -- why Henry would have anything to

13   do with telling Mr. Steward not to come testify is ludicrous.

14           Your Honor, I said this last time and I'll say it

15   again.  The issue here is whether or not Mr. Rosenau is going

16   to appear for court and whether or not he's going to interfere

17   with witnesses.   The government has offered not one scintilla

18   of evidence that he would interfere with the witness.  They've

19   offered evidence that some other person who claims to be

20   acting as an agents of Mr. Rosenau had contact with Mr.

21   Whelpley, and yet they haven't even established that that

22   contact constituted a crime, and they have no evidence that

23   Mr. Rosenau was involved in that contact in any way, shape, or

24   form.

25           The only evidence offered is exactly the opposite,

1  that he did not authorize, he did not approve.  There's

2  evidence about the meeting we had where Mr. Rosenau told Mr.

3  Roberts not to have contact.  There's zero evidence to the

4  contrary.

5        I'll close with what I closed with at the first

6  hearing, which is the presumption of innocence.  There is an

7  implication here that this lawsuit is vexatious because it is

8  not well founded and it's not well founded because it can't be

9  true, and it can't be true because everyone knows Mr. Whelpley

10  is telling the truth, and anyone saying otherwise is somehow

11  doing an illegal act.  That's like an irrebuttable presumption

12  of guilt.  Our presumption is the presumption of innocence

13  applies here.  Mr. Rosenau is presumed innocent.  There is

14  absolutely no showing that he violated these conditions, and

15  there's no showing that this lawsuit in Canada constitutes any

16  violation of conditions, and it does not constitute a crime;

17  therefore, there is no basis for the government's position.

18  Thank you.

19        THE COURT:  All right.  Ms. Roe, any brief

20  rebuttal?

21        MS. ROE:  No, your Honor.

22        THE COURT:  All right.  So, Mr. Rosenau, today is a

23  sad day because I will find that there is a violation of the

24  alleged condition.  There is a violation of the condition of

25  supervision regarding the contact, and let me kind of, you

October 28, 2011

Page 68

1    know, set this straight because the arguments have kind of
2    ranged all over the place regarding the propriety of lawsuits,
3    and I think in some ways we're all kind of missing the point
4    here.
5              I'm not here to discuss the laws, extradition laws,
6    if they're good or bad.  I'm not here to discuss whether
7    somebody can bring a civil lawsuit in Canada or not.  We're
8    here to discuss whether or not there was indirect contact in
9    this case, and your lawyer says that there is no evidence or
10   not a scintilla of evidence in this case, but I think the
11   evidence in this case indicates that there is in fact a very
12   direct connection between you and the contact in this case.
13             Now, we do begin with Julie Busic, the probation
14   office pretrial service unit supervisor, going over the list
15   of witnesses.  They're in plain English.  Kip Whelpley is
16   there, and for you to tell her I don't recognize any of these
17   names is just frankly not really believable, especially since
18   Kip Whelpley was just sued this year and you're the named
19   plaintiff, and also because his name is in the discovery in
20   this case, and so it would not be a surprise to anyone to see
21   Kip Whelpley as a witness and it would not be very believable
22   for you to say I don't recognize this person at all.
23             I did admit the exhibits presented by the government
24   over the defense objection regarding their relevance, and I'm
25   not here to say that I am relying on them as your lawyer says

October 28, 2011

Page 69

1   in an ex post facto way saying that the violations occurred in

2   January or February or sometime before May, but I do think

3   that they paint a fuller picture of what's going on, and I do

4   think they are relevant in terms of at least your knowledge as

5   to who Kip Whelpley is in relationship to your case.

6          I think we want to separate the difference between

7   is the lawsuit proper, is the order proper, which I don't have

8   to decide, versus whether there was contact or indirect

9   contact, which I do have to decide.  As your lawyer says, it

10  was okay for a lawyer actually representing you to in a lawful

11  way have contact with witnesses to do investigation as

12  appropriate.  That's Mr. Platt's job, to go and investigate

13  the criminal side.  That's Mr. Botting's job to investigate

14  and prepare the extradition side.

15         Well, Mr. Platt and Mr. Botting didn't act in this

16  case.  Instead we have Mr. Roberts, Paddy Roberts, with the

17  argument essentially he's out of control, no one can control

18  him, so just don't blame Mr. Rosenau, but you really can't

19  have your cake and eat it.  You can't have a benefit without

20  saying I take no responsibility, it's just a wild and crazy

21  guy doing this.  You're the named plaintiff.  You're the

22  beneficiary of an order.  You're the beneficiary of a lawsuit

23  and an order that still as far as I know stands at this very

24  moment, an order that says you have to pay me money, me, Mr.

25  Rosenau, the defendant in this criminal case, because you're

October 28, 2011

Page 70

1    lying or you've given lies regarding a criminal case pending
2    in the United States, and not only that, you're prohibited
3    from even leaving the country and entering the United States,
4    and that's still a pending order.
5          Now, your lawyer suggesting that, well, maybe the
6    order has no effect because we don't know the effect of the
7    order, and maybe that's true, there is nobody that has
8    testified as to the effect, but that order still stands, and
9    there have been communications regarding this order.
10          And so I do think that putting aside the propriety
11   of filing lawsuits and obtaining orders, and I don't have any
12   problem with that, but we're not here to decide that, that
13   there is evidence in this case given all of the evidence
14   presented of indirect contact.  And of course, you know,
15   although this is a wild man that everyone says we can't
16   control, this is your lawsuit.  You are the beneficiary of the
17   lawsuit.  You are the plaintiff.  You're the party in that
18   lawsuit, and if all these things were no good, you would have
19   sent some kind of letter.  You would have withdrawn the
20   lawsuit if you wanted to.  You would have sent some letter
21   saying I do not authorize any of these things.  You would have
22   contacted your lawyers, I do not not authorize any of these
23   things that Paddy Roberts is sending off, please ignore them.
24   That never happened.  It's just all Paddy's fault.  But
25   Paddy's not going to get the damages.  He's not the plaintiff.

October 28, 2011

Page 71

1   Paddy doesn't have anything necessarily to benefit from Mr.

2   Kip Whelpley coming or not coming to your trial.  That's your

3   case.

4           Regarding Mr. Steward, I do understand your lawyer's

5   point.  I mean Mr. Steward is sort of a side issue, and I'm

6   not here to decide anything, and there's no allegation that

7   you had anything to do with Mr. Steward's purported issue of

8   coming to the United States.  I don't have to decide that as a

9   violation.  That's really not in front of me, just as I don't

10  have to decide whether or not the lawsuit in Canada is

11  vexatious or not.  That is not the allegation, that a

12  vexatious lawsuit was brought in violation of a condition of

13  release.  The only issue is was there or was there not

14  indirect contact, and I find that there was in this case.

15          Now, your lawyer, find I should say, says that,

16  well, there's no violation because a lawsuit in Canada is not

17  a law violation, but witness tampering or obstruction is, and

18  to the extent -- I suppose the simplest way to say it is to

19  the extent the best defense is to make all the witnesses go

20  away, I think that this is not sort of farfetched to say

21  somebody is tampering with the witnesses because nobody is

22  going to show up for the trial and the trial will go away.

23          So I think that while I'm not here to say that the

24  lawsuit in and of itself standing alone is a law violation

25  under the laws of Canada, I do think in relationship to this

Page 72

1    case not the lawsuit but the contact and the communications --

2    the communication, since it is an October allegation,

3    essentially is one of those situations where one could easily

4    say this witness is being pressured or tampered with, and by

5    the way, as you know, under the witness tampering federal law

6    where it has to do with a witness for proceeding in a federal

7    proceeding, in a federal criminal proceeding, the state of

8    mind is quite relevant.  If it happens, it happens, and a

9    violation can occur.

10        So, Mr. Rosenau, I will find that the violation has

11   been proven in this case.  The government has moved for

12   revocation in this case, which means a remand to custody.  I

13   find that that is appropriate.  I know that you have otherwise

14   been doing very well on supervision, but when it comes to an

15   allegation that's not a technical kind of thing like were you

16   around somebody smoking marijuana or did you forget to turn in

17   a monthly report or you forgot to call Ms. Busic on one day,

18   things that perhaps you get a second or third chance, when it

19   comes to witnesses in a case and untoward contact, I think

20   it's grounds for both revocation and remand to custody.

21        Now, this decision of course, as your lawyer will

22   tell you, is reviewable by your district judge, Judge Pechman,

23   and I believe under the rules if you have any kind of appeal

24   or attempt to review, I'm advising you now so that you'll know

25   that you need to do that within 14 days of today's date.

October 28, 2011

Page 73

1    Otherwise you might be time barred in doing that.

2            All right.  Ms. Roe, anything further from the

3    government?

4            MS. ROE:  No, thank you, your Honor.

5            THE COURT:   Mr. Platt.

6            MR. PLATT:  Nothing further.  Thank you.

7            THE COURT:   All right.  So unfortunately, Mr.

8    Rosenau, you're being remanded to custody.  You might want to

9    talk to Mr. Platt.  If you have any valuables or cars to deal

10   with or whatever, to make arrangements right now.  You should

11   remain in the courtroom.  The marshall will come and escort

12   you to detention.  All right.  Anything further?

13           MS. ROE:  No, your Honor.

14           THE COURT:   We'll be in recess.

15           THE CLERK:  All rise.  Court is in recess.

16               (Proceedings terminated.)

17

18

19

20

21

22

23

24

25

October 28, 2011

Page 74

1                    C E R T I F I C A T E

2

3          I do hereby certify that the foregoing audiotape

4    hearing was transcribed by me as a transcriptionist; and that

5    the transcript is true and accurate to the best of my

6    knowledge and ability; and that I am not a relative or

7    employee of any attorney or counsel employed by the parties

8    hereto, nor financially interested in its outcome.

9          The portions of this transcript marked "(inaudible)"

10   were inaudible or indecipherable due to the speaker dropping

11   their voice or simultaneous speech.

12          IN WITNESS WHEREOF, have hereunto set my hand and

13   seal this _____ day of November 2011.

14

15

16

17          _____

18          Karen L. Larsen, RPR(Ret.)

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,          )          NO. CR06-157MJP
                                   )
                       Plaintiff,  )          GOVERNMENT'S RESPONSE
                                   )          TO DEFENDANT'S MOTION FOR
            v.                     )          REVOCATION OF DETENTION
                                   )          ORDER
HENRY CARL ROSENAU,                )
                                   )
                      Defendant.   )
_____)

# Exhibit 14

*U.S. Probation And Pretrial Services Office*
*Western District of Washington*

# Memorandum

| | |
|---|---|
| DATE: | June 13, 2011 |
| REPLY TO: | Julie M. Busic<br>Supervising U.S. Probation Officer<br>Pretrial Services Unit |
| TO: | Henry Rosenau |
| cc: | Craig Platt |
| SUBJECT: | **No Contact Requirements** |

Upon consultation with the parties, in order to be in full compliance with the following conditions:

- You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) in this case.

- You shall not have direct contact or indirect contact with any existing and/or future witnesses in this case.

You are prohibited from having direct/indirect contact with the following:

Stacy Hinckley
Donald Cramer
Wesley Cole
Braydon Miraback
Zachary Miraback
Birgis Brooks
Brian Fews
Trevor Schouten
Kip Whelpley
Jonathan Senecal
Alexander Swanson
Timothy Smith
David Mendoza
John Sanders



JUL 1 2 2011

In the event that you have any accidental/incidental contact or are contacted by any of the above-named individuals, you must immediately terminate the contact and report it to Pretrial Services and your attorney of record.

My signature below acknowledges the above requirements.

Henry Rosenau
Date: JUNE 20/11

CAUSE *USV-Rosenau*

PLAINTIFF
EXHIBIT
NO. *2*

ADMITTED *10/28/11*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR06-157MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION FOR |
| v. | ) | REVOCATION OF DETENTION |
| | ) | ORDER |
| HENRY CARL ROSENAU, | ) | |
| | ) | |
| Defendant. | ) | |

# Exhibit 15

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                     AT SEATTLE

8    UNITED STATES OF AMERICA

9                        Plaintiff,           Case No. CR06-157-MJP

10          v.                                **DETENTION ORDER**

11   HENRY C. ROSENAU,

12                        Defendant.

13   Offenses charged:

14          Conspiracy to Import Marijuana;
            Conspiracy to Distribute Marijuana; and
15          Possession of Marijuana with Intent to Distribute.

16   Date of Detention Hearing:  October 28, 2011.

17          The Court, having conducted a detention hearing pursuant to Title 18 U.S.C. § 3142(f),

18   and based upon the factual findings and statement of reasons for detention hereafter set forth,

19   finds that no condition or combination of conditions which the defendant can meet will

20   reasonably assure the appearance of the defendant as required and the safety of any other person

21   and the community.

22          **FINDINGS OF FACT AND STATEMENT OF REASONS FOR DETENTION**

23          Defendant is charged with drug offenses for which detention is presumed.  Despite this,

DETENTION ORDER - 1

1   the Court fashioned an appearance bond and ordered defendant released on May 4, 2011.  On

2   July 24, 2011, defendant admitted he violated his appearance bond by possessing marijuana.

3   The Court modified his appearance bond and allowed defendant to remain in the community.  On

4   October 26, 2011, a petition was filed alleging defendant violated his appearance bond by having

5   indirect contact with a Kip Whelpey, a witness in his case, on October 20, 2011.  On October 28,

6   2011, the Court conducted an evidentiary hearing on this allegation.  Based on the evidence

7   presented, the Court found defendant had indirect contact with Mr. Whelpey in violation of his

8   conditions of release.

9         Mr. Whelpey is a witness the government intends to call against defendant.  According to

10   the government, Mr. Whelpey conspired with defendant to commit the drug offenses.  Mr.

11   Whelpley has already pled guilty and served his prison sentence.  As part of his plea agreement,

12   he agreed to appear as a witness at defendant's trial this year.  However, earlier this year, a civil

13   action was initiated in Canada.  The named plaintiff is defendant and the action was brought

14   against Mr. Whelpley, essentially for defamation and alleging Mr. Whelpley has lied about

15   defendant's criminal conduct.

16         The Court need not decide the propriety of this Canadian lawsuit as that issue is not

17   material to decide whether defendant had indirect contact with Mr. Whelpey, which is the

18   violation before the Court.  Instead, focusing on the evidence regarding whether defendant had

19   indirect contact with the witness, the Court first finds, U.S. and Canadian counsel for defendant

20   did not initiate the lawsuit and were not involved in contacting Mr. Whelpley.  Hence, this is not

21   a case where counsel was fulfilling his proper functions as a lawyer by investigating or

22   contacting witnesses.

23         Second, in June 2011, defendant's pretrial supervising officer reviewed with defendant a

DETENTION ORDER - 2

1   written list of witnesses that defendant was not to have contact with.  That list included Mr.

2   Whelpley.  Defendant told his pretrial supervising officer he did not know any of the witnesses, a

3   claim that is belied by the fact he had been involved in a lawsuit against Mr. Whelpley for many

4   months.

5          Third, defendant is the named plaintiff in his Canadian lawsuit and the sole beneficiary.

6   If he prevails, he will have succeeded in not only obtaining money damages against Mr.

7   Whelpley but also succeeded in preventing Mr. Whelpley, a key government witness, from

8   testifying against him.  His direct interest as the sole beneficiary of his Canadian lawsuit

9   evidences his indirect contact with Mr. Whelpley.

10         Fifth, defendant's claim the contact with Mr. Whelpley is the product of an

11  uncontrollable non-lawyer named Paddy Roberts, is unpersuasive.  Even if Mr. Roberts initiated

12  the Canadian suit in January 2011, without consulting defendant, defendant has done nothing to

13  reign Mr. Robert's in or direct him to have no contact with Mr. Whelpley.  In fact, it appears

14  defendant has succeeded, via Mr. Robert's actions, in obtaining an order directing Mr. Whelpley

15  to pay money damages and prohibiting him from entering the United States.  Defendant cannot

16  have his cake and eat it too.  He cannot be the sole beneficiary of a law suit against a key

17  government witness and then turn around and claim no responsibility.

18         Based on the evidence presented, the Court concludes defendant violated the condition of

19  release that he have no indirect contact with the witnesses in this case.  The Court also concludes

20  revocation and detention are appropriate at this point given the nature of the offense and the

21  nature of the violation.  The violation does not involve a technicality such as failing to submit a

22  monthly report.  Instead, the conduct involved in this case involves sophisticated actions to

23  influence and prevent a witness in this case from appearing and testifying in this case.

DETENTION ORDER - 3

1    It is therefore **ORDERED**:

2        (1)    Defendant shall be detained pending trial and committed to the custody of the

3    Attorney General for confinement in a correctional facility separate, to the extent practicable,

4    from persons awaiting or serving sentences, or being held in custody pending appeal;

5        (2)    Defendant shall be afforded reasonable opportunity for private consultation with

6    counsel;

7        (3)    On order of a court of the United States or on request of an attorney for the

8    Government, the person in charge of the correctional facility in which defendant is confined shall

9    deliver the defendant to a United States Marshal for the purpose of an appearance in connection

10    with a court proceeding; and

11        (4)    The clerk shall direct copies of this order to counsel for the United States, to

12    counsel for the defendant, to the United States Marshal, and to the United States Pretrial Services

13    Officer.

14    DATED this 28th day of October, 2011.

15

16

17                                BRIAN A. TSUCHIDA
                                  United States Magistrate Judge

18

19

20

21

22

23

DETENTION ORDER - 4