IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

SA  NOV  8 2011

_ _ _ AT SEATTLE _ _ _ _
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

----------------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. CR06-157 MJP |
| HENRY ROSENAU, | ) |
| Defendant. | ) |

**ORIGINAL**

----------------------------------------------------------

BOND REVOCATION HEARING

Before the Hon. Brian A. Tsuchida

Magistrate Judge

October 28, 2011

----------------------------------------------------------

**06-CR-00157-TN**

**DISK
ENCLOSED**

REPORTED BY:   Audiotape

TRANSCRIBED BY:      Karen L. Larsen, RPR(Ret.)

Seattle Deposition Reporters

600 University Street, Suite 320

Seattle, WA 98101

206-622-6661

```
 1   APPEARANCES:

 2   For the Plaintiff:   SUSAN ROE, ESQ.

 3                        MARC PEREZ, ESQ.

 4                        Assistant U.S. Attorneys

 5                        700 Stewart Street, Suite 5200

 6                        Seattle, WA 98101

 7   For the Defendant:   CRAIG PLATT, ESQ.

 8                        Platt & Buescher

 9                        P.O. Box 727

10                        Coupeville, WA 98239

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S
 2   NO.   DESCRIPTION                            PAGE
 3   1     Rosenau conditions of release          12
 4   2     List of witnesses prohibited contact   12
 5   3     Emails                                 27
 6   4     Letter from Botting to Moffatt         50
 7
 8                 E X A M I N A T I O N
 9   WITNESS                                      PAGE
10   Julie Busic
11       Direct by Ms. Roe                          8
12       Cross by Mr. Platt                        15
13       Redirect by Ms. Roe                       20
14   Bruce Erickson
15       Direct by Ms. Roe                         22
16       Cross by Mr. Platt                        27
17   Gary N. A. Botting
18       Direct by Mr. Platt                       35
19       Cross by Ms. Roe                          44
20       Redirect by Mr. Platt                     50
21   Closing Argument
22       By Ms. Roe                                57
23       By Mr. Platt                              59
24   Ruling by the court                           67
25       Seattle, Washington; Friday, October 28, 2011
```

October 28, 2011

Page 4

```
 1                    --------------------------
 2            THE CLERK:  All rise.  United States District Court
 3     for the Western District of Washington is now in session, the
 4     Honorable Bryan H. Cheetham presiding.
 5            THE COURT:   Good afternoon.  Please be seated.
 6            THE CLERK:   Your Honor, the matter before you is
 7     scheduled for an initial appearance on bond revocation
 8     hearing, cause number CR06-157 MJP, assigned to Judge Pechman,
 9     United States versus Henry Rosenau.  Counsel please make
10     appearances.
11            MS. ROE:  Good afternoon, your Honor.  Susan Roe on
12     behalf of United States.  Also present at counsel table is
13     Marc Perez and the pretrial services officer Julie Busic.
14            THE COURT:   And Ms. Roe, good afternoon.  Mr.
15     Platt, good afternoon.
16            MR. PLATT:  Good afternoon, your Honor.  Craig Platt
17     on behalf of Henry Rosenau, who is seated or standing to my
18     left.
19            THE COURT:   And good afternoon, Mr. Rosenau.
20     Please be seated.
21            Mr. Rosenau, we are here because I have received a
22     petition alleging a violation of a condition of release, and,
23     Mr. Platt, has the defense received a copy?
24            MR. PLATT:  Yes, your Honor.
25            THE COURT:   And for our record, Ms. Roe, if you'd
```

October 28, 2011

Page 5

1   state the allegation.

2           MS. ROE:  The allegation is that the defendant has

3   violated the special condition of his bond by having contact

4   indirect with existing or future witnesses in this case by

5   having indirect contact with Kip Whelpley on October 20th of

6   this year.

7           THE COURT:  All right.  So, Mr. Rosenau, you know

8   that the government has brought this allegation, and of course

9   you have no obligation to make any kind of admission, and we

10  can contest this.  I have in fact received a number of

11  materials regarding this allegation, and I trust, Mr. Platt,

12  that you also received a copy.  I think the government filed

13  it earlier today.  It's the government's -- it's a pleading in

14  support of a request for revocation with attachments, and I

15  also received from you, Mr. Platt, just a little while ago a

16  copy of an email from Craig Platt to Mr. Botting or Boatting

17  (phonetic).  All right.  And I also -- in terms of the

18  submissions from the government as well as the defense, do I

19  have everything or is there something I'm missing?

20          MS. ROE:  You have everything from the government,

21  your Honor.

22          THE COURT:  All right.

23          MR. PLATT:  Your Honor, the court should have

24  everything at this point.  We're going to ask Mr. Botting to

25  address the court at this hearing.  He does have with him some

1  books that he brought that he's written.  It's just by way of

2  establishing his credentials as an expert in this area in

3  Canadian law.

4         THE COURT:  Well, I guess the question is whether

5  we need expert testimony about the factual allegations, so

6  what's really before me is a allegation on a violation of a

7  condition of supervision.  I don't think that's really a

8  matter of expert testimony in terms of whether the government

9  can show that there was indirect contact between Mr. Rosenau

10  and one of the witnesses in this case, unless of course Mr.

11  Botting is a fact witness and has some testimony regarding the

12  facts regarding that allegation.

13         MR. PLATT:  And, your Honor, our position would be

14  that it's a question of mixed facts and law in this matter.

15  He would be testifying as a fact witness as well because he is

16  personally aware of some of the circumstances surrounding the

17  allegations with respect to the violation.  To the extent that

18  there's an argument being made by the government that the

19  lawsuit in question was in any way frivolous or, you know, it

20  was -- it's referred to as vexatious I believe in their moving

21  paper.  To that extent I think that's a question of mixed fact

22  and law whether or not that's vexatious, and Mr. Botting is

23  able to address the court on that issue.

24         THE COURT:  All right.  Well, why don't we at this

25  point -- first of all, let's just start with what the

1    government has, and so Ms. Roe, why don't you start, and then

2    we can address the whole issue about other evidence and as

3    presented by the defense as this plays out.

4            MS. ROE:  Your Honor, thank you.  I will.  But I'd

5    ask that any witness be excused from the courtroom.  Mr.

6    Botting shouldn't be present listening to the testimony if

7    he's going to be a fact witness.

8            THE COURT:  All right.  Do you have any objection?

9            MR. PLATT:  We will object.  I think it's important

10   if he is offering his opinion about the lawsuit that he be

11   able to hear the testimony so he can opine on that when he's

12   called to.

13           THE COURT:  Well, if he brought the lawsuit or

14   assisted, I don't know if he needs to hear what anybody else

15   thinks about it, so I'll grant the motion, and we'll excuse I

16   guess witnesses until they're called.  Are there any other

17   witnesses here?  From either side?

18           MR. PLATT:  No, your Honor.

19           THE COURT:  Just spectators.  All right.  Thank you

20   very much, Mr. Botting.  So Ms. Roe, go ahead.

21           MS. ROE:  Thank you.  Your Honor, the government

22   calls pretrial services officer Julie Busic.

23           THE COURT:  All right.  Ms. Busic, if you'll step

24   forward and we'll have you sworn in.

25   JULIE BUSIC, witness sworn.

October 28, 2011

Page 8

1            THE COURT:   And go ahead, Ms. Roe, any time you're

2    ready.

3            MS. ROE:   Thank you.

4                  D I R E C T   E X A M I N A T I O N

5    BY MS. ROE:

6        Q.   Ms. Busic, would you just briefly identify yourself

7    for the record and give us briefly what you do and what your

8    role in this incident is.

9        A.   Yes.   I'm Julie Busic.   I'm a supervising U.S.

10   probation officer working in the pretrial unit, and I have

11   been so employed for over 14 years and currently supervising

12   Mr. Rosenau since May of 2011.

13       Q.   Okay.   Mr. Rosenau is living in Canada; is that

14   correct?

15       A.   Correct.

16       Q.   And so you deal with the Canadians.   One of your

17   duties is to deal with the Canadians who are on pretrial

18   release.

19       A.   That's correct.

20       Q.   When did you first take Mr. Rosenau on your case

21   load?

22       A.   May 6, 2011.

23       Q.   And what's your procedure for reviewing the

24   conditions of his release with him and what did you do with

25   him?

1      A.    May 6 I telephonically reviewed the conditions of

2  supervision with Mr. Rosenau.  Given the distance between us,

3  he was provided an email copy of the documents and we reviewed

4  them telephonically.

5      Q.    Can you look at what's been marked exhibit 1?  Do

6  you recognize that as the written conditions of his release?

7                    (Exhibit 1 marked.)

8      A.    Yes.

9      Q.    And is that his signature at the bottom?

10      A.    Correct.

11      Q.    And is one of the conditions that he not have

12  contact with witnesses direct or indirect?

13      A.    That is a special condition of his bond, yes.

14      Q.    Did he have one -- generally speaking has Mr.

15  Rosenau been pretty good on supervision?

16      A.    Mr. Rosenau has reported as directed.  There was a

17  previous violation in this matter that was before the court in

18  July.  As a result his bond was modified.

19      Q.    And it was modified so that he changed residences;

20  is that it?

21      A.    At the time the bond was actually modified to

22  include a drug and alcohol testing condition.  There were

23  discussions between Mr. Rosenau and myself about a move, and

24  essentially the requirement for supervision was he lived in a

25  home that would be free of any controlled substances or he

1    would relocate.

2        Q.    And what was your understanding with Mr. Rosenau?

3        A.    We had several discussions about the topic, and

4    there was some discussion or some word from Mr. Rosenau that

5    he would move to another location and was preparing to do

6    that, and what the agreement between us was that he had

7    permission to move.  He'd provided me with the address and the

8    particulars; however, upon when he would be ready to

9    officially do that he would call me, and if he didn't reach me

10   personally, it was acceptable to leave a voice mail.  However,

11   as of today he has not moved.  He continues to reside in his

12   home that he released to.

13       Q.    And when did you learn that he hadn't moved?

14       A.    I did confirm with him on Monday of this week that

15   he was still residing in his home.

16       Q.    Did you discuss the condition that he have no

17   contact direct or indirect with witnesses also with his

18   attorney, Mr. Platt?

19       A.    Yes.

20       Q.    When was that discussion?

21       A.    Well, it was a condition of his release, and the

22   discussions started about that upon release.  At that time I

23   had made requests for a full list of the parties that he

24   should not have contact with, and that on May 25th, 2011, I

25   was contacted by counsel about the condition.  I was informed

1    that there were some proceedings in Canada and that there were

2    some third parties that may need to be served regarding

3    extradition, and would that be a violation of the conditions

4    of supervision.

5         Q.   What was your advice to Mr. Platt, defense counsel?

6         A.   What I said at the time is that I had not received

7    any lists of prohibited parties, and, therefore, as long as it

8    was a legal matter served by legal counsel, that was

9    acceptable for me and that I would document it in my records.

10        Q.   And did you so document?

11        A.   Yes, I did.

12        Q.   Both Mr. Platt's inquiry and your response.

13        A.   Yes.

14        Q.   Okay.  And did you understand that this had to do

15   with extradition, not with the underlying criminal matter?

16        A.   I understood it to be regarding extradition.

17        Q.   What would your response have been if you knew that

18   it was regarding the underlying criminal matter or the

19   availability of a witness?

20             MR. PLATT:  Objection, assumes facts not in

21   evidence.

22             THE COURT:   Go ahead and answer the question.

23        A.   I would not view myself as having the authority to

24   authorize that and would have sought direction from the court

25   directly or suggested that the parties do so.

1       Q.    Sometime later, a few weeks later, did you give Mr.

2   Rosenau a list of the witnesses with whom he was prohibited

3   from contacting?

4       A.    Yes.   I was in receipt of the names.   I created a

5   document that would spell them out and to advise of what he

6   should do in the event there was contact, and on June 14th I

7   emailed the document to the defendant as well as counsel.

8       Q.    And looking at what's been marked for purposes of

9   this hearing exhibit number 2, is that a list of your memo to

10  Mr. Rosenau with a list of witnesses?

11      A.    Yes.

12            MS. ROE:   Government offers 1 and 2.

13            THE COURT:   Any objections, Mr. Platt.

14            MR. PLATT:   No objection.

15            THE COURT:   All right.   Number 1 and 2 are admitted.

16               (Exhibits 1-2 admitted.)

17      Q.    Did you also talk to Mr. Rosenau about the list?

18      A.    Yes.   We talked on June 16 of 2011 about the

19  document.   Mr. Rosenau was concerned at that point because he

20  indicated he didn't know any of the parties, and as I noted,

21  he indicated a concern that he might approach somebody and ask

22  them for directions and not knowing that they were someone he

23  should not be having contact with.

24      Q.    And what did you advise him to do?

25      A.    My response was if he didn't know any of the

1    parties, that the condition was going to be easy to comply

2    with, and as it notes on my form, that if there was some kind

3    of incidental or accidental contact, he would report it to me

4    immediately.

5         Q.   Is that form signed by Mr. Rosenau?

6         A.   Yes.

7         Q.   And does it also have sort of an odd date, like a

8    date a week or two later?

9         A.   Yes.  At the time that I had sent this to the

10   defendant, there were a number of things going on.  He was

11   having some computer difficulties in being able to print the

12   document.  He could view it, and then it was amidst the

13   Canadian mail strike, and so he was being very receptive in

14   terms of telling me that there was going to be a delay in

15   getting it to me because of the mail strike.

16        Q.   Okay.  So that was received by your office in July.

17        A.   Correct.

18        Q.   Since that time has Mr. Rosenau mentioned that he or

19   his friends have contacted witnesses in this matter?

20        A.   No.

21        Q.   Inadvertently or other?

22        A.   No.

23        Q.   Did you receive copies -- oh, let me ask.  Where

24   does he live?

25        A.   Quesnel.

October 28, 2011

Page 14

1       Q.   Have you been there?

2       A.   No.

3       Q.   How far is it, do you know?

4       A.   It's my understanding it's about 8 hours north of

5    the border.

6       Q.   Did you receive copies this week of emails forwarded

7    by Bruce Erickson purportedly from his client Kip Whelpley?

8       A.   Yes.

9       Q.   Is Mr. Whelpley on the list of witnesses with whom

10   Mr. Rosenau was not sporesed to have contact?

11      A.   Yes.

12      Q.   And are there some emails between Patrick with a

13   Gaelic last name and Kip Whelpley regarding a civil lawsuit

14   and a default order?

15      A.   Yes.

16      Q.   Do most of those emails you've seen predate Mr.

17   Rosenau being on supervised release?

18      A.   Yes.

19      Q.   Is there one dated last week?

20      A.   Yes, October 20th.

21      Q.   And is the October 20th email one of the attached

22   for the basis of this allegation?

23      A.   Yes.

24      Q.   Have you asked Mr. Rosenau about it?

25      A.   No.

1    Q.   Why do you view it as a violation of the condition?

2    A.   When I read the email, there had been no requests

3  for specific permission regarding that, and I noted the court

4  order which spells out the defendant's name and the witness's

5  name.

6    Q.   And does it seem to be about an underlying

7  extradition matter?

8    A.   No.

9         MS. ROE:   No further questions.

10        THE COURT:   Mr. Platt.

11        MR. PLATT:   Thank you, your Honor.

12             C R O S S - E X A M I N A T I O N

13  BY MR. PLATT:

14    Q.   Good afternoon, Ms. Busic.

15    A.   Hello.

16    Q.   I just have a few questions for you.  I just want to

17  confirm first of all the phone call that you and I had on the

18  25th.  Now, I called you; is that your recollection, on that

19  date?

20    A.   If I can just quickly refer to my notes, I will

21  confirm what I jotted down.  Yes.

22    Q.   And I told you that I was calling in part to ask you

23  about how to handle something that had come to my attention,

24  namely a lawsuit involving what we thought might be a

25  potential witness; is that correct?

1         A.   There were proceedings regarding an extradition,

2    that you had learned from a Canadian attorney that some third

3    parties may be served paperwork as they were likely witnesses

4    in this matter.

5         Q.   Okay.  So I did tell you that I was concerned they

6    might be witnesses, correct?

7         A.   Right.

8         Q.   And in fact, at that point we had a discussion about

9    having a problem because there was no witness list yet

10   provided by the government; is that correct?

11        A.   That's correct.

12        Q.   And in fact, that was a little bit of an impediment

13   for us to be able to go forward and figure out who exactly Mr.

14   Rosenau was to have no contact with at that time.

15        A.   Correct.

16        Q.   But I think for the purpose of that discussion is it

17   fair to say I said let's just assume that it is a witness, and

18   that's why I need to talk to you about it, words to that

19   effect?

20        A.   Correct.

21        Q.   And then we agreed that if there was a valid lawsuit

22   existing in British Columbia and if paperwork from that

23   lawsuit was served on a witness, so long as it was done

24   through counsel and done legally, that that would be not

25   considered a violation of no contact, correct?

1       A.    Correct.

2       Q.    And I specifically expressed to you my concerns

3   about that issue because I did not want that to be later

4   misunderstood and interpreted as a violation of the no contact

5   condition.

6       A.    Yes.

7       Q.    Let's talk a little bit about Mr. Rosenau's

8   adjustment on release, and you've talked about that a bit, but

9   leaving aside the issue that we're here addressing and the

10  issue that we addressed at the last hearing, is it fair to say

11  that his adjustment has gone fairly smoothly?

12      A.    Yes.

13      Q.    That when you have asked him for paperwork, he has

14  provided it.

15      A.    Yes.

16      Q.    That when you have asked him to check in with you,

17  he has.

18      A.    Yes.

19      Q.    That he has met with you at least one or -- how many

20  times has he met with you at the border?

21      A.    Could be three.  Definitely two.

22      Q.    All right.

23      Q.    And is he always there?

24      A.    Yes.

25      Q.    And on time?

```
 1      A.    Yes.

 2      Q.    And cooperative?

 3      A.    Yes.

 4      Q.    And answers your questions?

 5      A.    He does.

 6      Q.    And gives you the materials you need?

 7      A.    Yes.

 8      Q.    Thank you.  Now, let me just ask you the general

 9  question then.  Other than the subject matter of this hearing

10  and the last hearing, have you had any problems whatsoever

11  supervising Mr. Rosenau on supervision?

12      A.    No.

13      Q.    Now, when you -- you said you talked to Mr. Rosenau

14  about whether or not he knew witnesses; is that correct?

15      A.    Uh-huh.

16      Q.    And he indicated to you that he was worried about

17  not recognizing people; is that correct?

18      A.    That's correct.

19      Q.    He didn't say I won't recognize their names, he said

20  I won't recognize how they look or words to that effect; is

21  that true?

22      A.    I need to refer to my notes.  He's worried because

23  he didn't know any of the names of the list of prohibited

24  parties.

25      Q.    Did he say that he would not recognize someone if he
```

1    met them on the street?

2         A.    Yes.

3         Q.    And he was concerned about that because he would not

4    recognize the way they looked.

5         A.    Correct.

6         Q.    And that was a concern he expressed to you.

7         A.    Yes, he did.

8         Q.    All right.  And your understanding of the subject

9    matter of today's hearing is that there was contact from some

10   third party, is that correct, somebody other than Henry

11   Rosenau had contact with a witness in the case; is that

12   correct?

13        A.    Correct.

14        Q.    And you're basing your conclusion that there was a

15   violation of the no contact condition on the fact that that

16   third person who made contact purported to have authorization

17   from Mr. Rosenau, that that information came from that third

18   person, correct?

19        A.    Correct.

20        Q.    And you've heard nothing from Mr. Rosenau to the

21   contrary.  He hasn't said, oh, yeah, I told him to have

22   contact or he knew about contact; is that correct?

23        A.    That's correct.

24        Q.    In fact, quite the opposite; is that true?

25        A.    We haven't spoke about the issue.

1    Q.   Right.  So other than reading the document

2    prepared -- well, strike that.

3         One final question.  Is it fair to say -- and I

4    don't know if you can answer this.  If not, just say so.  But

5    is it fair to say that in your experience Mr. Rosenau is not

6    exactly an expert user of computers?  Do you have any opinion

7    on that?

8    A.   I can't make an assessment of his use of a computer,

9    nor can he properly make one of mine.  I will acknowledge he's

10   had some difficulties with email.

11   Q.   All right.  And he has expressed that he has trouble

12   with the computer and using emails and that type of thing, has

13   he ever said that?

14   A.   Yes, he has said that.

15        MR. PLATT:  Thank you very much.

16        THE COURT:   All right.  Any follow-up questions,

17   Ms. Roe?

18        MS. ROE:  Just a couple, your Honor, if I may.

19        R E D I R E C T   E X A M I N A T I O N

20   BY MS. ROE:

21   Q.   Ms. Busic, that conversation you had with defense

22   counsel was regarding future matters; is that right?  In May

23   the conversation about future matters, were you told at that

24   time that there was already some sort of civil lawsuit or

25   notice of lawsuit filed against one of the witnesses?

1      A.   I wasn't aware of that.

2      Q.   And were you told that when you handed over or gave

3   the list of names to the defendant and defense counsel?

4      A.   No.

5           MS. ROE:  Nothing further.  Thank you.

6           THE COURT:   You have further questions regarding

7   the cross, I mean the redirect?

8           MR. PLATT:  Yes, your Honor.

9           THE COURT:   Sure.  Go ahead.

10              R E C R O S S - E X A M I N A T I O N

11   BY MR. PLATT:

12      Q.   I'll just be brief here, but when we talked, I told

13   you there was a lawsuit in Canada; is that correct?

14      A.   Correct.

15      Q.   Okay.  So I told you there was already a lawsuit in

16   Canada, correct?

17      A.   Excuse me.  I'm going to go back to my notes, which

18   is how I recorded it, that you were concerned that there are

19   proceedings regarding the extradition that you'd learned from

20   a Canadian attorney and that some third parties needed to be

21   served and would likely be witnesses in this matter.  That's

22   what I understood.

23      Q.   Okay.  And I didn't say this is going to be a

24   lawsuit off in the future, did I?

25      A.   I don't recall that.

1          MR. PLATT:  Thank you.  Nothing further.

2          MS. ROE:  Nothing further.

3          THE COURT:  All right.  And thank you very much,

4    Ms. Busic.

5              (Witness excused.)

6          MS. ROE:  Bruce Erickson.

7          THE COURT:  All right.

8    BRUCE ERICKSON,           witness sworn.

9              D I R E C T   E X A M I N A T I O N

10   BY MS. ROE:

11        Q.   State your name, please, spell your last name?

12        A.   Bruce Erickson, E-r-i-c-k-s-o-n.

13        Q.   Mr. Erickson, are you a criminal defense attorney in

14   this town?

15        A.   I am.

16        Q.   And do you represent a witness in the U.S. versus

17   Rosenau matter, Kip Whelpley?

18        A.   That's correct.

19        Q.   And Mr. Whelpley lives in Canada?

20        A.   That's correct.

21        Q.   But you represented him in his underlying matter

22   here and continue to represent him; is that correct?

23        A.   That's correct.

24        Q.   Do you know, does he know Henry Rosenau?

25        A.   I believe he does.

1      Q.    And how do you know that?

2      A.    I've heard many statements made by Mr. Whelpley in

3   various contexts to that effect.

4      Q.    And from a review of your discovery in the

5   underlying case of Mr. Whelpley's?

6      A.    That's true also.

7      Q.    Did you receive a series of emails from your client

8   Kip Whelpley on October 20th of this year?

9      A.    I'm thinking.  In terms of the date I --

10     Q.    May I ask that the witness be handed what's been

11   marked exhibit 3, which is sort of confusingly 4 packets,

12   exhibits 1 through 4 that were attached to the pleading today.

13            THE CLERK:  (Inaudible).

14            MS. ROE:  Well, let's do this.  Let's call it 3.

15            (Exhibit 3 marked.)

16     A.    All right.  I'm looking at it.

17     Q.    Right.  There should be 4 packets, and although your

18   client's email address and home address has been redacted,

19   otherwise are those the same?  Do you recognize them?

20     A.    It's the matters contained within what's marked as

21   exhibit 1 within plaintiff's exhibit number 3, and those do

22   appear to be the same emails that I received, yes.

23     Q.    Okay.  Would you also look at the other exhibits.

24   Is exhibit 2 and 3 and 4 other emails that you received from

25   your client as well as some attachments, for instance, some

1    letters that were attached to those emails?

2       A.   I believe they are, but, you know, I can't be a

3    hundred percent sure, I'm sorry, because the ones that I

4    reviewed were the ones that were addressed to me.  The

5    attachments I didn't spend a lot of time with.

6       Q.   And those have page breaks in them for easier

7    reading.  So the ones that you had were just long and

8    sequential, some of those emails?

9       A.   That's correct.

10      Q.   Okay.  Did you forward the emails and the

11   attachments that you'd received from your client to my office?

12      A.   I did.

13      Q.   And are -- those emails and letters indicate that

14   they came to my office from your office, Bruce D. Erickson, by

15   the top or by the email note?

16      A.   Well, I -- there's no question that I sent along the

17   email, packet of emails that I received from my client Kip

18   Whelpley and the attachments to your office.  They had a

19   slightly different format, and I'm not sure if I'm recalling

20   precisely what your -- I think your question was is there

21   something in here that identifies them as coming from my

22   office to your office, and I'm not sure that I can find that

23   but --

24      Q.   Let me ask you this.  Do you recognize those as

25   appearing to be the emails you forwarded to my office?

1      A.    Yes.

2      Q.    Why did you forward them to us?

3      A.    Mr. Whelpley in his plea agreement in his case had a

4   paragraph calling for cooperation.  The government was asking

5   him to fulfill his cooperation obligations.  He had made a

6   decision to do that and to make himself available for

7   testimony at the upcoming trial.  I had been in touch with him

8   just regarding logistics of getting ready to fulfill that

9   obligation, and he forwarded these emails to me.  I read them.

10  They were new to me, and I conferred with my client and

11  obtained his permission to forward them to you and did so.

12     Q.    And did they in fact appear to affect the ability to

13  fulfill his cooperation agreement, that is, to come down and

14  testify at the trial in U.S. versus Rosenau?

15     A.    Well, you know --

16           MR. PLATT:  That calls for an expert opinion.

17     A.    I'm sorry.

18           THE COURT:   Go ahead and answer.

19     A.    You know, I don't really have any information beyond

20  the documents themselves.  I'm aware that one of the documents

21  contains what purports to be an order from somebody in Canada

22  who is either a judicial person or a clerical or staff person

23  working with some court in Canada, and it appears that the

24  order prohibits him from entering -- him meaning Kip

25  Whelpley from entering the United States and therefore it did

1    appear that it might be an obstacle towards his fulfilling his

2    obligationses pursuant to the cooperation clause in his plea

3    agreement, and I think that that's part of the reason why I

4    brought it to your attention.

5         Q.    Okay.   Does Mr. Whelpley, if you know, know a man

6    named Paddy (phonetic) Roberts, the man who sent him these

7    emails?

8         A.    I'm sorry, I didn't hear that.

9         Q.    Do you know if your client knows the man who sent

10   him these emails?

11        A.    I don't think he does.   I believe that there may

12   have been one face-to-face meeting about the time that this

13   sequence of emails started, but other than that he has no

14   connection with him.

15        Q.    And, Mr. Erickson, does your client live in the

16   interior of British Columbia?

17        A.    That's right, near --

18        Q.    Kelowna?

19        A.    Yes.

20        Q.    Near Kelowna?

21        A.    Yes.

22             MS. ROE:   No further questions.   Offer what's been

23   marked exhibit 3.

24             THE COURT:   And, Mr. Platt, any objections to the

25   exhibit 3?

1          MR. PLATT:  I hate to be difficult, your Honor, but

2    with respect to any emails that are dated prior to the

3    imposition of conditions by this court in May, we would object

4    that they're irrelevant.

5          THE COURT:   All right.  I'm going to overrule the

6    objection, and I'll admit exhibit number 3.

7               (Exhibit 3 admitted.)

8               C R O S S - E X A M I N A T I O N

9    BY MR. PLATT:

10       Q.    Good afternoon, Mr. Erickson.  How are you.

11       A.    I'm good.  Thank you.

12       Q.    At some point during the last few months have you

13   had any contacts with the U.S. Attorney's office about making

14   arrangements to have Mr. Whelpley, your client, deposed in

15   Canada?

16       A.    Yes.

17       Q.    And as part of those discussionses did you talk with

18   anyone at the U.S. Attorney's office about reasons that a

19   deposition should take place in Canada?

20       A.    I think so, yes.  I think the answer to that

21   question is yes.

22       Q.    And what were those reasons?

23       A.    Convenience to my client, some reluctance of my

24   client to come into the United States.  My client -- as I

25   think the court knows, my client was previously here as a

1  defendant, was convicted upon a plea of guilty and did time

2  and was trying to rebuild his life in Canada and was trying to

3  stay focused on rebuilding his life in Canada and was

4  reluctant to come down to the United States.

5      Q.   So it would largely be for the convenience of your

6  client.  Is that a fair statement?

7      A.   Yes, I think that -- I mean largely, I'm not sure

8  precisely what that word means, but I would agree with that,

9  yes.

10     Q.   And is it fair to assume then that Mr. Whelpley did

11 not tell you about any lawsuit that was pending against him,

12 any order that was out there preventing him from coming to the

13 United States?

14     A.   I don't recall that being mentioned to me by my

15 client at the time we were discussing the possibility of his

16 testimony being received by deposition.

17     Q.   At any point have you had a conversation with anyone

18 in the United States Attorney's office regarding the fact that

19 there is that lawsuit up in British Columbia?  At any time.

20     A.   Yes.  I think I mentioned, since, and I guess it was

21 the 20th -- I'm not sure which day on the calendar it was, but

22 not too long ago on the day that I forwarded -- same day I

23 forwarded this material to the U.S. Attorney we had a

24 conversation on the topic, yes.

25     Q.   Okay.  And did you know about the lawsuit before

October 28, 2011

Page 29

1  that?

2      A.   I don't think I did.  I mean it certainly didn't

3  penetrate my consciousness if there was any mention of it at

4  all to me prior to that.  I don't think there was.

5      Q.   Now, you and I had a conversation, I don't know, a

6  couple weeks ago regarding whether or not your client would be

7  available for an interview.  Do you recall that?

8      A.   Yeah.  Well, I think you -- it was fairly recently.

9      Q.   Yeah.

10     A.   Yes, I do.

11     Q.   But that was before the 20th, correct?

12     A.   I think that there was a series of phone calls is my

13  recollection, and -- here's my recollection, you know.  My

14  recollection is that it was mentioned I think -- I think we

15  encountered each other on an unrelated matter here in the

16  court house.  You called me a day or two later and indicated

17  you were representing Mr. Rosenau, and that it may have been

18  in that first message that you indicated that you might want

19  to meet with my client for an interview.  It was not -- the

20  inquiry was not answered, it wasn't really resolved is my

21  recollection.

22          And then when we went up -- recently I saw my client

23  in Canada, and at that time it still had not yet been

24  resolved, and it was only, you know, in the last couple of

25  days that I put the question to my client, and he said, no, he

October 28, 2011

Page 30

1    does not want -- he would prefer not to be interviewed.

2    That's my recollection.

3         Q.    Well, do you recall whether or not you and I have

4    discussed this since the 20th?

5         A.    Yes, I think we have.

6         Q.    All right.

7         A.    But I'm hoping -- I'm not getting my dates right, I

8    don't have a calendar here, I didn't bring my file, but I

9    believe that -- trying to -- let's see.  Well, it was just,

10   you know, last -- yes, I think it was this week.  Huh.

11        Q.    We talked yesterday, right?

12        A.    What's that?

13        Q.    We talked yesterday?

14        A.    Yeah.  Was that it?

15        Q.    We talked about Saipan?

16        A.    That's right.

17        Q.    Remember that?

18        A.    Yes.

19        Q.    Did we talk before then?

20        A.    Yes.  I'm sorry.  I'm doing my best to be precise on

21   this, and I -- I recall it just being in the last couple of

22   days here that I informed you that I'd conferred with my

23   client and he'd indicated that he preferred not to have an

24   interview with Mr. Rosenau's attorney.

25        Q.    And you were following up on a prior phone call.

October 28, 2011

Page 31

1       A.    That's correct.

2       Q.    And during that prior phone call you brought up the

3   topic of there was something going on up in Canada with some

4   lawsuit.  Do you remember that?

5       A.    Yes.  No one -- here's my recollection on that.

6   After -- after I sent the emails to the U.S. Attorney's

7   office, and I'm not sure whether telephones the same day -- I

8   think it was the next day -- I felt as a courtesy to you, Mr.

9   Rosenau's attorney, that I would inform you that I had -- that

10  this issue had come to my attention and I had brought it to

11  the attention of the U.S. Attorney's office.

12      Q.    All right.  And during our first phone call we

13  talked about that issue as well, correct, about the fact there

14  was a lawsuit.

15      A.    Was that -- is this -- are you referring to a

16  separate phone call than this one I was just talking about in

17  my last answer?

18      Q.    The one before the one yesterday.

19      A.    Yeah.  Well, no, you know, I'm not even clear

20  whether I just left -- yeah, we did talk.  There were a couple

21  of times when I left voice mail messages, but there was this

22  one occasion we did talk, and we did talk, yes.  I mean that

23  was the purpose of my call was to notify you of that fact.

24  The fact being that I had become aware of this and I had sent

25  this information off to the U.S. Attorney's office, and it

1   might be something you would have to be dealing with.

2        Q.   And then one last question.   On this issue of the

3   lawsuit up there, you were asked whether or not that prevented

4   your client from leaving Canada to testify in this lawsuit,

5   whether or not there was a problem?   Ms. Roe just asked you

6   about that?

7        A.   Okay.  You're referencing my prior testimony here

8   this afternoon now?

9        Q.   Right.

10       A.   Uh-huh.

11       Q.   And I objected and said, you know, that's expert

12   something, you remember that answer?

13       A.   Just now?

14       Q.   Yeah.

15            THE COURT:   Why don't we ask another question, not

16   whether you remember the question and the actual answer.   Why

17   don't you ask.

18       A.   I'm sorry.

19       Q.   Let me ask you this.   Is it fair to say that reading

20   the pleadings from British Columbia, it's hard for you to have

21   a legal opinion about the full force and effect that any order

22   up there would have on someone's ability to travel?   Is that a

23   fair statement?

24       A.   Yes.

25            MR. PLATT:  Thank you.  Nothing further.

October 28, 2011

Page 33

1              THE COURT:  All right.

2              MS. ROE:  Nothing further, your Honor.

3              THE COURT:   All right.  Thank you very much, Mr.

4    Erickson.  Can Mr. Erickson be excused?

5              MS. ROE:  Yes.  The government would so ask.

6                   (Witness excused.)

7              THE COURT:  And, Ms. Roe, any other witnesses?

8              MS. ROE:  No.

9              THE COURT:  All right.  Mr. Platt, witnesses?

10             MR. PLATT:  Mr. Botting, your Honor.

11             THE COURT:   All right.  Before Mr. Botting gets on

12   the stand, can you just give me a brief nutshell of exactly

13   what he's supposed to testify about?

14             MR. PLATT:  Yes, your Honor.  He can testify to

15   several things.  The allegation of violation here is that a

16   third party had contact with Kip Whelpley.  That third party

17   goes by different names, but for the purposes of this hearing

18   we'll call him Paddy Roberts.  I believe he has used a

19   different name in the email.  I believe that's his Gaelic

20   name.

21             Mr. Botting was involved in dealings with Mr.

22   Roberts with respect to the lawsuit that is the subject matter

23   of these emails.  He can testify that on several occasions he

24   advised Mr. Roberts not to have contact with Mr. Whelpley,

25   that he can also testify he was not involved directly in that

1    lawsuit but was aware of it.

2              THE COURT:  Mr. Botting was not involved in it,

3    correct?

4              MR. PLATT:  Correct.  He was not counsel, and I

5    don't know if you got -- I didn't actually get to see the

6    exhibits that were just offered from the government.  I did

7    get them in an email.

8              THE COURT:   Right.

9              MR. PLATT:  But I don't know if the exhibits in

10   there with a letter from Mr. Botting basically telling the

11   attorney up in Canada I'm not involved in this lawsuit, I'm

12   not going to represent Mr. Rosenau on that, I'm just on the

13   extradition.  I don't know if you got a copy of that one, but

14   he can testify to that.  He can also testify to a meeting that

15   occurred where Mr. Rosenau was present, Mr. Roberts was

16   present, I was present, and the discussion of having no

17   contact with Mr. Whelpley came up, and he can testify about

18   what happened during that discussion, and I think that's

19   highly relevant to this litigation.

20             THE COURT:  All right.  So why don't you call him

21   for these facts regarding it sounds like his knowledge of the

22   contact between Paddy Roberts or Paddy Roibeaird or whatever

23   his name is, and let's start at that point.  So why don't you

24   go ahead and call your witness.

25             MR. PLATT:  Thank you, your Honor.

1    GARY NORMAN ARTHUR BOTTING,    witness sworn.

2              THE COURT:   Please have a seat, Mr. Botting, and

3    Mr. Platt, go ahead.

4                   D I R E C T   E X A M I N A T I O N

5    BY MR. PLATT:

6         Q.   Mr. Botting, good afternoon.

7         A.   Good afternoon.

8         Q.   Can you please state your full name for the record?

9         A.   Gary Norman Arthur Botting.

10        Q.   Mr. Botting, can you tell us what your profession

11   is.

12        A.   I'm a lawyer.

13        Q.   And how long have you been a lawyer?

14        A.   20 years.

15        Q.   And where do you practice?

16        A.   In Vancouver, B.C., and area.

17        Q.   And what is your official designation up there,

18   barrister, solicitor?

19        A.   Both.

20        Q.   And have you had any involvement in your capacity as

21   an attorney representing Mr. Rosenau?

22        A.   Yes.  I represented him in an application and appeal

23   to the Supreme Court of Canada in 2010, 2011.

24        Q.   And can you tell us just what that case was about?

25        A.   Basically it was an extradition case to bring him to

1    the United States, or to send him to the United States from

2    Canada.  That had gone through a hearing sometime earlier with

3    another lawyer, and it had gone through appeal, and I was

4    appealing the appeal to the Supreme Court of Canada.

5          Q.   All right.  What was the outcome of that?

6          A.   The Supreme Court of Canada receives about 3,000

7    applications a year, declined to hear the appeal.

8          Q.   Are you familiar with an individual by the name of

9    Paddy Roberts?

10         A.   Yes, I am.

11         Q.   Who is that?

12         A.   Paddy Roberts is basically a person who has a lot to

13   do with trying to defend people, especially when they have

14   been charged with offenses such as marijuana possession and

15   that kind of thing.  He's a leader of a political party in

16   Canada and basically an advocate for people who are not

17   represented, and he often refers clients to other lawyers, but

18   he's also in this particular case he has helped me as a

19   paralegal.

20         Q.   In what capacity?

21         A.   Well, basically to act as a go-between in certainly

22   anything that happens up island, or sorry, in the interior of

23   British Columbia as opposed to in the Vancouver area where I'm

24   located.  In particular he acted as a paralegal or potentially

25   acted as a paralegal with respect to -- well, we talked about

1   this at least, in connection with his serving a document that

2   he had initiated on his own in a civil claim --

3           MS. ROE:  Move to strike.  It's not responsive to

4   the question.

5           THE COURT:   Go ahead and just -- go ahead and

6   explain what he did.

7           A.   Yeah, in connection with a civil suit that he had

8   brought against John (phonetic) and Kip Whelpley, which was a

9   suit of defamation, and basically the suit sought remedies of

10  various kinds including damages, and also it basically sought

11  a court order so that Mr. Whelpley could not come to the

12  United States to increase the damage that he'd allegedly done.

13          Q.   And with respect to that lawsuit, not the

14  extradition but the other lawsuit, all right?  With respect to

15  that lawsuit were you representing Mr. Rosenau in your

16  capacity as his attorney in that lawsuit?

17          A.   No, I was not.  It was Mr. Roberts' own bailiwick.

18          Q.   And did you have any conversations with or

19  communications with an attorney representing Mr. Whelpley

20  regarding that lawsuit?

21          A.   Yes.  He thought that I had initiated it, and I

22  denied that I had, and that ended the communication.  He knew

23  that Mr. Roberts I believe had initiated that lawsuit.

24          Q.   And did you indicate to this attorney -- was his

25  name Mr. Moffat?

October 28, 2011

Page 38

1      A.   Yes, that's right.

2      Q.   Did you indicate to Mr. Moffat, Mr. Whelpley's

3  attorney, that you were not in any way involved in that

4  lawsuit and that Mr. Roberts was acting on his own in that

5  issue?

6      A.   Yes, that's right.  Because at that time I was

7  representing Mr. Rosenau in the extradition appeal to the

8  Supreme Court.

9      Q.   But in your capacity as his attorney on the

10  extradition, you and I did coordinate to partly to educate me

11  about what had occurred up in British Columbia; is that a fair

12  statement?

13      A.   That's correct.  And you came to my office, and in

14  fact Mr. Roberts was there as well, had driven down there, and

15  you made it very clear to him that you didn't want him

16  involved directly in serving Mr. Whelpley with the order,

17  because there was a -- I should explain.  There was a default

18  order.

19          MS. ROE:  Objection, your Honor.  (Inaudible).

20          MR. PLATT:  Well, I can ask another question.

21          THE COURT:   Go ahead.

22      Q.   I want to look back a little bit before that.  Back

23  in May 2011 when I first became involved --

24      A.   Right.

25      Q.   -- do you recall us having communication about you

1   informing me about this other lawsuit and there was a question

2   about the no contact conditions that were imposed on Mr.

3   Rosenau, do you recall that?

4       A.   Yes, I do.

5       Q.   And do you recall that I informed you I would check

6   with Julie Busic and find out whether or not that would be a

7   problem?

8       A.   Yes, I remember that.  It was on the 24th of May, I

9   believe.  You had indicated or I had asked you whether it was

10  all right for us to continue, you know, in some capacity to

11  serve that order.

12      Q.   And on the 25th of May do you recall I sent an email

13  telling you that I'd just got off the phone with Ms. Busic --

14      A.   Yes.

15      Q.   -- and we determined it would at that point not be

16  necessarily an issue?

17      A.   Yes, that's correct.

18      Q.   But at that point were you acting in your legal

19  capacity for Mr. Rosenau or were your simply acting as his

20  extradition attorney making sure there were no complications

21  with the case?

22      A.   That's right.  I didn't want Mr. Rosenau to be

23  breached in any way.

24      Q.   And did you have any contact with Mr. Roberts about

25  informing him not to have contact with this other individual?

1      A.    Yes.   I told him not to have direct contact with the

2   other individual.

3          Q.   How did you tell him that the process service should

4   be done?

5      A.   By process server or by sheriff.

6          Q.   And as far as you know, did Mr. Roberts follow those

7   instructions?

8      A.   Well, I thought he was going to, but as it turned

9   out, Mr. Roberts contacted me last week and said that he felt

10  that this is the time for us --

11          MS. ROE:   Objection (inaudible) Mr. Roberts, what he

12  said.

13          THE COURT:    Why don't you ask another question

14  because I think this is an answer to some other question.

15          MR. PLATT:   Right.

16          Q.   What did you learn of whether or not Mr. Roberts was

17  following instructions about serving paperwork?

18      A.   Well, basically he wasn't following instructions.

19  Mr. Roberts is a loose cannon.  He very often goes off on his

20  own, and since he initiated this claim in the first place, I

21  think he wanted to make sure that it didn't fall on deaf ears

22  and that it was served properly on Mr. Whelpley.  To that end

23  he called me, and I said make sure this goes through legal

24  channels and that it's done through process server.  He said

25  that he had contacted a sheriff and that he would do it that

1    way.  He did not consult me.  I understand that he sent an

2    email and he did not consult me about that ahead of time at

3    all.

4         Q.    And you didn't want there to be a problem with any

5    allegation that Mr. Rosenau was involved with contact; is that

6    correct?

7         A.    Precisely.

8         Q.    So had you and I discussed our concerns about Mr.

9    Roberts and his ability to follow instructions?

10        A.    I think we talked about it -- well, as I say, he's

11   rather a loose cannon.  He does what he does, he's Irish.

12   Sorry.  But that's basically -- that's basically the way he

13   operates is as an individual, and it's difficult to know when

14   he's going to follow instructions because he really

15   (inaudible).

16        Q.    Have you spoken to him specifically about whether or

17   not he obtained approval from Mr. Rosenau or had anything to

18   do with Mr. Rosenau with respect to this email that was sent

19   in the last few weeks?

20             MS. ROE:  Objection as to the double hearsay, your

21   Honor.

22             MR. PLATT:  It's the 1101, your Honor.

23             THE COURT:  Go ahead and answer if you know the

24   answer.

25        A.    Yeah, I do know the answer.  In talking to them

1    individually, Mr. Rosenau was quite upset that Mr. Roberts had

2    taken that step because he felt that, you know, it might put

3    him in jeopardy.  And Mr. Roberts told me that he had

4    specifically done -- acted alone and had decided to do this

5    partly because we as lawyers were not acting precipitously

6    enough to serve Mr. Whelpley.

7         Q.    Now, there was a meeting up in Canada in mid August,

8    do you recall that, with myself and you?

9         A.    Yes.  Yes, I do.

10        Q.    And Mr. Roberts at one point was at the meeting; is

11   that correct?

12        A.    That's correct.

13        Q.    And Mr. Rosenau was there at the same time?

14        A.    That's right.

15        Q.    And do you recall me cautioning everyone that there

16   should be no contact with Mr. Whelpley?

17        A.    Yes, in particular that Mr. Roberts should not

18   contact him alone.  And I gave the same instruction to him.

19        Q.    And how would you characterize the way that I

20   relayed that instruction to Mr. Roberts?

21        A.    No uncertain terms.

22        Q.    And was Mr. Rosenau there when I said that?

23        A.    Yes.

24        Q.    And was there any resistance by Mr. Roberts to what

25   I was telling him or anything that you heard?  Did you hear

1   Mr. Rosenau say anything about that?

2       A.    That's kind of a double question.  Mr. Roberts

3   wasn't upset.  He acknowledged that we would be responsible,

4   that I would somehow take the step, and I think that was the

5   context in which I asked your earlier question.  Should I

6   decide to serve this on Mr. Whelpley, would that be okay and

7   it would not jeopardize Mr. Rosenau's status, and you said

8   that's fine, you'd clear with Ms. Busic,  and you eventually

9   gave me an email to that effect.  When it comes to Mr.

10  Rosenau, I think he was just standing there at the time that

11  we had this dialogue with Mr. Roberts.  It's a 3-way dialogue

12  rather than 4.

13      Q.    Did you hear Mr. Rosenau say anything to Mr. Roberts

14  about whether or not he should serve that paperwork himself?

15          MS. ROE:  Again, your Honor, I object.  The

16  defendant is here and can testify.  It's hearsay.  I know

17  it's --

18          THE COURT:  Go ahead if you (inaudible).

19      A.    As I recall, Mr. Rosenau said, yeah, don't do

20  anything to breach me, for goodness sake, words to that

21  effect.

22      Q.    All right.  Is it a crime in British Columbia to

23  serve a person named in a lawsuit with valid pleadings

24  pursuant to that lawsuit?

25      A.    Of course not.  It's normal process.

October 28, 2011

Page 44

1          THE COURT:    That was a rhetorical question.

2      Q.    Although you're not involved in that separate

3  lawsuit with the order relating to travel, are you aware of

4  whether or not that's a real lawsuit?

5      A.    Yes, a real lawsuit.  It's real.  A real looker

6  springs out of it.

7      Q.    And is that a real order?  I mean that's not a

8  forgery or anything?

9      A.    No, it's a valid order, certainly looks it to me in

10  every respect.

11          MR. PLATT:  Nothing further.  Thank you, Mr.

12  Botting.

13          THE COURT:    Ms. Roe, any questions?

14          MS. ROE:  Yes, thank you, your Honor.

15              C R O S S - E X A M I N A T I O N

16  BY MS. ROE:

17      Q.    Mr. Botting, I talked to you on the phone yesterday;

18  is that right?

19      A.    That's correct.

20      Q.    Okay.  And you were I think driving because you

21  were -- I called your cell phone, and you pulled over and

22  chatted with me for a few minutes?

23      A.    That's correct.  I did pull over.

24      Q.    Thank you very much for doing that.  At that time

25  you said that Paddy Roberts was your paralegal, right?

1        A.    Yes.

2        Q.    And that what he did was you said acting somewhat

3    beyond what I asked him to do.

4        A.    Yes.

5        Q.    And that is you asked him to have it served by the

6    sheriff; is that right?

7        A.    Yes.

8        Q.    Okay.  And then you indicated just now that you have

9    reviewed the order in the civil defamation case.

10       A.    Yes.

11       Q.    And it's a real order in your mind.

12       A.    In my mind, yes.

13       Q.    And you've reviewed the filings also?

14       A.    I believe a long time ago, but not recently.  I

15   should --

16       Q.    Let me ask you --

17       A.    Well, no, I have to clarify something because it's

18   not quite right.  Mr. Roberts was not acting as my agent or as

19   my paralegal in terms of deciding to serve this.  He phoned me

20   up, asking me how he should serve it.  In other words, he

21   initiated that, and I said either by process server or

22   sheriff.

23       Q.    And in fact, you told me that yesterday and said the

24   process server would cost $300, sheriff $100.

25       A.    Yes.

1     Q.    So you discussed the service of this with him.

2     A.    That's right.

3     Q.    And he has been a paralegal in your office or

4  continues to be?

5     A.    Not in my office.   In the interior B.C.

6     Q.    Okay.   So paralegal for you in your law practice.

7     A.    Right.

8     Q.    So you received the paper and the order in the civil

9  defamation suit from Mr. Roberts.

10    A.    Yes, that's right.

11    Q.    Is Mr. Roberts here today?

12    A.    No.

13    Q.    Is he in the country?

14    A.    No.

15    Q.    Did he think of coming with you or did you ask him

16  to come with you?

17    A.    I asked him to stand by so that you could

18  interrogate him or ask him questions or ask him questions on

19  his affidavit which he had signed earlier on that I had seen.

20    Q.    And do you know why he didn't come to the United

21  States?   Could it be because he has a warrant outstanding for

22  drug importation?

23    A.    I have no idea whatsoever about anything to do with

24  that.

25    Q.    You know Mr. Roberts faced those charges in Canada

1    at the same time the U.S. was trying to extradite him on

2    those?

3        A.    I have no knowledge of that whatsoever.

4        Q.    Have you ever looked at his blog?

5        A.    I beg your pardon.

6        Q.    Have you ever looked at Paddy Roberts' blog?

7        A.    I think I did at one point, very -- well, not his

8    blog so much as his web site, whatever it is that he has.

9        Q.    And his stories in the newspaper that he writes,

10   like cannabis and the magazine?

11       A.    I've looked at a couple.

12       Q.    And he really feels that extradition to the United

13   States is a violation of sovereignty, doesn't he?

14       A.    You could put it that way, especially when you can

15   prosecute in Canada and it's not extradition.  It's certain

16   times of extradition such as this one where actions take place

17   in Canada and in the United States, and Canada never -- it

18   always turns a blind eye and refuses to prosecute in Canada,

19   and it seems ridiculous that people should be sent out of

20   their homeland and into a -- well, a city like Seattle or in

21   California or all over the states.

22       Q.    And you feel that way --

23       A.    And typically what happens is that Canada will not

24   prosecute its own people, and that is Mr. Roberts' main

25   concern.

1      Q.   And you're in agreement or sympathetic to that,

2  aren't you?

3      A.   I wouldn't say -- am I sympathetic?  Yeah, I'm

4  sympathetic.  Am I in agreement?  Well, I think extradition

5  process is extradition process.  I write books on extradition,

6  and basically of course I take an objective stand on that, but

7  increasingly I think this is disappointing that Canada does

8  not take its responsibility properly in my view.

9      Q.   And that it turns over its citizens in to the United

10  States --

11      A.   The United States, yeah.

12      Q.   Mr. Botting, did you -- have you ever been up to Mr.

13  Rosenau's home in Quesnel?

14      A.   No.

15      Q.   Why?  Is it far?

16      A.   Yes.

17      Q.   How many hours?

18      A.   Four or 5.  No, it's more than that because --

19      Q.   8 hours?

20      A.   Probably 6 hours, yeah.

21      Q.   You were his attorney on the extradition, is that

22  correct, just the appeal?

23      A.   Yes, to the Supreme Court of Canada only.

24      Q.   And your representation began in November of 2010?

25      A.   That's correct.

1    Q.    And then the appeal was denied when?

2    A.    It wasn't denied.  It was -- the leave to appeal was

3  not granted.

4    Q.    Okay.  So not accepted.  It was like cert denied.

5    A.    Yes, and of course that happens to almost all but

6  200 cases a year out of 3000.

7    Q.    By far the majority, isn't that right?

8    A.    Right.

9    Q.    So when was that done?

10   A.    Oh dear.

11   Q.    In April?

12   A.    I can't recall the exact time.

13   Q.    And at that time you had completed or exhausted all

14  remedies on the extradition in Canada; is that correct?

15   A.    That's correct.

16   Q.    And was your representation of him done?

17   A.    Technically, yes.

18   Q.    I'd like to hand what's been marked exhibit 4.  Mr.

19  Botting, is that a letter that Mr. Platt asked you about, you

20  referenced in your direct testimony?

21              (Exhibit 4 marked.)

22   A.    Yes, that's correct.

23   Q.    And that's the one that you sent to Mr. Moffat, a

24  lawyer Kip Whelpley contacted in March or February of 2011?

25   A.    That's right, and this says I represent Mr. Rosenau

1    strictly for his appeal of committal for extradition.

2        Q.   Right.  Okay.  And at that time you indicated your

3    familiarity with this civil lawsuit or civil, you know,

4    whatever it is, lawsuit that Paddy Roberts, using his Gaelic

5    name, had brought against Mr. Whelpley; is that right?

6        A.   If you can point that out to me in here?

7        Q.   You have had nothing to do but to give advice -- you

8    understand about it.  The emails in the second paragraph were

9    between the two people, your name has been used, but you sort

10   of separate yourself from that lawsuit.

11       A.   Yes, okay.

12            MS. ROE:  I offer exhibit 4.

13            THE COURT:   Mr. Platt?

14            MR. PLATT:  No objection.

15            THE COURT:   All right.  Number 4 is admitted.

16                 (Exhibit 4 admitted.)

17            MS. ROE:  Nothing further then, your Honor.

18            THE COURT:   Mr. Platt?

19            R E D I R E C T   E X A M I N A T I O N

20   BY MR. PLATT:

21       Q.   By the way, is it Mr. Botting or Dr. Botting?

22       A.   I go by both, but doctor, yeah, is fine.

23       Q.   Is it a crime -- well, let me ask you this.  Have

24   you had an opportunity to review the email that was sent

25   within the last couple weeks allegedly by Paddy Roberts to Mr.

1  Whelpley?

2        A.    I read it.  I do recall it.

3        Q.    In your opinion is that email -- does that

4  constitute a criminal act?

5        A.    No.

6        Q.    Okay.  Not under the laws of British Columbia; is

7  that correct?

8        A.    No, I think he's warning Mr. Whelpley that if he

9  comes down to the United States, he would be in contempt of

10  court.  That's by context, and indeed, he would be.

11        Q.    Now, Ms. Roe asked you about whether or not you

12  separate yourself from Mr. Roberts, and I want to ask you

13  about why.  Is one of the reasons you separate yourself from

14  Mr. Roberts because he's a bit of a loose cannon?

15        A.    Yeah.  You have to be very much -- be very specific

16  and direct with him, and now apparently even if you are

17  specific and direct as you and I have both been, he still acts

18  on his own initiative sometimes, especially in this particular

19  case it almost becomes a project.  He initiated the civil suit

20  in the first place, and he may have had the nod at the

21  beginning, but, you know, I chose not to serve this document,

22  and when finally he said, okay, now's the time to serve it, we

23  got to serve it, we got to serve it, we got to serve it, I

24  said, well, make sure you do it in a legal way then, either

25  through a sheriff or process server, and the email came as a

1    complete surprise, but it's not illegal, no.

2        Q.   Would you characterize his interests in this area as

3    borderline if not totally obsessive?

4        A.   Obsessive is pretty close.

5        Q.   And it's true and you've been asked about this and

6    testified that your dealings with Paddy, it's very obvious

7    that he feels very strongly about these issues of extradition;

8    is that right?

9        A.   Yes, he feels very strongly, to the point that --

10   you know, he doesn't trust lawyers.  I don't think he trusts

11   you and I.  I don't think he trusts me either, but sometimes

12   he thinks that we are much too conservative, you know, that we

13   don't act quickly enough and he's drafted affidavits that are

14   frankly inflammatory.  As I say, he's a loose cannon, and it's

15   very hard to control somebody like that.

16       Q.   And have you seen an affidavit that he prepared for

17   this hearing where he talks about how he did this on his own

18   without Mr. Rosenau's sworn affidavit?

19       A.   Yes, I have.

20       Q.   So is it fair that it's somewhat of a personal issue

21   for him, this whole question of extradition, that he takes it

22   personally?

23       A.   Yes.  Initially he attempted to have Mr. Rosenau

24   charged in Canada so that any details, you know, that might

25   come out of this, like out of the extradition hearing would in

1    fact be dealt with in a Canadian court rather than in an

2    American court and thereby avoiding extradition altogether,

3    and that of course the expectation was that the Canadian court

4    would simply throw it out because there was no -- there was

5    not enough evidence whatsoever.  So, you know, that's how he

6    was fighting off the extradition.

7          He did the same thing with Mark Emery (phonetic),

8    just trying to charge him domestically so that the Canadian

9    courts could meet their responsibility.  But this is a

10   political ploy on his part.  It's strictly a political gambit

11   where he tries to involve himself in other people's business,

12   shall we say, and in this case that's how he I think became

13   involved.

14        Q.   And he considers himself or he is the leader of a

15   political party whose stated purpose, one of them, is to

16   secede from the rest of Canada; is that correct?

17        A.   That's correct.

18        Q.   So does it surprise you that he would go off and act

19   independently even after we've instructed him not to do so?

20        A.   Well, it doesn't surprise me.  You want to tap into

21   that kind of enthusiasm I suppose at one level, but there are

22   downsides to that in this case.  We wouldn't know here if it

23   wasn't for his acting precipitously to try to get this -- Mr.

24   Whelpley served with the results of his litigation.

25        Q.   Now, you were asked about your feelings regarding

October 28, 2011

Page 54

1    the extradition process by Ms. Roe, and I'd like to follow up

2    on that.  Is it fair to say that to the extent you have a

3    problem with extradition that you have a problem with the way

4    the extradition was handled in Mr. Rosenau's case.

5        A.   Yes.

6        Q.   What is it?

7        A.   Well, first of all, the record of the case seems to

8    be something --

9             MS. ROE:  (Inaudible) with the underlying

10   (inaudible).

11            THE COURT:  I'm going to sustain that objection

12   only because we're not going to relitigate the litigation in

13   Canada at this point in this court.

14            MR. PLATT:  No further questions.  Thank you.

15            THE COURT:  All right.  Ms. Roe.

16            MS. ROE:  Your Honor, I have a point of inquiry.

17   Mr. Platt mentioned an affidavit from Mr. Roberts, and I

18   haven't seen that.  Relating that, may I ask --

19            MR. PLATT:  We're not offering it, your Honor.

20            MS. ROE:  Then I have no further questions.

21            THE COURT:  All right.  May Mr. Botting step down?

22            MR. PLATT:  Yes.

23            THE COURT:  And can he be excused if he wants to

24   go?

25            MR. PLATT:  Yes, your Honor.

1                THE COURT:   All right.  Thank you very much, Mr.

2     Botting.  And Mr. Platt, additional witnesses?

3                     (Witness excused.)

4                MR. PLATT:  Your Honor, I have a point of order to

5     inquire.

6                THE COURT:   Sure.

7                MR. PLATT:  I've never been in this situation

8     before, but if possible, and I normally never ask constructure

9     (phonetic) from the court, but we've debated whether or not we

10    wanted to put Mr. Rosenau on the stand for the very limited

11    purpose of responding to whether or not he directed Mr.

12    Roberts in any way to have this contact.  That seems to be the

13    gist of the entire violation.  But we would not want him to be

14    in any way considered to be waiving his fifth or sixth

15    amendment right, that he would not be cross-examined on

16    anything to do with the underlying offense, and that we would

17    strictly limit the inquiry to the specific issue of whether or

18    not he instructed Mr. Roberts or authorized or approved this,

19    comparable to a 3.5 hearing.

20               THE COURT:   Ms. Roe, what's your I guess position?

21               MS. ROE:  Your Honor, I think the appropriate

22    testimony if it's to be so limited would be coming from Mr.

23    Roberts as to his instructions.  I think it would be -- since

24    the scope of this hearing has been so broad that should Mr.

25    Rosenau take the stand, it should be equally broad regarding

1    the lawsuit, the civil suit, what was expected, really bigger

2    than just a very limited question of whether he got --

3              THE COURT:   All right.  Mr. Platt?

4              MR. PLATT:  I have no response.  I would just --

5              THE COURT:   Well, I understood your first request

6    as a request to limit the examination as to matters relevant

7    to this hearing, although maybe your idea of the scope of that

8    limitation may be different than the scope as understood by

9    Ms. Roe, and I think what Ms. Roe is saying is that what's

10   before her or what's before the court has this whole issue

11   about what is your client's involvement in this lawsuit, and

12   it's not limited to a few questions about what he specifically

13   said on a certain day to Paddy Roberts or not.  So I don't

14   know if that is putting words in Ms. Roe's mouth, but I think

15   I suppose that -- I can't give you an advisory opinion or

16   ruling sort of in the abstract here because as you probably

17   could surmise, I suppose the questions rise and fall on how

18   relevant they are to the question before the court.

19              You know, we're not going to allow a situation where

20   Ms. Roe is going to say, well, let's talk about the charges

21   and helicopters or things like that.  Perhaps that would be

22   reserved for trial if your client wanted to testify then, but

23   of course I would have to make relevance determinations as to

24   any question posed in cross-examination as it relates to the

25   issue before me.  So that's about all I can say.

1          MR. PLATT:  That's extremely useful, your Honor.

2          THE COURT:   And I say this, Mr. Rosenau, because

3    you do have a right, as your lawyer is probably indicating, to

4    testify if you want.  You have the right not to testify.  It's

5    your decision to make between yourself and your lawyer.  All

6    right?  And so Mr. --

7          MR. ROSENAU:  I think I understand.

8          THE COURT:   So Mr. Platt, it's up to you how you

9    want to proceed at this moment.

10          MR. PLATT:  May I have just one moment, your Honor?

11          THE COURT:  Sure.

12          MR. PLATT:  Your Honor, this is a very difficult

13    decision, but we have no further witnesses at this time.

14          THE COURT:   All right.  All right.  So I guess I

15    should hear closing remarks.  Ms. Roe, why don't you start

16    off, and then we'll hear from the defense.

17          MS. ROE:  Your Honor, this is really an interesting

18    question of whether the court's going to enforce the

19    conditions of a release for a defendant who really seems to be

20    unsupervisable at this point.  He lives far from the border.

21    Ms. Busic has done a good job and tried to keep in touch, but

22    clearly there have been games being played for the lasts few

23    months.

24          The defendant has a presumption of being detained,

25    and at this point now the government's position is that he,

1   through his friend Paddy Roberts, a drug -- a pilot who has

2   been charged with delivering marijuana into the United States

3   also, has acted on behalf of Mr. Rosenau and with Mr.

4   Rosenau's permission.

5          What's interesting about exhibit 4, the letter that

6   Mr. Botting authored, is the lasts paragraph in which he says,

7   you know, Mr. Rosenau gives instructions and we follow them,

8   and I think it's pretty clear that that's what's happening.

9   Mr. Rosenau is no fool.  He had someone else do it.  Probably

10  wisely or perhaps wisely, Mr. Botting wasn't going to do it,

11  but he had his friend Paddy Roberts do it under his Gaelic

12  name.

13         Most importantly, too, is that this had nothing to

14  do with an extradition order.  This is pure and simple trying

15  to stop a against Mr. Rosenau from testifying and being

16  available in court, and the history of this lawsuit, this

17  notice and defamation suit and this default order is what's

18  amazing here and what's important because it's all done to

19  stop the trial from going forward.

20         No one in this courtroom knows the validity of that

21  Canadian order, so the government cannot ask Mr. Whelpley to

22  ignore it, and we cannot hold him harmless for doing that.  It

23  may be a valid order, at least it seems to be at this time.

24  This is an attempt by Mr. Rosenau to thwart the witnesses

25  against him.  As such it is a violation of his supervised

Page 59

1    release.  He is presumed to have been detained and we ask that

2    he be detained now as he has not conformed and is unable --

3    and the court is unable to assure that he is conforming with

4    the terms of his supervision.

5              THE COURT:  All right.  And Mr. Platt.

6              MR. PLATT:  Thank you, your Honor.  I know this

7    hearing has gone long, your Honor, but the reason is it's --

8              THE COURT:  No rush.  No rush.  Go ahead.

9              MR. PLATT:  Thank you.  Just responding to the point

10   about the term instructions.  I worked in London for a while

11   with a solicitor firm, and instruction means whether or not

12   you're retained.  That's really what that means.

13             And in that letter what Mr. Botting is saying over

14   and over again is I'm not involved in this.  How can I respond

15   if I haven't been instructed.  If I'm instructed, I'll

16   respond, and the implication is he wasn't instructed.  So to

17   flip that on the other side and say somehow that shows he was

18   instructed is patently absurd.

19             With respect to the violation here, the standard

20   that the court should apply is clear, cogent, and convincing

21   evidence.  Obviously the burden here is on the government.

22   Our position is that the evidence at this hearing is far from

23   clear, cogent, or convincing in terms of what happened about

24   this contact by Mr. Roberts with Mr. Whelpley, and there is

25   basically no evidence that Mr. Rosenau in any way authorized,

1    requested, approved, or facilitated any action by Mr. Roberts

2    with respect to to Mr. Whelpley.

3            In fact, the only evidence offered in that regard is

4    to the contrary, that Mr. Roberts goes off on his own, he does

5    things on his own, he's hard to control, he was repeatedly

6    told not to have contact and did anyway, that he was told at a

7    meeting where Mr. Rosenau was participating not to have

8    contact with Whelpley, and that he did so anyway.  There's no

9    evidence to the contrary.  There is zero evidence linking Mr.

10   Rosenau with what occurred here whatsoever, none.  So Mr.

11   Rosenau did not authorize the email sent by Paddy Roberts, and

12   he denies any involvement in that.

13           Number two, in addition, all emails other than this

14   email in the last couple weeks were dated prior to the

15   imposition of pretrial release conditions in this case.

16   Therefore, it is essentially impossible for those to be

17   considered violations.  That would be an ex post facto

18   application of the conditions of release in this case, back in

19   time.  You can't impose conditions and then violate someone

20   because before those conditions were imposed there's an

21   allegation of violation.

22           But we don't even agree it is a violation.  Service

23   of process of legitimate legal pleadings which, let's face it,

24   includes notifying someone about the service, that's

25   legitimate.  You can call somebody up and say I got to serve

1    you with legal papers.  It happens every single day.

2            There's also an implication here which we didn't get

3    too far into, but something about the lawsuit in Canada is

4    vexatious.  Well, I think every lawsuit is vexatious to the

5    person involved.  That doesn't mean it's illegal or it's

6    invalid or it's not proper.  There's nothing improper

7    whatsoever about the lawsuit that was prepared here, and

8    there's an implication that somehow that constitutes some kind

9    of interference with the witness.

10           And above all, the question of service of process

11   was brought to the attention of the person who is in charge of

12   reviewing whether or not the conditions are being followed,

13   and that's Julie Busic.  Early on in the case, a few weeks

14   after I was appointed, we contacted Ms. Busic, we taulked

15   about it.  I told her there was a lawsuit.  She read her

16   notes, she said that.  And she said that she didn't have a

17   witness list, but we assumed for the purpose of that

18   conversation that this would be a witness.  We couldn't have

19   been any more above board.  We weren't hiding the ball at all.

20           So filing the lawsuit is not a violation, and I

21   think there's an analogy here that is very relevant, and that

22   would be in the context of a dissolution.  It is quite common

23   for -- and unfortunate, but quite common that you would have a

24   husband who hits his wife and she wants a divorce.  The

25   husband winds up charged in criminal court, and there's also a

1    divorce suit pending.  The husband no doubt will have a no

2    contact condition imposed, domestic violence no contact order

3    of some kind.  He retains counsel.  The attorney for the

4    husband may represent him in both the dissolution and the

5    criminal matter.  If he represents them in the dissolution,

6    it's quite likely that he would file the dissolution petition,

7    and if there are temporary orders, especially if it involves

8    children and so on, there could be affidavits filed by the

9    husband denying and disputing the subject matter of the

10   criminal case.  This is not a violation of the no contact

11   order.

12            Here we have a lawsuit disputing the allegations

13   made by Mr. Whelpley essentially saying that he's lying and

14   he's defaming Mr. Rosenau, and to serve him with such

15   paperwork or to make arrangements for that service could not

16   possibly be a violation of a no contact condition.  In fact,

17   I'm not sure, but I recall there was somewhat of a colloquy by

18   the court in the very first hearing where Mr. Rosenau was

19   released talking about you've got Mr. Platt as your attorney,

20   let him deal with all these things, and you admonished Mr.

21   Rosenau not to have any contact, and by implication verified

22   that it would be acceptable if I did have contact, and that's

23   all this amounts to.

24            So we're saying, you know, it's arguable there's not

25   a violation here at all, even by Mr. Roberts, even if he were

1    acting with authority, which he was not.

2            So Mr. Roberts acted totally alone.  He was told by

3    everyone not to be involved in this, and Mr. Rosenau

4    specifically told him he didn't want to be breached on his

5    pretrial release conditions because of Mr. Roberts' behavior.

6    Personally I never knew anything about any of these emails

7    until they were provided to me a couple days ago.  I did know

8    about the lawsuit obviously.  But Mr. Roberts -- we're not

9    offering the affidavit because he cannot stay on task.  He did

10   supply an affidavit that was absurd, lengthy.  We're not

11   wasting the court's time with it, but in that he does say as

12   Mr. Botting indicated that he acted alone without any --

13           MS. ROE:  Objection as to something that's not

14   before the court (inaudible).

15           MR. PLATT:  Well, it was testified to.  So the other

16   argument the government may wish to make is that somehow this

17   lawsuit is illegal.  That's why I asked those questions.  This

18   is a legal order, it's been properly filed.  Mr. Botting

19   talked about that.  It was issued by a judge in Canada.  If

20   that's a crime, then the judge who issued the order is part of

21   the crime.  It's a legitimate legal process.  It was approved

22   in advantages by Ms. Busic, and I also asked Mr. Botting, who

23   is an attorney in British Columbia whether or not the emails

24   sent by Mr. Roberts constitutes a crime, and the answer was

25   no.  Ms. Roe herself has indicated that we don't know British

1    Columbia law, so they can't show here that any crime occurred.

2    It has to be a violation of conditions, and they have to show

3    that by clear, cogent, and convincing evidence, which they

4    haven't done.

5              There are some things that weren't brought up in

6    testimony, but they're in the brief filed by Ms. Roe, and I

7    think they should be addressed.

8              There is an implication here of some impropriety

9    with the way we characterize the issue in our response to the

10   government's motion for authorization of deposition, which I

11   take strong issue with.  The implication there is that somehow

12   we were hiding the ball on the fact that there was this

13   lawsuit in British Columbia.  We obviously weren't.  I told

14   Ms. Busic about it early on.

15             Not only that, if you read the conclusion in that

16   document, it's document number 28, in the conclusion we say

17   the government has not met their burden.  Instead Ms. Roe

18   inserts a footnote in her brief where she quotes us as saying

19   that there is no issue here.  Now, that's a bit of a side

20   issue, but it's there, and I think it needs to be addressed.

21             Our conclusion is very clear.  The government had

22   the burden of showing that there were some substantial basis

23   for the request for a foreign deposition.  They didn't do it,

24   and the court ruled that in fact they would not be allowed to

25   have this deposition.

1        As far as whether or not we knew anything about

2   whether or not the lawsuit would prevent someone from coming

3   to the United States, I don't think anyone in this courtroom

4   is clear on that.  That involves law in Canada, and I don't

5   think any of us totally understand it.  Mr. Erickson agreed

6   with that.

7        One thing that is interesting about the deposition,

8   though, is apparently the government was requesting a

9   deposition of a witness where there was a lawsuit supposedly

10  preventing him from leaving Canada, and yet nowhere is there

11  any discussion whatsoever of that lawsuit, and yet it's the

12  only witness the government has asked to depose in this case.

13  So that means they set up a deposition apparently without

14  talking to the witness first or they would have found out

15  about this lawsuit.

16        There's also something that wasn't talked about

17  here, which is Mr. Steward (phonetic), Glen Steward, and him

18  being contacted by someone.  It's completely unclear, it's far

19  from convincing.  There's no indication whatsoever who talked

20  to Mr. Steward.  I can assure the court as an officer of the

21  court, I'd be willing to make an offer of proof to this

22  regard.  I talked to Mr. Steward, and our conversation was

23  about how I wanted him to testify and I wanted to make

24  arrangements to get him down here to testify at the trial.

25        So casting aspersions on the defense that we were

1   somehow impeding Mr. Steward from coming down to testify, if
2   it was Paddy Roberts involved in that, that shows just how far
3   afield Mr. Roberts goes, that anybody telling Mr. Steward not
4   to come down here and testify would be going directly against
5   my strategy as the trial attorney for Mr. Rosenau.  So we have
6   no idea what that's about.
7           And further, I can tell the the court Mr. Rosenau
8   was well aware that we wanted Mr. Steward to come down here
9   and testify, and discussions were had talking about getting
10  Mr. Steward down here to testify and what's the best way to
11  make the arrangements, what date would he be needed, that kind
12  of thing.  So why anybody -- why Henry would have anything to
13  do with telling Mr. Steward not to come testify is ludicrous.
14          Your Honor, I said this last time and I'll say it
15  again.  The issue here is whether or not Mr. Rosenau is going
16  to appear for court and whether or not he's going to interfere
17  with witnesses.   The government has offered not one scintilla
18  of evidence that he would interfere with the witness.  They've
19  offered evidence that some other person who claims to be
20  acting as an agents of Mr. Rosenau had contact with Mr.
21  Whelpley, and yet they haven't even established that that
22  contact constituted a crime, and they have no evidence that
23  Mr. Rosenau was involved in that contact in any way, shape, or
24  form.
25          The only evidence offered is exactly the opposite,

1   that he did not authorize, he did not approve.  There's

2   evidence about the meeting we had where Mr. Rosenau told Mr.

3   Roberts not to have contact.  There's zero evidence to the

4   contrary.

5            I'll close with what I closed with at the first

6   hearing, which is the presumption of innocence.  There is an

7   implication here that this lawsuit is vexatious because it is

8   not well founded and it's not well founded because it can't be

9   true, and it can't be true because everyone knows Mr. Whelpley

10  is telling the truth, and anyone saying otherwise is somehow

11  doing an illegal act.  That's like an irrebuttable presumption

12  of guilt.  Our presumption is the presumption of innocence

13  applies here.  Mr. Rosenau is presumed innocent.  There is

14  absolutely no showing that he violated these conditions, and

15  there's no showing that this lawsuit in Canada constitutes any

16  violation of conditions, and it does not constitute a crime;

17  therefore, there is no basis for the government's position.

18  Thank you.

19            THE COURT:  All right.  Ms. Roe, any brief

20  rebuttal?

21            MS. ROE:  No, your Honor.

22            THE COURT:  All right.  So, Mr. Rosenau, today is a

23  sad day because I will find that there is a violation of the

24  alleged condition.  There is a violation of the condition of

25  supervision regarding the contact, and let me kind of, you

1   know, set this straight because the arguments have kind of

2   ranged all over the place regarding the propriety of lawsuits,

3   and I think in some ways we're all kind of missing the point

4   here.

5           I'm not here to discuss the laws, extradition laws,

6   if they're good or bad.  I'm not here to discuss whether

7   somebody can bring a civil lawsuit in Canada or not.  We're

8   here to discuss whether or not there was indirect contact in

9   this case, and your lawyer says that there is no evidence or

10  not a scintilla of evidence in this case, but I think the

11  evidence in this case indicates that there is in fact a very

12  direct connection between you and the contact in this case.

13          Now, we do begin with Julie Busic, the probation

14  office pretrial service unit supervisor, going over the list

15  of witnesses.  They're in plain English.  Kip Whelpley is

16  there, and for you to tell her I don't recognize any of these

17  names is just frankly not really believable, especially since

18  Kip Whelpley was just sued this year and you're the named

19  plaintiff, and also because his name is in the discovery in

20  this case, and so it would not be a surprise to anyone to see

21  Kip Whelpley as a witness and it would not be very believable

22  for you to say I don't recognize this person at all.

23          I did admit the exhibits presented by the government

24  over the defense objection regarding their relevance, and I'm

25  not here to say that I am relying on them as your lawyer says

1    in an ex post facto way saying that the violations occurred in

2    January or February or sometime before May, but I do think

3    that they paint a fuller picture of what's going on, and I do

4    think they are relevant in terms of at least your knowledge as

5    to who Kip Whelpley is in relationship to your case.

6         I think we want to separate the difference between

7    is the lawsuit proper, is the order proper, which I don't have

8    to decide, versus whether there was contact or indirect

9    contact, which I do have to decide.  As your lawyer says, it

10   was okay for a lawyer actually representing you to in a lawful

11   way have contact with witnesses to do investigation as

12   appropriate.  That's Mr. Platt's job, to go and investigate

13   the criminal side.  That's Mr. Botting's job to investigate

14   and prepare the extradition side.

15        Well, Mr. Platt and Mr. Botting didn't act in this

16   case.  Instead we have Mr. Roberts, Paddy Roberts, with the

17   argument essentially he's out of control, no one can control

18   him, so just don't blame Mr. Rosenau, but you really can't

19   have your cake and eat it.  You can't have a benefit without

20   saying I take no responsibility, it's just a wild and crazy

21   guy doing this.  You're the named plaintiff.  You're the

22   beneficiary of an order.  You're the beneficiary of a lawsuit

23   and an order that still as far as I know stands at this very

24   moment, an order that says you have to pay me money, me, Mr.

25   Rosenau, the defendant in this criminal case, because you're

1    lying or you've given lies regarding a criminal case pending

2    in the United States, and not only that, you're prohibited

3    from even leaving the country and entering the United States,

4    and that's still a pending order.

5            Now, your lawyer suggesting that, well, maybe the

6    order has no effect because we don't know the effect of the

7    order, and maybe that's true, there is nobody that has

8    testified as to the effect, but that order still stands, and

9    there have been communications regarding this order.

10           And so I do think that putting aside the propriety

11   of filing lawsuits and obtaining orders, and I don't have any

12   problem with that, but we're not here to decide that, that

13   there is evidence in this case given all of the evidence

14   presented of indirect contact.  And of course, you know,

15   although this is a wild man that everyone says we can't

16   control, this is your lawsuit.  You are the beneficiary of the

17   lawsuit.  You are the plaintiff.  You're the party in that

18   lawsuit, and if all these things were no good, you would have

19   sent some kind of letter.  You would have withdrawn the

20   lawsuit if you wanted to.  You would have sent some letter

21   saying I do not authorize any of these things.  You would have

22   contacted your lawyers, I do not not authorize any of these

23   things that Paddy Roberts is sending off, please ignore them.

24   That never happened.  It's just all Paddy's fault.  But

25   Paddy's not going to get the damages.  He's not the plaintiff.

1   Paddy doesn't have anything necessarily to benefit from Mr.

2   Kip Whelpley coming or not coming to your trial.  That's your

3   case.

4           Regarding Mr. Steward, I do understand your lawyer's

5   point.  I mean Mr. Steward is sort of a side issue, and I'm

6   not here to decide anything, and there's no allegation that

7   you had anything to do with Mr. Steward's purported issue of

8   coming to the United States.  I don't have to decide that as a

9   violation.  That's really not in front of me, just as I don't

10  have to decide whether or not the lawsuit in Canada is

11  vexatious or not.  That is not the allegation, that a

12  vexatious lawsuit was brought in violation of a condition of

13  release.  The only issue is was there or was there not

14  indirect contact, and I find that there was in this case.

15          Now, your lawyer, find I should say, says that,

16  well, there's no violation because a lawsuit in Canada is not

17  a law violation, but witness tampering or obstruction is, and

18  to the extent -- I suppose the simplest way to say it is to

19  the extent the best defense is to make all the witnesses go

20  away, I think that this is not sort of farfetched to say

21  somebody is tampering with the witnesses because nobody is

22  going to show up for the trial and the trial will go away.

23          So I think that while I'm not here to say that the

24  lawsuit in and of itself standing alone is a law violation

25  under the laws of Canada, I do think in relationship to this

October 28, 2011

Page 72

1   case not the lawsuit but the contact and the communications --

2   the communication, since it is an October allegation,

3   essentially is one of those situations where one could easily

4   say this witness is being pressured or tampered with, and by

5   the way, as you know, under the witness tampering federal law

6   where it has to do with a witness for proceeding in a federal

7   proceeding, in a federal criminal proceeding, the state of

8   mind is quite relevant.  If it happens, it happens, and a

9   violation can occur.

10           So, Mr. Rosenau, I will find that the violation has

11   been proven in this case.  The government has moved for

12   revocation in this case, which means a remand to custody.  I

13   find that that is appropriate.  I know that you have otherwise

14   been doing very well on supervision, but when it comes to an

15   allegation that's not a technical kind of thing like were you

16   around somebody smoking marijuana or did you forget to turn in

17   a monthly report or you forgot to call Ms. Busic on one day,

18   things that perhaps you get a second or third chance, when it

19   comes to witnesses in a case and untoward contact, I think

20   it's grounds for both revocation and remand to custody.

21           Now, this decision of course, as your lawyer will

22   tell you, is reviewable by your district judge, Judge Pechman,

23   and I believe under the rules if you have any kind of appeal

24   or attempt to review, I'm advising you now so that you'll know

25   that you need to do that within 14 days of today's date.

1    Otherwise you might be time barred in doing that.

2              All right.  Ms. Roe, anything further from the

3    government?

4              MS. ROE:  No, thank you, your Honor.

5              THE COURT:   Mr. Platt.

6              MR. PLATT:  Nothing further.  Thank you.

7              THE COURT:   All right.  So unfortunately, Mr.

8    Rosenau, you're being remanded to custody.  You might want to

9    talk to Mr. Platt.  If you have any valuables or cars to deal

10   with or whatever, to make arrangements right now.  You should

11   remain in the courtroom.  The marshall will come and escort

12   you to detention.  All right.  Anything further?

13             MS. ROE:  No, your Honor.

14             THE COURT:   We'll be in recess.

15             THE CLERK:  All rise.  Court is in recess.

16                  (Proceedings terminated.)

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3          I do hereby certify that the foregoing videotape

4    hearing was transcribed by me as a transcriptionist; and that

5    the transcript is true and accurate to the best of my

6    knowledge and ability; and that I am not a relative or

7    employee of any attorney or counsel employed by the parties

8    hereto, nor financially interested in its outcome.

9          The portions of this transcript marked "(inaudible)"

10   were inaudible or indecipherable due to the speaker dropping

11   their voice, simultaneous speech, or noise in the courtroom.

12         IN WITNESS WHEREOF, have hereunto set my hand and

13   seal this _____ day of _____ 2011.

14

15

16

17        _____

18            Karen L. Larsen, RPR(Ret.)

19

20

21

22

23

24

25