```
 1                    UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF WASHINGTON

 3   THE UNITED STATES OF AMERICA, )
                                   ) No. CR 06-157 MJP
 4        Plaintiff,               )
                                   )
 5             vs.                 )
                                   )
 6   HENRY C. ROSENAU,             )
                                   )
 7        Defendant.               )
     _____)
 8

 9              VERBATIM TRANSCRIPT OF PROCEEDINGS

10                              OF

11                  A BOND REVOCATION HEARING

12      BEFORE THE HONORABLE BRIAN A. TSUCHIDA, MAGISTRATE JUDGE

13                          10/28/2011

14                          APPEARANCES

15                 For Plaintiff: Susan Roe

16                 For Defendant:  Craig Platt

17

18

19

20

21          Transcribed from electronic sound recording

22         Transcript produced by transcription service

23

24

25              Transcribed by Brian Killgore
```

1

# TABLE OF CONTENTS

2

## Proceedings

3  1)  Proceedings of 10/28/2011................................3

4

## Testimony

5  Botting, Gary)...........................................36

6  Botting, Gary.  1.  Direct by Mr. Platt.....................36

7  Botting, Gary.  2.  Cross by Ms. Roe........................47

8  Botting, Gary.  3.  Redirect by Mr. Platt...................53

9  Busic, Julie)............................................7

10  Busic, Julie.  1.  Direct by Ms. Roe..........................7

11  Busic, Julie.  2.  Cross by Mr. Platt.......................15

12  Busic, Julie.  3.  Redirect by Ms. Roe......................20

13  Busic, Julie.  4.  Re-Cross by Mr. Platt....................21

14  Erickson, Bruce).........................................22

15  Erickson, Bruce.  1.  Direct by Ms. Roe.....................22

16  Erickson, Bruce.  2.  Cross by Mr. Platt....................28

17

## Exhibits

18  Exhibit No. 01 admitted..................................12

19  Exhibit No. 02 admitted..................................12

20  Exhibit No. 03 admitted..................................28

21  Exhibit No. 04 admitted..................................53

22

## Argument

23  1.  Closing by Ms. Roe....................................61

24  2.  Closing by Mr. Platt.................................63

25

1                   (Proceedings of 10/28/2011)

2            THE CLERK:  All rise.  United States District

3    Court for the Western District of Washington is now in

4    session, the Honorable Brian A. Tsuchida presiding.

5            THE COURT:  Good afternoon.  Please be seated.

6            THE CLERK:  Your Honor, the matter before you is

7    scheduled for an initial appearance on bond revocation

8    hearing in cause number CR 06-157, assigned to Judge

9    Pechman, United States v. Henry Rosenau.

10      Will counsel please make appearances?

11      MS. ROE:  Good afternoon, Your Honor, Susan Roe on

12   behalf of the United States.

13      Also present at counsel table is Mark Perez and the

14   Pretrial Services officer, Julie Busic.

15           THE COURT:  And Ms. Roe, good afternoon.  And Mr.

16   Platt, good afternoon.

17           MR. PLATT:  Good afternoon, Your Honor, Craig

18   Platt on behalf of Henry Rosenau who is seated or standing

19   to my left.

20           THE COURT:  And good afternoon, Mr. Rosenau.

21   Please be seated.

22      Mr. Rosenau, we are here because I have received a

23   petition alleging a violation of a condition of release, and

24   Mr. Platt, has the defense received a copy?

25           MR. PLATT:  Yes, Your Honor.

1    THE COURT:  And for our record, Ms. Roe, if you

2    would state the allegation?

3    MS. ROE:  The allegation is that the defendant has

4    violated the special condition of his bond by having

5    contact, indirect, with existing or future witnesses in this

6    case.  I have an indirect contact Kip Wepley (phonetic) on

7    October 20 of this year.

8    THE COURT:  All right.

9    And so Mr. Rosenau, you know that the government has

10    brought this allegation, and of course you have an

11    obligation to make any kind of admission, and we can contest

12    this.

13    I have in fact received a number of materials regarding

14    this allegation, and I trust, Mr. Platt, that you also

15    received a copy -- I think the government filed it earlier

16    today -- it is the government's -- it is a pleading in

17    support of a request for revocation with attachments.

18    And I also received from you, Mr. Platt, just a little

19    while ago, a copy of an e-mail from Craig Platt to Mr.

20    Botting (phonetic) -- and I also -- in terms of the

21    submissions from the government, as well is the defense, do

22    I have everything or is there something I am missing?

23    MS. ROE: You have everything from the government,

24    Your Honor.

25    THE COURT:  All right.

1           MR. PLATT:  Your Honor, the Court should have
2     everything at this point.
3           We are going to ask Mr. Botting to address the Court at
4     this hearing.
5           He does have with him some books that he has written.
6     It is just by way of establishing his credentials as an
7     expert in this area in Canadian law.
8           THE COURT:  Well, I guess the question is whether
9     we need expert testimony about the factual allegation, so
10    what is really before me is an allegation on the violation
11    of a condition of supervision.
12          I don't think that is really a matter of expert
13    testimony in terms of whether the government can show that
14    there was indirect contact between Mr. Rosenau and one of
15    the witnesses in this case.
16          Unless, of course, Mr. Botting is a fact witness, and
17    has some testimony regarding the facts regarding that
18    allegation.
19          MR. PLATT:  Your Honor, our position would be that
20    it is a question of mixed facts and law in this matter.
21          He would be testifying as a fact witness, as well,
22    because he is personally aware of some of the circumstances
23    surrounding the allegations with respect to the violation.
24          To the extent that there is an argument being made by
25    the government that the lawsuit in question was in any way

1    frivolous or, you know -- it was referred to as vexatious, I

2    believe, in their moving papers.  To that extent I think

3    that is a question of mixed fact and law, whether or not

4    that is vexatious, and Mr. Botting is able to address the

5    Court on that issue.

6              THE COURT:  All right, well why don't we, at this

7    point, first of all, let's just start with what the

8    government has, and so Ms. Roe, why don't you start, and

9    then we can address the whole issue about other evidence as

10   presented by the defense as this plays out.

11             MS. ROE:  Your Honor, thank you, I will.  But I

12   would ask that the witness, any witness be excused from the

13   courtroom.  Mr. Botting shouldn't be present listening to

14   other testimony --

15             THE COURT:  All right.

16             MS. ROE:  -- if he is going to be a fact witness.

17             THE COURT:  Do you have any objection?

18             MR. PLATT:  We will object.  I think it is

19   important if he is offering his opinion about the lawsuit

20   that he be able to hear the testimony so he can opine on

21   that when he is called to.

22             THE COURT:  Well, if he brought the lawsuit or

23   assisted -- I don't know if he needs to hear what anybody

24   else thinks about it, so I will grant the motion and we will

25   excuse, I guess, witnesses, until they're called.

1           Are there any other witnesses here from either side?

2               MR. PLATT:  No, Your Honor.

3               THE COURT:  Just spectators?  All right.

4           Thank you very much, Mr. Botting.

5           So Ms. Roe, go ahead.

6               MS. ROE:  Thank you.

7           Your Honor, the government calls Pretrial Services

8       Officer Julie Busic.

9               THE COURT:  All right, and Ms. Busic, if you would

10      step forward and we will have you sworn in?

11              JULIE BUSIC SWORN

12              THE COURT:  And go ahead, Ms. Roe, any time you're

13      ready.

14              MS. ROE:  Thank you.

15                        * * * * *

16              D I R E C T   E X A M I N A T I O N

17      BY MS. ROE:

18      Q.  Ms. Busic, would you identify yourself for the record, and

19          just give us briefly what you do and what your role in this

20          incident is?

21      A.  Yes, Julie Busic.  I am a supervising US probation officer

22          working in the pretrial unit, and I have been so employed

23          for over 14 years, and currently supervising Mr. Rosenau

24          since May 2011.

25      Q.  Okay.

1          And Mr. Rosenau is living in Canada; is that correct?

2  A.  Correct.

3  Q.  And so you deal with the Canadians -- one of your duties is

4      to deal with the Canadians who are on pretrial release?

5  A.  That is correct.

6  Q.  Okay.

7          When did you first take Mr. Rosenau on your caseload?

8  A.  May 6, 2011.

9  Q.  And what is your procedure for reviewing the conditions of

10     his release with him, and what did you do with him?

11 A.  On May 6 I telephonically reviewed the conditions of

12     supervision with Mr. Rosenau, given the distance between us.

13     He was provided an e-mail copy of the documents, and we

14     reviewed them telephonically.

15 Q.  And do you recognize that as the written conditions of his

16     release?

17 A.  Yes.

18 Q.  And is that his signature at the bottom?

19 A.  Correct.

20 Q.  And is one of the conditions that he not have contact with

21     witnesses, direct or indirect?

22 A.  That is a special condition of his bond.  Yes.

23 Q.  Did he have one -- generally speaking, has Mr. Rosenau been

24     pretty good on supervision?

25 A.  Mr. Rosenau has reported has directed.  There was a previous

1   violation in this matter that was before the Court in July;

2   as a result, his bond was modified.  And it was modified so

3   that he changed residences; is that it?

4        At the time the bond was actually modified to include a

5   drug and alcohol testing condition.  There were discussions

6   between Mr. Rosenau and myself about a move, and essentially

7   the requirement for supervision was he lived in a home that

8   would be free of any controlled substances or he would

9   relocate.

10  Q.  And what was your understanding with Mr. Rosenau?

11  A.  We had several discussions about the topic, and there was

12      some -- some discussion or some word from Mr. Rosenau that

13      he would move to another location and was preparing to do

14      that, and what the agreement between us was that he had

15      permission to move.  He had provided me with the address and

16      the particulars; however, upon -- when he would be ready to

17      officially do that, he would call me, and if he didn't reach

18      me personally, it was acceptable to leave a voicemail.

19          However, as of to date, he has not moved.  He continues

20      to reside in his home that he released to.

21  Q.  Okay, and when did you learn that he hadn't moved?

22  A.  I did confirm with him on Monday of this week that he was

23      still residing in his home.

24  Q.  Okay.

25          Did you discuss the condition that he have no contact,

1      direct or indirect, with witnesses -- also with his

2      attorney, Mr. Platt?

3   A.  Yes.

4   Q.  When was that discussion?

5   A.  Well, it was a condition of his release, and the discussions

6      started about that upon release.

7          At that time I had made requests for a full list of the

8      parties that he should not have contact with, and that on

9      May 25, 2011, I was contacted by counsel about the

10      condition.  I was informed that there were some proceedings

11      in Canada and that there were some third parties that may

12      need to be served regarding extradition, and would that be a

13      violation of the conditions of supervision?

14   Q.  And what was your advice to Mr. Platt, defense counsel?

15   A.  What I said at the time is that I had not received any lists

16      of prohibited parties, and therefore as long as it was

17      illegal matter, served by legal counsel, that was acceptable

18      for me and that I would document it in my records.

19   Q.  And did you so document it?

20   A.  Yes, I did.

21   Q.  Both Mr. Platt's inquiry and your response?

22   A.  Yes.

23   Q.  Okay, and did you understand that this had to do with

24      extradition, not with the underlying criminal matter?

25   A.  I understood it to be regarding extradition.

1    Q.  What would your response have been if you knew that it was

2        regarding the underlying criminal matter or the availability

3        of a witness?

4             MR. PLATT:  Objection, Your Honor, assumes facts

5        not in evidence.

6             THE COURT:  Go ahead and answer the question.

7    A.  I would not view myself as having the authority to authorize

8        that and would have sought direction from the Court,

9        directly, or suggested that the parties do so.

10   Q.  Okay.

11        Sometimes later, a few weeks later, did you give Mr.

12       Rosenau a list of the witnesses with whom he was prohibited

13       from contacting?

14   A.  Yes, I was receipt of the names; I created a document that

15       would spell them out and to advise of what he should do in

16       the event that there was contact, and on June 14 I e-mailed

17       the document to the defendant, as well as counsel.

18   Q.  Okay, and looking at what has been marked for purposes of

19       this hearing, Exhibit 2, is that a list of your memo to Mr.

20       Rosenau with a list of witnesses?

21   A.  Yes.

22            MS. ROE:  Okay, the government offers Exhibit 1

23       and Exhibit 2.

24            THE COURT:  Any objection, Mr. Platt?

25            MR. PLATT:  No objection.

1           THE COURT:  All right, Exhibit 1 and Exhibit 2 are

2       admitted.

3    BY MS. ROE:

4    Q.  Did you also talk to Mr. Rosenau about list?

5    A.  Yes, we talked on June 16, 2011, about the document.  Mr.

6        Rosenau was concerned at that point because he indicated he

7        didn't know any of the parties and, as I noted, he indicated

8        a concern that he might approach somebody and ask them for

9        directions, and not knowing they were someone he should not

10       be having contact with.

11   Q.  And what did you advise him to do?

12   A.  My response was if he didn't know any of the parties, that

13       the condition was going to be easy to comply with, and as it

14       notes on my form, that if there was some kind of incidental

15       or accidental contact, he would report it to me immediately.

16   Q.  All right, is that form signed by Mr. Rosenau?

17   A.  Yes.

18   Q.  And does it also have sort of an odd date, like a date a

19       week or two later?

20   A.  Yes.  At the time that I had sent this to the defendant,

21       there were a number of things going on.  He was having some

22       computer difficulties in being able to print the document.

23       He could view it.  And then it was amidst the Canadian mall

24       strike, and so he was being very receptive in terms of

25       telling me that it was going to be a delay in getting it to

1    me because of the mall strike.

2    Q.  Okay, so that was received by your office in July?

3    A.  Correct.

4    Q.  Since that time has Mr. Rosenau mentioned that he or his

5        friends have contacted witnesses in this matter?

6    A.  No.

7    Q.  Inadvertently or other?

8    A.  No.

9    Q.  Okay.

10        Did you receive copies -- oh, let me ask, where did he

11       live?

12   A.  Quesnel.

13   Q.  Have you been there?

14   A.  No.

15   Q.  How far is it, do you know?

16   A.  It is my understanding it is about eight hours north of the

17       border.

18   Q.  All right.

19        Did you receive copies this week of e-mails forwarded

20       by Bruce Erickson purportedly from his client Kip Wepley?

21   A.  Yes.

22   Q.  Is Mr. Wepley on the list of witnesses with whom Mr. Rosenau

23       is not supposed to have contact?

24   A.  Yes.

25   Q.  And are there some e-mails between Patrick -- with a Gaelic

1   last name, and Kip Wepley, regarding a civil lawsuit and a

2   default order?

3 A. Yes.

4 Q. Do most of those e-mails that you have seen, predate Mr.

5   Rosenau being on supervised release?

6 A. Yes.

7 Q. Is there one dated last week?

8 A. Yes, October 20.

9 Q. And is the October 20 e-mail on the attached order the basis

10   of this allegation?

11 A. Yes.

12 Q. Have you asked Mr. Rosenau about it?

13 A. No.

14 Q. Why do you view it as a violation of the condition?

15 A. When I read the e-mail, there had been no request for

16   specific permission regarding that, and I noted the court

17   order, which spells out the defendant's name and the

18   witness's name.

19 Q. All right, and is it -- and does it seem to be about an

20   underlying extradition matter?

21 A. No.

22      MS. ROE:  No fur

23      THE COURT:  All right.

24   Mr. Platt?

25      MR. PLATT:  Thank you, Your Honor.

```
 1                         * * * * *
 2            C R O S S - E X A M I N A T I O N
 3   BY MR. PLATT:
 4    Q.  Good afternoon, Ms. Busic.
 5    A.  Hello.
 6    Q.  How are you?
 7            I just have a few questions for you.  I just want to
 8        confirm, first of all, the phone call that you and I had on
 9        the 25th.
10            Now I called you; is that your recollection on that
11        date?
12    A.  If I can just quickly refer to my notes I will confirm what
13        I jotted down.
14                    (Brief pause in proceedings)
15    A.  Yes.
16   BY MR. PLATT:
17    Q.  Okay, and I told you that I am calling in part to ask you
18        about how to handle something that had come to my attention,
19        namely a lawsuit involving a -- what we thought might be a
20        potential witness; is that correct?
21    A.  There were proceedings regarding an extradition that you had
22        learned from a Canadian attorney that some third parties may
23        be served paperwork, as they were likely witnesses in this
24        matter.
25    Q.  Okay, so I did tell you that I was concerned they might be
```

1    witnesses?

2    A.   Right.

3    Q.   Correct?  Okay.

4         And in fact at that we had a discussion about having a

5         problem because there was no witness list yet provided by

6         the government; is that correct?

7    A.   That is correct.

8    Q.   And in fact that was a little bit of an impediment for us to

9         be able to go forward and figure out who exactly Mr. Rosenau

10        was to have no contact with at that time?

11   A.   Correct.

12   Q.   And but I think for the purposes of that discussion, is it

13        fair to say that I said, "Well, let's just assume that it is

14        a witness, and that's why I need to talk to you about

15        it," -- words to that effect?

16   A.   Correct.

17   Q.   Okay.

18        And then we agreed that if there was a valid lawsuit

19        existing in British Columbia and if paperwork from that

20        lawsuit was served on a witness, so long as it was done

21        through counsel and done legally, that that would be not

22        considered a violation of no contact, correct?

23   A.   Correct.

24   Q.   And I specifically expressed to you my concerns about that

25        issue because I did not want that to be later misunderstood

1  and interpreted as a violation of the no contact condition?

2 A. Yes.

3 Q. Now let's talk a little bit about Mr. Rosenau's adjustment

4  on release, and you have talked about that a bit, but

5  leaving aside the issue that we are here addressing, and the

6  issue that we addressed at the last hearing, is it fair to

7  say that his adjustment has gone fairly smoothly?

8 A. Yes.

9 Q. That when you have asked him for paperwork he has provided

10  it?

11 A. Yes.

12 Q. That when you have asked him to check in with you, he has?

13 A. Yes.

14 Q. That he has met with you at least one or -- how many times

15  has he met with you at the border?

16 A. Could be three.

17 Q. Okay.

18 A. Definitely two.

19 Q. And is he always there?

20 A. Yes.

21 Q. And on time?

22 A. Yes.

23 Q. And cooperative?

24 A. Yes.

25 Q. And answers your questions?

1   A.   He does.

2   Q.   And gives you the materials you need?

3   A.   Yes.

4   Q.   Thank you.

5        Now let me just ask you the general question then:

6        Other than the subject matter of this hearing and the last

7        hearing, have you had any problems whatsoever supervising

8        Mr. Rosenau on supervision?

9   A.   No.

10  Q.   Now when you -- you said you talked to Mr. Rosenau about

11       whether or not he knew witnesses; is that correct?

12  A.   Um-hum.

13  Q.   And he indicated to you that he was worried about not

14       recognizing people; is that correct?

15  A.   That is correct.

16  Q.   He didn't say, "I won't recognize their names"; he said, "I

17       won't recognize how they look," or words to that effect; is

18       that true?

19  A.   I need to refer to my notes.

20            (Brief pause in proceedings)

21  A.   He was worried because he didn't know any of the names of

22       the list of prohibited parties.

23  BY MR. PLATT:

24  Q.   Did he say that he would not recognize someone if he met

25       them on the street?

1   A.   Yes.

2   Q.   And he was concerned about that because he would not

3        recognize the way they look?

4   A.   Correct.

5   Q.   And that was a concern he expressed to you?

6   A.   Yes, he did.

7   Q.   All right.

8   A.   And your understanding of the subject matter of today's

9        hearing is that there was contact from some third party; is

10       that correct? -- somebody other than Henry Rosenau had

11       contact with a witness in the case; is that correct?

12  A.   Correct.

13  Q.   All right, and you are basing your conclusion that there was

14       no -- there was a violation of the no contact condition on

15       the fact that that third person who made contact purported

16       to have authorization from Mr. Rosenau; that that

17       information came from that third person, correct?

18  A.   Correct.

19  Q.   And you have heard nothing from Mr. Rosenau to the contrary?

20       He hasn't said, "Oh, yeah, I told him to have contact," or

21       "he knew about contact"; is that correct?

22  A.   That is correct.

23  Q.   In fact quite the opposite; is that true?

24  A.   We haven't spoke about the issue.

25  Q.   Right.

1          So other than reading the document prepared -- well

2     strike that.

3          Okay, one final question:  Is it fair to say, and I

4     don't know if you can answer this; if not, just say so, but

5     is it fair to say that in your experience Mr. Rosenau is not

6     exact an expert user of computers?  Do you have any opinion

7     on that?

8  A. I can't make an assessment of his use of a computer, nor can

9     he probably make one of mine.

10         I will acknowledge he has had some difficulties with e-

11    mail.

12 Q. All right, and he has expressed that he has trouble with the

13    computer and using e-mails and that type of thing?  Has he

14    ever said --

15 A. Yes, he has said that.

16 Q. Thank you very much.

17             THE COURT:  All right, any follow-up questions,

18    Ms. Roe?

19             MS. ROE:  Just a couple, Your Honor, if I may.

20                        * * * * *

21        R E D I R E C T   E X A M I N A T I O N

22 BY MS. ROE:

23 Q. Ms. Busic, did that conversation you had with defense

24    counsel was regarding future matters; is that right?  In

25    May, the conversation about future matters?  Were you told

1      at that time that there was already some sort of civil

2      lawsuit or notice of lawsuit filed against one of the

3      witnesses?

4   A.  I wasn't aware of that.

5   Q.  And were you told that when you handed over or gave a list

6      of names to the defendant and defense counsel?

7   A.  No.

8   Q.  Okay.  And --

9              MS. ROE:  Nothing further.

10              THE WITNESS:  Thank you.

11              THE COURT:  Do you have further questions

12      regarding the cross?  I mean the redirect?

13              MR. PLATT:  Yes, Your Honor.

14              THE COURT:  Sure.  Go ahead.

15                      * * * * *

16           R E - C R O S S   E X A M I N A T I O N

17   BY MR. PLATT:

18   Q.  I will just be brief here, but when we talked, I told you

19      there was a lawsuit in Canada; is that correct?

20   A.  Correct.

21   Q.  Okay, so I told you there was already a lawsuit in Canada,

22      correct?

23   A.  Excuse me.

24          I am going to go back to my notes, which is how I

25      recorded it -- that you were concerned that there are

1        proceedings regarding the extradition that you had learned

2        from a Canadian attorney and that some third parties needed

3        to be served and would likely be witnesses in this matter.

4            That is what I understood.

5   Q.  Okay, and I didn't say, "This is going to be a lawsuit off

6        in the future," did I?

7   A.  I don't recall that.

8   Q.  Thank you.  Nothing further.

9                MS. ROE:  Nothing further.

10               THE COURT:  All right.  And thank you very much,

11       Ms. Busic.

12               MS. ROE:  Ms. Erickson?

13               THE COURT:  All right.

14               BRUCE ERICKSON SWORN

15                      * * * * *

16            D I R E C T   E X A M I N A T I O N

17  BY MS. ROE:

18  Q.  State your name, please, and spell your last name?

19  A.  Bruce Erickson, E-R-I-C-K-S-O-N.

20  Q.  And Mr. Erickson, are you a criminal defense attorney in

21       this town?

22  A.  I am.

23  Q.  And do you represent a witness in the US v. Rosenau matter,

24       Kip Wepley?

25  A.  That is correct.

1   Q.  And Mr. Wepley lives in Canada?

2   A.  That is correct.

3   Q.  But you represented him in his underlying matter here and

4       have continued to represent him; is that right?

5   A.  That is correct.

6   Q.  Okay.

7         Do you know -- does he know Henry Rosenau?

8   A.  I believe he does.

9   Q.  And how do you know that?

10  A.  I have heard many statements made by Mr. Wepley in various

11      contexts to that effect.

12  Q.  And from a review of your discovery in the underlying case

13      of Mr. Wepley's?

14  A.  That's true, also.

15  Q.  Okay.

16        Did you receive a series of e-mails from your client,

17      Kip Wepley, on October 20 of this year?

18  A.  I am thinking.  In terms of the date, I --

19        MS. ROE:  May I ask the witness be handed what has

20     been marked Exhibit 3, which is sort of confusingly four

21     packets, Exhibits 1 through 4, that were attached to the

22     pleading today?

23       Let's call it 3.  Thank you.

24  A.  All right.  I am looking at it.

25  BY MS. ROE:

USA v.  Henry C. Rosenau - CR 06-157 MJP - (10/28/2011)- P. 24

1   Q.  All right, there should be four packets, and although your

2       client's e-mail address and home address has been redacted;

3       otherwise are those the same?  Do you recognize them?

4               (Brief pause in proceedings)

5   A.  It is the matters contained in -- within what is marked as

6       Exhibit 1, within plaintiff's Exhibit 3.

7   BY MS. ROE:

8   Q.  Okay.

9   A.  And those do appear to be the same e-mails that I received,

10      yes.

11  Q.  Okay.

12          Would you also look at the other exhibits?  Is Exhibit

13      2 and 3 and 4 other e-mails that you received from your

14      client, as well as some attachments; for example, some

15      letters that were attached to those e-mails?

16  A.  I believe they are, but you know, I can't be 100% sure.  I

17      am sorry because I -- they -- the ones that I reviewed were

18      the ones that were addressed to me; the attachments I didn't

19      spend a lot of time with, but --

20  Q.  Okay, and those have page breaks in them for easier reading,

21      so the ones that you had were just long and sequential?

22      Some of those e-mails?

23  A.  That is correct.

24  Q.  Okay.

25          Did you forward the e-mails and the attachments that

1        you had received from your client to my office?

2    A.   I did.

3    Q.   Okay, and are those e-mails and letters indicate that they

4        came to my office from your office, Bruce D. Erickson by --

5        you know, at the top, or by the e-mail note?

6    A.    Well I -- there is no question that I sent along the e-

7        mail, packet of e-mails that I received from my client, Kip

8        Wepley, and the attachments, to your office.

9             They had a slightly different format, and I am not sure

10        if I am recalling precisely what your -- I think your

11        question was is there something in here that identifies them

12        as coming from my office to your office?  And I am not sure

13        that I can find that, but --

14   Q.   Let me ask you this:  Do you recognize those as appearing to

15        be the e-mails you forwarded to my office?

16   A.   Yes.

17   Q.   Okay.  Why did you forward them to us?

18   A.   Mr. Wepley, in his plea agreement in his case, had a

19        paragraph calling for cooperation.  The government was

20        asking him to fulfill his cooperation obligations.  He had

21        made a decision to do that, and to make himself available

22        for testimony at the upcoming trial.

23             I had been in touch with him just regarding the

24        logistics of getting ready to fulfill that obligation and he

25        forwarded these e-mails to me; I read them; they were new to

```
 1        me and I conferred with my client and obtained his

 2        permission to forward them to you, and did so.

 3   Q.   Okay, and did they affect or appear to affect his ability to

 4        fulfill his cooperation agreement; that is to come down and

 5        testify at the trial in US v. Rosenau?

 6   A.   Well, you know --

 7             MR. PLATT:  Objection, that calls for an expert

 8        opinion.

 9             THE WITNESS:  I'm sorry?

10             THE COURT:  Go ahead and answer.

11   A.   You know, I don't really have any information beyond the

12        documents themselves.  I am aware that one of the documents

13        contains what purports to be an order from somebody in

14        Canada who is either a judicial person or a clerical or

15        staff person working with some court in Canada and it

16        appears that the order prohibits him from entering -- "him"

17        meaning Kip Wepley from entering the United States, and

18        therefore did appear that it might be an obstacle towards

19        his fulfilling his obligations pursuant to the cooperation

20        clause in his plea agreement, and I think that that's part

21        of the reason why I brought it your attention.

22   BY MS. ROE:

23   Q.   Okay, does Mr. Wepley, if you know, know a man named Paddy

24        Roberts, the man who sent him these e-mails?

25   A.   I'm sorry, I didn't hear that?
```

USA v.  Henry C. Rosenau - CR 06-157 MJP - (10/28/2011)- P. 27

1    Q.  Do you know if your client knows the man who sent him these
2        e-mails?
3    A.  I don't think he does.  I believe that there may have been
4        one face-to-face meeting about the time that this sequence
5        of e-mails started, but other than that, he has no
6        connection with him.
7    Q.  Okay.
8            And Mr. Erickson, does your client live in the interior
9        of British Columbia?
10   A.  That's right, near --
11   Q.  Kelowna?
12   A.  Yes.
13   Q.  Near Kelowna?
14   A.  Yes.
15   Q.  Okay.
16             MS. ROE:  No further questions.
17             THE COURT:  All right.
18             MS. ROE:  Offer what has been marked Exhibit 3.
19             THE COURT:  And Mr. Platt, any objections to the
20        Exhibit 3?
21             MR. PLATT:  I hate to be difficult, Your Honor,
22        but with -- I hate to be difficult, but with respect to any
23        e-mails that are dated prior to the imposition of conditions
24        by this court in May, we would object that they are
25        irrelevant.

1           THE COURT:  All right.  I am going to overrule

2      that objection and I will admit Exhibit 3.

3                       *  *  *  *  *

4               C R O S S - E X A M I N A T I O N

5    BY MR. PLATT:

6    Q.  Good afternoon, Mr. Erickson.  How are you?

7    A.  I'm good.  Thank you.

8    Q.  At some point during the last few months, have you had any

9        contacts with the U US Attorney's Office about making

10       arrangements to have Mr. Wepley, your client, deposed in

11       Canada?

12   A.  Yes.

13   Q.  And as part of those discussions, did you talk with anyone

14       at the US Attorney's Office about reasons that a deposition

15       should take place in Canada?

16   A.  I think so, yes.  I think the answer to that question is

17       yes.

18   Q.  And what were those reasons?

19   A.  Convenience to my client; a reluctance to my client to come

20       into the United States.  My client, as I think the Court

21       knows, my client was previously here as a defendant; was

22       convicted upon a plea of guilty and did time, and was trying

23       to rebuild his life in Canada, and was trying to stay

24       focused on rebuilding his life in Canada and was reluctant

25       to come down to the United States.

1    Q.   So it would largely be for the convenience of your client?

2         Is that a fair statement?

3    A.   Yes, I think that -- I mean largely -- I am not sure

4         precisely what that word means, but I would agree with that.

5         Yes.

6    Q.   And is it fair to assume, then, that Mr. Wepley did not tell

7         you about any lawsuit that was pending against him, any

8         order that was out there preventing him from coming to the

9         United States?

10   A.   I don't recall that being mentioned to me by my client at

11        the time we were discussing the possibility of his testimony

12        being received by deposition.

13   Q.   At any point have you had a conversation with anyone in the

14        United States Attorney's Office regarding the fact that

15        there is that lawsuit up in British Columbia, at any time?

16   A.   Yes.  I think I mentioned, since I -- and I guess it was the

17        20th; I am not sure which day on the calendar it was, but

18        not too long ago on the day that I forwarded this, the same

19        day that I forwarded this material to the US Attorney, we

20        had a conversation on the topic, yes.

21   Q.   Okay.

22             And did you know about the lawsuit before then?

23   A.   I don't think I did.  I mean it certainly didn't penetrate

24        my consciousness if there was any mention of it at all to me

25        prior to that.  I don't think there was.

1    Q.   Now you and I had a conversation, I don't know, a couple of

2         weeks ago regarding whether or not your client would be

3         available for an interview.  Do you recall that?

4    A.   Yeah.  Well, I think you -- it was fairly recently.

5    Q.   Right.

6    A.   Yeah.  Yes, I do.

7    Q.   But that was before the 20th, correct?

8    A.   I think that there was a series of phone calls, is my

9         recollection, and here is my recollection, you know:  My

10        recollection is that it was -- it was mentioned, I think --

11        I think we encountered each other on an unrelated matter

12        here at the courthouse.  You called me a day or two later

13        and you indicated you were representing Mr. Rosenau, and

14        that it may have been in that first message that you

15        indicated that you might want to meet with my client for an

16        interview.

17             It was not -- the inquiry was not answered; it wasn't

18        really resolved is my recollection, and then when we went

19        up -- recently I saw my client in Canada, and at that time

20        it still had not yet been resolved, and it was only, you

21        know, in the last couple of days that I put the question to

22        my client and he said, "No, he does not want" -- he would

23        prefer not to be interviewed.

24             That is my recollection.

25    Q.   Well, do you recall whether or not you and I have discussed

1    this since the 20th?

2  A.  Yes, I think we have.

3  Q.  All right.

4  A.  I am hoping I am not getting my dates right; I don't have a

5      calendar here.  I didn't bring my file, but I believe

6      that -- I am trying to -- let's see.  Well, it was just, you

7      know, last -- yes, I think it was this week.  Huh.

8  Q.  We talked yesterday, right?

9  A.  What is that?

10  Q.  We talked yesterday?

11  A.  Yeah, was that it?

12  Q.  And we talked about Saipan?

13  A.  That's right.

14  Q.  Remember that?

15  A.  Yes.

16  Q.  All right.

17        Did we talk before then?

18  A.  Yes.

19  Q.  All right.

20  A.  I'm sorry, I am doing my best to be precise on this, and I

21      recall it just being in the last couple of days here that I

22      informed you that I had conferred with my client and he had

23      indicated that he preferred not to have an interview with

24      Mr. Rosenau's attorney.

25  Q.  Right, and you were following up on a prior phone call?

1    A.   That is correct.

2    Q.   All right.  And during that prior phone call, you brought up

3         the topic of there was something going on up in Canada with

4         some lawsuit?  Do you remember that?

5    A.   Yes.

6              Here is my recollection on that:  After I sent the e-

7         mails to the US Attorney's Office, and I am not sure whether

8         it was the same day; I think it was the next day.  I felt as

9         a courtesy to you, Mr. Rosenau's attorney, that I would

10        inform you that I had -- that this issue had come to my

11        attention and I had brought it to the attention of the you

12        US Attorney's Office.

13   Q.   All right, and during our first phone call, we talked about

14        that issue as well?  Correct?  About the fact there was a

15        lawsuit?

16   A.   Was that -- is this -- are you referring to a separate phone

17        call then this one I was just talking about in my last

18        answer?

19   A.   The one before the one yesterday?

20   Q.   Yeah.  Well, no -- I am not even clear whether I just

21        left -- yeah, we did talk.  There were a couple of times

22        when I left voicemail messages, but there was just one

23        occasion we did talk and we did talk -- yes, I mean that was

24        the purpose of my call.

25   Q.   Right?

1   A.   Was to notify you of that fact -- the fact being that I had

2        become aware of this and I had sent this information off to

3        the US Attorney's Office, and it might be something you

4        would have to be dealing with.

5   Q.   And then one last question:  On this issue of the lawsuit up

6        there, you were asked a question about whether or not that

7        prevented your client from leaving Canada to testify, this

8        lawsuit?  Whether or not that was a problem?  Ms. Roe just

9        asked you about that?

10  A.   Okay.  You are --

11  Q.   I objected --

12  A.   You are referencing my prior testimony here this afternoon

13       now?

14  Q.   Right.

15  A.   Uh-huh.

16  Q.   And I objected and said, you know, as expert something; do

17       you remember that, that answer?

18  A.   Just now?

19  Q.   Yeah?

20            THE COURT:  Okay, why don't we ask another

21       question.

22            THE WITNESS:  I'm sorry.

23            THE COURT:  Whether you remember the question and

24       the actual answer?

25            MR. PLATT:  Right.

1              THE COURT:  Why don't you ask --

2              THE WITNESS:  I'm sorry.

3              MR. PLATT:  I apologize, Your Honor.

4    BY MR. PLATT:

5    Q.  Let me ask you this:  Is it fair to say that reading the

6        pleadings from British Columbia, it is hard for you to have

7        a legal opinion about the full force and effect that any

8        order up there would have on someone's ability to travel?

9        Is that a fair statement?

10   A.  Yes.

11   Q.  Thank you.  Nothing further.

12              THE COURT:  All right.

13              MS. ROE:  Nothing further, Your Honor.

14              THE COURT:  All right.  Thank you very much, Mr.

15        Erickson.

16              THE WITNESS:  All right.

17              THE COURT:  Can Mr. Erickson be excused?

18              MS. ROE:  Yes, the government would so ask.

19              THE COURT:  All right.

20           And Ms. Roe, any other witnesses?

21              MS. ROE:  No other witnesses at this time.

22              THE COURT:  All right.

23           Mr. Platt, witnesses?

24              MR. PLATT:  Mr. Botting, Your Honor.

25              THE COURT:  All right, so before Mr. Botting gets

1    on the stand, can you just give me a brief nutshell of

2    exactly what he is supposed to testify about?

3              MR. PLATT:  Yes, Your Honor.  He can testify to

4    several things.

5         The allegation of violation here is that a third-party

6    had contact with Kip Wepley.  That third-party goes by

7    different names, but for the purposes of this hearing, we

8    will call him Paddy Roberts.  I believe he has used a

9    different name in the e-mail.  I believe that is his Gaelic

10   name.

11        Mr. Botting was involved in dealings with Mr. Roberts

12   with respect to the lawsuit that is the subject matter of

13   these e-mails.  He can testify that on several occasions he

14   advised Mr. Roberts not to have contact with Mr. Wepley;

15   that he can also testify that he was not involved directly

16   in the lawsuit, but was aware of it.

17             THE COURT:  Mr. Botting was not involved in it?

18             MR. PLATT:  Correct, he was not counsel there, and

19   I don't know if you got -- I didn't actually get to see the

20   exhibits that were just offered from the government.  I did

21   get them in an e-mail, but I don't know if the exhibits in

22   there with the letter for Mr. Botting, basically telling the

23   attorney up in Canada, "I am not involved in this lawsuit; I

24   am not going to represent Mr. Rosenau on that, I am just on

25   the extradition."  I don't know if you got a copy of that

1    one?

2         But he can testify to that.

3         He can also testify to a meeting that occurred where

4    Mr. Rosenau was present.  Mr. Roberts was present.  I was

5    present and the discussion of having no contact with Mr.

6    Wepley came up, and he can testify about what happened

7    during that discussion.  And I think that is highly relevant

8    to this case.

9              THE COURT:  All right, so why don't you call him

10   for these facts regarding -- it sounds like his knowledge of

11   the contact between Paddy Roberts or Paddy Robbard

12   (phonetic), or whatever his name is, and let's start at that

13   point.

14        So why don't you go ahead and call your witness?

15             MR. PLATT:  Thank you, Your Honor.

16             GARY BOTTING SWORN

17             THE COURT:  Please have a seat, Mr. Botting.

18        And Mr. Platt, go ahead.

19             MR. PLATT:  Thank you.

20                       * * * * *

21          D I R E C T   E X A M I N A T I O N

22   BY MR. PLATT:

23   Q.  Mr. Botting, good afternoon.

24   A.  Good afternoon.

25   Q.  Can you please state your full name for the record?

1    A.  Gary Norman Arthur Botting.

2    Q.  Mr. Botting, can you tell us what your profession is?

3    A.  I am a lawyer.

4    Q.  And how long have you been a lawyer?

5    A.  Twenty years.

6    Q.  And where do you practice?

7    A.  In Vancouver, BC, and area.

8    Q.  And what is your official designation up there, barrister,

9        solicitor?

10   A.  Both.

11   Q.  All right.

12       And have you had any involvement in your capacity as an

13       attorney representing Mr. Rosenau?

14   A.  Yes, I represented him in an application, an appeal to the

15       Supreme Court of Canada in 2010/2011.

16   Q.  And can you tell us just what that case was about?

17   A.  Basically it was an extradition case to bring him to the

18       United States, or to send him to the United States from

19       Canada.

20       That had gone through a hearing sometime earlier with

21       another lawyer, and it had gone through appeal, and I was

22       appealing the appeal to the Supreme Court of Canada.

23   Q.  All right, and what was the outcome of that?

24   A.  The Supreme Court of Canada receives about 3000 applications

25       a year -- declined to hear the appeal.

1    Q.   Are you familiar with an individual by the name of Paddy

2         Roberts?

3    A.   Yes, I am.

4    Q.   Who is that?

5    A.   Paddy Roberts is basically a person who has a lot to do with

6         trying to defend people, especially when they have been

7         charged with offenses such as marijuana possession and that

8         kind of thing.

9              He is leader of a political party in Canada and

10        basically an advocate for people who are not represented,

11        and he often refers clients to other lawyers, but he is

12        also, in this particular case, he has helped me as a

13        paralegal.

14   Q.   In what capacity?

15   A.   Well basically to act as a go-between and certainly anything

16        that happens up island, or sorry, in the interior of British

17        Columbia, as opposed to in the Vancouver area where I am

18        located.

19             In particular, he acted as a paralegal or potentially

20        acted as a paralegal with respect to -- well we talked about

21        this, at least in connection with his serving a document

22        that he had initiated on his own in a civil claim --

23             MS. ROE:  Move to strike.  It is nonresponsive to

24        the question.

25             THE COURT:  Go ahead and just -- go ahead and

1    explain what he did.

2              THE WITNESS:  Yeah.

3              THE COURT:  Thank you.

4    A.   In connection with a civil suit that he had brought against

5         John and Kip Wepley, which was a suit in defamation, and

6         basically the suit sought remedies of various kinds,

7         including damages, and also basically sought a court order

8         so that Mr. Wepley could not come to the United States to

9         increase the damage that he had allegedly done.

10   BY MR. PLATT:

11   Q.   And with respect to that lawsuit, not the extradition, but

12        the other lawsuit, all right?  With respect to that lawsuit,

13        were you representing Mr. Rosenau in your capacity as his

14        attorney in that lawsuit?

15   A.   No, I was not.  It was Mr. Roberts' own bailiwick.

16   Q.   And did you have any conversations with, or communications

17        with an attorney representing Mr. Wepley regarding that

18        lawsuit?

19   Q.   Yes, he thought that I had initiated it, and I denied that I

20        had, and that ended the communication.

21             He knew that Mr. Roberts, I believe, had initiated that

22        lawsuit.

23   Q.   And did you indicate to this attorney -- was his name Mr.

24        Moffat?

25   A.   Yes, that's right.

1    Q.   Did you indicate to Mr. Moffat, Mr. Wepley's attorney, that

2         you were not in any way involved in that lawsuit and that

3         Mr. Roberts was acting on his own initiative?

4    A.   That is correct.  Yeah, because at that time I was

5         representing Mr. Rosenau in the extradition appeal to the

6         Supreme Court.

7    Q.   But in your capacity as his attorney on the extradition, you

8         and I did coordinate to partly to educate me about what had

9         occurred up in British Columbia; is that a fair statement?

10   A.   That is correct, and you came to my office, and in fact Mr.

11        Roberts was there, as well -- had driven down there -- and

12        you made it very clear to him that you didn't want him

13        involved directly in serving Mr. Wepley, but the order --

14        because there was a -- I should explain; there was a default

15        order --

16                  MS. ROE:  Objection, Your Honor.

17                  THE COURT:  Yeah, well --

18                  MR. PLATT:  I can ask another question.

19                  THE COURT:  Go ahead.

20   BY MR. PLATT:

21   Q.   I want to look back a little bit before that.  Back in May

22        2011 when I first became involved, do you recall us having

23        communication about you informing me about this other

24        lawsuit, and there was a question about the no contact

25        conditions that had been imposed on Mr. Rosenau?  Do you

1       recall that?

2   A.  Yes, I do.

3   Q.  And do you recall that I informed you that I would check

4       with Julie Busic and find out whether or not that would be a

5       problem?

6   A.  Yes, I remember that.  It was on 24 May, I believe -- you

7       had indicated -- or I had asked you whether it was all right

8       for us to continue, you know, in some capacity to serve that

9       order.

10  Q.  And on 25 May, do you recall I sent an e-mail telling you

11      that I had just gotten off the phone with Ms. Busic and --

12  A.  Yes.

13  Q.  -- we determined that at that point it would not be

14      necessarily an issue?

15  A.  Yes, that is correct.

16  Q.  But at that point were you acting in your legal capacity for

17      Mr. Rosenau, or were you simply acting as his extradition

18      attorney, making sure there were no complications with the

19      case?

20  A.  That's right, I didn't want Mr. Rosenau to be breached in

21      any way.

22  Q.  And did you have any contact with Mr. Roberts about

23      informing him not to have contact with this other

24      individual?

25  A.  Yes, I told him not to have direct contact with the other

1    individual.

2    Q.  How did you tell him that the process service should be

3        done?

4    A.  By process server or by sheriff.

5    Q.  And as far as you know, did Mr. Roberts follow those

6        instructions?

7    A.  Well I thought he was going to, but as it turned out Mr.

8        Roberts contacted me last week and said that he -- he felt

9        that this was the time for us --

10              MS. ROE:  Objection to Mr. Roberts.  What he said.

11              THE COURT:  Well, why don't you ask another

12       question, because I think this is an answer to some other

13       question.

14              MR. PLATT:  All right.

15   BY MR. PLATT:

16   Q.  What did you learn of whether or not Mr. Roberts was

17       following instructions about serving paperwork?

18   A.  Well basically he wasn't following instructions.  Mr.

19       Roberts is a loose cannon.  He very often goes off on his

20       own, and since he's initiated this claim in the first place,

21       I think he wanted to make sure that it didn't fall on deaf

22       ears and that it was served properly on Mr. Wepley.

23           To that end he called me and I said, "Make sure that it

24       is done through legal channels, and that it is done through

25       the process server."

1           He said that he had contacted a sheriff and he would do

2       it that way.  He him not consult me.  I understand that he

3       sent an e-mail and he did not consult me about that ahead of

4       time at all.

5   Q.  And you didn't want there to be a problem with any

6       allegation that Mr. Rosenau was involved with contact; is

7       that correct?

8   A.  Precisely.

9   Q.  So had you and I discussed our concerns about Mr. Roberts

10      and his ability to follow instructions?

11  A.  I think we talked about it.  Well, as I say, he is rather a

12      loose cannon.  He does what he does.  He is Irish.  Sorry,

13      but that is basically -- that is basically the way he

14      operates as an individual, and it is difficult to know when

15      he is going to follow instructions, because he really --

16  Q.  Have you spoken to him specifically about whether or not he

17      obtained approval from Mr. Rosen or had anything to do with

18      Mr. Rosen with respect to this e-mail that was sent --

19              MS. ROE:  Objection as to the double hearsay.

20  BY MR. PLATT:

21  Q.  -- in the last weeks?

22              THE COURT:  Yeah.

23              MR. PLATT:  It is 1101, Your Honor.

24              THE COURT:  Go ahead and answer it, if you know

25      the answer.

1   A.   Yeah, I do know the answer.  In talking to them

2        individually, Mr. Rosenau was quite upset that Mr. Roberts

3        had taken that step, because he felt it -- you know, it I

4        put him in jeopardy.

5             And Mr. Roberts told me that he had specifically acted

6        alone, and had decided to do this, partly because we as

7        lawyers were not acting precipitously enough to serve Mr.

8        Wepley.

9   BY MR. PLATT:

10  Q.   Now there was a meeting up and Canada in mid-August; do you

11       recall that with myself --

12  A.   Yes.

13  Q.   -- and you?

14  A.   Yes, I do.

15  Q.   And Mr. Roberts at one point was at the meeting; is that

16       correct?

17  A.   That is correct.

18  Q.   And Mr. Rosenau was there at the same time?

19  A.   That's right.

20  Q.   And do you recall me cautioning everyone that there should

21       be no contact with Mr. Wepley?

22  A.   Yes, and in particular that Mr. Roberts should not contact

23       him alone.  And I gave the same instruction to him.

24  Q.   And how would you characterize the way that I relayed that

25       instruction to Mr. Roberts?

1    A.   No uncertain terms.

2    Q.   And was Mr. Rosenau there when I said that?

3    A.   Yes.

4    Q.   And was there any resistance by Mr. Roberts to what I was

5         telling him or any -- anything that you heard?  Did you hear

6         Mr. Rosenau say anything about that?

7    A.   That is kind of a double question.  Mr. Roberts doesn't --

8         wasn't upset.  He acknowledged that we would be responsible,

9         that I would somehow take the step.  I think that was the

10        context in which I asked your earlier question:  Should I

11        decide to serve this on Mr. Wepley, would that be okay and

12        it would not jeopardize Mr. Rosenau's status, and you said

13        that's fine.  You cleared it with Ms. Busic.  Eventually you

14        gave me an e-mail to that effect.

15             When it comes to Mr. Rosenau, I think he was just

16        standing there at the time that we had this dialogue with

17        Mr. Roberts.  It is a three-way dialogue rather than four.

18   Q.   Did you hear Mr. Rosenau say anything to Mr. Roberts about

19        whether or not he should serve that paperwork himself?

20                  MS. ROE:  And Your Honor, I object since the

21        defendant is here and could testify as to this hearsay.  I

22        know it is a --

23                  THE COURT:  Go ahead, if you know?

24   A.   I -- as I recall, Mr. Rosenau said, "Yeah, don't do anything

25        to breach me, for goodness sakes."  You know, words to that

1          effect.

2     BY MR. PLATT:

3       Q.  All right.

4            Is it a crime in British Columbia to serve a person

5          named in a lawsuit with valid pleadings pursuant to that

6          lawsuit?

7       A.  Of course not.  It is normal process.

8                    THE COURT:  That was a rhetorical question.

9                    THE WITNESS:  Okay.

10    BY MR. PLATT:

11      Q.  Although you are not involved in that separate lawsuit with

12          the order relating to travel, are you aware of whether or

13          not that is a real lawsuit?

14      A.  Yes, a real lawsuit, and it is a real order that springs out

15          of it.

16      Q.  And is the order -- is that a real order?  I mean that is

17          not a forgery or anything?

18      A.  No, it is a valid order.  It certainly looks it to me in

19          every respect.

20      Q.  Nothing further.  Thank you Mr. Botting.

21                    THE COURT:  Ms. Roe, any questions?

22                    MS. ROE:  Yes, thank you, Your Honor.

23                            *  *  *  *  *

24                  C R O S S - E X A M I N A T I O N

25    BY MS. ROE:

1   Q.  Mr. Botting, I talked to you on the phone yesterday; is that
2       right?
3   A.  That is correct.
4   Q.  Okay, and you were, I think, driving, because you were -- I
5       called your cell phone and you pulled over and chatted with
6       me for a few minutes?
7   A.  That's right.
8   Q.  Thank you very much.
9   A.  I did pull over.
10  Q.  Thank you very much for doing that.
11          At that time you said that Paddy Roberts was your
12      paralegal, right?
13  A.  Yes.
14  Q.  And that what he did was you said acting somewhat beyond
15      what I asked him to do?
16  A.  Yes.
17  Q.  And that is you asked him to have it served by the sheriff?
18  A.  Yes.
19  Q.  Is that right?
20  A.  Yes.
21  Q.  And then you indicated just now that you have reviewed the
22      order in the civil defamation case?
23  A.  Yes.
24  Q.  And it is a real order in your mind?
25  A.  In my mind.

USA v.  Henry C. Rosenau - CR 06-157 MJP - (10/28/2011)- P. 48

1    Q.   And you have reviewed the filings, also?

2    A.   I believe a long time ago, but not recently.

3              I should explain --

4    Q.   Let me ask another question.

5    A.   Well, no, I have to clarify something, because it is not

6         quite right.

7              Mr. Roberts was not acting as my agent in -- or as my

8         paralegal in terms of deciding to serve this.  He phoned me

9         up, asking me how he should serve it.  In other words, he

10        initiated that, and I said either by process service or

11        sheriff.

12   A.   And in fact you told me that yesterday and said process

13        server would cost $300, sheriff $100?

14   A.   Yes.

15   Q.   So you discussed the service of this with him?

16   A.   That is correct.

17   Q.   All right, and he has been a paralegal in your office, or

18        continues to be?

19   A.   Not in my office.  Up in the interior of BC.

20   Q.   Okay, so a paralegal for you in your law practice?

21   A.   Yes.

22   Q.   All right, and so you received the paper and the order in

23        the civil, in the defamation suit, from Mr. Roberts?

24   A.   Yes, that's right.

25   Q.   Is Mr. Roberts here today?

1   A.   No.

2   Q.   Is he in the country?

3   A.   No.

4   Q.   Is it -- did he think of coming with you or did you ask him

5        to come with you?

6   A.   I asked him to stand by so you could interrogate him or ask

7        him questions, or ask him questions on his affidavit, which

8        he had signed earlier on that I had seen.

9   Q.   And do you know why he didn't come to the United States?

10  A.   Uhm --

11  Q.   Could it be because he may have a warrant outstanding for

12       drug importation?

13  A.   I have no idea whatsoever about anything to do with that.

14  Q.   You know Mr. Roberts faced those charges in Canada at the

15       same time the US was trying to extradite him on those?

16  A.   I have no knowledge of that whatsoever.

17  Q.   Have you ever looked at his blog?

18  A.   I beg your pardon?

19  Q.   Have you ever looked at Paddy Roberts' blog?

20  A.   I think I did at one point.  Not his blog so much as his

21       website or whatever it is that he has.

22  Q.   And his stories in the newspaper -- that he writes, like

23       cannabis in the magazines?

24  A.   I have looked at a couple.

25  Q.   Okay, and he really feels that extradition to the United

1        States is a violation of sovereignty, doesn't he?

2    A.  You could put it that way, especially when you can prosecute

3        in Canada, and it is not extradition, it is certain types of

4        extradition, such as this one where actions take place in

5        Canada and in the United States, and Canada never -- it

6        always turns a blind eye and refuses to prosecute in Canada,

7        and it seems ridiculous that people should be sent out of

8        their homeland and into a -- well, a city like Seattle, or

9        in California, or all over the United States --

10   Q.  And you feel that way --

11   A.  And typically what happens is that Canada will not prosecute

12       its own people, and that is Mr. Roberts' main concern.

13   Q.  And you have -- you are in agreement or sympathetic to that,

14       aren't you?

15   A.  I wouldn't say -- am I sympathetic?  Yeah, I am sympathetic.

16       Am I in agreement?  Well, I think extradition process is

17       extradition process.  I write books on extradition, and

18       basically of course I take an objective stand on that, but

19       increasingly I think this is disappointing that Canada does

20       not take its responsibility properly, in my view.

21   Q.  And that it turns over its citizens to the United States?

22   A.  To the United States, yeah.

23   Q.  Yeah.

24       Mr. Botting, did you -- have you ever been up to Mr.

25       Rosenau's home in Quesnel?

1   A.   No.

2   Q.   Okay.

3          Why, is it far?

4   A.   Yes.

5   Q.   How many hours?

6   A.   Four or five -- no, it is more than that, because --

7   Q.   Eight or nine?

8   A.   Probably six hours, yeah.

9   Q.   Okay.

10          You were his attorney on the extradition; is that

11      correct?  Just the appeal?

12   A.   Yes.

13   Q.   And that --

14   A.   The appeal to the Supreme Court of Canada only.

15   Q.   Okay, and your representation began in November 2010?

16   A.   That is correct.

17   Q.   And then the appeal was denied when?

18   A.   It wasn't denied, it was -- the leave to appeal was not

19      granted.

20   Q.   Okay, so not accepted?  It was like cert denied?

21   A.   Yes, and of course that happens to almost all but 200 cases

22      a year out of 3000.

23   Q.   By far the majority; isn't that right?

24   A.   Yes.

25   Q.   So when was that done?

1   A.  Oh, dear.

2   Q.  In April of

3   A.  I can't recall the exact --

4   Q.  And at that time you had completed or exhausted all remedies

5       on the extradition in Canada; is that correct?

6   A.  That is correct.

7   Q.  And was your representation of him done?

8   A.  Technically, yes.

9   Q.  Okay.

10        I would like to hand what has been marked Exhibit 4.

11         (Brief pause in proceedings)

12  BY MS. ROE:

13   Q.  Mr. Botting, is that letter that Mr. Platt asked you about,

14       you referenced in your direct testimony?

15   A.  Yes, that's right.

16   Q.  Okay, and that is the one that you sent to Mr. Moffat, a

17       lawyer -- Kip Wepley contacted in March or February 2011?

18   A.  That's right.  I represented Mr. Rosenau strictly for his

19       appeal of committal for extradition.

20   Q.  Right.

21        Okay, and at that time you indicated your familiarity

22       with this civil lawsuit or civil, whatever it is, lawsuit

23       that Paddy Roberts, using his Gaelic name, had brought

24       against Mr. Wepley; is that right?

25   A.  If you can point that out to me in here?

1    Q.  You have had nothing to do but you understand about it.  The

2         e-mails in the second paragraph were between the two people.

3         Your name has been used but you sort of separate yourself

4         from that? -- lawsuit?

5    A.  Yes.  Okay.

6              MS. ROE:  I offer Exhibit 4.

7              THE COURT:  Mr. Platt?

8              MR. PLATT:  No objection.

9              THE COURT:  All right, Exhibit 4 is admitted.

10             MS. ROE:  Nothing further, then, Your Honor.

11             THE COURT:  Mr. Platt?

12                      * * * * *

13            R E D I R E C T   E X A M I N A T I O N

14   BY MR. PLATT:

15   Q.  By the way, is it Mr. Botting or Dr. Botting?  Either one?

16   A.  I go by both, but Dr., yeah, that's fine.

17   Q.  Is it a crime -- well, let me ask you this:  Have you had an

18        opportunity to review the e-mail that was sent within the

19        last couple of weeks, allegedly by Paddy Roberts, to Mr.

20        Wepley?

21   A.  I read it.  I do recall it.

22   Q.  In your opinion is that e-mail -- does that constitute a

23        criminal act?

24   A.  No.

25   Q.  Okay, not under the laws of British Columbia; is that

1     correct?

2  A.  No, I think he is warning Mr. Wepley that if he -- if he

3     comes down to the United States he will be in contempt of

4     court.  That is by context.  And indeed he would be.

5  Q.  Now Ms. Roe asked you about whether you separate yourself

6     from Mr. Roberts, and I want to ask you about why.

7       Is one of the reasons you separate yourself from Mr.

8     Roberts because he is a bit of a loose cannon?

9  A.  Yeah, you have to be very much -- be very specific and

10    direct with him, and now, apparently, even if you are

11    specific and direct, as you and I have both been, he still

12    acts on his own initiative sometimes, especially in this

13    particular case, it almost becomes a project.  He initiated

14    the civil suit in the first place, and he may have had the

15    nod in the beginning, but you know, I chose not to serve

16    this document, and when finally he said, "Okay, now it is

17    the time to serve it; we have got to serve it, we have got

18    to serve it, we have got to serve it, we have got to serve

19    it," I said, "Well, make sure you do it in a legal way then,

20    through a sheriff or through a process server," and the e-

21    mail came as a complete surprise, but it is not illegal, no.

22  Q.  Would you characterize his interest in this area as

23    borderline if not totally obsessive?

24  A.  Obsessive is pretty close.

25  Q.  And it is true, and you have been asked about this and

1       testified, that your dealings with Paddy, it is very obvious

2       that he feels very strongly about these issues of

3       extradition?  Is that correct?

4    A.  Yes, he feels very strongly -- to the point that, you know,

5       he doesn't trust lawyers.  I don't think he trusts you and

6       I.  I don't think he trusts me, either, but sometimes he

7       thinks that we are much too conservative -- you know, that

8       we don't act quickly enough to -- you know, and he has

9       drafted affidavits that are frankly inflammatory.

10          As I say, he is a loose cannon and it is very hard to

11       control somebody like that.

12   Q.  And have you seen an affidavit that he prepared where -- for

13       this hearing where he talks about how he did this on his own

14       without Mr. Rosenau's sworn affidavit?

15   A.  Yes, I have.

16   Q.  So is it fair that it is somewhat of a personal issue for

17       him, this whole question of extradition, that he takes it

18       personally?

19   A.  Yes.  Initially he attempted to have Mr. Rosenau charged in

20       Canada so that any details -- you know, that might come out

21       of this, like out of the extradition hearing, would in fact

22       be dealt with in the Canadian court, rather than in an

23       American court, and thereby avoiding extradition altogether.

24          And that of course -- the expectation was that the

25       Canadian court would simply throw it out, because there was

1       no -- there was not enough evidence whatsoever.

2           So you know, that is how he was fighting off the

3       extradition.

4           He did the same thing with Mark Emory, just trying to

5       charge him domestically so that the Canadian courts could

6       meet their responsibility, but this is a political ploy on

7       his part.  It is strictly a clinical gambit where he tries

8       to involve himself in other people's business, shall we say?

9       And in this case that is how he, I think, became involved.

10  Q.  And he considers himself, or he is the leader of a political

11      party whose stated purpose, one of them, is to secede from

12      the rest of Canada.  Is that correct?

13  A.  That is correct.

14  Q.  So does it surprise you that he would go off and back

15      independently, even after we have instructed him not to do

16      so?

17  A.  Well, it doesn't surprise me.  You want to tap into that

18      type of enthusiasm, I suppose, at one level, but there are

19      downsides to that.  In this case we wouldn't be here if it

20      wasn't for his acting precipitously to try to get this --

21      Mr. Wepley served with his -- the results of his litigation.

22  Q.  Now you were asked about your feelings regarding the

23      extradition process by Ms. Roe, and I would like to follow-

24      up on that.

25          Is it fair to say that if you -- to the extent you have

1        a problem with extradition, you have a problem with the way

2        the extradition was handled in Mr. Rosenau's case?

3    A.   Yes.

4    Q.   What is it?

5    A.   Well, first of all, the record of the case -- the record of

6        the case seems to be something --

7                  MS. ROE:  Objection to the -- what the

8        underlying --

9                  THE COURT:  I am going to sustain the objection,

10       only because we are not going to re-litigate the litigation

11       in Canada.

12                 THE WITNESS:  Okay.

13                 THE COURT:  At this point in this court.

14                 MR. PLATT:  No further questions.  Thank you, Your

15       Honor.

16                 THE COURT:  All right.  Ms. Roe?

17                 MS. ROE:  Your Honor, I have a point of inquiry.

18            Mr. Platt mentioned an affidavit from Mr. Roberts and I

19       haven't seen that.

20                 THE COURT:  Well --

21                 MS. ROE:  Relating to that, may I ask --

22                 MR. PLATT:  We are not offering it, Your Honor.

23                 THE COURT:  Yeah.

24                 MS. ROE:  So I have no further questions.

25                 THE COURT:  All right.

1           May Mr. Botting step down?

2                   MR. PLATT:  Yes.

3                   THE COURT:  Or -- and can he be excused if he

4      wants to go?

5                   MR. PLATT:  Yes, Your Honor.

6                   THE COURT:  All right.

7           Thank you very much, Mr. Botting.

8                   THE WITNESS:   Thank you.

9                   THE COURT:  And Mr. Platt, additional witnesses?

10                  MR. PLATT:  Your Honor, I have a point of order to

11     inquire?

12                  THE COURT:  Sure.

13                  MR. PLATT:  I have never been in this situation

14     before, but if possible, and I normally never ask

15     instruction from the Court, but we have debated whether or

16     not we would want to put Mr. Rosenau on the stand for the

17     very limited purpose of responding to whether or not he

18     directed Mr. Roberts to have this contact.  That seems to be

19     the gist of the entire violation.

20          But we would not want him to be in any way considered

21     to be waving his fifth or sixth amendment right that he

22     would not be cross-examined on anything to do with the

23     underlying offense, and that we would strictly limit the

24     inquiry to the specific issue of whether or not he

25     instructed Mr. Roberts, or authorized or approved this --

1    comparable to a 3.5 hearing.

2              THE COURT:  And Ms. Roe, what is your, I guess,

3    position?

4              MS. ROE:  Your Honor, I think the appropriate

5    testimony, if it is to be so limited and be coming from Mr.

6    Roberts as to his instructions.  I think it would be --

7    since the scope of this hearing has been so broad that

8    should Mr. Rosenau take the stand, it should be equally

9    broad regarding the lawsuit, the civil suit, what was

10   expected -- really bigger than just a very limited question

11   of whether he got --

12             THE COURT:  Right, and Mr. Platt?

13             MR. PLATT:  I have no response.

14             THE COURT:  Well, I understood your first request

15   to -- as a request to limit the examination as to matters

16   relevant to this hearing, although maybe your idea of the

17   scope of that limitation may be different than the scope as

18   understood by Ms. Roe.  And I think what Ms. Roe is saying

19   is that what is before her, or what is before the Court, has

20   this whole issue about what is your client's involvement in

21   this lawsuit, and it is not limited to a few questions about

22   what he specifically said on a certain day to Paddy Roberts

23   or not.

24        So I don't know if that is putting words in Ms. Roe's

25   mouth, but I think -- I suppose that -- I can't give you an

1    advisory opinion or ruling sort of in the abstract here,

2    because as you probably could surmise, I suppose the

3    questions rise and fall on how relevant they are to the

4    question before the Court.

5         You know, we are not going to allow a situation where

6    Ms. Roe is going to say, "Well, let's talk about the charges

7    and helicopters or things like that," and perhaps it would

8    be reserved for trial, if your client wanted to testify

9    then, but of course I would have to make relevance

10   determinations as to any question posed in cross-examination

11   as it relates to the issue for me.

12        So that is about all I can say.

13             MR. PLATT:  That is extremely useful.

14             THE COURT:  And I say this, Mr. Rosenau, because

15   you do have a right, as your lawyer is probably indicating,

16   to testify, if you want; you have the right not to testify.

17   It is your decision to make between yourself and your

18   lawyer.  All right?  And so Mr. Platt --

19             MR. ROSENAU:  I think I understand.

20             THE COURT:  So Mr. Platt, it is up to you how you

21   want to proceed at this point.

22             MR. PLATT:  May I have just one moment?

23             THE COURT:  Sure.

24             (Brief pause in proceedings)

25             MR. PLATT:  Your Honor, this is a very difficult

1    decision, but we have no further witnesses at this time.

2              THE COURT:  All right.

3         All right, so I guess I should hear closing remarks.

4    Ms. Roe, why don't you start off, and then we will hear from

5    the defense?

6              MS. ROE:  Your Honor, this is really an

7    interesting question of whether the Court is going to

8    enforce the conditions of a release for a defendant who

9    really seems to be unsupervisable at this point.

10        He lives far from the border.  Ms. Busic has done a

11   good job and tried to keep in touch, but clearly there have

12   been games being played for the last few months.

13        The defendant is -- has a presumption of being

14   detained, and at this point now, the government's position

15   is that he, through his friend Paddy Roberts, a drug -- a

16   pilot who has been charged with delivering marijuana into

17   the United States, also, has acted on behalf of Mr. Rosenau

18   and with Mr. Rosenau's permission.

19        What is interesting about Exhibit 4, the letter that

20   Mr. Botting authored is the last paragraph in which he says,

21   you know, "Mr. Rosenau gives instructions and we follow

22   them," and I think it is pretty clear that that's what is

23   happening.

24        Mr. Rosenau is no fool.  He had someone else do it --

25   probably wisely, or perhaps wisely, Mr. Botting wasn't going

1     to do it, but he had his friend Paddy Roberts do it under

2     his Gaelic name.

3          Most importantly, too, is that this had nothing to do

4     with an extradition order.  This is pure and simple trying

5     to stop a witness against Mr. Rosenau from testifying and

6     being available in court.

7          In the history of this lawsuit, this notice of

8     defamation suit, and this default order is what is amazing

9     here and what is important, because it is all done to stop

10    the trial from going forward.

11         No one in this order knows the validity of that

12    Canadian order, so the government cannot ask Mr. Uply

13    (phonetic) to ignore it, and we cannot hold him harmless for

14    doing that.

15         It may be a valid order; at least it seems to be at

16    this time.

17         This is an attempt by Mr. Rosenau to thwart the

18    witnesses against him.  As such, it is a violation of his

19    supervised release.

20         He is presumed to have been detained and we ask that he

21    be detained now as he has not conformed and is unable -- and

22    the Court is unable to assure that he is conforming with the

23    terms of supervised -- of his supervision.

24              THE COURT:  All right.

25         And Mr. Platt?

1          MR. PLATT:  Thank you, Your Honor.

2      I know this hearing has gone long, Your Honor, but the

3  reason is --

4          THE COURT:  No rush.  No rush.  Go ahead.

5          MR. PLATT:  Thank you.

6      Just responding to the point about the term

7  instructions, I worked in London for a while with a

8  solicitor firm, and instruction means whether or not you are

9  retained; that is really what that means.  And in that

10  letter what Mr. Botting is saying, over and over again is,

11  "I am not involved in this.  How can I respond if I haven't

12  been instructed?  If I am instructed, I will respond."

13      And the implication is he wasn't instructed, so to flip

14  that on the other side and say somehow that shows he was

15  instructed is patently absurd.

16      With respect to the violation here, the standard that

17  the Court should apply is clear, cogent and convincing

18  evidence.  Obviously the burden here is on the government.

19  Our position is that the evidence at this hearing is far

20  from clear, cogent or convincing, in terms of what happened

21  about this contact by Mr. Roberts with Mr. Wepley.

22      And there is basically no evidence that Mr. Rosenau in

23  any way authorized, requested, approved or facilitated any

24  action by Mr. Roberts with respect to Mr. Wepley.  In fact

25  the only evidence offered in that regard is to the contrary;

1    that Mr. Roberts goes off on his own, he does things on his

2    own, he is hard to control -- he was repeatedly told not to

3    have contact and did anyway; that he was told at a meeting

4    where Mr. Rosenau was participating not to have contact with

5    Wepley, and that he did so anyway.

6         There is no evidence to the contrary.  There is zero

7    evidence linking Mr. Rosenau with what occurred here,

8    whatsoever.  None.

9         So Mr. Rosenau did not authorize the e-mail sent by

10   Paddy Roberts, and he denies any involvement in that.

11        Number two, in addition, all e-mails other than this e-

12   mail in the last couple of weeks, were dated prior to the

13   imposition of pretrial release conditions in this case.

14   Therefore, it is essentially impossible for those to be

15   considered violations.  That would be an ex post facto

16   application of the conditions of release in this case, back

17   in time.  You can't impose conditions and violate someone

18   because before the conditions are imposed there is an

19   allegation of violation.

20        But we don't even agree it is a violation.  Service of

21   process of legitimate legal pleadings, which, let's face it,

22   includes notifying someone about the service -- that is

23   legitimate.  You can call somebody up and say, "I have got

24   to serve you with legal papers."  It happens every single

25   day.

1          There is also an implication here, which we didn't get

2     too far into, but something about the lawsuit in Canada is

3     vexatious.  Well I think every lawsuit is vexatious to the

4     person involved.  That doesn't mean it is illegal or it is

5     invalid or it is not proper.

6          There is nothing improper whatsoever about the lawsuit

7     that was prepared here.  There is an implication that

8     somehow that constitutes some kind of interference with the

9     witness.

10          And above all, the question of service of process was

11     brought to the attention who is in charge of reviewing

12     whether or not the conditions are being followed, and that

13     is Julie Busic.

14          Early on in the case, a few weeks after I was

15     appointed, I contacted Ms. Busic, we talked about it, I told

16     her there was a lawsuit, she read her notes, she said that,

17     and she said she didn't have a witness list, but we assumed

18     for the purpose of that conversation that this would be a

19     witness.  We couldn't have been any more aboveboard.  We

20     weren't hiding the ball at all.

21          So filing the lawsuit is not in violation, and I think

22     there is an analogy here that is very relevant, and that

23     would be in the context of a dissolution.

24          It is quite common for -- and unfortunate, but quite

25     common that you would have a husband who hits his wife and

1    she wants a divorce.

2        The husband wants up charged in criminal court and

3    there is also a divorce suit pending.

4        The husband no doubt will have a no contact condition

5    imposed -- domestic violence no contact order of some kind.

6        He retains counsel.  The attorney for the husband may

7    represent him in both the dissolution and the criminal

8    matter.

9        If he represents him in the dissolution, it is quite

10   likely that he would file the dissolution petition, and if

11   there are temporary orders, especially if it involves

12   children and so on, there could be affidavits filed by the

13   husband denying and disputing the subject matter of the

14   criminal case.

15       This is not a violation of the no contact order.

16       Here we have the lawsuit disputing the allegations made

17   by Mr. Wepley, essentially saying that he is lying and he is

18   defaming Mr. Rosenau, and to serve him with such paperwork,

19   or to make arrangements for that service could not possibly

20   be a violation of a no contact condition.

21       In fact, I am not sure, but I recall there was somewhat

22   of a colloquy by the Court in the very first hearing where

23   Mr. Rosenau was released, talking about, "You have got Mr.

24   Platt as your attorney; let him deal with all these things,"

25   and you admonished Mr. Rosenau not to have any contact, and

1      by implication, verified that it would be acceptable if I

2      did have contact.

3           And that is all this amounts to.  So we are saying, you

4      know, it is arguable there is not a violation here at all,

5      even by Mr. Roberts -- even if he were acting with

6      authority, which he was not.

7           So Mr. Roberts acted totally alone.  He was told by

8      everyone not to be involved in this, and Mr. Rosenau

9      specifically told him he didn't want to be breached on his

10     pretrial release conditions because of Mr. Roberts'

11     behavior.

12          Personally, I never knew anything about any of these e-

13     mails until they were provided to me a couple of days ago.

14     I did know about the lawsuit, obviously.  But Mr. Roberts --

15     we are not offering the affidavit because he cannot stay on

16     task.  He did supply an affidavit that was absurd, lengthy;

17     we are not wasting the Court's time with it, but in that he

18     does say, as Mr. Botting indicated, that he acted alone

19     without any --

20          MS. ROE:  Objection as to, you know, something

21     that is not before the Court.

22          THE COURT:  Well --

23          MR. PLATT:  Well, it was testified to.

24          So the other argument the government may wish to make

25     is that somehow this lawsuit is illegal; that is why I asked

1    those questions.  This is a legal order.  It has been

2    properly filed.  Mr. Botting talked about that.  It was

3    issued by a judge in Canada.

4         If that is a crime, then the judge who issued the order

5    is part of the -- part of the crime.  It is a legitimate

6    legal process.  It was approved in advance by Ms. Busic.

7    And I also asked Mr. Botting, who is an attorney in British

8    Columbia, whether or not the e-mail sent by Mr. Roberts

9    constitutes a crime, and the answer was no.  Ms. Roe herself

10   has indicated that we don't know British Columbia law, so

11   they can't show here that any crime occurred.  It has to be

12   a violation of conditions and they have to show that by

13   clear, cogent and convincing evidence, which they haven't

14   done.

15        There are some things that weren't brought up in

16   testimony, but they are in the brief filed by Ms. Roe, and I

17   think they should be addressed.

18        There is an implication here of some impropriety with

19   the way we characterize the issue in our response to the

20   government's motion for authorization of deposition, which I

21   take strong issue with.

22        The implication there is that somehow we were hiding

23   the ball on the fact that there was this lawsuit in British

24   Colombia.  We obviously weren't.  I told Ms. Busic about it

25   early on.

1          Not only that, if you read the conclusion in that

2     document, it is document number 28, in the conclusion we say

3     the government has not been their burden.  Instead Ms. Roe

4     inserts a footnote in her brief where she quotes us as

5     saying that there is no issue here.

6          Now that is a bit of a side issue, but it is there and

7     I think it needs to be addressed.

8          Our conclusion is very clear.  The government had the

9     burden of showing that there was some substantial basis for

10    their request for a foreign deposition.  They didn't do it

11    and the Court ruled that in fact they would not be allowed

12    to have this deposition.

13         As far as whether or not we knew anything about whether

14    or not lawsuit would prevent someone coming to the United

15    States, I don't anybody in this courtroom is clear on that.

16    That involves law in Canada, and I don't think any of us

17    totally understand it.  Mr. Erickson agreed with that.

18         One thing that is interesting about the deposition,

19    though, is apparently the government was requesting a

20    deposition of a witness where there was a lawsuit supposedly

21    preventing him from leaving Canada, and yet nowhere is there

22    any discussion whatsoever of that lawsuit, and yet it is the

23    only witness the government has asked to depose in this

24    case.

25         So that means they set up a deposition, apparently

1    without talking to the witness first, or they would have

2    found out about this lawsuit.

3         There is also something that wasn't talked about here,

4    which is Mr. Stewart, Glenn Stewart, and him being contacted

5    by someone.  It is completely unclear, it is far from

6    convincing.  There is no indication whatsoever who talked to

7    Mr. Stewart.

8         I can assure the Court as an officer of the Court, and

9    I would be willing to make an offer of proof to this regard,

10   I talked to Mr. Stewart and our conversation was about how I

11   wanted him to testify, and I wanted to make arrangements to

12   get him down here to testify at the trial.

13        So casting aspersions on the defense that we were

14   somehow impeding Mr. Stewart from coming down to testify, if

15   you was Paddy Roberts involved in that, that shows just how

16   far afield Mr. Roberts goes.  That anybody telling Mr.

17   Stewart not to come down here and testify would be going

18   directly against my strategy as the trial attorney for Mr.

19   Rosenau.

20        So we have no idea what that's about.

21        And further, I can tell the Court, Mr. Rosenau was well

22   aware that we wanted Mr. Stewart to come down here and

23   testify and discussions were had, talking about getting Mr.

24   Stewart down here to testify and what is the best way to

25   make the arrangements?  What date would he be needed? --

1    that kind of thing.  So why anybody -- why Henry would have

2    anything to do with telling Mr. Stewart not to come testify

3    is ludicrous.

4         Your Honor, I said this last time and I will say it

5    again:  The issue here is whether or not Mr. Rosenau is

6    going to appear for court and whether or not he is going to

7    interfere with witnesses.  The government has offered not

8    one scintilla of evidence that he would interfere with the

9    witness.  They have offered evidence that some other person

10   who claims to be acting as an agent of Mr. Rosenau had

11   contact with Mr. Wepley, and yet they haven't even

12   established that that contact constituted a crime, and they

13   have no evidence that Mr. Rosenau was involved in that

14   contact in any way, shape or form.

15        The only evidence offered is exactly the opposite:

16   That he did not authorize, he did not approve; there is

17   evidence about the meeting we had where Mr. Rosenau told Mr.

18   Roberts not to have contact.  There is zero evidence to the

19   contrary.

20        I will close with what I closed with at the first

21   hearing, which is the presumption of innocence.  There is an

22   implication here that this lawsuit is vexatious because it

23   is not well founded, and it is not well-founded because it

24   can't be true, and it can't be true because everyone knows

25   Mr. Wepley is telling the truth, and anyone saying otherwise

1    is somehow doing an illegal act.

2         That is like an irrebuttable presumption of guilt.  Our

3    position is the presumption of innocence applies here.  Mr.

4    Rosenau is presumed innocent.  There is absolutely no

5    showing that he violated these conditions and there is no

6    showing that this lawsuit in Canada constitutes any

7    violation of conditions, and it does not constitute a crime.

8    Therefore there is no basis for the government's position.

9    Thank you.

10             THE COURT:  All right.

11        And Ms. Roe, any brief rebuttal?

12             MS. ROE:  No, Your Honor.

13             THE COURT:  All right.

14        So Mr. Rosenau, today is a sad day because I will find

15   that there is a violation of the alleged condition -- there

16   is a violation of the condition of supervision regarding the

17   contact, and let me kind of, you know, set this straight,

18   because the arguments have kind of ranged all over the place

19   regarding the propriety of lawsuits, and I think in some

20   ways we are all kind of missing the point here.

21        I am not here to discuss the laws, extradition laws; if

22   they are good or bad.  I am not here to discuss whether

23   somebody can bring a civil lawsuit in Canada or not.  We are

24   here to discuss whether or not there was indirect contact in

25   this case, and your lawyer says that there is no evidence,

1    or not a scintilla of evidence in this case, but I think the

2    evidence in this case indicates that there is in fact a very

3    direct connection between you and the contact in this case.

4         Now we do begin with Julie Busic, the probation office,

5    Pretrial Services unit supervisor, going over the list of

6    witnesses.  They are in plain English.  Kip Wepley is there.

7    And for you to tell her, "I don't recognize any of these

8    names" is just frankly not really believable -- especially

9    since Kip Wepley was just sued this year and you are the

10   named plaintiff, and also because his name is in the

11   discovery in this case, and so it would not be a surprise to

12   anyone to see Kip Wepley as a witness, and it would not be

13   very believable for you to say, "I don't recognize this

14   person at all."

15        I did admit the exhibits presented to the -- by the

16   government, over the defense objection regarding their

17   relevance, and I am not here to say that I am relying on

18   them as your lawyer says, in an ex post facto way, saying

19   that the violations occurred in January or February or

20   sometime before May, but I do think that they paint the

21   fuller picture of what is going on, and I do think they are

22   relevant in terms of at least your knowledge as to who Kip

23   Wepley is in relationship to your case.

24        I think we want to separate the difference between is

25   the lawsuit proper, is the order proper? -- which I don't

1    have to decide, versus whether there was contact, or

2    indirect contact, which I do have to decide.

3         As your lawyer says, it was okay for a lawyer actually

4    representing you to, in a lawful way, have contact with

5    witnesses, do investigation as appropriate.  That is Mr.

6    Platt's job, to go and investigate the criminal outside;

7    that is Mr. Botting's job to investigate and prepare.

8         The extradition side, well Mr. Platt and Mr. Botting

9    didn't act in this case; instead we have Mr. Roberts, Paddy

10   Roberts -- the argument essentially is he is out of control,

11   no one can control him so just don't blame Mr. Rosenau.  But

12   you really can't have your cake and eat it.  You can't have

13   a benefit without saying, "I take no responsibility; it is

14   just a wild, crazy guy doing this."

15        You are the named plaintiff.  You are the beneficiary

16   of an order.  You are beneficiary of a lawsuit and an order

17   that is still, as far as I know, stands at this very moment;

18   an order that says you have to pay me money -- me, Mr.

19   Rosenau, the defendant in this criminal case, because you

20   are lying, or you're going to give, or you have given lies

21   regarding a criminal case pending in the United States, and

22   not only that, you are prohibited from even leaving the

23   country and entering the United States, and that is still a

24   pending order.

25        Now your lawyer is suggesting well maybe that order has

1    no effect because we don't know the effect of the order, and

2    maybe that is true.  There is nobody who has testified as to

3    the fact, but that order still stands, and there have been

4    communications regarding this order.  And so I do think that

5    putting aside the propriety of filing lawsuits and obtaining

6    orders, and I don't have any problem with that; we are not

7    here to decide that; that there is evidence in this case,

8    given all of the evidence presented, of indirect contact.

9         And of course, you know, although this is a wild man

10   that everyone says, "We can't control," this is your

11   lawsuit.  You are the beneficiary of the lawsuit.  You are

12   the plaintiff.  You are the party in that lawsuit, and if

13   all these things were no good, you would have sensed some

14   kind of letter.  You would have withdrawn the lawsuit if you

15   wanted to.  You would have sent some letter saying, "I do

16   not authorize any of these things."  You would have

17   contacted your lawyers:  "I do not authorize any of these

18   things that Paddy Roberts is sending off; please ignore

19   them."

20        That never happened.  It is just all Paddy's fault, but

21   Paddy is not going to get the damages.  He is not the

22   plaintiff.  Paddy doesn't have anything, necessarily, to

23   benefit from Mr. Wepley coming or not coming to your trial.

24   That is your case.

25        Regarding Mr. Stewart, I do understand your lawyer's

1    point.  I mean Mr. Stewart is sort of a side issue, and I am

2    not here to decide anything -- and there is no allegation

3    that you had anything to do with Mr. Stewart's purported

4    issues of coming to the United States.  I don't have to

5    decide that as a violation.  That is really not in front of

6    me, just as I don't have to decide whether or not the

7    lawsuit in Canada is vexatious or not.  That is not the

8    allegation that a vexatious lawsuit was brought in violation

9    of a condition of release.

10        The only issue is was there or was there not indirect

11   contact, and I find that there was in this case.

12        Now your lawyer -- finally I should say -- says that,

13   "Well, there is no violation because a lawsuit in Canada is

14   not a law violation," but witness tampering or obstruction

15   is, and to the extent -- I suppose the simplest way to say

16   it is to the extent the best defense is to make all of the

17   witnesses go away, I think that this is not sort of far-

18   fetched to say somebody is tampering with the witnesses,

19   because nobody is going to show up for the trial, and the

20   trial will go away.

21        So I think that while I am not here to say that the

22   lawsuit, in and of itself, standing alone, is a law

23   violation under the laws of Canada, I do think, in

24   relationship to this case, not the lawsuit, but the contact

25   and the communications -- that the communication, since it

1    is an October allegation, essentially is one of those

2    situations where one could easily say, "This witness is

3    being pressured or tampered with, and by the way, as you

4    know, under the witness tampering federal law, where it has

5    to do with a witness for a proceeding in a federal

6    proceeding, in a federal criminal proceeding, the state of

7    mind is quite irrelevant.  If it happens, it happens, and a

8    violation can occur.

9        So Mr. Rosenau, I will find that the violation has been

10   proven in this case.

11       The government has moved for revocation in this case,

12   which means a remand to custody.  I find that that is

13   appropriate.  I know that you have otherwise been doing very

14   well on supervision, but when it comes to an allegation, it

15   is not a technical kind of thing like were you around

16   somebody smoking marijuana, or did you forget to turn in a

17   monthly report? -- or you forgot to call Ms. Busic on one

18   day -- things that perhaps you get a second or third chance.

19       When it comes to witnesses in a case, and untoward

20   contact, I think it is grounds for both revocation and

21   remand to custody.

22       Now this decision, of course, as your lawyer will tell

23   you, is reviewable by your district judge, Judge Pechman,

24   and I believe under the rules, if you have any kind of

25   appeal, or attempt to review, I am advising you now so that

USA v.  Henry C. Rosenau - CR 06-157 MJP - (10/28/2011)- P. 78

1   you will know that you need to do that within 14 days of

2   today's date; otherwise, you might be time barred in doing

3   that.

4        All right, Ms. Roe, anything further from the

5   government?

6             MS. ROE:  Nothing further, Your Honor.

7             THE COURT:  Mr. Platt?

8             MR. PLATT:  Nothing further, Your Honor, thank

9   you.

10            THE COURT:  All right.

11       All right, so unfortunately, Mr. Rosenau, you're being

12   remanded to custody.  You might want to talk to Mr. Platt if

13   you have any valuables or cars to deal with or whatever --

14   to make arrangements right now.

15       You should remain in the courtroom.  The marshal will

16   come and escort you to detention.

17       All right.  Anything further?  All right, we will be at

18   recess.

19            THE CLERK:  All rise, the Court is in recess.

20            (End of proceedings for 10/28/2011)

21

22

23

24

25                    CERTIFICATE

USA v.  Henry C. Rosenau - CR 06-157 MJP - (10/28/2011)- P. 79

1      I certify that the foregoing is a correct transcript from the

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4        /Brian J. Killgore/          November 9, 2011

5
         AAERT Certified Electronic Court Reporter & Transcriber
6        License CERT*D-498

7        ACE Reporting Services, Inc.
         720 Queen Anne Ave. N. #311
8        Seattle, WA 98109
         (206) 467-6188
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25