# EXHIBIT 2

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, February 11, 1988.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of Canada on Mutual Legal Assistance in Criminal Matters, with Annex (the "Treaty"), signed at Quebec City on March 18, 1985. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Italy, the Netherlands, Switzerland and Turkey; and others have been concluded (but not yet entered into force) with Colombia, Morocco, Mexico, Thailand, Belgium, the Bahamas and the United Kingdom on behalf of the Cayman Islands. The Treaty contains many provisions similar to those in the other treaties as well as some innovations.

The Treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly 28 U.S.C. 1782.

Article I contains the necessary definitions. It defines a "request" under the Treaty and provides for a Central Authority in each State, which is responsible for complying with requests made by a Competent Authority or transmitting them to the Competent Authorities to do so. For the United States, the Attorney General or officials designated by him will be the Central Authority. For Canada, the Minister of Justice or officials designated by him will be the Central Authority. The Competent Authorities for both countries shall be law enforcement authorities with responsibility related to the investigation and prosecution of offenses. The article defines an offence within the scope of the Treaty, for the United States, as felonies and misdemeanors other than petty offenses, and for Canada, as any offense that may be prosecuted upon indictment or an offense created by the Legislature of a Province in a category specified in the Annex. The Annex states that the term offence includes securities, wildlife protection, environmental protection and consumer protection offences under the law of Canada or the United States. Article I also defines the "public interest" as "any substantial interest related to national security or other essential public policy."

Article II provides for assistance in the "investigation, prosecution and suppression of offences." The Treaty thereby provides for

(v)

assistance at the investigative stage (such as grand jury proceed-
ings), as well as after formal charges have been filed. Assistance
under the Treaty will include: taking testimony or statements of
persons; provision of documents records and evidence; executing re-
quests for searches and seizures; obtaining of witness testimony;
and other forms of assistance. The article explicitly states that it is
not intended to create rights in private parties either to gather evi-
dence or secure other assistance or to suppress or exclude in civil
or criminal proceedings evidence obtained under the Treaty.

Article III provides that the parties may provide each other as-
sistance pursuant to any other agreements, arrangements or prac-
tices, and, in exceptional cases, pursuant to the Treaty, provide as-
sistance in respect of illegal acts that do not constitute offenses as
defined in the Treaty.

Article IV states that when a party seeks documents, records or
other articles of evidence known to be located in the territory of
the other party, except when assistance is sought pursuant to other
arrangements, agreements or practices, it shall request assistance
under the Treaty. The parties shall consult in the event of the
denial of a request or delay in its execution that jeopardizes suc-
cessful completion of an investigation or prosecution. Unless other-
wise agreed, at the end of 30 days after they were requested, consul-
tations shall be deemed to have terminated and the parties to have
fulfilled their obligations under this article.

Article V specifies the limited bases under the Treaty in which
assistance may be denied by the Requested State. These bases are
when the request is not in conformity with the Treaty or when exe-
cution of the request is contrary to the Requested State's "public
interest," as determined by its Central Authority. The Requested
State may postpone execution of a request if its execution would
interfere with an ongoing investigation or prosecution. This article
also provides that, before the Central Authority of the Requested
State refuses a request, it should try to determine whether there is
a way to render the assistance, subject to specified terms and con-
ditions. If the Requesting State accepts the assistance subject to
limitations, it must comply with those limitations.

Article VI provides that requests shall be made directly from one
Central Authority to the other, and shall contain the information
required by the Requested State to execute the request, including
but not limited to, the subject matter and the nature of the investi-
gation or proceeding to which the request relates, a description of
the evidence, information or other assistance sought, and the pur-
pose for which it is sought. It provides that when use of compulsory
process is required in the Requested State, requests shall be made
in writing, except that in urgent circumstances requests may be
made orally, but they must be confirmed in writing "forthwith."
The article provides that the Requested State shall use its "best ef-
forts" to keep confidential a request and its contents, except when
otherwise authorized.

Article VII obligates each party to execute requests promptly
and, to the extent not prohibited by its law, in accordance with the
directions of the Requesting State. It also provides that the courts
of the Requested State shall have authority to issue all orders nec-
essary to execute a request.

VII

Article VIII provides that the Requested State shall pay all ordinary costs relating to the execution of the request within its territory, except for the lawful fees of expert witnesses, the travel and incidental expenses of witnesses travelling to that State, and for translation and transcription expenses. The article also provides for consultation when expenses of an extraordinary nature are required to execute a request.

Article IX authorizes the Requested State, after consultation, to require that information or evidence furnished to the Requesting State be kept confidential or disclosed or used only subject to terms or conditions it may specify. Moreover, absent the prior consent of the Requested State, it restricts the disclosure or use of any information or evidence obtained under the Treaty to the investigation, prosecution or suppression of criminal offenses stated in the request. However, once the Requested State has consented to disclosure or has become public, the Requesting State may use the information for any purpose.

Article X obligates the parties to make best efforts to ascertain the location and identity of persons specified in the request.

Article XI creates an obligation on the part of the Requested State to serve any legal document transmitted by the Central Authority of the Requesting State. The Requesting State must transmit a document relating to a response or appearance in the Requesting State within a reasonable time before the scheduled response or appearance. A request for the service of a document relating to the appearance of a person in the Requesting State must include such notice as the Central Authority in the Requesting State is reasonably able to provide of outstanding warrants or other judicial orders in criminal matters against the person to be served.

Article XII provides that the Requested State may compel the taking of testimony or production of documents for the Requesting State by means available under and in accordance with the Requested State's laws. It also provides that every person whose attendance is required for the purpose of giving testimony under the article is entitled to the fees and allowances provided for by the laws of the Requested State.

Article XIII states that the Requested State shall provide the Requesting State with copies of publicly available records of government departments and agencies and may provide any other record or information in the possession of a government office or agency to the same extent and under the same conditions as it would be available to the Requested State's own law enforcement or judicial authorities.

Article XIV provides for the certification and authentication of documents and records in any manner required by the Requesting State or in any other mutually agreeable manner.

Article XV provides that the Requested State shall transfer a person in its custody to the Requesting State, for purposes under the Treaty, unless the Requested State has a reasonable basis to object or the person in custody does not consent. The Requesting State must keep that person in custody at all times and return that person immediately after the execution of the request.

VIII

Article XVI establishes a formal procedure for handling requests for the search and seizure of objects located in the Requested State for use as evidence in the Requesting State.

Article XVII requires that one Central Authority notify the other when it believes the proceeds of a criminal offense are in the territory of the other State. In addition, it provides that, to the extent permitted by their respective laws, the parties shall assist each other in proceedings relating to the forfeiture of proceeds, restitution to victims of crimes and the collection of fines imposed as a sentence for an offense.

Article XVIII provides that the parties shall consult periodically on the implementation of the Treaty and on developing other specific agreements or arrangements on mutual legal assistance.

Article XIX provides that the treaty shall enter into force on the date of the exchange of the instruments of ratification.

Article XX establishes termination procedures.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

GEORGE P. SHULTZ.