# EXHIBIT F

October 28, 2011

Page 38

1          A.    Yes, that's right.
2          Q.    Did you indicate to Mr. Moffat, Mr. Whelpley's
3    attorney, that you were not in any way involved in that
4    lawsuit and that Mr. Roberts was acting on his own in that
5    issue?
6          A.    Yes, that's right.  Because at that time I was
7    representing Mr. Rosenau in the extradition appeal to the
8    Supreme Court.
9          Q.    But in your capacity as his attorney on the
10   extradition, you and I did coordinate to partly to educate me
11   about what had occurred up in British Columbia; is that a fair
12   statement?
13         A.    That's correct.  And you came to my office, and in
14   fact Mr. Roberts was there as well, had driven down there, and
15   you made it very clear to him that you didn't want him
16   involved directly in serving Mr. Whelpley with the order,
17   because there was a -- I should explain.  There was a default
18   order.
19              MS. ROE:  Objection, your Honor.  (Inaudible).
20              MR. PLATT:  Well, I can ask another question.
21              THE COURT:  Go ahead.
22         Q.    I want to look back a little bit before that.  Back
23   in May 2011 when I first became involved --
24         A.    Right.
25         Q.    -- do you recall us having communication about you

October 28, 2011

Page 39

1  informing me about this other lawsuit and there was a question
2  about the no contact conditions that were imposed on Mr.
3  Rosenau, do you recall that?
4      A.  Yes, I do.
5      Q.  And do you recall that I informed you I would check
6  with Julie Busic and find out whether or not that would be a
7  problem?
8      A.  Yes, I remember that.  It was on the 24th of May, I
9  believe.  You had indicated or I had asked you whether it was
10 all right for us to continue, you know, in some capacity to
11 serve that order.
12     Q.  And on the 25th of May do you recall I sent an email
13 telling you that I'd just got off the phone with Ms. Busic --
14     A.  Yes.
15     Q.  -- and we determined it would at that point not be
16 necessarily an issue?
17     A.  Yes, that's correct.
18     Q.  But at that point were you acting in your legal
19 capacity for Mr. Rosenau or were your simply acting as his
20 extradition attorney making sure there were no complications
21 with the case?
22     A.  That's right.  I didn't want Mr. Rosenau to be
23 breached in any way.
24     Q.  And did you have any contact with Mr. Roberts about
25 informing him not to have contact with this other individual?

October 28, 2011

Page 40

```
 1       A.   Yes.  I told him not to have direct contact with the
 2   other individual.
 3       Q.   How did you tell him that the process service should
 4   be done?
 5       A.   By process server or by sheriff.
 6       Q.   And as far as you know, did Mr. Roberts follow those
 7   instructions?
 8       A.   Well, I thought he was going to, but as it turned
 9   out, Mr. Roberts contacted me last week and said that he felt
10   that this is the time for us --
11            MS. ROE:  Objection (inaudible) Mr. Roberts, what he
12   said.
13            THE COURT:  Why don't you ask another question
14   because I think this is an answer to some other question.
15            MR. PLATT:  Right.
16       Q.   What did you learn of whether or not Mr. Roberts was
17   following instructions about serving paperwork?
18       A.   Well, basically he wasn't following instructions.
19   Mr. Roberts is a loose cannon.  He very often goes off on his
20   own, and since he initiated this claim in the first place, I
21   think he wanted to make sure that it didn't fall on deaf ears
22   and that it was served properly on Mr. Whelpley.  To that end
23   he called me, and I said make sure this goes through legal
24   channels and that it's done through process server.  He said
25   that he had contacted a sheriff and that he would do it that
```

October 28, 2011

Page 41

1   way.  He did not consult me.  I understand that he sent an
2   email and he did not consult me about that ahead of time at
3   all.
4        Q.   And you didn't want there to be a problem with any
5   allegation that Mr. Rosenau was involved with contact; is that
6   correct?
7        A.   Precisely.
8        Q.   So had you and I discussed our concerns about Mr.
9   Roberts and his ability to follow instructions?
10       A.   I think we talked about it -- well, as I say, he's
11  rather a loose cannon.  He does what he does, he's Irish.
12  Sorry.  But that's basically -- that's basically the way he
13  operates is as an individual, and it's difficult to know when
14  he's going to follow instructions because he really
15  (inaudible).
16       Q.   Have you spoken to him specifically about whether or
17  not he obtained approval from Mr. Rosenau or had anything to
18  do with Mr. Rosenau with respect to this email that was sent
19  in the last few weeks?
20            MS. ROE:  Objection as to the double hearsay, your
21  Honor.
22            MR. PLATT:  It's the 1101, your Honor.
23            THE COURT:  Go ahead and answer if you know the
24  answer.
25       A.   Yeah, I do know the answer.  In talking to them

October 28, 2011

Page 42

1  individually, Mr. Rosenau was quite upset that Mr. Roberts had
2  taken that step because he felt that, you know, it might put
3  him in jeopardy. And Mr. Roberts told me that he had
4  specifically done -- acted alone and had decided to do this
5  partly because we as lawyers were not acting precipitously
6  enough to serve Mr. Whelpley.
7      Q.  Now, there was a meeting up in Canada in mid August,
8  do you recall that, with myself and you?
9      A.  Yes. Yes, I do.
10     Q.  And Mr. Roberts at one point was at the meeting; is
11 that correct?
12     A.  That's correct.
13     Q.  And Mr. Rosenau was there at the same time?
14     A.  That's right.
15     Q.  And do you recall me cautioning everyone that there
16 should be no contact with Mr. Whelpley?
17     A.  Yes, in particular that Mr. Roberts should not
18 contact him alone. And I gave the same instruction to him.
19     Q.  And how would you characterize the way that I
20 relayed that instruction to Mr. Roberts?
21     A.  No uncertain terms.
22     Q.  And was Mr. Rosenau there when I said that?
23     A.  Yes.
24     Q.  And was there any resistance by Mr. Roberts to what
25 I was telling him or anything that you heard? Did you hear

October 28, 2011

Page 43

1 Mr. Rosenau say anything about that?
2    A. That's kind of a double question. Mr. Roberts
3 wasn't upset. He acknowledged that we would be responsible,
4 that I would somehow take the step, and I think that was the
5 context in which I asked your earlier question. Should I
6 decide to serve this on Mr. Whelpley, would that be okay and
7 it would not jeopardize Mr. Rosenau's status, and you said
8 that's fine, you'd clear with Ms. Busic, and you eventually
9 gave me an email to that effect. When it comes to Mr.
10 Rosenau, I think he was just standing there at the time that
11 we had this dialogue with Mr. Roberts. It's a 3-way dialogue
12 rather than 4.
13    Q. Did you hear Mr. Rosenau say anything to Mr. Roberts
14 about whether or not he should serve that paperwork himself?
15      MS. ROE: Again, your Honor, I object. The
16 defendant is here and can testify. It's hearsay. I know
17 it's --
18      THE COURT: Go ahead if you (inaudible).
19    A. As I recall, Mr. Rosenau said, yeah, don't do
20 anything to breach me, for goodness sake, words to that
21 effect.
22    Q. All right. Is it a crime in British Columbia to
23 serve a person named in a lawsuit with valid pleadings
24 pursuant to that lawsuit?
25    A. Of course not. It's normal process.

Page 44

1         THE COURT: That was a rhetorical question.
2    Q.   Although you're not involved in that separate
3    lawsuit with the order relating to travel, are you aware of
4    whether or not that's a real lawsuit?
5    A.   Yes, a real lawsuit. It's real. A real looker
6    springs out of it.
7    Q.   And is that a real order? I mean that's not a
8    forgery or anything?
9    A.   No, it's a valid order, certainly looks it to me in
10   every respect.
11        MR. PLATT: Nothing further. Thank you, Mr.
12   Botting.
13        THE COURT: Ms. Roe, any questions?
14        MS. ROE: Yes, thank you, your Honor.
15              C R O S S - E X A M I N A T I O N
16   BY MS. ROE:
17   Q.   Mr. Botting, I talked to you on the phone yesterday;
18   is that right?
19   A.   That's correct.
20   Q.   Okay. And you were I think driving because you
21   were -- I called your cell phone, and you pulled over and
22   chatted with me for a few minutes?
23   A.   That's correct. I did pull over.
24   Q.   Thank you very much for doing that. At that time
25   you said that Paddy Roberts was your paralegal, right?