# EXHIBIT D

 Transport   Transports
Canada    Canada

Canada Place
~~████████████~~
Edmonton City Centre Airport
Edmonton, Alberta
T5G 0W6

                                        5008-FRKM (RAER)

15 July, 2005

Henry Rosenau
~~████████████████████~~
Armstrong, BC
V0E 1B5

Dear Sir;

As per the bill of sale, dated June 24, 2005, custody and control of the following aircraft
has been transferred to yourself:

C-FRKM      Robinson R44   Serial Number: 006

In order to complete the registration of this aircraft, please submit the following
documents:

-            application for registration   (blank copy attached)

-            fee payment of $110.00, for re-registration of the aircraft

Please submit these items as soon as possible, to the following address, so that the
registration for your aircraft may be completed.

Transport Canada, Civil Aviation
Pacific Region
620-800 Burrard Street
Vancouver BC V6Z 2J8

Tel.: (604) 666-5575     Colleen Hewlett
Fax: (604) 666-4839

Thank you for your assistance in this matter. Should you have any questions, you may
also contact me at (780) 495-5255.

Yours truly,

C.M. Pearson
Licensing Officer
Edmonton TCC

                                                                        002576

**Pearson, Carla**

To:                     Information Mgmt-EDM
Subject:                Please forward all volumes of C-FRKM out to city centre, attn Carla,

Please forward all volumes of C-FRKM out to City Centre, attn: Carla.

Robinson, R44,   Serial Number: 006

The new owner is based in BC and we will be transferring the files.

1

002577

PAGE.01   7804868282                                    JUL 12 '05 08:37

## AIRCRAFT BILL OF SALE

THIS IS TO CERTIFY THAT _____ 594515 Alberta Ltd. _____
(Seller – Please Print)

ADDRESS: ████████████ Edmonton, Alberta Canada  T5M 2S5

THE SUM OF _____ $90,000.00 US Dollars plus GST _____ , HAS
THIS DATE SOLD, ASSIGNED AND TRANSFERRED ALL RIGHT, TITLE AND
INTEREST IN THE AIRCRAFT DESCRIBED AS FOLLOWS:

| Nationality & Registration Marks | Manufacturer |
|---|---|
| C-FRKM | Robinson Helicopter Company |
| Manufacturer's Designation of Aircraft | Aircraft Serial Number |
| R44 Astro | 006 |
| Engine Type | Engine Serial Number |
| Lycoming 0-540-F1B5 | L-2453B-40A |

UNTO (Purchaser)   Henry Rosenau

████████████████████

Armstrong, BC  Canada

V0E 1B5

Phone Number:  260-546-9933

DATED AT _____ Whitecourt _____ THIS 28ᵗʰ DAY OF _____ June _____ , 2005

## *PLEASE PRINT AND SIGN NAME(S) BELOW*

<u>WITNESS</u>

SIGNATURE OF SELLER
(If executed for co-owners,
all must sign)
Kenneth R. Miller

PAGE 01/01                     NWFP EDM                     7804868282     07/12/2005  08:06

07/12/2005  08:06   7804868282     NWFP EDM                     PAGE 01/01

Protected "A' **/** Law Enforcement Sensitive/ FOUO

The Canadian Civil Aircraft Register (Transport Canada) shows this helicopter to be registered to Airborne Energy Solutions Ltd of Whitecourt, Alberta from 1998-09-21 through to 2005-07-05.

Border Integrity has on file a fax copy of the Bill of Sale for C-FRKM received from Transport Canada on 2005-12-14 (faxed from 604-666-3982). The Bill of Sale is dated 2005-12-06 and shows a transfer of the helicopter from Henry C ROSENAU of ▮▮▮▮▮▮▮▮▮▮▮▮▮, Armstrong, BC for the sum of $90,000 to Jarren TRUANT of ▮▮▮▮▮▮▮, Bellevue, Alberta, TOK OCO. TRUANT registered C-FRKM with Transport Canada effective 2006-12-19. A request has been submitted to Transport Canada in an attempt to determine when this helicopter was transferred from Airborne Energy Solutions to Henry C ROSENAU.

As per your request detailed below are the responses to your queries regarding the Bell 206B helicopter registered as **C-FNMM** (1996 Robinson R44, serial number 0290) (Documents enclosed in Folder #8):

In 2005 C-FNMM was the mark of a 1996 Robinson R44 helicopter, serial number 0290, registered with Transport Canada. According to Transport Canada's Canadian Civil Aircraft Registry C-FNMM was registered to Eldorado Enterprises Ltd of Williams Lake, British Columbia from 2004-03-16 to 2005-12-21. However, Border Integrity has on file a Bill of Sale for C-FNMM (Robinson R44, serial number 0290) between Eldorado Enterprises Ltd (Seller) and Saul SHARP (Buyer) dated 2005-06-22 for the sum of $240,000. The Bill of Sale was provided to Border Integrity on 2005-12-14.

As per your request for the RCMP Surveillance Report dated 2005-09-21 please find same attached along with the corresponding Occurrence Report provided for clarification (Documents enclosed in Folder #9)

As per your request for the RCMP Exhibit Report (Document enclosed in Folder #10) related to the seizure from Henry ROSENAU on 2005-09-21 and in reference to the Smith **&** Wesson 44 Magnum (serial number N331202) seized from Henry ROSENAU on 2005-09-21:

The firearm was registered to Mr. ROSENAU under the appropriate registration system at the time. The exhibit report notes that the firearm was loaded with six round of Remington 44 Magnum shells. Canadian law prohibits the transportation of loaded firearms in any civilian aircraft in Canadian airspace. (Document enclosed in Folder #11)

The surveillance photos of the residence at 4767 N. Grandview Flats Road, Armstrong, British Columbia taken on 2005-11-16 were taken by Cst. M. SMITH of the Abbotsford Police Service. At the time Cst.

This document is the property of the RCMP. **It** is loaned to your agency/department in confidence and it is not be reclassified, copied, reproduced, use or further disseminated, in whole or part, without the consent of the originator. The dissemination of information is subject to **THIRD PARTY RULE,** members shall consult with the originator prior to further use or dissemination to a third party. Members shall consult with the originator before using the information in affidavits, court proceedings or subpoenas or for any other legal or judicial purposes. This caveat is an integral part of this document and must accompany any information extracted from it.

Page 1B of 14 pages

| | |
|---|---|
| 9 June, 2002 | 9 June 2002 to 9 June 2003 |
| 12 May 2003 | 12 May 2003 to 15 Nov. 2003 |
| 15 Nov 2003 | 15 Nov 2003 to 15 Nov 2005 |

4 July, 2005 — Last Certificate of Registration issued, in the name of Airborne Energy Solutions Ltd, on 22 Aug., 2000, is returned to Transport Canada.
The application on the back has been completed in the name of Airborne Energy Solutions and then was 'voided'.
**FAXED**

13 July, 2005 — Received the following documentation, towards the re-registration of the aircraft to Henry Rosenau.
(All the following documents are in RDIMS under #1263194)

- Bill of Sale, dated 24 June, 2005
  Seller: 594515 Alberta Ltd
  Purchaser: Henry Rosenau          **FAXED**

- Lease cancellation between Airborne Energy Solutions (Lessee) and 594515 Alberta Ltd
  (Lessor).          **FAXED**

  This cancellation letter was dated 11 July, 2005, but it advises that the lease terminated effective June 24, 2005. Letter was signed by both parties.

15 July, 2005 — Requirement letter sent, by Carla Pearson, RAER, to Henry Rosenau. In order to complete the registration, an application for registration is required, as well as a fee payment of $110.00    (RDIMS#1263194)  **FAXED**

25 Aug, 2005 — Fee payment of $110.00 (for re-registration of a/c) entered in CCARCS by R. Pegararo, in Vancouver.
Paid by Henry Rosenau.

Aircraft Registration has never been completed because an application for registration has never been received from the client.

# EXHIBIT E

# United States District Court

## Western District of Washington

Case No. 2:06-cr-00157-MJP

UNITED STATES OF AMERICA

V.

HENRY CARL ROSENAU

---

**IN THE MATTER OF THE UNITED STATES OF AMERICA V. HENRY CARL ROSENAU AND IN THE MATTER OF A HEARING SCHEDULED FOR FRIDAY, OCTOBER 28, 2011 INTO AN ALLEGATION THAT HENRY CARL ROSENAU VIOLATED A CONDITION OF HIS RELEASE BOND**

---

AFFIDAVIT

I, Padraig Mac Roibeaird, of ████████████████████, Vanderhoof, British Columbia, Canada, HEREBY MAKE OATH AND SAY THAT:

1. I am the appointed agent for Henry Carl Rosenau in the matter of Henry Carl Rosenau, Plaintiff, v. Kip John Whelpley, Defendant, which is File number 14781 in the Quesnel Registry of the Supreme Court of British Columbia, and as such I have personal knowledge of the matters hereinafter deposed to, except where such matters are stated to be based on information and belief, in which case I believe such matters to be true.

2. I act pro bono for Henry Carl Rosenau ("Mr. Rosenau") in this civil matter, which was first filed on or about January 25, 2011. I also act as a paralegal in association with Dr. Gary Botting ("Dr. Botting"), a British Columbia lawyer who has acted for Mr. Rosenau in matters before the Supreme Court of Canada and in submissions to Canada's Minister of Justice in regard to the extradition of Mr. Rosenau to the United States.

3. I do not believe there is a corresponding role in United States courts to that of an agent in provincial and Supreme Courts in British Columbia. In British Columbia, due primarily to the inability of many, if not most, litigants to afford lawyers, there has been a marked increase in the presence of unpaid volunteers representing persons incapable of handling their own affairs due to lack of any legal knowledge whatsoever. Representation by agent is very common in civil matters at the provincial and Supreme Court levels in British Columbia and in summary conviction (misdemeanour) matters in our provincial courts.

4. I have been involved in a number of cases as an exercise of social conscience on my part, and as a result have a considerable experience of appearing in civil matters before the Supreme Court of BC, which I am happy to say has to date been tolerant of my efforts on behalf of others while not infringing on the economic monopoly of the legal profession. The

1

standard term for the role I and other pro bono representatives play is described as an agent and sometimes as an advocate.

5. In addition to this matter with Mr. Rosenau, in the past two years I have acted as defence counsel for two individuals in a minor criminal matter in the provincial court, am retained as a forensic accounting investigator in a civil debt and fraud action in the Supreme Court, and am retained as an expert witness to prepare a report and testify in an aviation business case in progress in the High Court in the province of Ontario.

6. My legal experience also includes three years as a court reporter for two different daily newspapers in British Columbia, during which I witnessed hundreds of hours of courtroom procedures and arguments in high profile criminal cases and inquests. I have also acted as an expert advisor to Mr. James Connolly, a former US Attorney for Eastern Washington, then in private practice and representing US victims of a Canadian air crash at inquest proceedings, and have appeared as counsel for clients arguing licensing matters before the Canadian Transport Commission in public hearings in British Columbia.

7. In the subject matter that this affidavit addresses, I acted as an agent for Mr. Rosenau in a civil matter between Mr. Rosenau and Mr. Kip Whelpley ("Mr. Whelpley") in which Mr. Rosenau was the Plaintiff suing Mr. Whelpley for damages and injunctive relief in regard to false statements Mr. Whelpley made related to extradition proceedings in Canada, and in a roundabout way, to the matters now before this Honorable Court. A copy of the Notice of Civil Claim that I prepared for Mr. Rosenau in that matter is attached as Exhibit A to this my affidavit, for future reference in this affidavit.

8. I had been approached by Mr. Rosenau at some point after his arrest in Canada at the beginning of extradition proceedings to see if I could proceed with an attempt to prosecute him in Canada through private prosecution provisions in the Canadian Criminal Code. I could not as I did not have reasonable and probable grounds to swear a private information charging Mr. Rosenau with exportation of marijuana from Canada.

9. At the time, I was well known in British Columbia to persons facing extradition to the United States, and preferring to face Canadian legal processes, as a result of my highly publicized efforts to preserve Canadian sovereignty over Canadians by the tactic of filing private criminal informations in Canada against Marc Emery and two others. Mr. Emery was a world famous Canadian politician and marijuana legalization advocate targeted by US authorities for extradition after Canadian police and courts refused to deal harshly with him over his marijuana seed sales which were used to fund his legalization efforts worldwide.

10. In Mr. Emery's case, he openly admitted his guilt, and I had no difficulty swearing to the requisite knowledge to file an information. Mr. Rosenau, however, maintained his innocence, and I did not have any independent evidence of his guilt. In fact, I knew of one helicopter pilot who was the actual pilot of at least one, and possibly all, of the helicopters Mr. Rosenau is now accused of flying. As a result of that, the Canadian charges tactic could not proceed at law.

11. I did, however, offer to assist Mr. Rosenau in obtaining legal counsel and as a result of that assistance, I first introduced him to Mr. Douglas Jevning, a Vancouver lawyer who conducted matters at Mr. Rosenau's extradition hearing, and his appeal of the committal order to the British Columbia Court of Appeal.

12. Following the British Columbia Court of Appeal decision, I introduced Mr. Rosenau to Mr. Botting, who is one of Canada's leading authorities on extradition law, and who I had worked with on the extradition of Marc Emery to the United States. Dr. Botting was retained by Mr. Rosenau to conduct an application for leave to appeal to the Supreme Court of Canada. I assisted to a small extent in a pro bono paralegal assistant type of role.

2

13. In my day to day paid employment and professional life, I am the program coordinator for an aviation business diploma program at a British Columbia post secondary institution and a member of the faculty at that institution, instructing in university business courses and aviation safety courses.

14. I hold a bachelor's degree in business administration from Simon Fraser University in Burnaby, British Columbia and a master's degree in business administration from Trinity College, Dublin in Dublin, Ireland. I am an airline transport licensed pilot for airplanes, and a commercial helicopter pilot. I have over 7000 hours as a pilot in command of aircraft, and a wide experience in operational and management roles in air carriers and air operations in Canada, the United States, and Europe.

15. I am involved in the political life of British Columbia, am the founder and chairman of a political party advocating the independence of British Columbia from Canada and have in the past been a well known public advocate for the legalization of marijuana and have stood for election to the legislature of British Columbia in two of the last three provincial elections. While I am no longer involved in the marijuana legalization movement, I remain actively involved in the political issues posed in the extradition processes between Canada and the United States, which are most contentious in regard to marijuana cases.

16. As many of these cases involve helicopters, and not a small number of those sought by the US have come to me for help in the Canadian charges tactic, I have developed a close to expert level knowledge of the history of helicopter smuggling between British Columbia and the north-western United States of Washington, Idaho, and Montana and in one instance, airplane smuggling between British Columbia and Montana.

17. I have in particular been an observer and commentator of the progression of this tactic from a relatively benign venture moving marijuana into the United States to one almost always resulting in cocaine trafficking back into Canada and for a period, a great increase in violence in my province, which to me is my country. I am considered a highly reliable source of information by reporters at the Canadian Broadcasting Corporation, and have been contacted for story insights by the Associated Press, Rolling Stone Magazine, and Magnum magazine. I have been involved in the production of national investigative reports on the BC marijuana industry, and have been a featured commentator on a recent documentary that aired many times across Canada and to my understanding, in the United States.

18. I am in agreement with Canadian and US law enforcement officials that the use of helicopters in drug smuggling has created an expertise that constitutes a serious threat to the United States by providing a certain method of entry for personnel and material to the United States undetected, and for the entry of dangerous drugs into Canada from the United States.

19. There is a particularly contentious issue in the proceedings now underway in the western district of Washington court in regard to Mr. Rosenau that relates back to events connected to the extradition process which went on in Canada.

20. In my assistance to Mr. Jevning, and Mr. Rosenau, I came to see a document called the Supplementary Record of the Case ("SROC") filed in the documentation supporting the American request for the extradition of Mr. Rosenau. This document listed the evidence that Mr. Whelpley was supposedly going to testify to at Mr. Rosenau's trial. A copy of that document is attached as Exhibit B to this my affidavit.

21. As a result of the aviation qualifications detailed above, and which were known to Mr. Jevning, he asked me to examine the SROC for any inconsistencies from an aviation point of view.

22. I firstly identified inconsistencies, or operational impossibilities, in the claims allegedly made by Mr. Whelpley regarding the use of the Robinson 44 helicopter in 2004 and possibly in 2005. It simply was not possible from an aircraft capability perspective for that helicopter to have carried the loads of marijuana alleged by Mr. Whelpley. I advised Mr. Jevning that Mr. Whelpley was either lying to the US authorities, or US authorities were falsifying what he said in their submissions to the Canadian courts and federal authorities.

23. I then received information that led me to believe that it could not have been possible that Mr. Rosenau had access to the Robinson 44 helicopter with registration C-FRKM. I then accessed the online database of Transport Canada giving historical records of aircraft ownership. I found that in the entire time period alleged by Mr. Whelpley, the helicopter was owned and operated by an Alberta company called Airborne Energy Services ("Airborne").

24. I was very familiar with Airborne. In 2006, I had been one of the last two candidates interviewed for the position of flight operations manager in their airplane division. It is one of the largest and most modern of Alberta aviation companies, and I knew that all of its aircraft were monitored by satellite tracking devices installed in each aircraft.

25. As I knew the president of Airborne, Mr. Anthony Hunley, I called him and put him in contact with Mr. Jevning and I understand that Mr. Hunley eventually provided an affidavit stating that Mr. Rosenau was never an employee of Airborne and had no access to the helicopter in the period stated by Mr. Whelpley.

26. There was nothing else of substance in Mr. Whelpley's claims that referenced a specific aircraft registration, a specific day or place, or specific people, other than Mr. Rosenau. However, two things were known in respect to Mr. Whelpley's story about C-FRKM. They were:
    a. that helicopter could not carry the loads Mr. Whelpley alleged even if Mr. Rosenau had possession or use of it;
    b. there was no rational possibility that Mr. Rosenau had the use of that helicopter, or that Airborne did not always know where it was at;
    c. there was certainly no possibility that Airborne was missing helicopters for entire days, or that it would knowingly be engaged in serious illegal activities.

27. I began to monitor the progress of Mr. Whelpley in the United States courts and I became aware when he was released and returned to Canada. I have family in Vernon, British Columbia, which is where Mr. Whelpley comes from. I asked persons I knew there to see if they could get any contact information for him. Eventually I was provided with a telephone number and the information that he worked at a resort just south of Vernon.

28. At some time in 2009, when I was next in Vernon, I called Mr. Whelpley and told him I was assisting Mr. Rosenau and working for Mr. Rosenau's lawyer. He was initially receptive to a suggestion that he call Mr. Jevning with a view towards telling the truth of what had happened between him and the US attorney, Ms. Susan Roe. In a second call the same evening, he indicated that he did not wish to meet and I told him that I would give his number to the lawyer and the lawyer would call him, and arrange for him to have legal counsel present for any meeting that he might agree to.

29. Unfortunately, I lost his number and no further telephone or any other type of contact went on for over a year, if not longer.

30. In the fall of 2010, I was at Mr. Rosenau's house and we were discussing the perplexing problem of the falseness of Mr. Whelpley's alleged "testimony" and the harm it was causing to Mr. Rosenau. I came up with the idea that he was liable in the Canadian courts for the

damages he had caused to Mr. Rosenau through what was essentially a false and malicious prosecution, although we could not think of why he would do such a thing.

31. The issue that was faced was that we were fairly sure that Mr. Whelpley did not say the things attributed to him in the SROC. He couldn't have even known about the existence of C-FRKM in the periods he supposedly claimed, at least until a picture of the helicopter and Mr. Rosenau was put in front of him when he eventually came into US custody.

32. The alternative reality was that Ms. Roe and US law enforcement officials had either simply made up Mr. Whelpley's story for him, or spoon fed him the story and told him he was going to tell that story when the time came. Implicit in that was that they had not done their homework in regard to the ownership of C-FRKM.

33. This opened up an avenue of resolution for Mr. Rosenau. If Mr. Whelpley would admit he never said the things attributed to him by Ms. Roe, than at that time there were still Canadian avenues open to bring the falseness of the ROC to ministerial and court authorities and have the extradition process ended.

34. I contacted Dr. Botting with the analysis. He said he could not become involved and did not wish to discuss it as he was then still acting as Mr. Rosenau's counsel in the extradition matter and he felt it would create some type of conflict for him. He asked me to let me know if it was resolved, but he would take no role in it himself.

35. In talking to people who knew Mr. Whelpley, I received quite firm information that Mr. Whelpley suffered from sometimes severe personality problems that were described as bi polar condition. I have a close family member with bipolar disorder and the problems it can cause for her and for family members and others around her can be nightmarish. I knew that lying was one of those problems and I resolved to not have any further conversations with Mr. Whelpley out of fear that he might concoct stories about what I said to him. I decided that I would always have dealings with him on paper or email, so that there always was a record of what said and that it was appropriate.

36. In late 2010 and early January of 2011, there were some email approaches that gave Mr. Whelpley the disputed sections of the SROC and asked him if it was true that he said what Ms. Roe certified he said. There was no response that I can recall to anything, other than when it was decided that suing him was the last recourse and given his likely fear of meeting people, it would be desirable to mail him the originating process papers. He did respond with an address.

37. Exhibit A was prepared. It contains all of the pertinent details as to the facts and legal issues involved. It lays out a perfectly valid cause of legal action and valid legal remedies in the Canadian courts. It was mailed to Mr. Whelpley at the address he gave and he received it.

38. There was some contact by some individual claiming to be a lawyer representing Mr. Whelpley. Contact was made with Dr. Botting, who denied any involvement and informed the letter writer that he was not counsel for Mr. Rosenau in the civil matter. The letter was wild and defamatory and there was some concern that Mr. Whelpley had simply found the name of a lawyer and concocted a Microsoft Word document with a primitive logotype and written the letter himself. I wrote one letter back to the individual telling him that if the conduct continued, I would report him to the law society and there was no further correspondence. I did discover there was such a lawyer, and after having observed his behaviour in the courts in Salmon Arm in July of 2011, I concluded that he was capable of writing the letter and that Mr. Whelpley did not write it.

39. No response was filed within the time allowed by the Rules and on March 7, 2011 the Supreme Court issued an Order that I attach as Exhibit C. The only operative part of the

Order was an order in the nature of prohibition or injunction prohibiting Mr Whelpley from leaving Canada for travel to the United States. The purpose of the order was, as stated in the pleadings, to stop him from continuing his false and malicious attacks in the United States with possibly dire consequences for Mr. Rosenau.

40. Orders prohibiting Canadians from leaving Canada are very commonplace in Canadian courts and issue for any number of reasons. The Order against Mr. Whelpley is a valid order of the Supreme Court of British Columbia, obtained on true facts and arguments advanced in that court, and not denied or in any way contested by Mr. Whelpley. It is exactly as valid an Order as the Order committing Mr. Rosenau to the United States, issued by the same Court.

41. The Order also provides for a future assessment of damages and costs on further applications. From a tactical viewpoint, it was felt that it would be highly dangerous to crystallize the costs issue prior to Mr. Rosenau's trial in the United States. The fear was that if Mr. Whelpley found himself assessed several hundred thousand dollars in damages, he would have a powerful incentive to violate the prohibition against going to the United States and manufacture whatever story was necessary to put Mr. Rosenau away for many years and render him helpless to collect on his Canadian damages judgment.

42. There was also the fear that simply the possibility of damages might trigger a flight from Canada to do whatever he could to have Mr. Rosenau imprisoned in the US.

43. I mailed a copy of the Order to Mr. Whelpley. He did not acknowledge service.

44. At some point, May of 2011 to my recollection, Mr. Rosenau was required to surrender himself to the United States. He did not expect to be released and the issue arose as to how he would be represented in the civil matter. It was decided to file a Notice of Intention to Act by Agent, with me acting as the agent and the Notice was duly filed on March 31st, 2011. A copy of the Notice is attached as Exhibit D to this my affidavit.

45. It was part of the agreement that I act as agent that Mr. Rosenau would be at arm's length from my actions, if any, in respect to the civil action in the Supreme Court.

46. Mr. Rosenau was released by the Court and returned to Canada. At some point, he showed me a no contact order that was part of his bond condition. I explained to him that he could not comply with the order as written as it did not name any witnesses and co accused or co conspirators and left him to his imagination alone as to who those might be. I advised him that he should go to his bail supervisor and request a list of who these people were.

47. I understand that sometime later, a list was provided. Mr. Rosenau said he wouldn't be able to identify any of the people on the list, and only knew one name, that of Whelpley. He only knew Whelpley in the sense that he knew that was the name in the SROC, and that was the name I had put into the lawsuit, but he would not have been able to identify Whelpley by physical appearance any more than he could identify any of the other names on the list.

48. I told him to request pictures of the people involved, so that he didn't find himself standing beside one of them, or worse still, have Mr. Whelpley come up to him, be photographed beside him, and then come up with a story that Mr. Rosenau had threatened to kill him, or his family, or offered him bribes, or something similar, with the result that Mr. Rosenau would have to go back to the Unites States and into prison awaiting his trial.

49. The no contact conditions created an issue in respect to what remained of the civil proceedings against Whelpley. Mr. Rosenau broke the arms length agreement and strongly stated that he did not want any contact with Whelpley related to the civil proceedings out of fear that such contact would violate the no contact conditions and that he would have to go to prison in the United States. Mr. Rosenau appeared to me to be almost terrified at the prospect that serving Whelpley with a court paper could result in him being imprisoned. He

was adamant about no contact with Mr. Whelpley and his wishes were respected in the short term, because there really was no reason to contact Mr. Whelpley on the presumption he had a copy of the order and would abide by its terms.

50. It was decided that Dr. Botting would approach Mr. Craig Platt, Mr. Rosenau's US counsel, and tell him that there were some civil proceedings underway in Canada that might require contact by persons other than Mr. Rosenau to correspond with Mr. Whelpley in respect to those proceedings or serve court documents. There was a feeling that it might be best to confirm that Whelpley was in receipt of the Court order and was aware of the travel restrictions on him.

51. In late May, I was forwarded an email from Mr. Platt to Dr. Botting on the issue of civil proceedings correspondence and service of documents. I attach a copy of that email as Exhibit E to this my affidavit. It clarifies the issue of how Mr. Whelpley may be contacted, but expresses a concern that perhaps I should not contact Mr. Whelpley for no legal reason, but simply because Mr. Platt was confused about my role.

52. There was no reason to contact Mr. Whelpley at the time, so that was not an issue.

53. My role was clarified at a meeting with Dr. Botting in Vancouver on or about August 13, 2011. I agreed to assist Dr. Botting in a paralegal capacity in dealing with minor things in Canada. I recall that my role then might have been to prepare what I knew about the helicopter smuggling business in a historical sense, and in a method sense based on what had been released by police authorities in press releases and disclosure in Canadian courts and newspaper articles.

54. The civil matter was not discussed, but the engagement was general enough that it would have included that matter. I had by then reverted back to my arms length arrangement with Mr. Rosenau and did not consult with him about any matter relative to the civil suit.

55. In mid August, Mr. Rosenau began to receive disclosure about the US case against him on a series of disks. He came to my house in Vanderhoof and we put the discs into a computer and began to go through them.

56. I eventually found two "Proffers" made by Whelpley to US authorities in the presence of Ms. Susan Roe, the US attorney who prepared and certified the SROC. At no time does Mr. Whelpley allege anything whatsoever about Mr. Rosenau using C-FRKM in the summer of 2004 and 2005. He gives a list of load quantities and the quantities are only 150 pounds per load, not 500-600 as stated by Ms. Roe. He says the helicopter used was a Bell Jet Ranger and he does not give an identification number at all. Finally, he specifically says that C-FRKM was Mr. Rosenau's "new" helicopter, clearly implying that he was not saying it had ever been used in smuggling to his knowledge.

57. Ms. Roe fabricated the story about C-FRKM contained in the SROC. That story, taken as credible because it was certified by an Assistant United States Attorney, was the entire basis for the extradition of Mr. Rosenau.

58. As a result of that fabrication, Mr. Whelpley has judgment against him in Canada and an order that he not leave Canada to participate in a further false and malicious prosecution of Mr. Rosenau. He has potential damages of hundreds of thousands of dollars to be levied against him because of Ms. Roe's behaviour in the extradition process. Ms. Roe has tried and failed to continue to involve him by using the process of deposition in Canada, which the Court denied.

59. Approximately two weeks ago, I received word through either Dr. Botting or Mr. Rosenau that Ms. Roe was now saying that Mr. Whelpley was "expected" to testify in the United States. That raised the possibility that he was either going to violate the Canadian order prohibiting his leaving Canada, or claim that he did not receive it.

60. I did not discuss what was to be done with Mr. Rosenau, although he might have been aware of the statement Ms. Roe had made. I did contact Mr. Botting and suggested he send a copy of the Order to the Sheriff's at Vernon courthouse and ask them to serve Mr. Whelpley and file an affidavit of service attesting to the service.

61. Dr. Botting was reluctant to do that, given that he had previously told the lawyer for Mr. Whelpley that he was not counsel in the civil matter, which he then wasn't. I said that I would do it, and I think that by then I had the Sheriff's contact information, and fees and any other information necessary.

62. One issue was that it was then obvious that there was less culpability for the false information in the SROC on Mr. Whelpley's part and much more on the part of Ms. Roe. There remained a feeling of sympathy for Mr. Whelpley as a victim of the whole affair and a desire if possible to mitigate any problems for him, including the payment of costs.

63. I took it upon myself to try one more email to him to gain acknowledgment of service and gain a confirmation that he was not going to violate the order. I sent the email attached as Exhibit F to this my affidavit.

64. I did not vet the email with Dr. Botting. It appeared to be very straightforward to me and well within the nature of a communication permitted by the agreement between Ms. Julie Busic, who I understand to be Mr. Rosenau's release supervisor, and Mr. Platt. I cannot see anything in other it than normal and courteous legal correspondence similar to what would issue hundreds of times a day in British Columbia.

65. I have had a chance to see the small bit of correspondence Ms. Roe has made in this regard and also to see what Mr. Whelpley has to say. I observe that Ms. Roe describes the email as "harassment and intimidation", but that Mr. Whelpley says nothing of the kind. He does not claim harassment and intimidation. He merely appears to be irritated.

66. At the time I wrote to him, Mr. Whelpley was not a witness. The US government request to depose him was denied. He is forbidden by an Order of the Supreme Court of British Columbia to leave Canada for the purposes of travelling to the United States, for any purpose whatsoever, but it is clear from the pleadings that the reason for the order is to stop him from being a witness in the United States and further compounding the harm already done to Mr. Rosenau.

67. In order for him to be a witness, he would have to be approached by Ms. Roe with encouragement to violate an order of the same Court that she misled in the extradition process and come down to the United States and testify. It is a criminal offense in Canada for anyone from outside Canada to send a communication into Canada encouraging a person in Canada to violate a lawful order of the Supreme Court in BC. It is also an offense in Canada to file false Records of Cases to secure the removal from Canada of a Canadian citizen.

68. For the reasons contained in 66 and 67 above, I did not consider Mr. Whelpley to any longer be a witness in any legal sense. For me to do so, I would have had to have accepted that a US prosecutor was prepared to come down to Canada and commit criminal offenses in Canada to bring before an American jury a witness that did not dispute that he was a liar in Canadian court proceedings, and could testify that that prosecutor asking him questions had lied in documents provided to a Canadian judge in order to have the defendant before the jury. I did not accept that.

69. I have not seen any evidence that Mr. Whelpley is a witness. He appears to me to simply be a mentally ill bipolar person who was a captive in the American legal system for a while and had words put into his mouth in order to have time knocked off his own sentence.

70. I did not tell Mr. Rosenau anything about what I was doing in respect to the civil matter with Mr. Whelpley. Until half an hour before I wrote and sent the email, I didn't know myself. He did not direct me to contact Mr. Whelpley or do anything at all. As far as I know, the first he knew of it was when he was informed today that he has to appear in Seattle on Friday.

71. I see Ms. Busic's comments that she was unaware of a civil suit in British Columbia. I have an email from Mr. Platt in which he says he discussed this very thing with her, told her there were proceedings, and she agreed that contact such as was made would not be a violation of Mr. Rosenau's no contact conditions.

72. I also see Ms. Busic refers to Mr. Rosenau's agent (myself) as being somehow associated with associates of the United Nations gang and that she gains that information from Canadian police sources. I do not know any members of the United Nations gang. I do know who they are as there has been considerable press coverage of them.

73. As I indicate above, I was for several years contacted by quite a number of people with extradition problems looking to be charged in Canada. I suppose some of them could have been associates of some gang, in fact it is probably likely. If so, they asked me for legal help. That was the extent of my association with them.

SWORN BEFORE ME at Vanderhoof,    )
in the Province of British Columbia    )
this 27th day of October, 2011    )
    )
    )
    )
    )
_____    )
A Commissioner for Taking Affidavits in    )
and for the Province of British Columbia    )

_P. Mac Roibeaird_

Padraig Mac Roibeaird

Carmen Wheatley
Notary Public
Fort St. James, BC   V0J 1P0
Box 1210
250.996.5060

9

This is exhibit "A" referred to in
the affidavit of _Padraig Mac Roibeaird_
SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
_27_ day of _Oct_ , 20 _11_

A Commissioner for taking Affidavits
within the Province of British Columbia

Form 1 (Rule 3-1 (1) )

No 14781

Quesnel Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

### HENRY CARL ROSENAU

Plaintiff

and

### KIP JOHN WHELPLEY

Defendant

### NOTICE OF CIVIL CLAIM

*[Rule 22-3 of the Supreme Court Civil Rules applies to all forms.]*

**This action has been started by the Plaintiff for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a) file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

(a) file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

(b)  serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiff(s),

(a)  if you reside anywhere in Canada, within 21 days after the date on which a copy of the filed notice of civil claim was served on you,

(b)  if you reside in the United States of America, within 35 days after the date on which a copy of the filed notice of civil claim was served on you,

(c)  if you reside elsewhere, within 49 days after the date on which a copy of the filed notice of civil claim was served on you, or

(d)  if the time for response to civil claim has been set by order of the court, within that time.


# Claim of the Plaintiff

**Part 1: STATEMENT OF FACTS**

1. The Plaintiff is a Canadian citizen and a truck driver who resides near Quesnel, British Columbia.

2. The Defendant is a Canadian citizen and an employee of Sparkling Hill Resort near Vernon, British Columbia.

3. The Defendant suffers from a mental illness or mental condition that requires medication and which is believed to be bipolar, or manic depressive, disorder.

4. On or about June 5, 2005, the Defendant was arrested by United States (US) police in Washington state in the act of transporting some 500 pounds of marijuana. He was released within 24 hours and not charged.

5. Glen Stewart is the owner of a property approximately 3 miles south of Yale which was being used in part for storage for three helicopters on the 21st of September, 2005. At approximately 9:20 AM on that date,  Mr. Stewart was on a part of his property away from the storage building where the helicopters were being kept. He was working with a friend on repairing a vehicle.

6. While working on the vehicle as described above, Mr. Stewart noticed a helicopter landing out of his vision on the other side of the shed and a while later observed the Plaintiff talking to a man who he assumed was a friend of the Plaintiff. He approached the area to the point where the helicopter was then in his view and spoke with the man talking to the Plaintiff. He discovered that the man was an RCMP officer. The officer asked for a key to the storage building and Mr. Stewart refused to provide the key.

7.  Mr. Stewart returned to working on the vehicle. He was on the property for over an hour working on the vehicle and then left. The RCMP were still on the property when he left and he has learned that they searched the storage building without a warrant after he left. When he left, the helicopter was still on a concrete pad in front of a door into the storage building.

8. At 9:45 AM on or about September 21, 2005, a US law enforcement officer observed a Robinson helicopter in an area in north central Washington state. The law enforcement officer did not observe the helicopter's registration or the helicopter land or meet any vehicle.

9. A short while later a vehicle was observed driving out of this area and followed to an area near Puyallup, Washington. It was stopped and some 1000 pounds of marijuana was seized. Two Canadian brothers named Miraback were arrested.

10. On or about the 10th of November, 2005, the Defendant was indicted along with one Tyrell Owens and charged with several counts related to the importation and distribution of marijuana. The US indictment contained a Notice of Criminal Forfeiture in regard to a Canadian Bell Jet Ranger helicopter with the registration C-FALQ.  A warrant for the arrest of the Defendant was contemporaneously issued.

11. On the 11th of May, 2006, the Plaintiff was indicted in the US on three counts related to the importation and distribution of marijuana. The US indictment contained a Forfeiture Allegation which does not make any reference to any helicopter.

12. On the 9th of April, 2007, a Record of the Case in support of a request to Canada for the extradition of the Plaintiff was certified.

13. The Record of the Case dealt with the seizure of marijuana from the Miraback brothers and indicated that they were expected to testify that he was the pilot of a Robinson R44 model helicopter with registration C-FRKM that had delivered the marijuana that had been seized from them on September 21, 2005.

14. A Robertson R44 helicopter is not capable of lifting a 1000 pound load.

15. In the same record of the case, two RCMP officers who appear to be the same ones observed by Mr. Stewart on his property near Yale between 9:20 AM and 10:20AM or even later claim C-FRKM was sitting on the ground before them and confirm they were talking to Mr. Rosenau.

16. On the 16th of April, 2007, the Minister of Justice for Canada issued an authority to proceed based on the Record of the Case certified on the 9th of April, 2007.

17. The Plaintiff was subsequently arrested and spent three days in prison before being released on conditions which seriously affected his personal liberty.

18. By the 30th of May, 2008, the Defendant was in US custody. The US District Court of the Western District of Washington issued a detention order holding him in custody based in part on representations made that he was a danger to the public and a danger to flee.

19. On or about the 8th of August, 2008, the Defendant pleaded guilty to an altered version of the original indictment against him.

4

20. On the 17th of September, 2008, a superseding indictment against the Plaintiff was issued by a federal grand jury in Seattle, Washington. The only significant difference from the original indictment was that the amount of marijuana involved in the conspiracy charge was raised to more than 1,000 pounds from more than 100 pounds.

21. On the 7th of October, 2008, a Supplemental Record of the Case (SROC) was certified by Assistant US Attorney Susan Roe and forwarded to Canadian authorities.

22. In the SROC, Roe certifies that the expectation that the Miraback brothers were returning to testify in the US no longer existed.

23. The Defendant is introduced in the SROC. He is said to have returned voluntarily to the US and to have cooperated fully with agents of the US Department of Homeland Security. As it did with the Mirabacks, the SROC says that "Whelpley is expected to testify to the following."

24. In the enumeration of what the Defendant will testify to, the SROC says in part "In the summer of 2004, Whelpley received approximately seven loads of marijuana in the United States. Each load was brought across the international border by helicopter from Canada. Specifically, Whelpley saw a Robinson 44 helicopter, with a missing or taped-over tail number, which was used to smuggle the marijuana that summer. Whelpley identified the picture of that helicopter, tail number C-FRKM, which was referred to in the original Record. Each load consisted of 10 to 12 hockey bags which he estimated contained approximately 50 pounds each for a full load of approximately 500 to 600 pounds of marijuana. He was paid $7,000 per load and, that summer, he made $50,000 to $60,000 smuggling in this fashion before the smuggling season ended."

25. The balance of what the Defendant was expected to say had no such specifics as did his claimed statement about the summer of 2004 and the helicopter C-FRKM. He made a number of allegations about events in 2005 that were extremely vague, void of names or places, and which could not be contradicted by evidence adduced by the Plaintiff at his extradition hearing.

26. In the summer of 2004 and until July 5, 2005, the aircraft in question was owned by Airborne Energy Services Ltd., an Alberta company which is one of the largest suppliers of helicopters to the western Canadian oil and gas industry. All of its helicopters are equipped with satellite tracking which provides continuous information as to the position of the aircraft within several meters. These helicopters are almost exclusively based in northern Alberta and the Northwest Territories, a minimum of 700 kilometres from the area in which these offences are alleged to have occurred.

27. At the committal hearing before Mr. Justice Slade of the BC Supreme Court, held in Vancouver on May 15, 2009, the Plaintiff provided affidavit evidence from the President of Airborne, Anthony Hunley,  to the effect that the helicopter was operated by Airborne for several years prior to 2004, up until July, 2005. Mr. Hunley deposed that the Plaintiff was never an employee of Airborne and did not have access to the helicopter during the summer of 2004 or at any time while it was registered to Airborne.

28. The Defendant claims that the Plaintiff also delivered marijuana to him in a red Bell Jet Ranger Helicopter on June 5, 2005. His evidence is contradicted by US law enforcement officials who observed the delivery flight and described the helicopter as being white.

29. The Plaintiff has been committed for extradition and the Minister of Justice has signed a surrender order. The Plaintiff now has an application for leave to appeal before the Supreme Court of Canada as a result of the decision of the BC Court of Appeal confirming the committal decision in the BC Supreme Court.

30. In its ruling, the BC Court of Appeal explicitly says the committal is based solely on the uncorroborated evidence of the Defendant.

31. The Defendant has been provided with a copy of the SROC containing what the US says he will testify to at a trial against the Plaintiff is he is extradited. He has not denied the American account of what he will testify to, and by implication, what he told law enforcement authorities and prosecutors in the United States.

32. The Plaintiff has incurred significant legal expenses since the first Record of the Case was withdrawn in favour of the SROC, based entirely on the false claims of the Defendant. The legal expenses incurred as a result of the Defendant's false claim in respect to helicopter smuggling in Robinson 44 C-FRKM total $70,000. Those expenses will continue to be incurred as the Plaintiff appeals to the Supreme Court of Canada on grounds primarily related to the false statements of the Defendant.

33. In addition to legal fee expenses, the Plaintiff has spent 18 days in prison in Canada, lost employment, and been subjected to an ongoing campaign of harassment by RCMP officers at Quesnel, British Columbia. The Plaintiff has suffered great emotional stress as a result of the extradition proceedings, which, as the Court of Appeal notes, are supported only by the statements, or claimed statements of the Defendant, and which are demonstrably false in the one instance in which specifics are given.

**Part 2: RELIEF SOUGHT**

1. General Damages

2. Specific Damages for legal expenses and loss of income that continue to accrue at the time of filing of this Notice of Civil Claim and will continue to accrue through a costly appeal to the Supreme Court of Canada in respect to the Minister of Justice's decision to surrender the Plaintiff to the US.

3. Punitive damages for false imprisonment and for malice in the event that the Defendant actually does return to the US to continue with his false statements against the Plaintiff.

4. An injunction against the Defendant prohibiting any attempt on his part to return to the US to continue his false and malicious attack against the Plaintiff.

5. Costs of the action

**Part 3: LEGAL BASIS**

1. The Plaintiff says that the Defendant contrived both in Canada and the United States to mitigate the consequences of his own criminal behaviour by bringing about the false and malicious prosecution of the Plaintiff in both Canada and the United States.

2. The Plaintiff says that American authorities suspected him of being involved in the Miraback matter based on the September 21, 2005 incident where RCMP spoke to the Plaintiff when he was observed standing near the Robinson 44 helicopter with registration letters C-FRKM near Yale, British Columbia. This incident resulted in the US authorities gaining access to a photograph of the Robinson helicopter C-FRKM.

3. The Plaintiff says that when the US authorities were forced to admit that their claim that the Miraback brothers were expected to testify to the Plaintiff's involvement was false, those authorities conspired with the Defendant to concoct the story about many loads of marijuana being flown to the US in the helicopter C-FRKM.

4. The Plaintiff says that this conspiracy was in part contrived to solve the problem then facing the US in that their Miraback case was the one for which the Minister of Justice had issued an authority to proceed with the Plaintiff's extradition. That authority to proceed had nothing to do with the Defendant.  The only evidence the Mirabacks were supposedly to deliver was that they had identified the Plaintiff's picture as the pilot of helicopter C-FRKM. They allegedly provided this information while they were American captives facing long prison sentences if they did not come up with a story implicating others.

5. The Plaintiff says that when the truth came out that the Mirabacks were not going to say anything the US authorities attributed to them, the authority to proceed was essentially extinguished as there was no evidence against the Plaintiff. The US then went to another captive. the Defendant. This captive was not only facing the same ten year minimum sentence as the Mirabacks had been, he was also suffering from bipolar disorder.

6. The Plaintiff says that there is a very close correlation between bipolar disorder and lying behaviour.  Lying and bipolar disorder seem to go hand in hand for most manic-depressives and this association is grounded in more than one

source. One obvious reason for the association between lying and bipolar disorder is fear. Almost every lie is rooted in fear- the fear of some possible punishment.

7. The Plaintiff says that the US authorities intimidated the Defendant into falsely identifying the helicopter C-FRKM and signing on to the story that this was the helicopter that had delivered him several loads of marijuana in 2004 and early 2005, then US authorities would significantly reduce his sentence. That story is demonstrably false and a total fabrication.

8. The Plaintiff says the facts fully support that contention. The Defendant, although admitting to being involved in the distribution of some 14,000 pounds of marijuana and facing a minimum ten year sentence. was allowed to plead guilty to a lesser amount of marijuana and received 21 months imprisonment, including time served.

9.  The Plaintiff says that this fabrication in exchange for a reduced sentence was one which had the purpose of establishing a continuous and false link between the single event of September 21, 2005, the event which precipitated the Minister of Justice's authority to proceed, and the totally uncorroborated claims of the Defendant in respect to helicopter smuggling in 2004 and early 2005.

10. The Plaintiff says that he understands and has sympathy for Canadians who become captives in the US law enforcement system and who can be placed under enormous stress and pressure to implicate innocent persons. He understands that this problem is endemic in the US criminal justice system, and that the Defendant suffers from problems of a mental health nature.

11. The Plaintiff says, however that, the Defendant is now back in Canada, is under no compulsion from the US legal authorities, is fully aware of what he is alleged to have done, and refuses to put it right and instead chooses to allow the harm he has done to the Plaintiff to continue.

12. The Plaintiff further says that as the Defendant is entirely free to refuse to continue on with this persecution by returning to the US at some future time and perjuring himself at such a trial with the false information about the helicopter used in 2004, or other false information, any such return should normally attract a very high level of punitive damages.

13. The Plaintiff says that damages are not a suitable recourse against the Defendant returning to the US to further this malicious prosecution and says that injunction is the proper remedy against the harm that such a return would bring about.

14. The Plaintiff says that the Defendant has engaged in a false and malicious prosecution and persecution of the Plaintiff both in Canada and the United States and that the Defendant is liable at law for the damages the Plaintiff has suffered as a result.

**Plaintiff's address for service:**

Street Address: ▮▮▮▮▮▮▮▮▮▮ Vanderhoof, B.C.

Mail Address: ▮▮▮▮▮▮ Vanderhoof, B.C. V0G 3A0

Fax number address for service: (250) 567-5817

E-mail address for service: pmacroibeaird@gmail.com

**Place of trial: Quesnel, B.C.**

**The address of the registry is:** ▮▮▮▮▮▮▮▮▮▮▮▮▮

Quesnel, BC

V2J 2C1

Date: January 24, 2011

Henry C. Rosenau
Plaintiff

Rule 7-1 (1) of the Supreme Court Civil Rules states:

(1) Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

(a) prepare a list of documents in Form 22 that lists

(i) all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

(ii) all other documents to which the party intends to refer at trial, and

(b) serve the list on all parties of record.

## Appendix

*[The following information is provided for data collection purposes only and is of no legal effect.]*

### Part 1: CONCISE SUMMARY OF NATURE OF CLAIM:

This is a claim for damages, punitive damages, and special damages and costs for malicious prosecution.

### Part 2: THIS CLAIM ARISES FROM THE FOLLOWING:

*[Check one box below for the case type that best describes this case.]*

A personal injury arising out of:

[ ] a motor vehicle accident

[ ] medical malpractice

[X ] another cause

A dispute concerning:

[ ] contaminated sites

[ ] construction defects

11

[ ] real property (real estate)

[ ] personal property

[ ] the provision of goods or services or other general commercial matters

[ ] investment losses

[ ] the lending of money

[ ] an employment relationship

[ ] a will or other issues concerning the probate of an estate

[ X] a matter not listed here

## Part 3: THIS CLAIM INVOLVES:

*[Check all boxes below that apply to this case]*

[ ] a class action

[ ] maritime law

[ ] aboriginal law

[ ] constitutional law

[ ] conflict of laws

[ X] none of the above

[ ] do not know

## Part 4:

NA

12

This is exhibit " B " referred to in
the affidavit of _Pedrcrin mae Roibeaird_
    SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
____ day of __Oct__ , 20 11

A Commissioner ~~for taking Affidavits~~ ... ENTAL RECORD OF THE CASE FOR PROSECUTION
within the Province of British Columbia

1.      This supplemental Record supplements the Record of the Case for Prosecution
(the "original Record"), dated April 9, 2007, submitted as part of the United States' request for
the extradition of Henry C. Rosenau from Canada.

2.      There is an additional witness who was not available at the time the original
Record was submitted. Kip John Whelpley came voluntarily to the United States, entered a
guilty plea to conspiracy to import and distribute marijuana, and has cooperated fully with agents
from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"),
since his arrival in the United States. Whelpley is expected to testify to the following:

a.      Whelpley came to United States in the spring of 2004 to assist with smuggling
marijuana from Canada into the United States. He first looked for helicopter landing spots in
unpopulated and rural areas south of the United States-Canada border. With the assistance of
another person, he purchased a truck and canopy cover which he used to receive and transport
shipments of marijuana in the United States. In the summer of 2004, Whelpley received
approximately seven loads of marijuana in the United States. Each load was brought across the
international border by helicopter from Canada. Specifically, Whelpley saw a Robinson 44
helicopter, with a missing or taped-over tail number, which was used to smuggle the marijuana
that summer. Whelpley identified the picture of that helicopter, tail number C-FRKM, which
was referred to in the original Record. Each load consisted of 10 to 12 hockey bags which he
estimated contained approximately 50 pounds each for a full load of approximately 500 to 600
pounds of marijuana. He was paid $7,000 per load and, that summer, he made $50,000 to
$60,000 smuggling marijuana in this fashion before the smuggling season ended.

b.      In early 2005, Whelpley resumed his role in marijuana smuggling after meeting
Henry Rosenau in Canada. During the meeting Henry Rosenau discussed the 2004 trips,
acknowledged he was the pilot of the helicopter, referred to above, during the 2004 trips, and
confirmed their prior contacts by his knowledge of Whelpley's Blackberry name and their
previous discussions. Specifically Rosenau recognized Whelpley's Blackberry moniker of
"Gilligan" and discussed details of a smuggling trip which was cancelled because of fog. Henry
Rosenau also told Whelpley that he maintained Whelpley's cash payments in his safe during the
prior summer. Whelpley visited Henry Rosenau at his residence at 4767 Grandview Flats,
Armstrong, British Columbia, Canada.

c.      In spring 2005, Whelpley returned to the United States with Henry Rosenau.
Together, they scouted areas in Washington State for landing zones for Henry Rosenau's
helicopter. Whelpley rented a small home in Washington State for the summer and began
receiving loads of marijuana. Henry Rosenau brought a few marijuana loads in his smaller
helicopter, a Robinson 22, however, that smaller helicopter could carry only 200 pounds at a
time. Henry Rosenau began flying a larger, red Bell helicopter by late spring and brought
marijuana loads of approximately 500 pounds at a time. Whelpley estimates that he received
twenty 500 pound marijuana loads from Henry Rosenau that summer, including one week in

which he received three 500 pound loads in five days.  Whelpley said that Henry Rosenau was
the pilot of every helicopter load, either flying alone or with one other person.  Whelpley was
stopped by ICE agents on June 9, 2005 with a 500 pound marijuana load he had just received
from Henry Rosenau.

       d.       Whelpley identified the person depicted in the photograph attached as Exhibit A
as Henry Rosenau.

3.      Referring to paragraph 7 of the original Record, Zachary and Braydon Miraback are no
longer expected to testify.

Seattle, Washington
October 6, 2008

_____
SUSAN M. ROE
Assistant United States Attorney
Western District of Washington

This is exhibit " C " referred to in
the affidavit of _Padraig Mac Roibeaird_
SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
_27 day of Oct_ ,20 11

A Commissioner for taking Affidavits
within the Province of British Columbia

SUPREME COURT
OF BRITISH COLUMBIA

MAR 0 7 2011

QUESNEL
REGISTRY

No 14781

Quesnel Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

**HENRY CARL ROSENAU**

Plaintiff

and

**KIP JOHN WHELPLEY**

Defendant

**BEFORE A REGISTRAR**

The Plaintiff having filed and served a Notice of Civil Claim and the Defendant Kip John Whelpley having failed to file and serve a Response to Civil Claim within the time allowed:

THIS COURT ORDERS THAT:

The Defendant pay to the Plaintiff general and punitive damages to be assessed.

The Defendant pay to the Plaintiff specific damages to be assessed

THIS COURT FURTHER ORDERS THAT Kip John Whelpley be prohibited from leaving Canada for the purpose of entering the United States of America until further order of this Court, with the form of the Order to be approved by the Court on application.

THIS COURT FURTHER ORDERS THAT the Defendant pay to the Plaintiff Costs to be assessed.

Dated this 7th day of March, 2011

District Registrar

This is exhibit " D " referred to in
the affidavit of _Padraig Mac Roibeaird_
SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
_27 day of Oct_ .20 11

A Commissioner for taking Affidavits
within the Province of British Columbia

No 14781

Quesnel Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

## HENRY CARL ROSENAU

Plaintiff

and

## KIP JOHN WHELPLEY

Defendant

### NOTICE OF INTENTION TO ACT BY AGENT

TAKE NOTICE that the Plaintiff, HENRY CARL ROSENAU, intends to act by an Agent in all further matters before the Court in the above described action and appoints Padraig Mac Roibeaird as his Agent.

FURTHER TAKE NOTICE that the Plaintiff grants to Padraig Mac Roibeard the right to do all those things the Plaintiff could himself do in person or by counsel in respect of this matter, and by leave of the Court, where such leave is required.

Dated at Quesnel, British Columbia, this 31st day of March, 2011.

_Henry C Rosenau_

Henry Carl Rosenau
Plaintiff

This is exhibit " E " referred to in
the affidavit of _Padraic mac Roibeaird_
SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
_5th day of Oct_ ,20 11

A Commissioner for taking Affidavits
within the Province of British Columbia

—— Original Message ——
**From:** Craig Platt
**To:** Dr. Gary Botting
**Sent:** Wednesday, May 25, 2011 7:05 PM
**Subject:** Re: ROSENAU

Hi Mr. Botting.  I just got off the phone with Julie Busic.  She states the Henry is doing fine with his release and that she is planning on seeing him tomorrow at Blaine.  I reviewed with her the issue of serving legal documents on a witness, through legitimate legal process (i.e. not via Henry) and she agreed with my analysis that this is not considered to be a violation of any no contact conditions.  In addition, I reviewed Henry's Appearance Bond Conditions.  There is a general admonishment prohibiting him from harassing, threatening, intimidating, tampering with or improperly influencing or injuring the person or property of a witness etc., in violation of 18 USC 1503, 1512 or 1513, copies of which I have attached.

At this point, I believe that it is acceptable to serve a witness with valid legal process.  One word of caution is that I don't think Mr. Roberts should be involved in any service, primarily because I am confused by his role in this.  If I am confused the AUSA might be confused.

Finally, Ms. Busic indicated that she will be making a note of the fact that we had this discussion and agreed that this would not violate the appearance bond conditions.

It appears that you may proceed with this.

I am still getting up to speed on this case and need to schedule a time to come up there for a visit. We bumped the trial to November, so we have some time now. How is your schedule over the coming weeks?

Thanks and take care,

Padraig Mac Roibeaird pmacroibeaird@gmail.com

hide details Oct
to Kip Wh(play-kitoh)isperers@g
20 (1 day ago)

date Thu, Oct 20, 2011 at 1:26 PM
subject Re: Address for service
mailed-by gmail.com

"Mr. Whelpley,

Please confirm that this remains the correct address for service for documents in the civil matter between yourself and Mr. Henry Rosenau in the Supreme Court of British Columbia.

▓▓▓▓▓▓▓Vernon, B.C. V1T 5P5

There is a document to be served which you may already have, but for which you have not acknowledged receipt of service. It is the order of the Court made March 7th, 2011 reflecting Default Judgment and four Orders made. Two orders are in respect of general and punitive damages to be assessed, and for specific damages. These Orders are not presently being pursued, but there is a further Order in the nature of a prohibition which reads as follows:

"THIS COURT FURTHER ORDERS THAT Kip John Whelpley be prohibited from leaving Canada for the purpose of entering the United States of America until further order of this Court, with the form of the Order to be approved by the Court on application."

I have previously forwarded a copy of the Order of default judgment to you at this email and have had no response. The concern which now arises comes from information originating in the United States to the effect you may be considering defying the order of the Supreme Court of British Columbia and travelling to the United States in contravention of the Order.

I accept that this information may be provided falsely and maliciously by the US government, however it makes it necessary that I, as Mr. Rosenau's agent in this matter, either confirm your acknowledgment of receipt of the Order of March 7th, 2011 and your acknowledgment that you intend to abide by the terms of the Order, or that I take steps to serve the order on you and have independent confirmation of service in order that Mr. Rosenau may have legal recourse in the event you violate the terms of the Order.

I enclose again a scanned copy of the Order. Please acknowledge receipt of the Order here, and acknowledge your intent to comply with the terms of the prohibition section of the Order.

If I have not had acknowledgment by 9am tomorrow, Friday, October 21, 2011 I will forward the Order to the Sheriffs at Vernon courthouse and have them personally serve it on you. The fourth Order made by the Court is an order for costs, and the costs of service, if necessary, will be charged to you under this Order.

I can be contacted at this email if you intend to acknowledge service and compliance with the Order.

Regards

Padraig Mac Roibeaird

This is exhibit " F " referred to in
the affidavit of _Padraig mac_ Roibeaird
SWORN BEFORE ME at
Vanderhoof in the Province
of British Columbia this
2 7 day _____ 20 11

A Commissioner for taking Affidavits
within the Province of British Columbia



SUPREME COURT
OF BRITISH COLUMBIA

APR 2 4 '12

PRINCE GEORGE
REGISTRY

No  1240884

Prince George Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

**HENRY CARL ROSENAU**

Plaintiff

and

**SUSAN M ROE**
**ROBERT NICHOLSON, MINISTER OF JUSTICE FOR CANADA**
**THE ATTORNEY GENERAL OF BRITISH COLUMBIA**
**DIBA MAJUB**
**KENNETH KACHUR**

Defendant

### NOTICE OF CIVIL CLAIM

*[Rule 22-3 of the Supreme Court Civil Rules applies to all forms.]*

**This action has been started by the plaintiff(s) for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a)  file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

(b)  serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

(a)  file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

1

(b)  serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

## Time for response to civil claim

A response to civil claim must be filed and served on the plaintiff(s),

(a)  if you reside anywhere in Canada, within 21 days after the date on which a copy of the filed notice of civil claim was served on you,

(b)  if you reside in the United States of America, within 35 days after the date on which a copy of the filed notice of civil claim was served on you,

(c)  if you reside elsewhere, within 49 days after the date on which a copy of the filed notice of civil claim was served on you, or

(d)  if the time for response to civil claim has been set by order of the court, within that time.

## Claim of the Plaintiff

### Part 1: STATEMENT OF FACTS

[*Using numbered paragraphs, set out a concise statement of the material facts giving rise to the plaintiff's claim.*]

1.  The Plaintiff is a Canadian citizen currently incarcerated at the Sea Tac Federal Detention Center at Seattle, in the state of Washington, in the United States of America, and normally resident at Quesnel, British Columbia.
2.  The Defendant Susan M. Roe (hereinafter "Roe") is an assistant United States attorney in the western district of Washington.
3.  Diba Majub (hereinafter "Majub")  is a lawyer employed by the government of Canada in the federal Department of Justice in the Vancouver office.
4.  Kenneth Kachur is, or was, a member of the Royal Canadian Mounted Police (hereinafter "RCMP") under contract to the province of British Columbia and was so employed on the 21st of September, 2005 and in the time frame thereafter in which his actions are the subject of this litigation.

2

5. On the 21st of September, 2005 the Defendant Kenneth Kachur (hereinafter "Kachur") entered onto private property near Yale, British Columbia, (hereinafter "the Property"), which property was leased by, and under the control of, the Plaintiff. In doing so, Kachur and another RCMP officer opened a closed gate with a sign "Private Property" and drove down a half mile long driveway to where the Plaintiff was located.

6. At the time of the entry, Kachur had been asked by other officers involved in an investigation of marijuana exportation to confirm the presence of a helicopter carrying bags of marijuana slung or otherwise suspended under it in the area.

7. Kachur was not asked to enter onto private property or approach any person. His actions on entering the property and subsequently arresting the Plaintiff are claimed to have seriously hindered a joint US Canadian investigation, both by the senior US agent directing the investigation, and by his own employers in the RCMP.

8. Kachur did not have a search warrant nor did he have permission to come past the gate and the Private Property sign and down the half mile long driveway.

9. Kachur and another officer remained on the Plaintiff's property for a period estimated to be between one and a half and two hours. In that time, the Plaintiff was under arrest and questioned without legal caution and without being given the opportunity to contact legal counsel.

10. Kachur searched both the Plaintiff and the Property without a warrant. He unlawfully removed property of the Plaintiff and others from the Property and is believed to have removed some or all of that property from Canada without authorization by any Court, and without making a report of the seizure to any Canadian court, and delivered it to US authorities and ultimately into the hands of Roe.

11. While on the property, Kachur taunted the Plaintiff, telling him that the "Americans" were going to be glad to get their hands on him and that he was going to die an old man in a US jail.

12. On May 11, 2006 an indictment charging the Plaintiff with marijuana offenses in the United States was issued in Seattle, Washington.

13. Extradition proceedings were commenced against the Plaintiff in 2007 and an authority to proceed was issued by the Minister of Justice for Canada in respect of allegations involving the seizure of marijuana in the United States from two Canadian brothers named Miraback.

14. As part of the extradition process, a Record of the Case (hereinafter "ROC") was certified by an assistant United States attorney named Douglas B. Whalley on April 9, 2007. Within the ROC is a claim made by Kachur that he entered upon the property of the Plaintiff at 11:10 am on September 21, 2005.

15. The claim that Kachur entered upon the property at 11:10 am is demonstrably false. The true time, which can be demonstrated by evidence produced by Kachur himself, would have provided an alibi for the Plaintiff for the charges he faces.

16. Within the ROC is another claim that the Miraback brothers were expected to testify against the Plaintiff. That claim is false. There was no reasonable expectation that the Miraback brothers would testify against the Plaintiff. They had been released to Canada and were under no obligation to return to the United States.

3

17. The Plaintiff was arrested as part of the process and released on conditions by a judge of the Supreme Court of British Columbia.

18. The extradition proceedings were conducted by Mr. Justice Slade of the BC Supreme Court.

19. The defendant Diba Majub acted as counsel for the United States of America in the extradition proceedings.

20. On October 6, 2008 Roe certified a Supplemental Record of the Case, hereinafter "SROC".

21. In the course of proceedings in 2008, Majub informed Slade J. that the Mirabeck brothers were no longer expected to testify and that the United States was not relying on any evidence gathered by Kachur at Yale on September 21, 2005.

22. The SROC introduced a new witness, one Kip John Whelpley, (hereinafter "Whelpley") a Canadian who had been arrested and released after being found with some marijuana in northwestern Washington state.

23. In the SROC, Roe represented to Slade J. that the Plaintiff had, in the summer of 2004, delivered many loads of marijuana to Whelpley in a Robinson R44 helicopter, identified by Whelpley, with the registration numbers C-FRKM. Roe claimed the total marijuana smuggled was between 3500 and 4200 pounds and that as much as 600 pounds of marijuana had been carried per trip by the Robinson 44 helicopter.

24. Roe also claimed in the SROC that certain conversations had taken place in 2005 between Whelpley and the Plaintiff which would have confirmed that the Plaintiff was involved in Whelpley's illegal activities in 2004.

25. The clear implication in the SROC was that Whelpley had provided the information that Roe provided in the SROC and would testify to the same in US proceedings.

26. In 2004, and up until July of 2005, the Robinson R44 helicopter with registration C-FRKM was registered to Airborne Energy Solutions Ltd. of Whitecourt, Alberta, (hereinafter "Airborne").

27. Airborne is one of Canada's largest commercial helicopter operators, with over 50 aircraft serving the oil and gas industry in western Canada. In 2004, the whereabouts of all of its helicopters, including C-FRKM, would have been known to its operational control staff through the use of satellite and global positioning equipment installed in the aircraft.

28. In the course of an application to Slade J for further disclosure from American authorities, counsel for the Plaintiff introduced an affidavit from the president of Airborne, one Anthony Hunley, (hereinafter "Hunley") .Hunley deposed that the Plaintiff was not an employee of Airborne at any time and to the best of his knowledge, had no access to C-FRKM in the summer of 2004 or at any time when it was registered to Airborne.

29. The central question in the application was one of the reliability of Whelpley, with counsel for the Plaintiff taking the position that the story of C-FRKM was a total fabrication.

4

30. Majub argued before the Court that the fact that Hunley has qualified his statement with the term "to the best of my knowledge" did not exclude the possibility that the Plaintiff did have access and thus Whelpley's account, as related by Roe, could be true.

31. There is, and never was, any possibility whatever that Majub's claim to Slade J could have been true. It requires both Majub and Slade J to entertain as credible a claim that an outsider could steal a satellite tracked helicopter many times during the busiest helicopter season of the year, and no one within Airborne would have noticed it missing, (hereinafter "the central lie")

32. Slade refused the application and the Plaintiff was eventually committed for extradition, largely based on the claim made by Roe in regards to what Whelpley would say about the summer of 2004. In his reasons for judgment, Slade J referred to C-FRKM and also the statement by Majub that the US would not be relying on evidence gathered by Kachur.

33. In his decision, Slade J noted that the extradition was based entirely on the uncorroborated evidence of the accomplice Whelpley.

34. As a result of Majub's assurance that the events at Yale on September 21, 2005 would not be an issue in American proceedings, counsel for the Plaintiff did not raise the violations of the Canadian Charter of Rights and Freedoms that plainly occurred as a result of Kachur's warrantless search and uncautioned questioning of the Plaintiff.

35. The extradition process then moved on to the ministerial stage. In submissions to the Minister of Justice, counsel for the Plaintiff again raised the credibility of Whelpley due to the plainly false story about the helicopter activity in the summer of 2004. The Minister refused the application, restating the central lie.

36. The BC Court of Appeal upheld the decision of Slade J, once again relying on the central lie.

37. The Plaintiff was eventually extradited in 2010 and immediately released without bond and under minimal conditions to return to Canada and appear as required for proceedings in the United States.

38. In January of 2011, the Plaintiff initiated an action for damages and injunction against Whelpley in the Supreme Court of British Columbia, Quesnel registry. The action claimed that Whelpley lied to Roe and that he was a person suffering from the mental health condition of manic depression, or bi polar condition, and that he lied as part of an arrangement with American authorities to avoid a long US prison term.

39. In that action described in 38 above, the Plaintiff described harm caused by Whelpley's false claims and his great concern that Whelpley intended to continue making false claims against him in the United States in the future. The Plaintiff asked for, among other remedies, a prohibition on Whelpley leaving Canada for the United States (hereinafter the "US entry prohibition order").

40. Whelpley did not dispute the allegations and did not file a Response to Civil Claim. Default judgment was ordered. The terms of the judgment included a prohibition against Whelpley leaving Canada to travel to the United States, and damages to be assessed on application to the Court. Whelpley was served with the Order.

5

41. In the course of his American trial preliminaries, the Plaintiff has been served with documents by way of disclosure from the American authorities.

42. Those documents indicate that on two occasions, Whelpley appeared with counsel to provide information in what is called a "proffer". This information is provided in exchange for a lighter sentence.

43. The documents reveal that at no time did Whelpley ever make any statement attributed to him about C-FRKM and the events of the summer of 2004, including the 3500 to 4200 pounds of marijuana. Whelpley refers to an entirely different helicopter and to much smaller loads of marijuana. He also does not refer to conversations which Roe claimed identified the Plaintiff as the pilot of C-FRKM in 2004.

44. Despite being fully aware that she procured the Plaintiff's extradition to the US through the tactic of willfully and deliberately lying in documents filed in a Canadian court, Roe continues to act as the Plaintiff's prosecutor in the United States.

45. As part of that prosecution, Roe actively pursues contravention of the BC Supreme Court order prohibiting Whelpley from entering the United States to continue his false and malicious claims against the Plaintiff. She has sought, and somehow obtained, an Order under the Mutual Assistance in Criminal Matters treaty between Canada and the United States, compelling Whelpley to appear in a Kelowna, B.C. courtroom on April 26, 2012 to give testimony via video link or some other such technological means, (hereinafter the "MLAT order").

46. The enabling legislation for such a process originates in the Mutual Assistance in Criminal Matters Act. That act states when such testimony is given, the witness is deemed to be in the United States of America. As such, the MLAT order directly contravenes the US entry prohibition order. It specifically seeks to renew the mendacious partnership between Roe and Whelpley, the very object the prohibition order sought to achieve.

47. Although the issue of Charter violations in the Yale trespass and warrantless seizure incident are before the courts in British Columbia, Roe also intends to use evidence seized in that incident in the Plaintiff's trial, which commenced on April 23, 2012.

48. Roe further continues to attempt to procure the attendance of Kachur at the American proceedings to give testimony about his own actions, which Kachur knows to be in violation of Canadian law. Kachur is restrained from attending by RCMP counsel until the legality of the search is finally determined under Canadian law.

49. Majub is aware that the SROC was false and aware of his own role in promoting that falsehood as a means of securing the Plaintiff's extradition, and has remained silent and taken no steps to remedy the wrong committed against the Plaintiff.

50. Roe has entered Canada in furtherance of her prosecution of the Plaintiff and has transmitted into Canada documents in furtherance of his extradition. She will enter Canada to pursue the partnership described in 46 above on April 26, 2012 and facilities of the Supreme Court of British Columbia, the very court she defies with her presence and objectives, will be used to violate that Court's own order.

51. In her pronouncements in American proceedings, Roe has openly expressed contempt for Canadian processes and Canadian court orders, denigrating their legitimacy and proclaiming American sovereignty even over matters occurring on Canadian soil.

6

52. Such further facts as may be revealed by disclosure and advanced in an amended Notice of this civil claim.

## PART 2: Relief Sought

1. The Plaintiff seeks general damages against all Defendants.

2. The Plaintiff seeks punitive damages against Roe, Nicholson, and Kachur

3. The Plaintiff seeks costs of this action.

4. Such further relief as this Honorable Court may deem just and necessary, either in the nature of injunctive relief to mitigate further damages to the Plaintiff, or in other relief consistent with the ends of justice.

## PART 3: Legal Basis

1. The Plaintiff says that Roe obstructed and perverted the course of justice in Canada willfully and intentionally to secure his removal from Canada and his imprisonment both in Canada and the United States of America.

2. The Plaintiff says that Roe conspired with Majub, and through Majub, with Nicholson to deny the Plaintiff a fair hearing into whether or not he should be extradited, and that the conspiracy resulted in the Plaintiff's extradition in a manner not in accordance with the fundamental principles of justice and in violation of the Plaintiff's rights to remain in Canada provided in section 6 of the Charter of Rights and Freedoms.

3. The Plaintiff says that Kachur unlawfully entered onto the Plaintiff's property and in violation of his rights under the Canadian Charter of Rights and Freedom and the common law seized his property and without judicial or other lawful process transmitted that property to the United States to be used in the trial of the Plaintiff, in which trial the American judge maintains indifference to the legality of the seizure in Canada.

4. The Plaintiff says that Kachur, although he purported to act as an officer of the RCMP and used the badge of that organization in his violations of the Plaintiff's rights, essentially acted as a renegade agent of US law enforcement, and intentionally violated the Plaintiff's rights and spirited the evidence thus gained away from Canada and into the hands of Roe, to be used with impunity for the rights of the Plaintiff, and that the Plaintiff has consequently suffered great harm for which both general and punitive damages should be awarded.

5. The Plaintiff says that the RCMP disown Kachur in terms of the investigative necessity of his actions and in fact claim that those actions seriously hindered an international investigation into marijuana smuggling by revealing the investigation to a wide group of alleged perpetrators.

6. The Plaintiff says that Nicholson owes a duty of care to all Canadian citizens, and in particular to the Plaintiff, in matters of extradition and must at all times act with amplified care when the *bona fides* of American authorities come into question, as has been the case in the extradition of the Plaintiff.

7

7. The Plaintiff says that Nicholson failed in that duty of care, and further says that Nicholson acted politically, rather than ministerially, and in pursuance of a personal extreme right wing ideology which prefers US justice and US prosecutorial methods to that within the Canadian legal system, of which he is the foremost guardian, and the Plaintiff has suffered great mental and financial harm, as well as loss of freedom and dignity as a result of Nicholson's abject failure to comply with the duty of care owed.

8. The Plaintiff says that Majub advanced the central lie without compunction and knew, or should have known, that the SROC was false and that he was assisting Roe in obstructing justice in Canada and that great harm would accrue to the Plaintiff as a result, for which harm the Plaintiff claims damages.

9. The Plaintiff says that Roe has caused him immense physical, mental, and financial harm by her unlawful actions, which are deliberate and malicious, and that her actions were intended to, and did have, effect in Canada and as such she is liable for her actions in the courts of Canada.

10. The Plaintiff says that Roe in particular seeks to bring about his unjust conviction through an obsessive pursuit of compelling the testimony of Whelpley, a mentally ill witness into whose mouth she has already put false statements in her attribution to him of the central lie, when she knows that such testimony is in contravention of an order of the Supreme Court of British Columbia for the very purpose of preventing the harm she seeks to inflict on the Plaintiff.

11. The Plaintiff says the actions of Roe and Nicholson, and the entire conspiracy threaten the very sovereignty of Canada and the credibility and reputation of the Supreme Court of British Columbia and the British Columbia Court of Appeal. As such, the Plaintiff says punitive damages of a very high order are merited in this action.

12. The Attorney General of British Columbia is a nominal defendant, being responsible for the actions of Kachur as a police officer in British Columbia.

**Plaintiff's address for service:**

Street Address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Vanderhoof, B.C.

Mail Address: ▮▮▮▮▮▮▮, Vanderhoof, B.C. V0G 3A0

Fax number address for service: (250) 567-5817

E-mail address for service: pmacroibeaird@gmail.com

8

**Place of trial: Prince George, B.C.**

**The address of the registry is:**



Prince George, BC
V2L 5S2

Date: April 23, 2012

*Henry C Rosenau*

Henry C. Rosenau
Plaintiff

9